**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION**

| | |
|---|---|
| In re: | **Chapter 11** |
| **XINERGY LTD.**, *et al.*, | **Case No. 15-[    ] (___)** |
| | **(Joint Administration Requested)** |
| **Debtors.**[1] | |

**DECLARATION OF MICHAEL R. CASTLE IN SUPPORT OF THE DEBTORS'
CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS**

Michael R. Castle declares and says:

1.      I am the Chief Financial Officer of Xinergy Ltd., a corporation headquartered in Knoxville, Tennessee.  I have been employed in this position by Xinergy Ltd. since January 1, 2010.  Prior to that, I held executive roles at National Coal Corp. and Quaker Coal Company.  I am familiar with the day-to-day operations, business, and financial affairs of the Debtors (as defined below).

2.      I submit this declaration (i) in support of the petitions of the Debtors for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"), (ii) pursuant to

---

[1] The Debtors, along with the last four digits of each Debtor's federal tax identification number, are listed on Schedule 1 attached hereto.

HUNTON & WILLIAMS LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia 23219
Telephone: (804) 788-8200
Facsimile: (804) 788-8218
Tyler P. Brown (VSB No. 28072)
Henry P. (Toby) Long, III (VSB No. 75134)
Justin F. Paget (VSB No. 77949)

*Proposed Counsel to the Debtors
and Debtors in Possession*

28 U.S.C. 1746 in support of the Debtors' petitions and contemporaneously-filed requests for relief in the form of motions and applications (the "**First Day Motions**") and (iii) to assist the Court and other interested parties in understanding the circumstances giving rise to the commencement of these chapter 11 cases.   I have reviewed the First Day Motions or have otherwise had their contents explained to me, and it is my belief that the relief sought therein is essential to the uninterrupted operation of the Debtors' business and to the Debtors' reorganization.

3.      Except as otherwise indicated, all facts set forth in this declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by employees working under my supervision, or my opinion based upon my experience, knowledge and information concerning the operations of the Debtors and the coal industry as a whole.   If called upon to testify, I would testify competently to the facts set forth in this declaration. Unless otherwise indicated, the financial information contained herein is unaudited and provided on a consolidated basis.

### Commencement of Reorganization Proceedings

4.      On April 6, 2015 (the "**Petition Date**"), Xinergy Ltd. and certain of its subsidiaries, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**", "**Xinergy**" or the "**Company**"), each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.   The Debtors intend to continue in the possession of their respective properties and the management of their respective businesses as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

5.      Part I of this declaration describes the Debtors' business, Part II describes the circumstances giving rise to the commencement of these chapter 11 cases, Part III describes the Debtors' prepetition restructuring initiatives and Part IV sets forth the relevant facts in support of the First Day Motions.

# I.

## The Debtors' Businesses

### A.      Coal Operations

6.      Xinergy is a U.S. producer of metallurgical and thermal coal with mineral reserves, mining operations and coal properties located in the Central Appalachian ("**CAPP**") regions of West Virginia and Virginia.  As of the Petition Date, Xinergy's operations principally include two active mining complexes known as South Fork and Raven Crest located in Greenbrier and Boone Counties, West Virginia.  Xinergy also leases or owns the mineral rights to properties located in Fayette, Nicholas and Greenbrier Counties, West Virginia and Wise County, Virginia.  Collectively, Xinergy leases or owns mineral rights to approximately 72,000 acres with proven and probable coal reserves of approximately 77 million tons and additional estimated reserves of 40 million tons.

7.      Xinergy currently produces and ships coal from its South Fork mid-volatile metallurgical mine and its Raven Crest thermal operations.  Xinergy's primary customers for metallurgical coal—used in a chemical process that yields coke for the manufacture of steel—are steel producers, commodities brokers and industrial customers throughout North America, Europe and South America.  Electric utilities and industrial companies in the southeastern U.S. and Europe are the principal customers for Xinergy's thermal coal.

3

8.      South Fork is currently producing between 35,000 and 40,000 tons of mid-volatile metallurgical coal per month.  Raven Crest currently produces between 55,000 and 60,000 tons of thermal coal per month.  After being idled due to market conditions, Raven Crest restarted production in January 2014[2] with the completion of a $9.5 million coal preparation plant.  The recent improvements to the coal processing facility at Raven Crest have allowed Xinergy to increase the marketability of its low cost, high quality thermal coal to markets in the eastern U.S. and Europe.  As of the nine months ending September 30, 2014, Xinergy had sold 734,129 tons of coal produced from its two active mining operations.[3]

9.      Historically, Xinergy enters into both short-term contracts and contracts exceeding twelve months for the sale of its coal for a specified per ton amount at a negotiated price.  Xinergy also quotes prices and sells coal on a one-day or one-shipment tonnage amount with prices directly correlated to the price per ton of coal quoted on the New York Mercantile Exchange or similar commodity exchanges, which is known as the "spot price."  Coal sold pursuant to short-term contracts or at the spot price is subject to current market pricing that can be significantly more volatile than the pricing structure achieved through long-term negotiated supply agreements.  Certain long-term agreements nonetheless may contain provisions that result in price adjustments, such as price reopener provisions, which reduce the protection from short-term price fluctuations traditionally offered by such agreements.  While the quality and volume

---

[2] The underground mining operations at the Raven Crest complex known as Brier Creek remain idle as of the Petition Date.

[3] The financial information contained in this Declaration has been prepared by the Debtors and their advisors and is provided for illustrative purposes only.  Such information may not be audited and may be subject to material change.  While the information is believed to be accurate, the Debtors cannot guarantee the accuracy of this information and expressly disclaim any obligation to update any information contained in this Declaration (including if new or different information is received and/or errors are discovered).

4

of coal to be supplied typically is stipulated in these agreements, their terms may vary significantly and in some cases buyers have the option to vary annual or monthly volumes. For the past two years, the majority of Xinergy's coal sales have occurred in the "spot" market or under short-term coal supply agreements.

10.      In prior years, Xinergy's sales have been concentrated among a small number of customers. During 2013, 82% of Xinergy's coal sales revenue was derived from two customers, which accounted for 68% of total tons of coal sold by Xinergy during that period. More recently, Xinergy has attempted to broaden its customer base and reduce its dependence on a few customers. To assist in that effort, in July 2014, Xinergy partnered with one of the largest and most experienced commodity trading companies in the world to market Xinergy's thermal and metallurgical coal. During the third fiscal quarter of 2014, Xinergy's top two customers accounted for 28% and 27%, respectively, of Xinergy's revenues.

11.      Xinergy's operational results are highly dependent on the costs of coal production and the costs of and ability to transport coal to customers. Primary mining-related expenses are wages and benefits, repairs and maintenance, diesel fuel, blasting and related supplies, coal transportation costs, freight and handling costs, royalties and taxes incurred in selling coal. The majority of Xinergy's coal is shipped via rail on CSX-controlled railways. The remaining coal is shipped via truck. Severe weather, rail stoppages, availability of equipment or other issues affecting CSX's operations could significantly impact the ability of Xinergy to ship its coal.

12.      Since Xinergy's inception, substantially all of its revenues have resulted from the sale of coal and asset sales. For the fiscal year ending December 31, 2013, Xinergy had revenues from coal sales of approximately $19 million and adjusted negative EBITDA of approximately

5

$10.8 million.  For the nine months ending September 30, 2014, Xinergy had revenue from coal sales of approximately $50.8 million and adjusted negative EBITDA of approximately $2.8 million.  For the three months ending September 30, 2014, Xinergy had revenue from coal sales of approximately $19.0 million and adjusted positive EBITDA of $1.1 million.

13.     In addition to its active mining operations, the Debtors own or lease rights to significant coal reserves.  In October 2012, Xinergy acquired approximately 12,500 acres located in Fayette, Nicholas and Greenbrier counties, West Virginia through Debtor Sewell Mountain Coal Company ("**Sewell Mountain**").  The acquisition included a site regionally known as the Meadow River Complex with existing permits and infrastructure.  Xinergy has received all necessary permit transfers for this mining property including the underground mine, preparation plant, rail loadout and refuse area.  Sewell Mountain has estimated reserves of 32.36 million tons of mid-volatile metallurgical coal and is in the planning and development stage.

14.     Xinergy also leases approximately 1,000 acres of surface mining operations in Wise County, Virginia, through Debtor True Energy, LLC ("**True Energy**").[4]  In response to market conditions, True Energy's mining operations were idled in 2012.  This site has proven and probable reserves of 2.3 million tons of high volatile metallurgical coal with estimated total reserves of 7 million tons based on recent additional land acquisitions.

15.     As of the Petition Date, Xinergy has approximately 178 employees working in full or part-time positions.  Eight employees perform executive management, sales and general administration functions and are assigned to Xinergy's Knoxville, Tennessee corporate office, but frequently work remotely or at Xinergy's mine locations.  The remaining individuals are

---

[4]  True Energy transacts business in Virginia as True Energy Fuels, LLC.

operational employees and work at Xinergy's mine locations.  All of Xinergy's coal processing and production is performed by its own employees.  None of Xinergy's employees are currently unionized.

16.    Xinergy provides healthcare and other benefits to primary insured full-time employees and beneficiaries.  Xinergy is subject to the Federal Coal Mine Health and Safety Act of 1969 (the "**Black Lung Act**") and other workers' compensation laws in the states in which Xinergy operates.   Under the Black Lung Act, Xinergy is required to provide benefits to its current and former coal miners suffering from pneumoconiosis or "black lung disease" and, in certain cases, the workers' beneficiaries.   Xinergy maintains insurance sufficient to cover the cost of present and future claims.  Xinergy believes that future costs associated with the Black Lung Act may increase as a result of the Patient Protection and Affordable Care Act, enacted in 2010, which provides for an automatic survivor benefit and a rebuttable presumption concerning a coal mine employee's disability in certain circumstances.   Separately, Xinergy maintains cash deposits and/or bonds to secure obligations under federal and state workers' compensation laws.

### B.    Corporate Structure

17.    Xinergy Corp. was incorporated in October 2007.   On December 21, 2009, Xinergy Corp. completed a reverse takeover of Greenwich Global Capital, Inc. ("**GGC**").  GGC changed its name to "Xinergy Ltd." on December 21, 2009.  Xinergy Ltd. is a Debtor and is the direct or indirect parent of each of the other Debtors.  Xinergy Ltd.'s common stock trades on the Toronto Stock Exchange (TSX), the largest stock exchange in Canada, under the ticker "XRG."  As of the Company's most recent quarterly public filing, there were 65,772,023 shares of Xinergy Ltd.'s common stock issued and outstanding.  The Debtors intend to pursue recognition

of these chapter 11 cases in Canada so that certain assets of Xinergy Ltd. will receive appropriate protection in Canada to the extent those assets may be subject to the Canadian courts' jurisdiction.

18.     All of Xinergy Ltd.'s direct and indirect subsidiaries are Debtors and debtors-in-possession in these proceedings except for Xinergy Finance Canada Ltd., a Canadian corporation that holds no assets and is not liable on any of the debt included in these chapter 11 cases. Xinergy's organization chart is attached to this Declaration as Exhibit A.

### C.     Capital Structure

19.     In May 2011, Xinergy issued $200 million of 9.25% Senior Secured Notes (the "**Second Lien Notes**") due May 15, 2019, which are guaranteed by the other Debtors and collateralized by substantially all of Xinergy's assets.  Interest payments of $9 million are due and payable semi-annually.  Approximately $72 million of the net proceeds from the issuance were used to retire existing debt and the remaining funds were used for capital expenditures, including construction of a preparation plant, purchase of mining equipment and construction of infrastructure, and for general corporate purposes.  The current amount outstanding on the Second Lien Notes is approximately $195 million.

20.     Xinergy Corp. subsequently entered into a Credit Agreement, dated as of December 21, 2012 (as amended, supplemented, modified, or amended and restated from time to time, the "**First Lien Term Loans**"), with Bayside Finance LLC, as lender ("**Bayside**"), and the other Debtors as guarantors.  The First Lien Term Loans facility provided for two term loans in the amount of $10 million each with terms of four years.  The first loan was drawn in December 2012 and the second loan was drawn in September 2013.  The proceeds of the First Lien Term

8

Loans were used to fund transaction costs, to provide working capital and for Xinergy's general corporate purposes.   The First Lien Term Loans are secured by a first-priority lien on substantially all of the Debtors' assets.  On April 1, 2015, the First Lien Term Loans were validly assigned to funds managed on behalf of Whitebox Advisors LLC ("**Whitebox**") and Highbridge Capital Management, LLC ("**Highbridge**") from Bayside.  The current amount outstanding on the First Lien Term Loans is approximately $20 million plus certain fees and expenses.

21.     The Debtors and holders of both the First Lien Term Loans and the Second Lien Notes are parties to a Collateral Trust Agreement, dated as of May 6, 2011 (the "**Collateral Trust Agreement**"), which authorizes Xinergy to obtain credit in certain amounts and for certain purposes that would have priority over the Second Lien Notes.   The First Lien Term Loans became senior to the Second Lien Notes pursuant to that provision.   The Collateral Trust Agreement, in Section 2.8, also authorizes the holder of any authorized senior notes to provide debtor-in-possession financing to Xinergy that would be senior to or on a parity with the senior liens, thus also having priority over the Second Lien Notes.  That same provision provides  that holders of the Second Lien Notes have expressly waived any right to object to any debtor-in-possession financing consented to by the senior lender pursuant to the Collateral Trust Agreement.

22.     On March 31, 2014, Xinergy completed a private placement of 11.0 million common shares for total proceeds of $4.9 million.

## II.

## Events Leading to the Chapter 11 Cases

23.     Recently, domestic demand for thermal coal has fallen sharply in large part due to increasingly attractive alternative sources of energy, such as natural gas, and burdensome environmental and governmental regulations impacting end users.   Simultaneously, the increasingly stringent regulatory environment in which coal companies operate has driven up the cost of mining and processing coal.   Continued weakness in the market for metallurgical and thermal coal, combined with an extremely cold and snowy winter that impacted the mining and shipment of coal, has continued to erode Xinergy's cash position.   Absent approval of additional borrowing capacity, Xinergy currently lacks the liquidity needed to maintain operations in the near term and to sustain its current capital structure.   The confluence of these factors and Xinergy's substantial debt burden have taken Xinergy to the point of unsustainability absent the relief provided by chapter 11.

### A.     Macroeconomic Factors Impacting Demand for Coal

24.     Prices for CAPP thermal coal fell sharply during the period between mid-2008 and mid-2009, corresponding with the severe global recession, and have failed to recover in the period since.   Over the last several years, the coal industry's share of the U.S. energy market has declined appreciably as a result of abundant supply and historically low prices of natural gas. During 2012, data from the U.S. Energy Information Administration indicated that 7.9 gigawatts of coal fired generation was retired, representing 2.5% of installed coal capacity.   Two-thirds of the coal capacity retired was in the Midwest and Southeast regions of the U.S., which had a disproportionate impact on CAPP coal producers due to geographic proximity.   Declining

demand for coal has caused many producers in the coal industry to curtail production, idle mines and lay off workers. Nonetheless, 2013 ended with thermal coal stockpiles at multi-year lows and a firming of natural gas prices, in part due to an extremely cold winter. Thermal coal inventories continue to remain at unsustainably low levels, suggesting an increase in future demand. Recent prices appear to be firming and CAPP thermal coal should continue to have a significant presence in the domestic energy market for decades to come due to its high quality and proximity to customers. Global thermal coal consumption is predicted to increase by 27% by 2020 and by one billion tons by 2035.

25.    The global market for metallurgical coal also has suffered from sharply-reduced demand in recent years. Demand for metallurgical coal generally is dependent on the strength of the global economy. Specifically, steel production, and thus the demand for metallurgical coal, is correlated with the economic climate in the U.S., Europe and certain developing countries such as Brazil, China and India. The market for metallurgical coal appeared to bottom in 2012 and resulted in production curtailments of 30 to 40 million metric tons on an annualized basis. The global market for metallurgical coal remained stagnant through 2013, with waning demand from China. Nonetheless, long term global growth trends point toward increasing demand for quality metallurgical coal. India steelmakers continue to bring on new coke plants and demand from Europe is steadily recovering. With its below-industry average operating costs and high quality mid-volatile metallurgical coal, Xinergy believes that it is well positioned to continue its recent growth and benefit from a recovering coal market.

**B.      Increased Competition**

26.      The mining business is highly competitive and the coal industry is becoming increasingly consolidated.  Xinergy competes with numerous other companies in the acquisition, exploration, financing and development of coal properties.  Many of the companies are larger, better capitalized and have longer operating track records.  Xinergy's competitive position depends on its ability to successfully and economically explore, acquire and develop new and existing coal properties.  Xinergy also competes with other mining companies for skilled mining engineers, geologists, geophysicists and other technical personnel.  Competition recently has come from outside the coal industry as well in the form of alternative fuel sources, such as natural gas.  These internal and external threats have contributed to a declining coal market.

27.      Despite facing competitive challenges, Xinergy believes that it can grow and operate profitably in the CAPP region due to its relatively low transportation costs, diversity in production and coal customers' desire to purchase coal from a diversity of suppliers.  In addition, Xinergy's mid-volatile metallurgical coal reserve at South Fork will increase the attractiveness of its product offerings and better position it to compete in the industry.  Mid-volatile coal is one of the scarcest types of metallurgical coal mined globally.  It is highly desirable to steel producers because it generally does not need to be blended.  The quality advantage of mid-volatile metallurgical coal supports premium pricing.  In the long-term, Xinergy believes that it is well positioned to operate profitably in the competitive environment, but has determined that short-term liquidity needs must be addressed.

12

C.    **Government Regulations and Costs of Compliance**

28.    Xinergy is subject to various federal, state and foreign regulatory and environmental laws.  Increasingly stringent regulations and environmental protection laws have resulted in dramatically increased costs of compliance for coal producers.  In addition, recent legislation has made it increasingly difficult for consumers of Xinergy's coal, such as electricity generators, to use coal as an energy source.

i.    *Regulation of the Coal Mining Industry*

29.    The coal industry is impacted by significant federal, state and local legislation governing employee health and safety, permitting and licensing requirements, water pollution, plant and wildlife protection, reclamation and restoration of mining properties, the discharge of materials into the environment, surface subsidence from underground mining, and the effects of mining on groundwater quality and availability.

30.    The Federal Mine Safety and Health Act of 1977 significantly expanded enforcement of safety and health standards and imposed safety and health standards on all aspects of mining operations.  Most states, including the states in which Xinergy operates, have programs for mine safety and health regulation and enforcement.  Collectively, federal and state safety and health regulation in the coal mining industry is perhaps the most comprehensive and pervasive system for protection of employee health and safety affecting any segment of the U.S. industry.  This regulation has had a significant impact on the operating costs for all domestic coal companies.

31.    Xinergy also is subject to extensive federal, state and foreign environmental laws, including the Surface Mining Control and Reclamation Act, the Clean Air Act, and the Clean

Water Act and their state counterparts.  These laws impact Xinergy's operations by requiring the Company to undertake the costly and time-consuming process of obtaining permits, to comply with stringent reporting and operating requirements, and to employ expensive pollution control technology.

>   ii.      *Regulation of Power Plants*

32.     The coal industry is indirectly impacted by environmental legislation restricting the ability of power plants to purchase coal as an energy source.  The Clean Air Act and similar state laws impose stringent regulation on air emissions from coal-fired power plants, which are the largest end user of Xinergy's coal.  Coal-fired power plants have expended considerable resources to install emission control equipment and take other steps to achieve regulatory compliance.  In addition, government agencies have been offering incentives to entities that are developing or selling alternative energy sources with lower greenhouse gas emissions.  The combination of these incentives and the increased cost of compliance with new emissions standards have contributed to power plant closures and conversion to alternative fuels, resulting in decreased demand for coal.

**D.     Recent Continued Weakness in Coal Prices and Inclement Weather**

33.      During the 1st quarter of 2015, thermal coal prices further deteriorated very quickly and unexpectedly.  In addition, inclement weather in CAPP region during the months of February and March hindered the company's mining operations and caused delays in truck-based shipments of coal, which is the method of delivery for one of the company's more lucrative offtake arrangements.  These factors delayed the launch of a new high wall miner at South Fork, an important event, which should save roughly $5 -$10 per ton on costs (that amount will vary

14

with the mine plan, due to recovery and high wall mining mix).   The combination of these factors with the macroeconomic and regulatory factors discussed above have created immense challenges for the company to continue operations absent the relief afforded by chapter 11.

### III.

### Prepetition Restructuring Efforts

34.    Xinergy's management team has taken various courses of action to attempt to meet the challenges described above.  In the third quarter of 2012, in response to poor market conditions for the sale of thermal and metallurgical coal, Xinergy idled its thermal coal mining operations at Raven Crest (including the Brier Creek underground mines) and its high-volatile mining operations at True Energy.  Surface and high-wall mining operations at Raven Crest resumed in January 2014 with the completion of the Bull Creek coal preparation plant.  The adjacent underground mining operations at Brier Creek and the high-volatile mining at True Energy remain idled.  During this time, Xinergy continued its mining operations at South Fork.

35.    On February 1, 2013, Xinergy entered into an asset purchase agreement for a cash sale of its mining operations located in Kentucky known as Straight Creek and Red Bird for $47.2 million.  The sale also included the assumption of all of Xinergy's related asset retirement obligations, which were valued at $7.2 million.  The purchaser of the assets was an investment fund majority owned by Bayside, the former holder of the First Lien Term Loans.  The Kentucky sale proceeds were held as restricted cash until used for certain capital expenditures in accordance with the terms of the Second Lien Notes.  As of September 30, 2014, Xinergy held approximately $1.07 million in restricted cash relating to the Kentucky sale proceeds.

36.     On March 31, 2014, Xinergy received $4.95 million from the sale of common shares pursuant to a private placement.

37.     On November 6, 2014, Xinergy entered into a commitment for a secured second lien credit agreement for convertible debt with Aries Energy Group Venture Investor, LLC, in the principal amount of $25 million (the "**Aries Loan**").  The proceeds of the proposed Aries Loan would have provided Xinergy additional liquidity necessary to, among other things, make the semi-annual interest payment on the Second Lien Notes in the amount of $9 million due on November 17, 2014.  Through no fault of Xinergy, the Aries Loan failed to close.  Nevertheless, the company was able to make the November interest payment from cash from operations prior to the expiration of the cure period.

38.     As the risk that the Aries Loan would not close became apparent, Xinergy began to anticipate a likely need to pursue a restructuring under chapter 11.  In December 2014, Xinergy retained Global Hunter Securities, a division of Seaport Global Securities LLC, as its financial advisor to pursue financial and strategic alternatives, including raising capital and other strategic transactions focused on providing additional liquidity for the Company.

39.     With the assistance of their professional advisors, Xinergy searched for an alternative source of financing, including DIP financing.  Xinergy and its advisors approached more than sixty high quality institutional firms as potential sources of financing, of which fifteen executed confidentiality agreements with Xinergy.  Ultimately, Xinergy secured commitment for a $40 million DIP financing facility from certain funds managed on behalf of Whitebox and Highbridge.  Approximately $20 of the DIP facility will be used to pay all amounts outstanding under the First Lien Term Loan.  The balance of the DIP facility, net of certain fees and expenses,

will provide Xinergy additional liquidity to continue operations and pursue a successful restructuring in chapter 11.

40.     Accordingly, the Debtors have determined, in the prudent exercise of their business judgment, that the commencement of these chapter 11 cases at this time is the best course of action to preserve liquidity, gain access to DIP financing, and pursue reorganization through a chapter 11 plan.   The Debtors believe that, despite its costs, chapter 11 provides the tools necessary for Xinergy to maximize value for the Debtors' estates and emerge with a stronger capital structure.   For the duration of the chapter 11 process, in reliance on the First Day Motions described below, the Debtors will devote all of their resources toward continuing and growing their profitable operations in the ordinary course, honoring valuable customer and vendor relationships and leveraging Xinergy's competitive advantage as the market recovers.

## IV.

### First Day Motions

41.     The Debtors filed the First Day Motions concurrently with the filing of their chapter 11 petitions.   The Debtors requests that each of the First Day Motion be granted, as each constitutes a critical element in achieving a successful transition to chapter 11.

42.     For a more detailed description of the relief requested in the First Day Motions, the Debtors respectfully refer the Court, creditors and other parties in interest to the respective First Day Motions.   To the extent that there are any inconsistencies between this Declaration and the First Day Motions, the First Day Motions should control.   Capitalized terms that are used in this Part IV but not otherwise defined herein shall have the meanings ascribed to them in the relevant First Day Motion.

17

A.    **Administrative Motions**

   i.    *Motion of Debtors and Debtors in Possession for an Order Directing Joint Administration of their Related Chapter 11 Cases (the "**Joint Administration Motion**")*

43.    The Debtors seek entry of an order directing joint administration of these cases for procedural purposes only, pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure and Rule 1015-1 of the Local Rules of the United States Bankruptcy Court for the Western District of Virginia (the "**Local Bankruptcy Rules**").  Specifically, the Debtors request that the Court maintain one file and one docket for all of the chapter 11 cases under the lead case, Xinergy Ltd.  Further, the Debtors request that an entry be made on the docket of each of the chapter 11 cases of the Debtors to indicate the joint administration of the estates.

44.    Given the provisions of the Bankruptcy Code and the Debtors' affiliation, joint administration of these cases is warranted.  Joint administration will avoid the preparation, replication, service and filing, as applicable, of duplicative notices, applications and orders, thereby saving the Debtors considerable expense and resources.  The Debtors' financial affairs and business operations are closely related.  Many of the motions, hearings and orders in these chapter 11 cases will affect each Debtor and their respective estates.  The rights of creditors will not be adversely affected, as this Motion requests only administrative, and not substantive, consolidation of the estates.  Moreover, each creditor can still file its claim against a particular estate.  In fact, all creditors will benefit by the reduced costs that will result from the joint administration of these chapter 11 cases.  The Court also will be relieved of the burden of entering duplicative orders and maintaining duplicative files.  Finally, supervision of the

administrative aspects of these chapter 11 cases by the United States Trustee for the Western

District of Virginia will be simplified.

45.     I believe that the relief requested in the Joint Administration Motion is in the best

interests of the Debtors' estates, their creditors, and all other parties in interest and constitutes a

critical element in achieving a successful and smooth transition to chapter 11.  Accordingly, on

behalf of the Debtors, I respectfully submit that the Joint Administration Motion should be

granted.

      ii.       *Motion of Debtors and Debtors in Possession for Entry of an Order Approving the Form and Manner of Notice of Commencement of the Chapter 11 Cases (the "**Notice of Commencement Motion**")*

46.     The Debtors seek entry of an order approving the Debtors' proposed form and

manner of the notice of commencement of the Debtors' chapter 11 cases.

47.     I believe that the relief requested in the Notice of Commencement Motion will

provide adequate notice of these cases to  the Debtors' creditors and all other parties in interest

and is critical to achieving a successful and smooth transition to chapter 11.  Accordingly, on

behalf of the Debtors, I respectfully submit that the Notice of Commencement Motion should be

granted.

      iii.       *Motion of Debtors and Debtors in Possession for Entry of an Order Appointing American Legal Claims Services, LLC as Claims, Noticing and Balloting Agent (the "**Claims Agent Retention Application**")*

48.     The Debtors seek entry of an order appointing American Legal Claims Services,

LLC ("**ALCS**") to act as the claims and noticing agent in order to assume full responsibility for,

among other things, the distribution of notices and the maintenance, processing and docketing of

proofs of claim filed in the Debtors' chapter 11 cases.  I believe that ALCS's rates are

competitive and reasonable given ALCS's quality of services and expertise.  Accordingly, on

behalf of the Debtors, I respectfully submit that the Claims Agent Retention Application should

be granted.

> iv.    *Motion of the Debtors and Debtors in Possession For Entry of an order Authorizing Debtors to (i) Prepare a List of Creditors in Lieu of Submitting a Formatted Mailing Matrix and (ii) File a Consolidated List of Debtors' 30 Largest Unsecured Creditors (the "**Consolidated Creditors List Motion**")*

49.    The Debtors seek entry of an order authorizing the Debtors to: (a) prepare a list of

creditors in lieu of submitting a formatted mailing matrix as required by Rule 1007-1 of the

Local Bankruptcy Rules and (b) file a consolidated list of the Debtors' 30 largest unsecured

creditors.

50.    I believe that the relief requested in the Consolidated Creditors List Motion is in

the best interests of the Debtors' estates, their creditors, and all other parties in interest and

constitutes a critical element in achieving a successful and smooth transition to chapter 11.

Accordingly, on behalf of the Debtors, I respectfully submit that the Consolidated Creditors List

Motion should be granted.

> v.    *Motion of the Debtors and Debtors in Possession for Entry of an Order Establishing Notice, Case Management and Administrative Procedures (the "**Case Management Motion**")*

51.    The Debtors seek entry of an order to implement certain procedures in connection

with the administration of the chapter 11 cases, including procedures to: (i) establish

requirements for the filing and service of notices, motions, applications, documents filed in

support thereof and objections and responses thereto; (ii) delineate standards for notices of

hearing and agendas; (iii) articulate mandatory guidelines for the scheduling of hearings

20

(including periodic omnibus hearings), objection deadlines, reply deadlines and evidentiary hearings; (iv) limit matters that are required to be heard by the Court; (v) authorize electronic service of documents; and (vi) authorize the Debtors to establish a website (to provide interested parties with access to certain documents filed in these chapter 11 cases).

52.     The Debtors believe that the requested relief will maximize the efficiency and orderliness of the administration of these chapter 11 cases and reduce the costs associated with traditional case management procedures.   The Debtors also believe that granting the relief requested will limit the administrative burdens and costs associated with preparing for hearings and serving and mailing documents.   In addition, the relief requested will assist the Debtors and their personnel and professionals in organizing and prioritizing the numerous tasks attendant to these cases.

53.     I believe that the relief requested in the Case Management Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and constitutes a critical element in achieving a successful and smooth transition to chapter 11.   Accordingly, on behalf of the Debtors, I respectfully submit that the Case Management Motion should be granted.

> vi.     *Motion of the Debtors and Debtors in Possession for Entry of an Order (i) Extending the Time to File Schedules and Statements of Financial Affairs and (ii) Extending the Time to Schedule the Meeting of Creditors (the "Schedules Extension Motion")*

54.     The Debtors seek entry of an order granting additional time to file their schedules and statements of financial affairs and additional time to schedule the meeting of creditors.   Due to the complexity of their operations, the large number of contracts to which the Debtors are party and the numerous other matters that the Debtors must attend to in connection with filing these cases, the Debtors will not be able to complete the schedules of assets and liabilities,

schedules of current income and expenditures, statements of executory contracts and unexpired

leases and statements of financial affairs in the fourteen days provided under Bankruptcy Rule

1007(c). The Debtors request a sixty day extension. To facilitate this extension, the Debtors

also seek entry of an order authorizing the U.S. Trustee to schedule the Section 341 meeting after

the 40-day deadline imposed by Bankruptcy Rule 2003(a).

55.     Given the many critical operational matters that the Debtors' accounting and legal

personnel must address in the early days of these chapter 11 cases, I believe that with the

extension requested, the Debtors will be able to focus their attention to business operations to

maximize the value of the Debtors' estates during the first critical post-petition months. I believe

this will help the Debtors make a smooth transition into chapter 11 and, therefore, maximize the

value of the Debtors' estates to the benefit of creditors and all parties in interest.

56.     I believe that the relief requested in the Schedules Extension Motion is in the best

interests of the Debtors' estates, their creditors, and all other parties in interest and constitutes a

critical element in achieving a successful and smooth transition to chapter 11. Accordingly, on

behalf of the Debtors, I respectfully submit that the Schedules Extension Motion should be

granted.

**B.      Operational Motions Requesting Immediate Relief**

i.      *Motion of Debtors and Debtors in Possession for Entry of an Order (i)
Authorizing Debtors To Pay Prepetition Wages, Salaries and Benefits;
(ii) Authorizing Debtors to Continue Employee Benefit Programs in the
Ordinary Course of Business; (iii) Authorizing Current and Former
Employees to Proceed with Workers' Compensation Claims; and (iv)
Directing Applicable Financial Institutions to Honor and Process Related
Checks and Transfers (the "**Wages and Benefits Motion**")*

57.    The Debtors seek entry of an order (a) authorizing, but not requiring, them to pay or cause to be paid, in their sole discretion, all or a portion of the amounts owing (and associated costs) under or related to health benefits, vacation pay, paid holidays, paid sick time and other earned time off, and reimbursement of certain business expenses and the other Employee Benefit Programs, (b) unless otherwise set forth in the Wages and Benefits Motion, authorizing, but not requiring, them to continue, in their sole discretion, those Employee Benefit Programs that were in effect as of the Petition Date and as may be modified, terminated, amended or supplemented from time to time in the ordinary course of the Debtors' businesses, (c) permitting current and former Employees holding claims under the Workers' Compensation Programs to proceed with such claims in the appropriate judicial or administrative fora and to permit insurers to continue to access collateral and security provided by the Debtors pursuant to the Workers' Compensation Programs, and (d) authorizing applicable banks and other financial institutions to receive, process and pay any and all checks drawn on the Debtors' payroll and general disbursement accounts and automatic payroll and other transfers to the extent that those checks or transfers relate to any of the foregoing.

58.    If the requested relief is not granted, the Debtors' relationships with their Employees would be adversely impacted and there could well be irreparable harm to the Employees' morale, dedication, confidence and cooperation.  The Debtors' businesses hinge on their relationships with their customers, and the ability to provide superior services is vital.  The Employees' support for the Debtors' efforts  is critical to the success of these chapter 11 cases. At this early stage, the Debtors simply cannot risk the substantial damage to their businesses that

would inevitably attend any decline in their Employees' morale attributable to the Debtors' failure to pay wages, salaries, benefits and other similar items.

59.     I believe that the relief requested in the Wages and Benefits Motion is in the best interests of the Debtors' estates, their creditors and all other parties in interest and constitutes a critical element in achieving a successful and smooth transition to chapter 11.  Accordingly, on behalf of the Debtors, I respectfully submit that the Wages and Benefits Motion should be granted.

> ii.     *Motion of the Debtors and Debtors in Possession for Entry of an Order (i) Authorizing Debtors to Maintain Existing Bank Accounts and Business Forms and Continue to Use Existing Cash Management System; (ii) Granting Administrative Expense Status for Intercompany Claims; and (iii) Waiving the Requirements of Section 345(b) of the Bankruptcy Code (the "***Cash Management Motion***")*

60.     The Debtors seek entry of an order authorizing the Debtors to (a) continue to operate their prepetition cash management system with respect to intercompany cash management and obligations, including the continuation of the investment of their cash in accordance with their investment guidelines, (b) fund the operations of affiliates and subsidiaries, (c) maintain the Debtors' existing bank accounts, and (d) maintain the Debtors' existing business forms.  Without the requested relief, the Debtors would have great difficulty maintaining their operations, which could cause grievous harm to the Debtors and their estates.

61.     I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and constitutes a critical element in achieving a successful and smooth transition to chapter 11.  Accordingly, on behalf of the Debtors, I respectfully submit that the Cash Management Motion should be granted.

24

      iii.      *Debtors' Motion for Entry of an Order (i) Prohibiting Utilities from Altering, Refusing or Discontinuing Service, (ii) Deeming Utility Companies Adequately Assured of Future Performance and (iii) Establishing Procedures for Determining Requests for Additional Adequate Assurance (the "***Utilities Motion***")*

62.      The Debtors seek entry of an order (i) determining that the Debtors' proposed offer of deposits, as set forth in the Utilities Motion, provides Utility Companies with adequate assurance of payment within the meaning of section 366 of the Bankruptcy Code, (ii) approving procedures for resolving requests by Utility Companies for additional or different assurances beyond those set forth in the Utilities Motion, and (iii) prohibiting the Utility Companies from altering, refusing or discontinuing any Utility Services on account of prepetition amounts outstanding or on account of any perceived inadequacy of the Debtors' proposed adequate assurance. Uninterrupted Utility Services are essential to the Debtors' ongoing operations. Should any Utility Company refuse or discontinue service, even for a brief period, the Debtors' operations could be severely disrupted. The impact of this disruption on the Debtors' day-to-day business operations and revenue would be extremely harmful and could jeopardize the value of the Debtors' assets.

63.      I believe that the relief requested in the Utilities Motion is in the best interests of the Debtors' estates, their creditors and all other parties in interest and constitutes a critical element in achieving a successful and smooth transition to chapter 11. Accordingly, on behalf of the Debtors, I respectfully submit that the Utilities Motion should be granted.

      iv.      *Motion of Debtors and Debtors in Possession for Entry of Interim and Final Orders Authorizing (i) Payment of Certain Prepetition Claims of Critical Vendors, (ii) Payment of 503(b)(9) Claims to Certain Critical Vendors and (iii) Financial Institutions to Honor and Process Related Checks And Transfers (the "***Critical Vendors Motion***")*

64.     The Debtors seek an entry of interim and final orders: (a) granting them the authority in their sole discretion, but not requiring them, to pay all or a portion of their prepetition obligations to certain Critical Vendors up to the Critical Vendor Claim Cap, (b) granting them the authority in their sole discretion, but not requiring them, to pay certain claims of Critical Vendors for the value of goods received by the Debtors in the ordinary course of their businesses during the 20-day period prior to the Petition Date, which are likely entitled to administrative expense priority under section 503(b)(9) of the Bankruptcy Code, and (c) authorizing financial institutions to receive, process, honor and pay checks or wire transfers used by the Debtors to pay the foregoing.

65.     The Debtors operate in a highly specialized, highly regulated and highly competitive industry.  The unique nature of the coal mining industry leaves coal mining companies with few options (and often no practical alternatives) when shopping for vendors. Certain suppliers and service providers at various venues are the only option available to the Debtors.  As a result, if the requested relief is not granted and certain essential trade vendors refuse to continue to supply goods and services to the Debtors post-petition, the Debtors may be unable to continue portions of their operations, thereby endangering the Debtors' successful reorganization and substantially harming all creditors.  I spent considerable time developing the Critical Vendors list and believe that each vendor included provides a critical service or product the Debtors could not obtain in the marketplace at equal or lesser price and for which cooperation is unlikely absent payment of the sums included in the Critical Vendor Cap.

66.     I believe that the relief requested in the Critical Vendors Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and constitutes a

critical element in achieving a successful and smooth transition to chapter 11. Accordingly, on

behalf of the Debtors, I respectfully submit that the Critical Vendors Motion should be granted.

> v. *Motion of Debtors and Debtors in Possession for Entry of an Order Authorizing (i) Debtors to Continue and Renew Their Liability, Property, Casualty and Other Insurance Programs and Honor All Obligations in Respect Thereof and (ii) Financial Institutions to Honor and Process Related Checks and Transfers (the "**Insurance Program Motion**")*

67.     The Debtors seek entry of an order authorizing (i) the Debtors to maintain,

continue and renew, in their sole discretion, the Insurance Programs on an uninterrupted basis

and in accordance with the same practices and procedures as were in effect before the Petition

Date and (ii) their banks and other financial institutions to receive, process, honor and pay

related checks or wire transfers. This relief requested in the Insurance Motion includes (a)

paying all Insurance Obligations, including, but not limited to, any Broker's Fees, whether due

and payable before or after the Petition Date and (b) renewing or obtaining new insurance

policies as needed in the ordinary course of business.

68.     The Debtors maintain various liability, casualty, property and other insurance and

reinsurance and risk control programs  through several private insurance carriers in the ordinary

course of the Debtors' businesses.  If the requested relief is not granted and the Insurance

Programs lapse or terminate, the Debtors may well be unable to continue large portions of their

operations, thereby endangering the value of the Debtors' assets and substantially harming all

creditors.  The Debtors believe that all material amounts related to the Insurance Programs that

were due and payable on or prior to the Petition Date have been fully paid but, out of an

abundance of caution and to avoid irreparable harm to their businesses, the Debtors seek

authority to satisfy any such prepetition obligations through the Insurance Motion.

69.     I believe that the relief requested in the Insurance Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and constitutes a critical element in achieving a successful and smooth transition to chapter 11.  Accordingly, on behalf of the Debtors, I respectfully submit that the Insurance Motion should be granted.

      vi.     *Motion of Debtors and Debtors in Possession for Entry of an Order Authorizing  (i) Debtors to Pay Certain Prepetition Taxes, Governmental Assessments and Fees and (ii) Financial Institutions to Honor and Process Related Checks And Transfers (the "***Prepetition Taxes Motion***")*

70.     The Debtors seek entry of an order (i) authorizing, but not requiring, the Debtors, in their sole discretion, to pay any Covered Taxes and Fees, whether asserted prior to or after the Petition Date, and (ii) authorizing the Debtors' financial institutions to receive, process, honor and pay checks or wire transfers used by the Debtors to pay such Covered Taxes and Fees.

71.     In connection with the normal operations of their businesses, the Debtors collect, withhold and incur production taxes, excise taxes, environmental and safety fees and assessments, sales taxes, use taxes, employment taxes, franchise taxes and fees and property taxes, as well as other taxes, fees and charges described in the Taxes and Fees Motion.  The Debtors remit Covered Taxes and Fees to various federal, state and local governments, including taxing and licensing authorities.  Covered Taxes and Fees are remitted by the Debtors through checks and electronic transfers that are processed through their banks and other financial institutions.

72.     I believe that the relief requested in the Taxes and Fees Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and constitutes a critical element in achieving a successful and smooth transition to chapter 11.  Accordingly, on behalf of the Debtors, I respectfully submit that the Taxes and Fees Motion should be granted.

28

vii.     *Debtors' Motion for Entry of Interim and Final Orders Authorizing (i) Debtors to Continue and Renew Surety Bond Program and (ii) Financial Institutions to Honor and Process Related Checks And Transfers (the "**Surety Bonds Motion**")*

73.     The Debtors seek entry of an interim and final orders authorizing the Debtors to maintain, continue and renew, in their sole discretion, their Surety Bond Program on an uninterrupted basis and in accordance with the same practices and procedures, including, but not limited to, the maintenance of cash collateral, as were in effect before the Petition Date.  This authority would include permitting the Debtors (i) to pay all amounts arising under the Surety Bond Program due and payable after the Petition Date and (ii) to renew or obtain new surety bonds as needed, including, but not limited to, as may be required by law or judicial authority.  If the requested relief is not granted and the Surety Bond Program lapses or terminates, the Debtors' operations could be severely affected, thereby endangering the Debtors' restructuring process and substantially harming all creditors.

74.     I believe that the relief requested in the Surety Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and constitutes a critical element in achieving a successful and smooth transition to chapter 11.  Accordingly, on behalf of the Debtors, I respectfully submit that the Surety Motion should be granted.

viii.    *Debtors' Motion for Entry of Interim and Final Orders Establishing Notification Procedures and Approving Restrictions on Certain Transfers of Equity Interests in the Debtors' Estates (the "**NOL Carry Forward Motion**")*

75.     The Debtors seek to enforce the automatic stay by implementing court-ordered procedures intended to protect the Debtors' estates against the possible loss of valuable tax benefits that could flow from inadvertent stay violations.  The Debtors seek entry of an order

authorizing the Debtors: (i) to establish and implement restrictions and notification requirements regarding the Tax Ownership and certain transfers of common stock of Xinergy Ltd., and (ii) to notify holders of Stock of the restrictions, notification requirements and procedures. The Debtors also seek approval of a form of notice, which will notify holders of Stock whose actions could adversely affect the Debtors' tax assets that the Procedures have been established by order of this Court.

76.    I believe that the relief requested in the NOL Carry Forward Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and constitutes a critical element in achieving a successful and smooth transition to chapter 11. Accordingly, on behalf of the Debtors, I respectfully submit that the NOL Carry Forward Motion should be granted.

ix.    *Motion of the Debtors and Debtors in Possession For Entry of Authorizing Xinergy Ltd. to Act as Foreign Representative Pursuant to 11 U.S.C. § 1505 (the "**Foreign Representative Motion**")*

77.    The Debtors seek appointment of Xinergy Ltd. as Foreign Representative of the Debtors in the Canadian Proceedings. As Foreign Representative, Xinergy Ltd. intends to seek emergency ancillary relief in Canada on behalf of the Debtors pursuant to Part IV of the *Companies' Creditors Arrangement Act* (Canada) R.S.C. 1985, c. C-36, as amended. The purpose of the ancillary proceeding is to request that the Canadian Court recognize these chapter 11 cases as a "foreign main proceeding" in order to, among other things, protect the assets of the Debtors that may be located in Canada.

78.    I believe that the relief requested in the Foreign Representative Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and

30

constitutes a critical element in achieving a successful and smooth transition to chapter 11. Accordingly, on behalf of the Debtors, I respectfully submit that the Foreign Representative Motion should be granted.

**V.**

79.    I respectfully request that all of the relief requested in the First Day Motions, and such other further relief as may be just and proper, be granted.

[Signature Page Follows.]

I, the undersigned Chief Financial Officer of Xinergy Ltd., declare under penalty of perjury that the foregoing is true and correct.

Dated: April 6, 2015

Michael R. Castle
Chief Financial Officer
Xinergy Ltd.

# SCHEDULE 1
## (Debtor Entities)

1.  Xinergy Ltd. (3697)

2.  Xinergy Corp. (3865)

3.  Xinergy Finance (US), Inc. (5692)

4.  Pinnacle Insurance Group LLC (6851)

5.  Xinergy of West Virginia, Inc. (2401)

6.  Xinergy Straight Creek, Inc. (0071)

7.  Xinergy Sales, Inc. (8180)

8.  Xinergy Land, Inc. (8121)

9.  Middle Fork Mining, Inc. (1593)

10. Big Run Mining, Inc. (1585)

11. Xinergy of Virginia, Inc. (8046)

12. South Fork Coal Company, LLC  (3113)

13. Sewell Mountain Coal Co., LLC (9737)

14. Whitewater Contracting, LLC (7740)

15. Whitewater Resources, LLC  (9929)

16. Shenandoah Energy, LLC (6770)

17. High MAF, LLC (5418)

18. Wise Loading Services, LLC (7154)

19. Strata Fuels, LLC (1559)

20. True Energy, LLC (2894)

21. Raven Crest Mining, LLC (0122)

22. Brier Creek Coal Company, LLC (9999)

23. Bull Creek Processing Company, LLC (0894)

24. Raven Crest Minerals, LLC (7746)

25. Raven Crest Leasing, LLC (7844)

26. Raven Crest Contracting, LLC (7796)

**EXHIBIT A**

