# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ROANOKE DIVISION

| | |
|---|---|
| In re: | **Chapter 11** |
| **XINERGY LTD.**, *et al.*, | **Case No. 15-[    ] (___)** |
| | **(Joint Administration Requested)** |
| **Debtors.**[1] | |

## MOTION OF THE DEBTORS AND DEBTORS IN POSSESSION FOR ENTRY OF INTERIM AND FINAL ORDERS PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364, 507 AND BANKRUPTCY RULES 2002 AND 4001 (I) AUTHORIZING DEBTORS TO (A) OBTAIN POSTPETITION FINANCING AND (B) UTILIZE CASH COLLATERAL, (II) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED CREDITORS AND (III) SCHEDULING FINAL HEARING

The above-captioned debtors and debtors-in-possession (collectively, the "Debtors"), by

their undersigned counsel, hereby move the Court (the "Motion") for entry of an interim order,

substantially in the form attached hereto as Exhibit A (the "Interim Order"), and subsequently a

final order, pursuant to sections 105, 362, 363, 364 and 507 of the United States Code, 11 U.S.C.

§§ 101-1532 (the "Bankruptcy Code") and Rules 2002 and 4001 of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules"), (i) authorizing the Debtors to (a) obtain post-

petition financing on a secured, super-priority basis and granting certain related relief and (b) to

---

[1]    The Debtors, along with the last four digits of each Debtor's federal tax identification number, are listed on Schedule 1 attached hereto.

HUNTON & WILLIAMS LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia 23219
Telephone: (804) 788-8200
Facsimile: (804) 788-8218
Tyler P. Brown (VSB No. 28072)
Henry P. (Toby) Long, III (VSB No. 75134)
Justin F. Paget (VSB No. 77949)

*Proposed Counsel to the Debtors
and Debtors in Possession*

use cash collateral and all other collateral ("Cash Collateral"), (ii) granting adequate protection to existing secured creditors described herein, and (iii) scheduling a final hearing on this Motion. In support of this Motion, the Debtors rely on the Declaration of Michael R. Castle in support of the Chapter 11 Petitions and Related Motions (the "Castle Declaration").  In further support of this Motion, the Debtors submit as follows:

## I.    Preliminary Statement

1.      Following a diligent solicitation process, the Debtors obtained the DIP Facility (defined below) from affiliates of Whitebox Advisors LLC and Highbridge Capital Management, LLC (collectively, the "Lenders"), which provides for an aggregate $40 million post-petition facility on a superpriority, administrative claim and first-priority priming lien basis.  The DIP Facility will be used to refinance the First Lien Term Notes (defined below) in the aggregate principal amount of approximately $20 million, plus all accrued interest, fees and expenses thereunder (the "Refinancing") and to provide the necessary liquidity for the Debtors to fund their operations and pursue a successful restructuring in chapter 11.

2.      The Debtors are requesting authority to immediately access $7.5 million, plus the Refinancing, on an interim basis pursuant to the Interim Order.

3.      Access to the DIP Facility will allow the Debtors to continue normal business operations in chapter 11, maintain vendor and supplier relationships, pay their employees, and satisfy other working capital and operational requirements.  Satisfaction of these key obligations is necessary to preserve and maintain the value of the enterprise.  Absent access to the DIP Facility, the Debtors likely will not have adequate cash on hand to satisfy their debt obligations and maintain uninterrupted operations, resulting in immediate liquidation, severe employee dislocation and crippling losses for vendors and customers.

4.     Thus, to ensure the Debtors' access to sufficient liquidity and provide the foundation for a successful restructuring, the Debtors respectfully submit that the DIP Facility should be approved.

## II.     Jurisdiction, Venue and Predicates for Relief

5.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334(b).   Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.   This matter is a core proceeding within the meaning of 28 U.S.C. §157 (b)(2).

6.     The predicates for the relief requested herein are 105, 362, 363, 364 and 507 of the Bankruptcy Code and Bankruptcy Rules 2002 and 4001.

## III.     Background

### A.     Chapter 11 Case

7.     On the date hereof (the "Petition Date"), each of the Debtors filed with the Court their respective voluntary petitions for relief under chapter 11 of Title 11 of the Bankruptcy Code, commencing the above-captioned chapter 11 cases.   The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

8.     No creditors' committee has been appointed in these cases.   No trustee or examiner has been appointed.

9.     Contemporaneously herewith, the Debtors have filed a motion requesting joint administration of their chapter 11 cases.

10.     A full description of the Debtors' business operations, corporate structures, capital structures, and reasons for commencing these cases is set forth in full in the Castle Declaration, which was filed contemporaneously with this Motion and which is incorporated herein by reference.   Additional facts in support of the specific relief sought herein are set forth below.

B.    **Prepetition Capital Structure**

11.    In May 2011, the debtor Xinergy Corp. ("Xinergy") issued $200 million of 9.25%

Senior Secured Notes (the "Second Lien Notes") due May 15, 2019, which are guaranteed by the

other Debtors and collateralized by substantially all of Xinergy's assets.  Interest payments of $9

million are due and payable semi-annually, the most recent of which was paid in December 2014.

Approximately $72 million of the net proceeds from the issuance were used to retire existing

debt and the remaining funds were used for capital expenditures, including construction of a

preparation plant, purchase of mining equipment and construction of infrastructure, and for

general corporate purposes.  The current amount outstanding on the Second Lien Notes is

approximately $195 million.

12.    Xinergy subsequently entered into a Credit Agreement, dated as of December 21,

2012 (as amended, supplemented, modified, or amended and restated from time to time, the

"First Lien Term Loans"), with Bayside Finance LLC, as lender ("Bayside"), and the other

Debtors as guarantors.  The First Lien Term Loans facility provided for the two term loans in the

amount of $10,000,000 each with terms of four years.  The first loan was drawn in December

2012 and the second loan was drawn in September 2013.  The proceeds of the First Lien Term

Loans were used to fund transaction costs, to provide working capital and for Xinergy's general

corporate purposes.  The First Lien Term Loans are secured by a first priority lien on

substantially all of the Debtors' assets.  The current amount outstanding on the First Lien Term

Loans is $20 million plus certain fees and expenses.  Shortly prior to the Petition Date, on or

around April 1, 2015, Bayside assigned the First Lien Term Notes to the Lenders.

13.    The Debtors and holders of both the First Lien Term Loans and the Second Lien

Notes are parties to a Collateral Trust Agreement, dated as of May 6, 2011 (the "**Collateral**

**Trust Agreement**"), which authorizes Xinergy to obtain credit in certain amounts and for certain purposes that would have priority over the Second Lien Notes.  The First Lien Term Loans became senior to the Second Lien Notes pursuant to that provision.  The Collateral Trust Agreement, in Section 2.8, permits Xinergy to obtain debtor-in-possession financing that would be senior to or on a parity with the senior liens, thus also having priority over the Second Lien Notes, upon the consent of the holder of the First Lien Term Loans.  That same provision provides that holders of the Second Lien Notes have expressly waived any right to object to any debtor-in-possession financing to which the holder of the First Lien Term Loans consents, provided that the holders of the Second Lien Notes are provided adequate protection in the form of replacement liens, coextensive with those provided to the Lenders, but subordinate in all respects to the rights of the Lenders.

14.    To the best of the Debtors' knowledge, the Lenders and the Second Lien Note holders are the only creditors with a lien upon the Debtors' cash collateral.

### IV.    The Proposed DIP Facility

15.    As described in full in the Castle Declaration, the Debtors have faced a confluence of macroeconomic and regulatory factors in recent years that prevented them from executing on their business plans, tightened their operating margins and threatened their ability to survive as a going concern.

16.    To address their liquidity needs, in December 2014, Xinergy retained Global Hunter Securities ("Global Hunter"), a division of Seaport Global Securities LLC, as its financial advisor to pursue financial and strategic alternatives, including raising capital and other strategic transactions focused on providing additional liquidity for the Debtors.

17.     As it became clearer that the Debtors likely would need the protection of chapter 11 in order to effectuate the best available strategic option for their businesses, the Debtors and Global Hunter initiated a process to identify potential post-petition lenders. The Debtors and Global Hunter approached more than twenty-five high quality institutional firms as potential sources of post-petition financing, of which ten executed confidentiality agreements.[2]   In connection with the marketing process, the Debtors also approached Bayside and the holders of the Second Lien Notes regarding a potential post-petition financing arrangement.

18.     Following a diligent and dedicated search for other and better financing alternatives, the Debtors and their professionals determined that the DIP Facility is the best available financing option available under the circumstances and will provide the Debtors with the necessary capital to run their chapter 11 process effectively.

19.     In accordance with Bankruptcy Rules 4001(b), (c) and (d), the following summarizes the significant terms of the DIP Credit Agreement and the Interim Order.[3]   The Debtors believe that the following provisions of the DIP Credit Agreement and the Interim Order are justified and necessary in the context and circumstances of these cases.

| **Borrower:** | Xinergy Corp., a Tennessee corporation (the "**Borrower**").[4] |
| --- | --- |
| **Guarantors:** | The DIP Term Loans (as defined below) and all other obligations arising under the DIP Facility (as defined |

---

[2]     The attached  Exhibit C consists of a compilation of information that was provided by the Debtors pursuant to the terms of those confidentiality agreements, either directly or through the Debtors' advisors, to one or more prospective DIP lenders for their consideration in determining whether they might offer to provide DIP financing to the Debtors.  Ultimately, the Debtors received a number of proposals for DIP financing and will be seeking approval of DIP financing as part of their first-day pleadings.

[3]     The following summary is included for convenience only and is qualified in its entirety by reference to the definitive DIP Loan Agreement, which shall control in the event of any inconsistency.

[4]     Capitalized terms used but not defined in this summary shall have the meaning ascribed to such terms in the DIP Credit Agreement.

below) will be unconditionally guaranteed on a joint and several basis by Xinergy Ltd., an Ontario corporation (the "**Company**") that is the parent to the Borrower, and any and all of the Borrower's and the Company's current, direct or indirect subsidiaries (other than the Borrower) (collectively with the Company, the "**Guarantors**") that are debtors (collectively with the Borrower, but not the Company, the "**Debtors**") in the proposed chapter 11 cases (the "**Cases**") to be commenced by the Debtors in the Western District of Virginia, Roanoke Division (the "**Bankruptcy Court**").

**DIP Lenders/DIP Agent:**    The lenders (the "**Initial Lenders**") shall be comprised of affiliates of Whitebox Advisors LLC and Highbridge Capital Management, LLC. WBOX 2014-4 Ltd. will serve as agent under the DIP Loan Agreement and the other Loan Documents (the "**DIP Agent**") to act on their behalf and each of the Initial Lenders shall have the right to assign the DIP Term Loans and the Commitment Amount subject to customary conditions (such assignees, together with the Initial Lenders, the "**Lenders**").

**DIP Facility:**    A multiple draw term loan facility ("**DIP Facility**") of up to $40 million (the "**Commitment Amount**") to be available to the Borrower to refinance the Prepetition Financing Facility in full (the "**Refinancing**") and, subject to the Budget referred to below, for working capital purpose during the pendency of the Cases. The DIP Facility shall also include an uncommitted accordion feature whereby the Borrower shall have the right, exercisable only one time, to incrementally increase the Commitment Amount by an aggregate principal amount equal to $10 million, subject to, among other conditions to be agreed, no default or Event of Default continuing at the time of such increase.

**Amount of Interim DIP Facility:**    Until a final order is entered approving the DIP Facility, no more than $7,500,000 (plus the Refinancing) shall be made available to the Debtors under the DIP Facility.

**Interest:**    Interest on the loans (the "**DIP Term Loans**") shall accrue and be payable monthly in arrears, based on a 360 day year, at a rate per annum equal to 14%, with 10% being payable in cash and the balance in-kind. Following an Event of Default (as defined in the DIP Loan Agreement referred to below), interest shall

accrue at an additional rate per annum of 2% and shall be payable in cash upon demand.

**Certain Payments and Expenses:**

An amount equal to 2.5% of the Commitment Amount shall be payable to the Initial Lenders out of the initial draw under the DIP Facility and such payment shall be structured in the most tax efficient manner for the Initial Lenders. In addition, the Debtors shall reimburse the Lenders and the DIP Agent from time to time for all expenses incurred by them in connection with the negotiation, documentation, administration and enforcement of the DIP Facility and the participation in the Cases in such capacity (including, without limitation, expenses of counsel and other consultants retained by the Lenders and/or the DIP Agent to the extent provided in the DIP Loan Agreement and other Loan Documents (as defined below)).

**Closing Date:**

By no later than April 15, 2015.

**Maturity:**

Borrowings under the DIP Facility are to be repaid in full in cash on the earliest of (a) the nine month anniversary of the Closing Date (the "**Stated Maturity**"), subject to two three-month extensions as described below, (b) the occurrence of an Event of Default and (c) the effective date of a confirmed chapter 11 plan for the Debtors; *provided* that the Lenders may convert the DIP Facility into an exit financing facility (the "**Exit Facility**") pursuant to a confirmed chapter 11 plan, the terms and conditions of such plan and Exit Facility to be acceptable to Lenders holding at least a majority in principal amount of the DIP Term Loans outstanding (the "**Requisite Lenders**"). As described above, the Debtors may elect (no more than twice) on written notice to the Lenders on or before the date that is 5 days prior to the then Stated Maturity to extend the Stated Maturity of the DIP Facility by a period of up to three months, subject to customary closing conditions including no default and the payment of an amount equal to 50 basis point for each extension (such payment to be structured in the most tax efficient manner for the Lenders).

**Exit Payment:**

Any payment, repayment or refinancing of the DIP Loans, including a refinancing through the Exit Facility, shall be accompanied by a payment in the amount of 1% on the principal amount being repaid or prepaid (such payment to be structured in the most tax efficient manner for the Lenders).

**Fees:**

There are no fees that will be payable to any investment bankers or financial advisors in connection with the DIP Facility.

**Collateral and Superpriority Claim:**

All amounts outstanding under the DIP Facility, including all payments and expenses in respect thereof, shall be secured by first priority priming liens (subject to the Carve Out defined below) on all assets of the Debtors and the other Guarantors under section 364 of the Bankruptcy Code (the "**Collateral**").  Upon either (a) an Event of Default or (b) termination of the DIP Facility, unless the DIP Facility shall have been repaid in full, the automatic stay shall be lifted without further action on the part of DIP Agent or the Lenders (other than five days' prior notice to the Debtors and any official committee) to permit the DIP Agent to foreclose on, or take other action with respect to, the Collateral. All such liens shall be automatically perfected pursuant to the DIP Orders (as defined below); provided that the automatic stay shall be modified to permit other perfection at the DIP Agent's option.

In addition, the DIP Agent and Lenders shall have an allowed superpriority claim for such amounts under sections 364(c)(1) and 503(b) of the Bankruptcy Code with priority over all other expenses of the kind specified in sections 503(b), 506(c), 507(b) and 726(b) of the Bankruptcy Code, other than the unpaid fees of the United States Trustee and, subject to the Budget, any unpaid bankruptcy court-approved professional fees in an amount not to exceed $500,000 ("**Carve Out**").

**Adequate Protection**

The DIP Orders shall provide that (i) until the Prepetition Financing Facility is repaid in full, the lender(s) under the Prepetition Financing Facility shall receive adequate protection in the form of replacement liens, superpriority claims, payment of fees and expenses (including, without limitation, expenses of

counsel and other consultants retained by the lender(s) under the Prepetition Financing Facility), and the payment of interest at the default rate under the Prepetition Financing Facility on a monthly basis and (ii) the holders of the Second Lien Notes (as defined in the Prepetition Financing Facility) shall receive adequate protection in the form of replacement liens and superpriority claims.

**Conditions to DIP Facility:**

Entry by the DIP Agent, Lenders and Debtors into definitive documentation in form and substance reasonably satisfactory to the Lenders and their counsel (the "**DIP Loan Agreement**" and other documents relating to the DIP Loan Agreement, the "**Loan Documents**"), including a form of budget (as updated from time to time, the "**Budget**") mutually acceptable to the Borrower and the Lenders.    The DIP Loan Agreement shall be based on the Prepetition Financing Facility but shall also contain such conditions, representations and warranties, mandatory prepayment provisions and covenants as are customarily found in DIP facilities of this type and such additional provisions appropriate in Lenders' judgment for this transaction, including:

1.     Entry of an order of the Bankruptcy Court ("**Interim Order**") in form and substance reasonably satisfactory to the Lenders, including a finding that the DIP Facility was entered into in good faith and otherwise complies with section 364(e) of the Bankruptcy Code, authorizing and approving:

   (a)     The DIP Facility on an interim basis, including the Refinancing and the granting of the liens and superpriority claims described above;

   (b)     The reimbursement of the DIP Agent and the Initial Lenders' fees and expenses as described above; and

   (c)     Scheduling the date of the final hearing on the DIP Facility.

2.      Entry of final order ("**Final Order**;" together with the Interim Order, the "**DIP Orders**") in form and substance reasonably satisfactory to the Required Lenders approving the DIP Facility on a final basis within 45 days of the commencement the Cases.

3.      Debtors shall provide the Lenders and their counsel with copies of all proposed pleadings and orders in the Cases, with sufficient time for review and comment by Lenders.  The relief requested by the Debtors in the first and second day orders and pleadings shall be reasonably acceptable to the Lenders.  The Debtors shall provide the Lenders will advance copies of (and a reasonable opportunity to comment on) any press release in which a Lender or any affiliate or agent of a Lender is mentioned.

4.      The Debtors shall comply with certain chapter 11 milestones set forth in the proposed DIP Loan Agreement.

**Events of Default:**          Such Events of Default as are customarily found in DIP facilities of this type and others appropriate in Lenders' judgment, including:

1.      Non-payment when due of amounts owing under DIP Facility;

2.      Material breach of any covenant contained in DIP Loan Agreement or other Loan Documents, including a material breach of the Budget, with appropriate grace periods to be agreed;

3.      Dismissal of the Cases, any conversion of the Cases to chapter 7, the appointment of a bankruptcy trustee or an examiner or other person with expanded powers, termination of the Debtors' exclusive right to file a plan of reorganization, the incurrence of other indebtedness under section 364 of the Bankruptcy Code or the payment of any prepetition obligations (other than for (x) postpetition rent or services rendered pursuant to a prepetition lease or contract and (y) the

refinancing of the Prepetition Financing Facility);

4.  Any stay or modification of the DIP Orders, without the consent of the Lenders; and

5.  The filing of a chapter 11 plan that does not provide for the payment in full of the DIP Facility and, to the extent not already repaid in full, the Prepetition Financing Facility, or is otherwise not acceptable to the Requisite Lenders in their reasonable discretion.

**Governing Law:**          Except to the extent governed by the Bankruptcy Code, the DIP Loan Agreement and other Loan Documents shall be governed by internal laws of the State of New York.

## IV.    Relief Requested

20.    By this Motion, the Debtors respectfully request entry of the Interim Order (i) authorizing the Debtors to (a) obtain post-petition financing on a secured, super-priority basis pursuant to the DIP Loan Agreement substantially in the form attached hereto as <u>Exhibit B</u> and granting certain related relief and (b) to use Cash Collateral, (ii) granting adequate protection to existing secured creditors described herein, and (iii) scheduling a final hearing on this Motion, at which time the Debtors will request entry of a final order under this Motion.

## V.    Basis for Relief Requested

### A.    The Debtors Should Be Authorized to Obtain the DIP Facility Under Section 364 of the Bankruptcy Code

21.    The Debtors meet the requirements for relief under section 364 of the Bankruptcy Code, which permits a debtor to obtain postpetition financing and, in return, to grant superpriority administrative status and liens on its property.  Specifically, section 364(c) provides as follows:


If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt:

(1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title; [or]

(2) secured by a lien on property of the estate that is not otherwise subject to a lien;

(3) secured by a junior lien on property of the estate that is subject to a lien[.]

11 U.S.C. § 364(c). Further, section 364(d) of the Bankruptcy Code provides:

(1) The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if:

(A) the trustee is unable to obtain such credit otherwise; and

(B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

(2) In any hearing under this subsection, the trustee has the burden of proof on the issue of adequate protection.

11 U.S.C. § 364(d).

22.     Provided that an agreement to obtain secured credit is consistent with the provisions of, and policies underlying, the Bankruptcy Code, courts grant a debtor considerable deference in exercising its sound business judgment in obtaining such credit. *See, e.g.*, *In re Barbara K. Enters., Inc.*, Case No. 08-11474, 2008 WL 2439649, at *14 (Bankr. S.D.N.Y. June 16, 2008) (explaining that courts defer to a debtor's business judgment "so long as a request for financing does not 'leverage the bankruptcy process' and unfairly cede control of the reorganization to one party in interest"); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 [of the

Bankruptcy Code] is to be utilized on grounds that permit [a debtor's] reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest."); *In re Farmland Indus., Inc.*, 294 B.R. 855, 881 (Bankr. W.D. Mo. 2003) (noting that approval of postpetition financing requires, *inter alia*, an exercise of "sound and reasonable business judgment").

23.     Further, in determining whether the Debtors have exercised sound business judgment in deciding to enter into the DIP Loan Agreement, the Court should consider the economic terms of the DIP Facility in light of current market conditions.  For example, in *In re ION Media Networks, Inc.*, the Bankruptcy Court for the Southern District of New York held that:

> Although all parties, including the Debtors and the Committee, are naturally motivated to obtain financing on the best possible terms, a business decision to obtain credit from a particular lender is almost never based purely on economic terms.  Relevant features of the financing must be evaluated, including non-economic elements such as the timing and certainty of closing, the impact on creditor constituencies and the likelihood of a successful reorganization.  This is particularly true in a bankruptcy setting where cooperation and established allegiances with creditor groups can be a vital part of building support for a restructuring that ultimately may lead to a confirmable reorganization plan.  That which helps foster consensus may be preferable to a notionally better transaction that carries the risk of promoting unwanted conflict.

Case No. 09-13125, 2009 WL 2902568, at *4 (Bankr. S.D.N.Y. July 6, 2009).

24.     Here, given all the facts and circumstances present in these cases, the Debtors have amply satisfied the necessary conditions under sections 364(c) and (d) for authority to enter into the DIP Facility.  The Debtors exercised proper business judgment in securing DIP Facility on terms that are fair, reasonable and the best available to them in the current market.  Moreover,

the Debtors were not otherwise able to obtain credit on an unsecured or administrative expense basis, and they have provided their prepetition secured creditors with adequate protection against any potential diminution in value of their interests caused by the priming liens proposed to be provided to the Lenders.  For all the reasons discussed further below, therefore, the Court should grant the Debtors' request to enter into the DIP Facility pursuant to sections 364(c) and (d) of the Bankruptcy Code.

> **i.    The Debtors Exercised Sound and Reasonable Business Judgment in Deciding to Enter into the DIP Financing Facility**

25.    Based on the facts of these cases, the DIP Facility represents a proper exercise of the Debtors' business judgment.  Bankruptcy courts routinely defer to the debtor's business judgment on most business decisions, including decisions about whether and how to borrow money.  *Group of Institutional Investors v. Chicago, Milwaukee, St. Paul & Pac. R.R.*, 318 U.S. 523, 550 (1943); *In re Simasko Prod. Co.*, 47 B.R. 444, 449 (Bankr. D. Colo. 1985) ("Business judgments should be left to the board room and not to this Court."); *In re Lifeguard Indus., Inc.*, 37 B.R. 3, 17 (Bankr. S.D. Ohio 1983).  "More exacting scrutiny would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially."  *Richmond Leasing Co. v. Capital Bank*, N.A., 762 F.2d 1303, 1311 (5th Cir. 1985).

26.    In general, a bankruptcy court defers to a debtor's business judgment regarding the need for, and the proposed use of, funds, unless the debtor's decision improperly leverages the bankruptcy process or its purpose is not so much to benefit the estate as it is to benefit a party in interest.  *See Ames Dep't Stores*, 115 B.R. at 40; *see also In re Curlew Valley Assocs.*, 14 B.R. 506, 511–13 (Bankr. D. Utah 1981).  Courts generally will not second-guess a debtor's business decisions when those decisions involve "a business judgment made in good faith, upon a

reasonable basis, and within the scope of [its] authority under the [Bankruptcy] Code." *Id.* at 513–14 (footnote omitted).

27.     Here, the Debtors have exercised sound business judgment in determining that the DIP Facility is appropriate.  As explained above, an extensive marketing effort was undertaken to obtain DIP financing, and the Debtors negotiated extensively to obtain the best possible terms. The terms of the DIP Facility are fair and reasonable, and are in the best interests of the Debtors' estates.  The Debtors have reason to believe that the funds made available through the DIP Facility will be adequate to pay all administrative expenses due and payable during the post-petition periods.  Accordingly, the Court should grant the Debtors authority to enter into the DIP Facility and obtain funds from the Lenders on the senior secured and administrative "superpriority" basis described above, pursuant to section 364(c) of the Bankruptcy Code.

28.     Moreover, the Refinancing is supported by the sound business judgment of the Debtors.  The Refinancing reduces the Debtors' cash interest expense (12.25% at the default rate under the Prepetition Term Loan vs. 10% under the DIP), simplifies the Debtors' capital structure and the need to prime the Prepetition Term Loan, and should reduce professional fees as it eliminates the need for the Prepetition Term Lenders and noteholders to retain separate counsel.  In addition, the DIP Lenders indicated that the Refinancing was an important factor in their willingness to lend and consent to use of their cash collateral.  For these reasons, the Debtors believe entering into the DIP Facility with the DIP Lenders is in the best interests of their estates and will advance their goal of maximizing the value of the Debtors' assets.

29.     It is worth noting that, any creditors' committee or other party-in interest that obtains standing may, subject to the limitations contained in the proposed DIP Order and the DIP

Documents, seek to challenge the Prepetition Lenders' security interests during the Challenge

Period notwithstanding the Refinancing.

> ### ii. The Debtors Meet the Conditions Necessary Under Section 364(c) to Obtain Postpetition Financing on a Senior Secured and Superpriority Basis

30.     Section 364(c) of the Bankruptcy Code authorizes a debtor to obtain postpetition

financing on a secured or superpriority basis, or both, where the Court finds, after notice and a

hearing, that the debtors are "unable to obtain unsecured credit allowable under section 503(b)(1)

of the [the Bankruptcy Code] . . . ." 11 U.S.C. § 364(c).

31.     Courts have articulated a three-part test to determine whether a debtor is entitled

to obtain financing under section 364(c) of the Bankruptcy Code.  Specifically, courts look to

whether:

> (a)     the debtor is unable to obtain unsecured credit under section 364(b), i.e., by allowing a lender only an administrative expense claim;

> (b)     the credit transaction is necessary to preserve the assets of the estate; and

> (c)     the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender.

*In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 37-39 (Bankr. S.D.N.Y. 1990); *accord In re St. Mary*

*Hosp.*, 86 B.R. 393, 401 (Bankr. E.D. Pa. 1988); *In re Crouse Group, Inc.*, 71 B.R. 544, 549

(Bankr. E.D. Pa. 1987).

32.     In order to satisfy this test, a debtor need only demonstrate "by a good faith effort

that credit was not available" to the debtor on an unsecured or administrative expense basis.

*Bray v. Shenandoah Fed. Savs. & Loan* Ass'n *(In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th

Cir. 1986); *accord In re Ames Dep't Stores, Inc.*, 115 B.R. at 37 (debtor must show that it has

made reasonable efforts to seek other sources of financing under sections 364(a) and (b) of the Bankruptcy Code); *In re Crouse Group, Inc.*, 71 B.R. at 549 (secured credit under section 364(c)(2) of the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained). "The statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." *Id.*; *see also Pearl-Phil GMT (Far East) Ltd. v. Caldor Corp.*, 266 B.R. 575, 584 (S.D.N.Y. 2001) (superpriority administrative expenses authorized where debtor could not obtain credit as an administrative expense). This is true especially when time is of the essence. *In re Reading Tube Indus.*, 72 B.R. 329, 332 (Bankr. E.D. Pa. 1987). When few lenders are likely to be able and willing to extend the necessary credit, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom.*, *Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); *see also Ames Dep't Stores*, 115 B.R. at 40 (approving financing facility and holding that the debtor made reasonable efforts to satisfy the standards of section 364(c) where it approached four lending institutions, was rejected by two, and selected the most favorable of the two offers it received).

33.    Here, the Debtors have used reasonable, good faith efforts to try to obtain credit other than on a secured superpriority basis. The Debtors and Global Hunter conducted a robust marketing process to identify potential financing sources, and the Debtors conducted arm's length, good faith negotiations with these prospective lenders on the terms of their postpetition financing. None of those potential lenders were willing to make a post-petition loan on an unsecured basis in an amount necessary for the Debtors' business operations and other financing needs. On the contrary, the Debtors' negotiations with lenders made clear that the Debtors could

only obtain the financing necessary to preserve their estates if the lenders were provided superpriority claims to secure these obligations.

34.     The Court should therefore authorize the Debtors to provide the Lenders superpriority administrative expense status for any obligations arising under the DIP Credit Agreement as provided for in section 364(c)(1) of the Bankruptcy Code.

### iii. The Debtors Should Be Authorized to Obtain Postpetition Financing Secured by Liens that are Senior to the Liens Securing the First Lien Term Loans and Second Lien Notes

35.     In addition to authorizing financing under section 364(c) of the Bankruptcy Code, a court may also authorize a debtor to obtain postpetition credit secured by a lien that is senior in priority to existing liens on the encumbered property if the debtor cannot otherwise obtain such credit and the interests of existing lien holders are adequately protected or consent is obtained. *See* 11 U.S.C. § 364(d)(1).

36.     When determining whether to authorize a debtor to obtain credit secured by a lien that is senior or equal to a prepetition lien as authorized by section 364(d) of the Bankruptcy Code, courts focus on whether the transaction will enhance the value of the debtor's assets. Courts consider a number of factors, including, without limitation:

- whether alternative financing is available on any other basis (i.e., whether any better offers, bids or timely proposals are before the court);

- whether the proposed financing is necessary to preserve estate assets and is necessary, essential and appropriate for continued operation of the debtor's businesses;

- whether the terms of the proposed financing are reasonable and adequate given the circumstances of both the debtor and proposed lender(s); and

- whether the proposed financing agreement was negotiated in good faith and at arm's length and entry therein is an

exercise of sound and reasonable business judgment and in
the best interest of the debtor's estate and its creditors.

*See, e.g.*, *Ames Dep't Stores*, 115 B.R. at 37–39; *Bland v. Farmworker Creditors*, 308 B.R. 109,

113-14 (S.D. Ga. 2003); *Farmland Indus.*, 294 B.R. at 862–79; *Barbara K. Enters.*, 2008 WL

2439649 at *10; *see also* 3 Collier on Bankruptcy ¶ 364.04[1] (16th ed.).

37.    The DIP Facility satisfies each of these factors.  First, the Debtors have explored

financial alternatives and are aware of the lack of financing available to them given the nature of

their capital structure.  As explained above, the Debtors conducted arm's-length negotiations

with several possible post-petition lenders, and the ultimate agreement reflects the most

favorable terms on which the Debtors were able to obtain financing.  The Debtors are not able to

obtain financing on equal or better terms from the Lenders, or any other source, without granting

post-petition liens on a first-priority priming lien basis.

38.    Second, the Debtors need the funds to be provided under the DIP Facility to

preserve the value of their estates for the benefit of all creditors and other parties in interest.

Absent the DIP Facility, the Debtors will be unable to operate their businesses or prosecute their

bankruptcy cases.  Providing the Debtors with the liquidity necessary to preserve their going

concern value through the pendency of these cases is in the best interests of all stakeholders.

39.    Third, the terms of the DIP Facility are reasonable and adequate to support the

Debtors' operations and restructuring activities through the pendency of these bankruptcy cases,

as the DIP Facility will allow the Debtors to maintain their operations and their relationships

with key constituents notwithstanding the commencement of these cases.

40.    Fourth, as described above, the Debtors and the Initial Lenders negotiated the DIP

Loan Agreement and other Loan Documents in good faith and at arm's-length, and the Debtors'

entry into the DIP Loan Agreement and the other Loan Documents is an exercise of their sound

business judgment.  The DIP Facility is on the most favorable terms available to the Debtors in the current market.  In light of all these factors, therefore, it is clear that the Debtors should be authorized to secure the DIP Facility with liens granted on a first-priority priming lien basis.

>       iv.     **The Interests of the Holders of the Second Lien Notes Are Adequately Protected**

41.     A debtor may obtain postpetition credit "secured by a senior or equal lien on property of the estate that is subject to a lien only if" the debtor, among other things, provides "adequate protection" to those parties whose liens are primed.  *See* 11 U.S.C. § 364(d)(1)(B). What constitutes adequate protection is decided on a case-by-case basis, and adequate protection may be provided in various forms, including payment of adequate protection fees, payment of interest or granting of replacement liens or administrative claims.  *See, e.g.*, *In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) ("the determination of adequate protection is a fact-specific inquiry . . . left to the vagaries of each case"); *In re Realty Sw. Assocs.*, 140 B.R. 360 (Bankr. S.D.N.Y. 1992); *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986) (the application of adequate protection "is left to the vagaries of each case, but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process") (citation omitted).  The critical purpose of adequate protection is to guard against the diminution of a secured creditor's collateral during the period when such collateral is being used by the debtor in possession.  *See 495 Cent. Park*, 136 B.R. at 631 ("The goal of adequate protection is to safeguard the secured creditor from diminution in the value of its interest during the chapter 11 reorganization."); *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986); *In re Hubbard Power & Light*, 202 B.R. 680, 685 (Bankr. E.D.N.Y. 1996).

42.     Here, the Holders of the Second Lien Notes will receive adequate protection in the form of replacement liens and a superpriority claim.  Under the terms of the Collateral Trust

Agreement, the Holders of the Second Lien Notes are not entitled to any additional adequate protection and are contractually bound not to contest the approval of the DIP Loan Facility.

43.     Bankruptcy Courts in Virginia and elsewhere have approved similar forms of adequate protection for prepetition secured lenders.  *See, e.g.*, *In re AMF Bowling Worldwide, Inc.*, Case No. 12-36495 (KRH) (Bankr. E.D. Va. Dec. 12, 2012) (granting, *inter alia*, first and second lien adequate protection liens); *In re Bear Island Paper Co., L.L.C.*, Case No. 10-31202 (DOT) (Bankr. E.D. Va. Mar. 31, 2010) (granting, *inter alia*, adequate protection liens and claim pursuant to 507(b) to prepetition lenders); *In re Circuit City Stores, Inc.*, Case No. 08-35653 (KRH) (Bankr. E.D. Va. Dec. 23, 2008); *In re Patriot Coal Corp.*, Case No. 12-12900 (SCC) (Bankr. S.D.N.Y. Aug. 3, 2012); *In re NewPage Corp.*, Case No. 11-12804 (KG) (Bankr. D. Del. Oct. 5, 2011); *In re The Great Atl. & Pac. Tea Co.*, Case No. 10-24549 (RDD) (Bankr. S.D.N.Y. Jan. 11, 2011).

44.     Accordingly, the Court should find that the adequate protection provided to the holders of the Second Lien Notes is fair and reasonable, and satisfies the requirements of section 364(d)(1)(B) of the Bankruptcy Code.

**C.      The Debtors Should be Authorized to Use the Cash Collateral**

45.     Section 363(c) of the Bankruptcy Code governs a debtor's use of a secured creditor's cash collateral.  Specifically, that provision provides, in pertinent part, that:

> The trustee may not use, sell, or lease cash collateral . . . unless—
>
> > (A) each entity that has an interest in such cash collateral consents; or
> >
> > (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section [363].

11 U.S.C. § 363(c)(2).  Further, section 363(e) provides that "on request of an entity that has an interest in property . . . proposed to be used, sold or leased, by the trustee, the court, with or

without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide

adequate protection of such interest." 11 U.S.C. § 363(e).

46.     The Debtors have satisfied the requirements of sections 363(c)(2) and (e), and

should be authorized to use the cash collateral.  First, the Lenders have consents to the use of the

cash collateral.  Second, as described above, the Debtors are providing the holders of the Second

Lien Notes with replacement liens to the same extent of any pre-petition liens.  The Debtors

propose that the replacement liens will be granted only to secure an amount equal to any

decrease in the value of the liens of the holders of the Second Lien Notes caused by the Debtors'

use of such cash collateral.  The interests of the holders of the Second Lien Notes are thus

adequately protected from diminution under the DIP Facility.  Accordingly, the Court should

authorize the Debtors to use the Cash Collateral under section 363(c)(2) of the Bankruptcy Code.

### D.     The Scope of the Carve-Out is Appropriate

47.     The DIP Facility subjects the security interests and administrative expense claims

of the Lenders to the Carve-Out.  Such carve-outs for professional fees have been found to be

reasonable and necessary to ensure that a debtor's estate and any statutory committee can retain

assistance from counsel.  *See Ames*, 115 B.R. at 40.  The DIP Facility does not directly or

indirectly deprive the Debtors' estates or other parties in interest of possible rights and powers by

restricting the services for which professionals may be paid in these cases.  *Id.* at 38 (observing

that courts insist on carve-outs for professionals representing parties-in-interest because "[a]bsent

such protection, the collective rights and expectations of all parties-in-interest are sorely

prejudiced").  Additionally, the Carve-Out protects against administrative insolvency during the

course of the case by ensuring that assets remain for the payment of U.S. Trustee fees and

professional fees of the Debtors and the future committee of unsecured creditors notwithstanding

the grant of superpriority and administrative liens and claims under the DIP Facility.

48.     Bankruptcy Courts in Virginia and elsewhere routinely approve of carve-outs agreed to by the debtors and their DIP lenders.  *See, e.g.*, *In re James River Coal Company*, Case No. 14-31848 (KRK) (Bankr. E.D. Va. May 9, 2014); *In re AMF Bowling Worldwide, Inc.*, Case No. 12-36495 (KRH) (Bankr. E.D. Va. Dec. 18, 2012); *In re Bear Island Paper Co., L.L.C.*, Case No. 10-31202 (DOT) (Bankr. E.D. Va. Mar. 31, 2010); *In re Circuit City Stores, Inc.*, Case No. 08-35653 (KRH) (Bankr. E.D. Va. Dec. 23, 2008); *In re The Great Atl. & Pac. Tea Co.*, Case No. 10-24549 (RDD) (Bankr. S.D.N.Y. Jan. 11, 2011); *In re Quebecor World (USA) Inc.*, Case No. 08-10152 (JMP) (Bankr. S.D.N.Y. Jan. 23, 2008); *In re Delphi Corp.*, Case No. 05-44481 (RDD) (Bankr. S.D.N.Y. Oct 12, 2005); *In re Delta Air Lines, Inc.*, Case No. 05-17923 (PCB) (Bankr. S.D.N.Y. Oct 6, 2005).

**E.     The DIP Lenders Should be Deemed Good Faith Lenders under Section 364(e)**

49.     Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal.  Section 364(e) provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

50.     As explained in detail herein, the DIP Loan Agreement and other Loan Documents are the result of the Debtors' reasonable and informed determination that the Lenders offered the most favorable terms on which to obtain needed postpetition financing, and of

extended arm's-length, good faith negotiations between the Debtors and the Lenders. The terms and conditions of the DIP Loan Agreement and other Loan Documents are fair and reasonable, and the proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code. Further, no consideration is being provided to any party to the DIP Loan Agreement other than as described herein. Accordingly, the Court should find that the DIP Lenders are "good faith" lenders within the meaning of section 364(e) of the Bankruptcy Code, and are entitled to all of the protections afforded by that section.

### F.    Modification of the Automatic Stay is Warranted for the Lender

51.    The Interim Order provides that the automatic stay provisions under section 362 of the Bankruptcy Code are vacated and modified to the extent necessary to permit the Lenders to exercise, upon the occurrence and during the continuation of any Event of Default, all rights and remedies provided for in the DIP Facility, and to take various actions without further order of or application to the Court. The Interim Order also proposes that the Lenders must provide the Debtors, any committee and the U.S. Trustee with five (5) business days' written notice prior to exercising any enforcement rights or remedies in the Event of Default.

52.    Stay modification provisions of this sort are ordinary features of DIP financing and, in the Debtors' business judgment, are reasonable under the circumstances. *See, e.g., In re James River Coal Company*, Case No. 14-31848 (KRK) (Bankr. E.D. Va. May 9, 2014); *In re AMF Bowling Worldwide, Inc.*, Case No. 12-36495 (KRH) (Bankr. E.D. Va. Dec. 18, 2012); *In re Roomstore, Inc.*, Case No. 11-37790 (KLP) (Bankr. E.D. Va. Jan. 5, 2012); *In re Canal Corp. f/k/a Chesapeake Corp.*, Case No. 08-36642 (DOT) (Bankr. E.D. Va. Feb. 3, 2009); *In re Circuit City Stores, Inc.*, Case No. 08-35653 (KRH) (Bankr. E.D. Va. Dec. 23, 2008); *In re Patriot Coal Corp.*, Case No. 12-12900 (SCC) (Bankr. S.D.N.Y. Aug. 3, 2012); *In re The Great Atl. & Pac.*

*Tea Co.*, Case No. 10-24549 (RDD) (Bankr. S.D.N.Y. Jan. 11, 2011); *In re Eastman Kodak Co.*,

Case No. 12-10202 (ALG) (Bankr. S.D.N.Y. Feb. 16, 2012).

**G.    The Debtors Require Immediate Access to the DIP Financing Facility**

53.    The Court may grant interim relief in respect of a motion filed pursuant to section

363(c) or 364 of the Bankruptcy Code where, as here, interim relief is "necessary to avoid

immediate and irreparable harm to the estate pending a final hearing."  Fed. R. Bankr. P.

4001(b)(2), (c)(2).  In examining requests for interim relief under this rule, courts generally

apply the same business judgment standard applicable to other business decisions.  *See Ames*

*Dep't Stores*, 115 B.R. at 36.

54.    The Debtors and their estates will suffer immediate and irreparable harm if the

interim relief requested herein, including authorizing the Debtors to borrow up to $7.5 million

under the DIP Facility plus the Refinancing, is not granted promptly after the Petition Date.  The

Debtors have insufficient cash to meet their debt obligations and fund operations without

immediate access to the DIP Facility.  Further, the Debtors anticipate that the commencement of

these cases will significantly and immediately increase the demands on their free cash as a result

of, among other things, the costs of administering these cases and addressing key constituents'

concerns regarding the Debtors' financial health and ability to continue operations in light of

these cases.  Accordingly, the Debtors have an immediate need for access to liquidity to, among

other things, continue the operation of their businesses, maintain their relationships with

customers, meet payroll, pay capital expenditures, procure goods and services from vendors and

suppliers and otherwise satisfy their working capital and operational needs, all of which is

required to preserve and maintain the Debtors' enterprise value for the benefit of all parties in

interest.

55.    The importance of a debtor's ability to secure postpetition financing to prevent immediate and irreparable harm to its estate has been repeatedly recognized by Bankruptcy Courts in Virginia and elsewhere in similar circumstances.  *See, e.g.*, *In re Va. United Methodist Homes of Williamsburg, Inc.*, Case No. 13-31098 (KRH) (Bankr. E.D. Va. Mar. 6, 2013) (order approving postpetition financing on an interim basis); *In re AMF Bowling Worldwide, Inc.*, Case No. 12-36495 (KRH) (Bankr. E.D. Va. Nov. 14, 2012) (same); *In re Roomstore, Inc.*, Case No. 11-37790 (KLP) (Bankr. E.D. Va. Dec. 14, 2011) (same); *In re Bear Island Paper Co., L.L.C.*, Case No. 10-31202 (DOT) (Bankr. E.D. Va. Feb. 26, 2010) (same); *In re Canal Corp. f/k/a Chesapeake Corp.*, Case No. 08-36642 (DOT) (Bankr. E.D. Va. Bankr. Dec. 30, 2008) (same); *In re Circuit City Stores, Inc.*, Case No. 08-35653 (KRH) (Bankr. E.D. Va. Nov. 10, 2008) (same); *In re Patriot Coal Corp.*, Case No. 12-12900 (ALG) (Bankr. S.D.N.Y. July 11, 2012); *In re Eastman Kodak Co.*, Case No. 12-10202 (ALG) (Bankr. S.D.N.Y. Jan. 20, 2012) (same); *In re Lyondell Chem. Co.*, Case No. 09-10023 (REG) (Bankr. S.D.N.Y. Jan. 8, 2009) (same).

56.    Accordingly, for the reasons set forth above, prompt entry of the Interim Order is necessary to avert immediate and irreparable harm to the Debtors' estates and is consistent with, and warranted under, Bankruptcy Rules 4001(b)(2) and (c)(2).

**H.    Request for Final Hearing**

57.    Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date that is no longer than 30 days from the entry of the Interim Order as a final hearing for consideration of entry of the Final Order.

58.    The Debtors request that they be authorized to serve a copy of the signed Interim Order, which fixes the time and date for the filing of objections, if any, by first class mail upon

the Notice Parties listed below.  The Debtors further request that the Court consider such notice

of the Final Hearing to be sufficient notice under Bankruptcy Rule 4001(c)(2).

## VI.    Request for Waiver of Stay

59.    To implement the foregoing successfully, the Debtors seek a waiver of the notice

requirements under Bankruptcy Rule 6004(a) and the 14-day stay of an order authorizing the use,

sale or lease of property under Bankruptcy Rule 6004(h).

## VII.    Notice

60.    The Debtors have provided copies of this Motion to (a) the Clerk's Office; (b) the

U.S. Trustee; (c) the attorneys for the administrative agent for the Debtors' proposed postpetition

lenders; (d) all known creditors holding secured claims against the Debtors' estates; (e) those

creditors holding the 30 largest unsecured claims against the Debtors' estates on a consolidated

basis; (f) the Internal Revenue Service; (g) the Canadian Revenue Agency; (h) the Securities and

Exchange Commission; (i) the Ontario Securities Commission; and (j) the United States

Environmental Protection Agency.

## VIII.    No Previous Request

61.    No previous request for the relief sought herein has been made by the Debtors to

this or any other court.

WHEREFORE, the Debtors respectfully request that the Court grant the relief requested herein and such other and further relief as is just and proper.

DATED: April 6, 2015

Respectfully submitted,

/s/ Henry P. (Toby) Long, III

Tyler P. Brown (VSB No. 28072)
Henry P. (Toby) Long, III (VSB No. 75134)
Justin F. Paget (VSB No.77979)
HUNTON & WILLIAMS LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia 23219
Telephone:  (804) 788-8200
Facsimile:    (804) 788-8218
Email:  tpbrown@hunton.com
        hlong@hunton.com
        jpaget@hunton.com

*Proposed Counsel to the Debtors*
*and Debtors in Possession*

# SCHEDULE 1

## (Debtor Entities)

| | | | | |
|---|---|---|---|---|
| 1. | Xinergy Ltd. (3697) | 14. | Whitewater Contracting, LLC (7740) |
| 2. | Xinergy Corp. (3865) | 15. | Whitewater Resources, LLC (9929) |
| 3. | Xinergy Finance (US), Inc. (5692) | 16. | Shenandoah Energy, LLC (6770) |
| 4. | Pinnacle Insurance Group LLC (6851) | 17. | High MAF, LLC (5418) |
| 5. | Xinergy of West Virginia, Inc. (2401) | 18. | Wise Loading Services, LLC (_____) |
| 6. | Xinergy Straight Creek, Inc. (0071) | 19. | Strata Fuels, LLC (1559) |
| 7. | Xinergy Sales, Inc. (8180) | 20. | True Energy, LLC (2894) |
| 8. | Xinergy Land, Inc. (8121) | 21. | Raven Crest Mining, LLC (0122) |
| 9. | Middle Fork Mining, Inc. (1593) | 22. | Brier Creek Coal Company, LLC (9999) |
| 10. | Big Run Mining, Inc. (1585) | 23. | Bull Creek Processing Company, LLC (0894) |
| 11. | Xinergy of Virginia, Inc. (8046) | 24. | Raven Crest Minerals, LLC (7746) |
| 12. | South Fork Coal Company, LLC  (3113) | 25. | Raven Crest Leasing, LLC (7844) |
| 13. | Sewell Mountain Coal Co., LLC (9737) | 26. | Raven Crest Contracting, LLC (7796) |

## **Exhibit A**

Interim Order

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA

```
-------------------------------------------------------- x
                                              :   Chapter 11
In re:                                        :
                                              :   Case No. 15-_____ (_____)
XINERGY LTD., et al.,                         :
                                              :   (Joint Administration Requested)
        Debtors.¹                             :
                                              :
-------------------------------------------------------- x
```

**INTERIM ORDER (I) AUTHORIZING DEBTORS (A) TO OBTAIN POSTPETITION FINANCING PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) AND 364(e) AND (B) TO UTILIZE CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363, (II) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES PURSUANT TO 11 U.S.C. §§ 361, 362, 363 AND 364 AND (III) SCHEDULING FINAL HEARING PURSUANT TO BANKRUPTCY RULES 4001(b) AND (c)**

Upon the motion (the "Motion"), dated April [6], 2015 (the "Petition Date"), of

the above-captioned debtors and debtors in possession (each, a "Debtor" and collectively, the

"Debtors") in the above-captioned chapter 11 cases (the "Cases" or "Chapter 11 Cases"),

pursuant to sections 105, 361, 362, 363 and 364 of title 11 of the United States Code, 11 U.S.C.

§§ 101 et seq. (as amended, the "Bankruptcy Code"), Rules 4001 and 9014 of the Federal Rules

of Bankruptcy Procedure (as amended, the "Bankruptcy Rules"), seeking, among other things:

(I)        authorization for Debtor Xinergy Corp. (the "Borrower") to obtain

postpetition financing consisting of a senior secured non-amortizing new money term

loan credit facility up to an aggregate principal amount of $40,000,000 (the "DIP

Facility" and together with all agreements, documents, guarantees, certificates and

instruments delivered or executed from time to time in connection therewith, as hereafter

---

[1]    The Debtors, along with the last four digits of each Debtor's federal tax identification number, are listed on Schedule 1 attached to the Motion.

amended, restated, amended and restated, supplemented, or otherwise modified from time

to time in accordance with the terms thereof and hereof, collectively, the "DIP

Documents") by and among the Borrower, guarantors party thereto and other credit

parties signatories thereto, WBOX 2014-4 Ltd., as administrative agent (in such capacity,

the "DIP Agent"), for and on behalf of itself and the other lenders thereto from time to

time (initially, the "Initial DIP Lenders" and, following the post-closing assignments

described herein, the "DIP Lenders");

     (II)    authorization for Xinergy Ltd., an Ontario corporation that is the parent of

the Borrower (the "Parent"), and any and all of the Borrower's and Parent's current,

direct or indirect subsidiaries (other than the Borrower) (collectively with the Parent, the

"Guarantors") to unconditionally guarantee on a joint and several basis all obligations

arising under the DIP Facility;

     (III)    authorization for the Debtors to execute and deliver the DIP Documents

and to perform such other and further acts as may be necessary or appropriate in

connection therewith;

     (IV)    authorization for the Debtors to immediately use proceeds of the DIP

Facility upon entry of this interim order (the "Interim Order" or the "Order"), to (a) pay

in full the Prepetition Term Loan Debt (as defined below), including any interest, fees,

expenses and other charges accrued through the date of payment, and, upon such

payment, receive the simultaneous release and termination of the liens, claims and

encumbrances of the Prepetition Lenders (as defined below) in accordance with this

Interim Order (the "Refinancing"), and (b) provide working capital to the Debtors and

pay fees and expenses in connection with the Cases;

2

(V)      authorization for the Debtors to (i) use the Cash Collateral (as defined

below) pursuant to sections 361, 362 and 363 of the Bankruptcy Code, in each case in

accordance with the relative priorities set forth more fully below, but subject in all

respects to the Carve-Out (as defined below), and (ii) provide adequate protection on the

terms set forth in this Interim Order to the Prepetition Lenders (as defined below) until

the consummation of the Refinancing and expiration of the Challenge Period (as defined

below) with no challenge having been brought or, if such a challenge is brought, upon the

entry of a final judgment resolving such challenge in favor of the Prepetition Lenders,

and Prepetition Secured Noteholders (as defined below) whose liens and security

interests are being primed by the DIP Facility;

(VI)      authorization for the DIP Agent, as applicable, to terminate the applicable

DIP Documents upon the occurrence and continuance of an Event of Default (as defined

therein);

(VII)    subject to the terms of this Order, authorization to grant first priority

superpriority claims to the DIP Lenders and first priority liens in favor of the DIP Agent

(for the benefit of the DIP Lenders) on all prepetition and postpetition property of the

Debtors' estates and all proceeds thereof (but excluding a lien on Avoidance Actions (as

defined below) and, prior to entry of the Final Order (as defined below), any Avoidance

Proceeds (as defined below)), subject to the Carve-Out (as defined below) and the terms

of this Order;

(VIII)   subject to and only effective upon the entry of a Final Order (as defined

below) granting such relief, the waiver by the Debtors of any right to surcharge against

3

the DIP Collateral or Prepetition Collateral (as each are defined below) pursuant to section 506(c) of the Bankruptcy Code or otherwise;

(IX)    modification of the automatic stay set forth in section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms of the DIP Documents and this Interim Order;

(X)    a waiver of any applicable stay with respect to the effectiveness and enforceability of this Interim Order (including under Bankruptcy Rule 6004); and

(XI)    pursuant to Bankruptcy Rule 4001(c)(2), requesting an Interim Hearing on the Motion be held before this Court to consider entry of this Interim Order (a) authorizing the Borrower, on an interim basis, to borrow from the DIP Lenders under the DIP Documents up to an aggregate principal or face amount not to exceed $7.5 million plus the amount necessary to consummate the Refinancing to (w) fund the operational and working capital needs of the Debtors, (x) pay the fees, costs and expenses incurred by the Debtors in connection with these Cases, (y) consummate the Refinancing and execute any documents related thereto and (z) pay the fees, costs and expenses incurred in connection with the foregoing, (b) authorizing the Debtors' use of Cash Collateral pursuant to the terms of this Interim Order, and (c) granting the liens, superpriority claims and adequate protection described herein; and

(XII)    the scheduling of a final hearing (the "Final Hearing") to consider entry of a final order (the "Final Order") approving the Motion and approving the Debtors' notice with respect thereto.

The Interim Hearing having been held by this Court on April 7, 2015, pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), and upon the record made by the Debtors at the

Interim Hearing and after due deliberation and consideration and sufficient cause appearing

therefor;

**IT IS FOUND, DETERMINED, ORDERED AND ADJUDGED**, that:

1.      <u>Jurisdiction</u>.  This Court has core jurisdiction over these Cases, this

Motion, and the parties and property affected hereby under 28 U.S.C. §§ 157(b) and 1334.

Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      <u>Notice</u>.  The notice given by the Debtors of the Motion and the Interim

Hearing was, in the Debtors' belief, the best available under the circumstances and included

service upon (a) the United States Trustee for the Western District of Virginia; (b) counsel to the

agent for the Debtors' Prepetition Lenders; (c) counsel to the Debtors' postpetition lenders;

(d) counsel to the Prepetition Indenture Trustee (as defined below); (e) counsel to the ad hoc

group of the Debtors' Prepetition Secured Noteholders (as defined below); (f) counsel to Wells

Fargo Bank, National Association as collateral trustee; (g) the United States Securities and

Exchange Commission; (h) the Canadian Revenue Agency; (i) the Ontario Securities

Commission; (j) the Internal Revenue Service; (k) the Office of the United States Attorney for

the Western District of Virginia; (l) the parties included on the Debtors' consolidated list of

thirty (30) largest unsecured creditors; and (m) all other known parties asserting a lien against the

Debtors' assets.  Such notice constitutes due and sufficient notice under the circumstances and

complies with Bankruptcy Rules 4001(b) and (c) and applicable local rules.  No further notice of

the relief sought at the Interim Hearing is necessary or required.

3.      <u>Creditors' Committee Formation</u>.  No statutory committee of unsecured

creditors has yet been appointed in the Chapter 11 Cases (the "<u>Creditors Committee</u>").

Case 15-70444   Doc 22   Filed 04/07/15   Entered 04/07/15 01:00:10   Desc Main
Document     Page 37 of 255

4.     <u>Debtors' Stipulations</u>.  Without prejudice to the rights of any other party-in-interest (but subject to the limitations thereon contained in paragraph 25 below) the Debtors admit, stipulate and agree that:

(a)     <u>The Prepetition Credit Agreement.</u>

(i)     Xinergy, as borrower, Xinergy Ltd., as parent, other guarantors party thereto and the lenders party thereto (the "<u>Prepetition Lenders</u>") are parties to that certain Credit Agreement dated as of December 21, 2012 (as amended, supplemented or otherwise modified from time to time, the "<u>Prepetition Credit Agreement</u>", and together with all agreements, documents, certificates and instruments, including, without limitation the Prepetition Collateral Trust Agreement (as defined below) delivered or executed from time to time in connection therewith, as amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof, collectively, the "<u>Prepetition Term Loan Documents</u>"), pursuant to which the Prepetition Lenders made term loans available to the Prepetition Borrower (the "<u>Prepetition Loans</u>").

(ii)     As of the Petition Date, the outstanding aggregate principal amount due under the Prepetition Credit Agreement was $20,000,000 (together with all other outstanding Obligations, as defined in the Prepetition Credit Agreement, including prepetition and postpetition interest, fees, expenses and other charges, the "<u>Prepetition Term Loan Debt</u>").

(iii)     To secure the Prepetition Term Loan Debt, the Debtors entered into various security agreements and other collateral documents, pursuant to which they granted to the Prepetition Lenders, valid, binding, perfected, first-priority liens and security interests (the "<u>Prepetition Term Loan Liens</u>") in substantially all of their assets, including, among other things, as the following terms are defined in the Prepetition Term Loan Documents: (a) Accounts;

(b) Chattel Paper; (c) Documents; (d) Fixtures; (e) General Intangibles (or "intangible" under any applicable Canadian PPSL); (f) Goods (including, without limitation, Inventory, Equipment and As-Extracted Collateral); (g) Instruments; (h) Insurance; (i) Intellectual Property; (j) Investment Related Property (including, without limitation, Deposit Accounts); (k) Letter-of-Credit Rights; (l) Money; (m) Receivables and Receivables Records; (n) Commercial Tort Claims; (o) to the extent not otherwise included in the foregoing, all coal and other minerals severed or extracted from the ground (including all severed or extracted coal purchased, acquired or obtained from other Persons), and all Accounts, General Intangibles an Products and Proceeds thereof or related thereto, regardless of whether any such coal or other minerals are in raw form or processed for sale and regardless of whether or not the Company or any Grantor had an interest in the coal or other minerals before extraction or severance; (p) to the extent not otherwise included above, all other personal property of any kind and all Collateral Records, Collateral Support and Supporting Obligations relating to any of the foregoing; and (q) to the extent not otherwise included above, all Proceeds, products, accessions, rents and profits of or in respect of any of the foregoing (collectively, the "Prepetition Term Loan Collateral").

(b)    The Prepetition Secured Notes.

(i)    Pursuant to that certain indenture, dated as of May 6, 2011 (as heretofore supplemented from time to time, the "Prepetition Indenture") by and among Xinergy Corp., as issuer, the guarantors listed therein and Wells Fargo Bank, National Association, as collateral trustee (in such capacity, the "Prepetition Indenture Trustee"), Xinergy Corp. issued 9.25% senior secured notes due 2019 (the "Prepetition Secured Notes", and holders thereof, the "Prepetition Secured Noteholders", and together with the Prepetition Lenders and the Prepetition Indenture Trustee, collectively, the "Prepetition Secured Parties").

(ii)    As of the Petition Date, the outstanding aggregate principal amount of Prepetition Secured Notes issued under the Prepetition Indenture was $195,000,000 (together with all other outstanding Obligations, as defined in the Indenture, including interest, fees, expenses and other charges, the "Prepetition Secured Notes Debt", and together with the Prepetition Term Loan Debt, collectively, the "Prepetition Debt").

(iii)    To secure the Prepetition Secured Notes Debt, the Debtors and Prepetition Indenture Trustee entered into that collateral trust agreement, dated as of May 6, 2011 (the "Prepetition Collateral Trust Agreement," and together with the Indenture and all agreements, documents, certificates and instruments delivered or executed from time to time in connection therewith, as hereafter amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof and hereof, collectively, the "Prepetition Secured Notes Documents," and together with the Prepetition Term Loan Documents, the "Prepetition Documents"), pursuant to which the Debtors granted to the Prepetition Indenture Trustee, for the benefit of itself and the Prepetition Secured Noteholders, valid, binding, perfected, second-priority liens and security interests (the "Prepetition Notes Liens," and together with the Prepetition Term Loan Liens, the "Prepetition Liens") in all property and assets of the issuer and guarantors under the Indenture, except for Excluded Assets (as defined in the Prepetition Secured Notes Documents), subject and subordinate to the Prepetition Term Loan Collateral (the "Prepetition Notes Collateral," and together with Prepetition Term Loan Collateral, the "Prepetition Collateral").

(c)    The Prepetition Liens are valid, binding, enforceable, non-avoidable and perfected liens and the Prepetition Debt constitutes the legal, valid, binding, enforceable and non-avoidable obligations of the applicable borrowers and guarantors, enforceable against

them in accordance with their respective terms (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code), and no portion of the Prepetition Liens or Prepetition Debt is subject to any challenge or defense, including avoidance, reduction, offset, attachment, disallowance, disgorgement, recharacterization, surcharge, recovery or subordination pursuant to the Bankruptcy Code or applicable nonbankruptcy law.

(d)    the Prepetition Debt and the Prepetition Collateral are not and shall not be subject to any attachment, contest, attack, rejection, recoupment, reduction, defense, counterclaim, setoff, offset, recharacterization, avoidance or other claim (as "claim" is defined by section 101(5) of the Bankruptcy Code), impairment, disallowance, counterclaim, subordination (whether equitable, contractual, or otherwise, except for any lien subordination under the Prepetition Collateral Trust Agreement contemplated herein), cause of action or any other challenge of any nature under the Bankruptcy Code (including, without limitation, under chapter 5 of the Bankruptcy Code), under applicable nonbankruptcy law or otherwise (including, without limitation, any applicable state Uniform Fraudulent Transfer Act or Uniform Fraudulent Conveyance Act);

(e)    subject to the reservation of rights set forth in paragraph 25 below, including the expiration of the Challenge Period, the Debtors and their estates hereby absolutely and unconditionally forever waive, discharge and release each of the Prepetition Lenders, the Prepetition Indenture Trustee and the Prepetition Secured Noteholders and each of their respective present and former predecessors, successors, assigns, affiliates, members, partners, managers, current and former equity holders, agents, attorneys, financial advisors, consultants, officers, directors, employees and other representatives thereof (all of the foregoing, solely in their respective capacities as such, collectively, the "Prepetition Secured

9

Party Releasees") of any and all "claims" (as defined in the Bankruptcy Code), counterclaims,

actions, causes of action (including, without limitation, causes of action in the nature of "lender

liability"), defenses, demands, debts, accounts, contracts, liabilities, setoff, recoupment or other

offset rights against any and all of the Prepetition Secured Party Releasees, whether arising at

law or in equity, relating to and/or otherwise in connection with the applicable Prepetition

Debt, the Prepetition Liens, Prepetition Collateral or the debtor-creditor relationship among

any of the applicable Prepetition Lenders, Prepetition Indenture Trustee or the Prepetition

Secured Noteholders, on the one hand, and the Debtors, on the other hand, from the beginning

of time until immediately preceding the entry of this Interim Order, including, without

limitation, (i) any recharacterization, subordination, avoidance or other claim arising under or

pursuant to section 105 or chapter 5 of the Bankruptcy Code or under any other similar

provisions of applicable state law, federal law or municipal law and (ii) any right or basis to

challenge or object to the amount, validity or enforceability of the applicable Prepetition Debt

or any payments made on account of the applicable Prepetition Debt, or the validity,

enforceability, priority or non-avoidability of the applicable Prepetition Liens or the Prepetition

Collateral securing the applicable Prepetition Debt.

      (f)    effective upon entry of this Interim Order, the Debtors and their estates

hereby absolutely and unconditionally forever waive, discharge and release each of the DIP

Agent and the DIP Lenders and each of their respective present and former predecessors,

successors, assigns, affiliates, members, partners, managers, current and former equity holders,

agents, attorneys, financial advisors, consultants, officers, directors, employees and other

representatives thereof (all of the foregoing, solely in their respective capacities as such,

collectively, the "DIP Party Releasees") of any and all "claims" (as defined in the Bankruptcy

Code), counterclaims, actions, causes of action (including, without limitation, causes of action in the nature of "lender liability"), defenses, demands, debts, accounts, contracts, liabilities, setoff, recoupment or other offset rights against any and all of the DIP Party Releasees, whether arising at law or in equity, relating to and/or otherwise in connection with the applicable DIP Obligations, DIP Liens, DIP Collateral or the debtor-creditor relationship among any of the DIP Agent or DIP Lenders, on the one hand, and any of the Debtors, on the other hand, from the beginning of time until immediately preceding the entry of this Interim Order, including, without limitation, (i) any recharacterization, subordination, avoidance or other claim arising under or pursuant to section 105 or chapter 5 of the Bankruptcy Code or under any other similar provisions of applicable state law, federal law or municipal law and (ii) any right or basis to challenge or object to the amount, validity or enforceability of the applicable DIP Obligations or any payments made on account of the applicable DIP Obligations, or the validity, enforceability, priority or non-avoidability of the applicable DIP Liens securing the applicable DIP Obligations; provided that, nothing herein shall relieve the DIP Party Releasees from fulfilling their obligations or commitments under the DIP Facility or operate as a release related thereto.

5.      Cash Collateral.  For purposes of this Interim Order, the term "Cash Collateral," including, without limitation, all cash proceeds of Prepetition Collateral, shall have the meaning ascribed to it in section 363(a) of the Bankruptcy Code.

6.      Use of Cash Collateral.  The Debtors are hereby authorized, subject to the terms and conditions of the DIP Documents, this Interim Order, the Prepetition Collateral Trust Agreement and in accordance with the Budget (as defined below), to use the Cash Collateral, during the period from the Petition Date through termination of the DIP Obligations pursuant to

the DIP Documents, solely for working capital and general corporate purposes. The Debtors'

right to use the Cash Collateral shall terminate automatically on the earlier of: (i) the Maturity

Date, as defined in the DIP Documents; and (ii) the occurrence of an Event of Default under any

DIP Documents, pursuant to which the DIP Agent provides the Debtors, with a copy to the

Debtors' counsel, five (5) days' prior written notice (which shall run concurrently with any

notice provided under the applicable DIP Documents).

       7.    <u>Findings Regarding the Financing and Use of Cash Collateral</u>.

    (a)   Good cause has been shown for the entry of this Interim Order.

    (b)   The Debtors have an immediate need to obtain the financing provided

under the DIP Facility and to use the Cash Collateral to, among other things, permit the orderly

continuation of their businesses, preserve their going concern value, maintain business

relationships with vendors, suppliers and customers, satisfy payroll obligations, consummate

the Refinancing, make capital expenditures, pay for certain costs and expenses related to the

Debtors' Chapter 11 Cases, and satisfy the Debtors' other working capital and operational

needs. The access of the Debtors to sufficient working capital and liquidity made available

through the DIP Facility and the use of Cash Collateral and other financial accommodations

under the DIP Facility and hereunder is vital to the preservation and maintenance of the

Debtors' going concern value and to the Debtors' successful reorganization.

    (c)   The Debtors are unable to obtain sufficient financing on more favorable

terms from sources other than the DIP Lenders under the DIP Documents and are unable to

obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as

an administrative expense. The Debtors are also unable to obtain secured credit allowable

solely under sections 364(c)(1), 364(c)(2) and 364(c)(3) of the Bankruptcy Code.

(d)     The DIP Agent and the DIP Lenders are willing to provide the DIP Facility, subject to the terms and conditions set forth in the DIP Documents and the provisions of this Order, as applicable, and provided that the DIP Liens, the Superpriority Claims and other protections granted by this Order and the DIP Documents will not be affected by any subsequent reversal or modification of this Order or any other order, as provided in section 364(e) of the Bankruptcy Code, which is applicable to the DIP Facility approved by this Order. The DIP Agent and the DIP Lenders have acted in good faith in agreeing to provide the DIP Facility approved by this Order and to be further evidenced by the DIP Documents and their reliance on the assurances referred to above is in good faith.

(e)     Among other things, entry of this Order will minimize disruption of the Debtors' businesses and operations by enabling them to meet payroll and other critical expenses, including vendor and professional fees.  The DIP Facility as set forth herein is vital to avoid immediate and irreparable loss or harm to the Debtors' estates, which will otherwise occur if immediate access to the DIP Facility is not obtained.  Consummation of the DIP Facility pursuant to the terms of this Order therefore is in the best interests of the Debtors' estates.

(f)     The DIP Documents and the DIP Facility contemplated thereunder, each as authorized hereunder, have been negotiated in good faith and at arm's length among the Debtors, the DIP Agent and the DIP Lenders, and the terms of the DIP Facility are fair and reasonable under the circumstances, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties and are supported by reasonably equivalent value and fair consideration.  All of the Debtors' obligations and indebtedness arising under, in respect of or in connection with the DIP Facility and the DIP Documents, including the Obligations (as

13

defined in the DIP Documents, collectively, the "DIP Obligations"), shall be deemed to have been extended by the DIP Agent and the DIP Lenders and their affiliates in good faith, as that term is used in section 364(e) of the Bankruptcy Code, and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code, and shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Order or any provision hereof is vacated, reversed or modified on appeal or otherwise.

(g)    The majority of the Prepetition Secured Noteholders have consented to the priming of their Prepetition Notes Liens by the DIP Liens in exchange for adequate protection of their interest in the Prepetition Collateral as set forth in this Order and have consented to the Refinancing.

(h)    The Debtors have requested immediate entry of this Order pursuant to Bankruptcy Rules 4001(b)(2) and (c)(2).  The permission granted herein on an interim basis to enter into the DIP Documents and to borrow up to an aggregate principal amount of $7.5 million plus the amount necessary to consummate the Refinancing is necessary to avoid immediate and irreparable harm to the Debtors and their estates.  This Court concludes that entry of this Order is in the best interests of the Debtors and their estates and creditors as its implementation will, among other things, allow the Debtors to facilitate their chapter 11 goals and maximize the value of their assets.

(i)    Based upon the record before the Bankruptcy Court, the terms of the use of Cash Collateral and the adequate protection granted in this Interim Order have been negotiated at arms' length and in good faith, as that term is used in section 364(e) of the Bankruptcy Code, and are in the best interests of the Debtors, their estates and creditors and are consistent with the Debtors' fiduciary duties.

8.    <u>Authorization of the Financing and the DIP Documents</u>.

(a)    The Borrower is hereby authorized to borrow money pursuant to the DIP Facility, and the guarantors under the DIP Facility are hereby authorized to guarantee such borrowings and the Borrower's obligations with respect to such borrowings, up to an aggregate principal amount of $7.5 million plus the amount necessary to consummate the Refinancing (plus interest, fees, amounts paid-in-kind, prepayment premiums, original issue discount, expenses (including professional fees and expenses whether incurred pre- or post-petition) and other amounts, in each case, as provided for in the DIP Documents) under the DIP Facility, in accordance with the terms of this Interim Order and the DIP Documents, which borrowings shall be used for all purposes permitted under the DIP Documents, including, without limitation, to consummate the Refinancing, to provide working capital for the Debtors and to pay interest, fees and expenses (including, the DIP Agent's and DIP Lenders' professional fees and expenses whether incurred pre- or post-petition) in accordance with this Interim Order and the DIP Documents.

(b)    The Debtors are hereby authorized and directed to execute, issue, deliver, enter into and adopt, as the case may be, the DIP Documents to be delivered pursuant hereto or thereto or in connection herewith or therewith, including, without limitation, the Budget (as defined herein) .

(c)    In furtherance of the foregoing and without further approval of this Court, each Debtor is authorized and directed to perform all acts, to make, execute and deliver all instruments and documents (including, without limitation, the execution or recordation of security agreements, mortgages and financing statements), and, without further application to the Court, to pay all fees referred to in this Interim Order and in the DIP Documents including,

15

without limitation, the reasonable fees and out-of-pocket expenses of the professionals of the DIP Agent and the DIP Lenders (whether incurred pre-or post-petition).

(d)    The Debtors are further hereby authorized to execute, deliver and perform one or more amendments, waivers, consents or other modifications to and under the DIP Documents, in such form as the Debtors and the DIP Agent may agree, and no further approval of the Bankruptcy Court shall be required for amendments, waivers, consents or other modifications to and under the DIP Documents (and any reasonable fees paid in connection therewith) that do not (A) shorten the maturity or the scheduled termination date thereunder, or (B) increase the commitments or the rate of interest (other than invoking the default rate upon an Event of Default) payable thereunder.

(e)    The Debtors are further hereby authorized and directed to (i) make the non-refundable payment to the DIP Agent or the DIP Lenders, as the case may be, of any fees and other amounts due, including any reimbursement of indemnified obligations referred to in the DIP Documents (and in any separate letter agreements between such applicable parties and the Debtors in connection with the DIP Facility) and reasonable costs and expenses as may be due from time to time, including, without limitation, the reasonable fees and expenses of the professionals retained as provided for in the DIP Documents (whether incurred pre-or post-petition), without the need to file retention motions or fee applications; (ii) perform all other acts required under or in connection with the DIP Documents, including the granting and perfection of the DIP Liens and the Superpriority Claims as permitted herein and therein; and (iii) cause the execution and delivery of and performance under the DIP Facility's guarantees.

(f)    Upon execution and delivery of the DIP Documents, the DIP Documents shall constitute valid and binding obligations of the Debtors, enforceable against each Debtor

16

party thereto in accordance with their terms.  No obligation, payment, transfer or grant of a

security or other interest under the DIP Documents or this Order shall be stayed, restrained,

voidable, or recoverable under the Bankruptcy Code or any applicable law (including, without

limitation, under section 502(d) of the Bankruptcy Code), or subject to any defense, reduction,

set-off, recoupment or counterclaim.

   (g) The Debtors' borrowings from the DIP Lenders under the DIP Facility and

this Order will be used in a manner consistent with the terms and conditions of the applicable

DIP Documents and only in express accordance with and to the extent set forth in the Budget

(as defined below), solely (a) to consummate the Refinancing, whereupon the Prepetition Term

Loan Liens shall be released and terminated except that (i) unless otherwise ordered by the

Court, if any Prepetition Term Loan Debt is subsequently reinstated after the payment thereof

because such payment (or any portion thereof) is required to be returned or repaid to the

Debtors or the DIP Lenders then such Prepetition Term Loan Liens shall be reinstated (unless

such Prepetition Term Loan Liens shall have been avoided) and (ii) such reinstated Prepetition

Term Loan Liens shall be junior and subordinate in all respects to the DIP Lenders' liens on

and security interests in the DIP Collateral (as defined below) (including, without limitation,

the DIP Liens (as defined below)) granted under this Interim Order and/or the DIP Documents

(such junior liens and security interests of the Prepetition Lenders are hereinafter referred to as

the "Contingent Liens", and any such reinstated Prepetition Term Loan Debt described in

clause (i) of this sentence is hereinafter referred to as the "Contingent Prepetition Debt"); and

(b) for working capital and other general corporate purposes and payment of fees and expenses

in connection with the Cases.  The Prepetition Lenders shall deliver or cause to be delivered, at

the Debtors' cost and expense, any termination statements, releases and/or assignments in

favor of the DIP Agent and the DIP Lenders or other documents, in each case as reasonably requested by the Debtors or the DIP Agent in order to effectuate and/or evidence the release and termination of the Prepetition Term Loan Liens.

(h)    In the event that the Prepetition Lenders (in their capacities as such) are ordered by the Bankruptcy Court to disgorge, refund or in any manner repay to the Debtors or their estates any amounts (the "Disgorged Amounts") leading to Contingent Prepetition Debt, the Disgorged Amounts, unless otherwise ordered by the Bankruptcy Court, shall be placed in a segregated interest bearing account in which the Prepetition Lenders shall have the first lien upon, pending a further final, non-appealable order of a court of competent jurisdiction regarding the distribution of such Disgorged Amounts (either returning the Disgorged Amounts to the Prepetition Lenders, distributing such amounts to the Debtors or otherwise); provided that, to the extent the Disgorged Amounts are returned to the Prepetition Lenders, they shall receive such amounts plus any interest accrued at the non-default rate set forth in the Prepetition Term Loan Documents.

(i)    (i) The proceeds from the DIP Loans shall not be loaned or advanced to, or invested in (in each case, directly or indirectly), any entity that is not a Debtor, (ii) the proceeds from the DIP Facility loaned or advanced to, or invested in, any non-Borrower Debtor shall be evidenced by an intercompany note, in form and substance reasonably satisfactory to the DIP Agent, for the full amount of the proceeds so loaned, advanced or invested, (iii) such intercompany note shall be pledged to the DIP Agent for the benefit of the DIP Lenders, to secure the applicable DIP Obligations (as defined herein), and (iv) all intercompany liens of the Debtors, if any, will be contractually subordinated to the liens securing the DIP Facility on terms satisfactory to the DIP Agent.

(j)    In no event shall the DIP Lenders or the Prepetition Secured Parties be subject to the equitable doctrine of "marshalling" or any similar doctrine with respect to the DIP Collateral or the Prepetition Collateral, as applicable.

(k)    Following the date of this Order and prior to the entry of the Final Order, the Initial DIP Lenders shall, through secondary market assignments, provide certain qualified holders of the Prepetition Secured Notes (including the Initial DIP Lenders) with an opportunity to participate in the DIP Facility on a pro rata basis based on any such holder's holdings of Prepetition Secured Notes as of the Petition Date.  For the avoidance of doubt, (i) any portion of the DIP Facility that is not assigned pursuant to the foregoing shall be retained by the Initial DIP Lenders, and (ii) any assignee pursuant to the assignment process described herein shall be entitled to its pro rata share of commitment fees.

9.    <u>Superpriority Claims</u>.

(a)    Pursuant to section 364(c)(1) of the Bankruptcy Code, all of the DIP Obligations shall constitute allowed superpriority senior administrative expense claims against the Debtors with priority over any and all administrative expense claims, adequate protection claims and all other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expense claims of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 503(b), 506(c) (subject to entry of a Final Order), 507(a), 507(b), 726, 1113 or 1114 of the Bankruptcy Code (the "<u>Superpriority Claims</u>"), whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed claims shall be payable from and have recourse to all pre-petition and post-petition property of the Debtors and

their estates and all proceeds thereof, subject only to the payment of the Carve-Out (as defined

below) to the extent specifically provided for herein.  Any payments, distributions or other

proceeds received on account of such Superpriority Claims shall be promptly delivered to the

DIP Agent to be applied or further distributed by the DIP Agent on account of the applicable DIP

Obligations in such order as is specified in this Order and the applicable DIP Documents.  The

Superpriority Claims shall be entitled to the full protection of section 364(e) of the Bankruptcy

Code in the event that this Order or any provision hereof is vacated, reversed or modified, on

appeal or otherwise.

        (b)      For purposes hereof, the "Carve-Out" means (i) all fees required to be paid

to the Clerk of the Bankruptcy Court and to the U.S. Trustee under 28 U.S.C. § 1930(a) and 31

U.S.C. § 3717 (as to the U.S. Trustee, in such amount as agreed to by the U.S. Trustee or Order

of the Court); (ii) all reasonable fees and expenses incurred by a trustee appointed under section

701 of the Bankruptcy Code in an amount not to exceed $25,000; (iii) to the extent allowed at

any time, but subject in all respects to the Budget (as defined in below) and the terms of this

Order, all accrued and unpaid fees, disbursements, costs and expenses ("Professional Fees")

(other than any monthly fee, restructuring fee, sale fee or other success fee of any investment

bankers or financial advisors of the Debtors), incurred by professionals or professional firms

retained by the Debtors and the Creditors' Committee, if any, whose retention has been approved

by the Court during these Cases pursuant to sections 327 and 1103 of the Bankruptcy Code

(collectively, "Professional Persons"), at any time before or on the first business day following

delivery by any DIP Agent of a Carve Out Trigger Notice (as defined below), to the extent such

Professional Fees are allowed by the Bankruptcy Court whether prior to or after delivery of a

Carve Out Trigger Notice; and (iv) after the first business day following delivery by any DIP

Agent of the Carve Out Trigger Notice, to the extent allowed by the Bankruptcy Court, all

unpaid fees, disbursements, costs and expenses incurred by Professional Persons, in an aggregate

amount not to exceed $500,000 (the amount set forth in this clause (iv) being the "Carve-Out

Cap").  For purposes of the foregoing, the term "Carve-Out Trigger Notice" shall mean a written

notice delivered by the DIP Agent to the Debtors and their lead counsel, the U.S. Trustee,

counsel to the Prepetition Lenders, counsel to the Prepetition Indenture Trustee, counsel to the

Prepetition Secured Noteholders and lead counsel to the Creditors' Committee, if any, which

notice may be delivered following the occurrence and during the continuation of an Event of

Default under the applicable DIP Documents, expressly stating that the Carve-Out Cap is

invoked and the Event of Default that is alleged to have occurred and be continuing.  For the

avoidance of doubt and notwithstanding anything to the contrary herein or elsewhere, the Carve-

Out shall be senior to all DIP Obligations and liens securing the DIP Obligations.  Nothing

herein shall be construed to impair the ability of any party to object to the allowance by the Court

of any of the fees, expenses, reimbursement or compensation described in clauses (i), (ii), (iii)

and (iv) above.

       (c)     The DIP Agent and DIP Lenders shall not be responsible for the direct

payment or reimbursement of any fees or disbursements of any Professional Persons incurred in

connection with these Cases or any successor cases under any chapter of the Bankruptcy Code.

Nothing in this Order or otherwise shall be construed (i) to obligate the DIP Agent or the DIP

Lenders in any way to pay compensation to or to reimburse expenses of any Professional

Persons, or to guarantee that the Debtors have sufficient funds to pay such compensation or

reimbursement; (ii) to increase the Carve-Out if actual allowed Professional Fees are higher in

fact than reflected in the Budget (as defined below); or (iii) as consent to the allowance of any

professional fees or expenses of any Professional Persons.  Any funding of the Carve-Out shall

be added to and made a part of the DIP Obligations and secured by the Collateral and otherwise

entitled to the protections granted under this Interim Order, the DIP Documents, the Bankruptcy

Code and applicable law.  The DIP Agent's and DIP Lenders' liens and claims shall, however,

be subject to the Carve-Out as set forth in this Interim Order.

        10.    <u>DIP Liens</u>.

       As security for the DIP Obligations, effective and perfected upon the date of this Order

and without the necessity of the execution, recordation of filings by the Debtors of mortgages,

security agreements, control agreements, pledge agreements, financing statements or other

similar documents, or the possession or control by the DIP Agent or any DIP Lender of, or over,

any DIP Collateral, the security interests and liens identified below are hereby granted to the DIP

Agent for its own benefit and the respective benefit of the DIP Lenders (all property identified in

clauses (a), (b), (c), (d) and (e) below, together with all other property to which the DIP Agent is

granted a lien under the applicable DIP Documents (other than as expressly excluded pursuant to

this Order), being collectively referred to as the "<u>DIP Collateral</u>"), subject to (a) the terms of the

DIP Facility and (b) payment of the Carve-Out as provided herein (all such liens and security

interests granted to the DIP Agent, for its benefits and for the benefit of the DIP Lenders,

pursuant to this Order and the DIP Documents, the "<u>DIP Liens</u>").  Notwithstanding the

foregoing, any DIP Agent may take any action (and is, to the extent necessary in connection

therewith, hereby granted relief from the automatic stay), to evidence, confirm, validate or

perfect, or to ensure the contemplated priority of, such liens, and the Debtors shall execute and

deliver to the DIP Agent and the DIP Lenders all such financing statements, notices and other

documents as the DIP Agent or any DIP Lender may reasonably request in connection therewith

and shall deliver account control agreements or other documentation in respect of and evidencing

perfection of all collection and deposit accounts to the extent required by the DIP Documents.

(a)    First Lien on Unencumbered Property.  Pursuant to section 364(c)(2) of

the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first priority

senior (but subject to the priorities set forth in the DIP Documents) security interest in and lien

upon all pre- and postpetition tangible and intangible property of the Debtors and the Debtors'

estates, whether existing on the Petition Date or thereafter acquired, that, on or as of the

Petition Date is not subject to valid, perfected and non-avoidable liens (or to valid liens in

existence as of the Petition Date that are subsequently perfected as permitted by section 546(b)

of the Bankruptcy Code) (collectively, "Unencumbered Property"), including without

limitation, all inventory, accounts, accounts receivable, general intangibles (or "intangibles"

under any applicable Canadian PPSL), chattel paper, contracts, owned real estate, real and

personal property leaseholds, property, plants, fixtures, machinery, equipment, as-extracted

collateral, all coal and other minerals as extracted from the ground, vehicles, vessels, deposit

accounts, commercial tort claims, documents, equity interests, books and records, cash and

cash collateral of the Debtors (whether maintained with the DIP Agent or otherwise) and any

investment of such cash and cash collateral, letter of credit rights, patents, copyrights,

trademarks, trade names, rights under license agreements and other intellectual property and

stock of subsidiaries of the Debtors.

(b)    Priming Liens on Prepetition Collateral.  Pursuant to section 364(d)(1) of

the Bankruptcy Code, the DIP Agent, for the benefit of the DIP Lenders, shall have a valid,

binding, continuing, enforceable, fully-perfected first-priority senior priming lien on, and

security interest upon all pre- and post-petition property of the Debtors and any other obligors

23

or credit parties under the DIP Facility, including, without limitation, cash and cash collateral of the Debtors (whether maintained with the DIP Agent or otherwise), including Cash Collateral, and any investment of such cash and cash collateral, inventory, accounts receivable, letter of credit rights and other rights to payment whether arising before or after the Petition Date, contracts, properties, plants, equipment, vehicles, general intangibles, documents, instruments, interests in leaseholds, real properties, patents, copyrights, trademarks, trade names, other intellectual property, capital stock of subsidiaries and the proceeds, product, offspring of profits of all the foregoing), whether now existing or hereafter acquired, that is subject to the existing liens (i) presently securing the Prepetition Debt and (ii) that will secure the Contingent Prepetition Debt in accordance with this Interim Order.  Such security interests and liens shall be senior in all respects to the interests in such property of the Prepetition Secured Parties arising from current and future liens of the Prepetition Secured Parties (including, without limitation, the Contingent Liens and the Adequate Protection Liens granted hereunder), but shall not be senior to any valid, perfected and unavoidable interest of other parties arising out of liens, if any, on such property existing immediately prior to the Petition Date.  The DIP Collateral shall be deemed to include, among the other assets purported to be collateral as described herein, all collateral securing All-Asset Priority Obligations; the DIP Facility, DIP Obligations and DIP Liens shall be deemed to have all the rights and benefits of All-Asset Priority Debt, All-Asset Priority Obligations and All-Asset Priority Liens (as such terms are defined in the Prepetition Collateral Trust Agreement), in each case, to the extent the proceeds of the DIP Facility refinanced the Prepetition Term Loans.

(c)     Liens Junior to Certain Other Liens.  Pursuant to section 364(c)(3) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected security interest

(subject to the priorities set forth in the DIP Documents) in and lien upon all pre- and

postpetition tangible and intangible property of the Debtors and the Debtors' estates (other than

property described in clauses (a), (b), or (d) of this paragraph 10, as to which the liens and

security interests in favor of the DIP Agent will be as described in such clauses), whether now

existing or hereafter acquired, that is subject to valid, perfected and unavoidable liens in

existence immediately prior to the Petition Date, or to any valid and unavoidable liens in

existence immediately prior to the Petition Date that are perfected subsequent to the Petition

Date as permitted by section 546(b) of the Bankruptcy Code (in each case, other than the

Prepetition Liens, the Contingent Liens and the Adequate Protection Liens), which security

interests and liens in favor of the DIP Agent are junior to such valid, perfected and unavoidable

liens.

       (d)   <u>Liens Senior to Certain Other Liens</u>.  The DIP Liens shall not be subject or

subordinate to (i) any lien or security interest that is avoided and preserved for the benefit of

the Debtors and their estates under section 551 of the Bankruptcy Code or (ii) unless otherwise

provided for in the DIP Documents, any liens arising after the Petition Date including, without

limitation, any liens or security interests granted in favor of any federal, state, municipal or

other domestic or foreign governmental unit (including any regulatory body), commission,

board or court for any liability of the Debtors.

       (e)   Notwithstanding the foregoing clauses (a), (b), (c) and (d), the DIP

Collateral under this Interim Order shall exclude the Debtors' claims and causes of action

under sections 502(d), 544, 545, 547, 548, 549, 550 and 553 of the Bankruptcy Code, or any

other avoidance actions under the Bankruptcy Code (collectively, "<u>Avoidance Actions</u>"), but,

subject only to and effective upon entry of the Final Order, shall include any proceeds or

property recovered, unencumbered or otherwise the subject of successful Avoidance Actions,

whether by judgment, settlement or otherwise ("Avoidance Proceeds").

## ADEQUATE PROTECTION OF PREPETITON LENDERS

11.    <u>Adequate Protection of Prepetition Lenders</u>.  Until the Refinancing has

been consummated and the expiration of the Challenge Period with no challenge having been

brought or, if such a challenge is brought, upon the entry of a final judgment resolving such

challenge in favor of the Prepetition Lenders, the Prepetition Secured Lenders are entitled,

pursuant to sections 361, 363(e) and 364(d)(1) of the Bankruptcy Code, to adequate protection of

their interest in the Prepetition Collateral, including the Cash Collateral, for and equal in amount

to the aggregate diminution in the value of the Prepetition Lenders' interest in the Prepetition

Term Loan Collateral, the Prepetition Term Loan Debt and the Contingent Debt, including,

without limitation, any such diminution resulting from the sale, lease or use by the Debtors (or

other decline in value) of Cash Collateral and any other Prepetition Term Loan Collateral, the

priming of the Prepetition Lenders' security interests and liens in the Prepetition Term Loan

Collateral by the DIP Agent and the DIP Lenders pursuant to the DIP Documents and this

Interim Order, the imposition of the automatic stay pursuant to section 362 of the Bankruptcy

Code.  As adequate protection, the Prepetition Lenders are hereby granted the following

(collectively, the "Prepetition Lenders Adequate Protection Obligations"):

(a)    <u>Adequate Protection Liens</u>.  The Prepetition Lenders are hereby granted

(effective and perfected upon the date of this Interim Order and without the necessity of the

execution by the Debtors of mortgages, security agreements, pledge agreements, financing

statements or other agreements), in the amount of such diminution and the amount of any

Contingent Debt, (a) a replacement security interest in and lien upon all the DIP Collateral,

subject and subordinate only to (i) the DIP Liens and any liens on the DIP Collateral to which

such DIP Liens are junior and (ii) the Carve-Out (such liens, the "Prepetition Lenders

Adequate Protection Liens") and (b) the Contingent Liens to secure any Contingent Prepetition

Debt.  Without limiting the generality of the foregoing, (A) the Contingent Liens and the

Prepetition Adequate Protection Liens granted to the Prepetition Lenders hereunder shall be

junior and subordinate in all respects to the DIP Liens and the Carve-Out; (B) the Contingent

Prepetition Debt shall be junior and subordinate in right of payment to all DIP Obligations and

the Carve-Out; (C) until such time as all of the DIP Obligations are indefeasibly paid in full in

cash in accordance with the DIP Documents and this Interim Order, the Prepetition Lenders

shall have no right to seek or exercise any enforcement rights or remedies in connection with

the Contingent Prepetition Debt, the Contingent Liens or the Prepetition Adequate Protection

Liens, including, without limitation, in respect of the occurrence or continuance of any Event

of Default (as defined in the Prepetition Credit Agreement); (D) the Prepetition Lenders shall

be deemed to have consented to any sale or disposition of DIP Collateral permitted under the

DIP Facility or approved, arranged for or by the DIP Agent or the requisite DIP Lenders, and

shall terminate and release upon any such sale or disposition all of its liens on and security

interests in such DIP Collateral (where the DIP Agent also releases any DIP Liens as

necessary); (E) the Prepetition Lenders shall deliver or cause to be delivered, at the Debtors'

costs and expense (for which the Prepetition Lenders shall be reimbursed upon submission to

the Debtors of invoices or billing statements), any termination statements, releases or other

documents necessary to effectuate and/or evidence the release and termination of any

Prepetition Lenders' liens on or security interests in any portion of the DIP Collateral subject to

any sale or disposition permitted under the DIP Facility or approved or arranged for by the DIP

Agent or any of the DIP Lenders (where the DIP Agent also releases any DIP Liens as necessary); and (F) upon the Final Order becoming a final and nonappealable order and the expiration of the Challenge Period (as defined below) with no challenge having been brought, or if such a challenge is brought, until the entry of a final judgment and the payment to the Prepetition Lenders of all amounts owed by the Debtors under the Prepetition Term Loan Documents and this Interim Order (or the Final Order), the Contingent Liens and the Prepetition Adequate Protection Liens shall terminate and be released (automatically and without further action of the parties), and the Prepetition Lenders shall execute and deliver such agreements to evidence and effectuate such termination and release as the Debtors or the DIP Agent may request, and the Debtors and the DIP Agent shall be authorized to file on behalf of the Prepetition Lenders such UCC termination statements or such other filings as may be applicable to the extent such authorization is required under the Uniform Commercial Code of the applicable jurisdiction.

(b)    Section 507(b) Claim.  The Prepetition Lenders are hereby granted, subject only to the Superpriority Claims and the Carve-Out, a superpriority claim (the "Prepetition Lenders Adequate Protection Claim"), as provided for in sections 503(b) and 507(b) of the Bankruptcy Code, immediately junior to the Superpriority Claims and any other claims under section 364(c)(1) of the Bankruptcy Code held by the DIP Agent and the DIP Lenders, and payable from and having recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof (but excluding Avoidance Actions and, prior to entry of the Final Order, any Avoidance Proceeds); provided, however, that the Prepetition Lenders shall not receive or retain any payments, property or other amounts in respect of the superpriority claims under sections 503(b) and 507(b) of the Bankruptcy Code granted

hereunder or under the Prepetition Term Loan Documents unless and until the DIP Obligations have indefeasibly been paid in full in cash in accordance with the DIP Documents; and *provided* further, that the Prepetition Lenders hereby irrevocably waive the section 503(b) claim granted to them by this Interim Order upon the expiration of the Challenge Period with no challenge having been brought or, if such a challenge is brought, upon the entry of a final judgment resolving such challenge in favor of the Prepetition Lenders.

(c)   Fees and Expenses.  The Debtors are authorized and directed under sections 361, 363 and 364 of the Bankruptcy Code to make adequate protection payments as follows:  (i) payment of interest on a monthly basis at the default rate as set forth in the Prepetition Credit Agreement (only to the extent of any amounts outstanding), (ii) immediate, non-refundable cash payment of all accrued and unpaid fees and disbursements owing to the Prepetition Lenders under the Prepetition Documents and incurred prior to the Petition Date, (iii) until the expiration of the Challenge Period with no challenge having been brought or, if such a challenge is brought, upon the entry of a final judgment resolving such challenge in favor of the Prepetition Lenders, current cash payments of all reasonable out-of-pocket costs, fees and expenses payable to the Prepetition Lenders under the Prepetition Documents as may hereafter be incurred in accordance with the Prepetition Documents, (iv) all reasonable fees, costs, expenses and disbursements (whether incurred pre-or post-petition) of one primary counsel, Paul, Weiss, Rifkind, Wharton & Garrison LLP, local counsel, including, without limitation, in Virginia, Kutak Rock LLP, and Canada, Fasken Martineau Dumoulin LLP, and one financial advisor, Houlihan Lokey Capital, Inc., to the Prepetition Lenders promptly upon receipt of invoices therefor without the need to file retention motions or fee applications, and (v) continued maintenance and insurance of the Prepetition Term Loan Collateral and the DIP

Collateral as required under the Prepetition Term Loan Documents and the DIP Documents (collectively, the "Prepetition Lenders Adequate Protection Payments").

**ADEQUATE PROTECTION OF PREPETITON SECURED NOTEHOLDERS**

12.    Adequate Protection of Prepetition Secured Noteholders.  The Prepetition Secured Noteholders are entitled, pursuant to sections 361, 363(e), 364(d)(1) and 507 of the Bankruptcy Code, to adequate protection of their interest in the Prepetition Notes Collateral, including any Cash Collateral, for and equal in amount to any aggregate diminution in the value of the Prepetition Secured Noteholders' interests in the Prepetition Notes Collateral, including, without limitation, any such diminution resulting from the sale, lease or use by the Debtors (or other decline in value) of Cash Collateral and the Prepetition Notes Collateral, the priming of the Prepetition Secured Noteholders' security interests and liens in the Prepetition Notes Collateral by the DIP Agent and the DIP Lenders pursuant to the DIP Documents and this Interim Order and the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code.  As adequate protection, the Prepetition Indenture Trustee and the Prepetition Secured Noteholders are hereby granted the following (collectively, the "Prepetition Noteholders Adequate Protection Obligations", and together with the Prepetition Lenders Adequate Protection Obligations, the "Adequate Protection Obligations"):

(a)    Prepetition Secured Noteholder Adequate Protection Liens. The Prepetition Indenture  Trustee, on behalf of itself and for the benefit of the Prepetition Secured Noteholders, is hereby granted (effective and perfected upon the date of this Interim Order and without the necessity of the execution by the Debtors of mortgages, security agreements, pledge agreements, financing statements or other agreements), in the amount of such diminution, a replacement security interest in and lien upon all the DIP Collateral, subject and

subordinate only to (i) the DIP Liens, (ii) the Carve-Out, (iii) the Prepetition Liens, and (iv) the

Prepetition Lenders Adequate Protection Liens (the "Prepetition Noteholders Adequate

Protection Liens", and together with the Prepetition Lenders Adequate Protection Liens, the

"Adequate Protection Liens").  The Prepetition Indenture Trustee and the Prepetition Secured

Noteholders are hereby authorized, but not required, to file or record financing statements,

intellectual property filings, mortgages, notices of lien or similar instruments in any

jurisdiction or take any other action in order to validate and perfect the Prepetition Secured

Noteholders Adequate Protection Liens.  Whether or not the Prepetition Indenture Trustee and

the Prepetition Secured Noteholders shall, in their respective sole discretion, choose to file

such financing statements, intellectual property filings, mortgages, notices of lien or similar

instruments or otherwise confirm perfection of the liens and security interests granted to them

hereunder, such liens and security interests shall be deemed valid, perfected, allowed,

enforceable, non-avoidable and not subject to challenge, dispute or subordination as of the date

of entry of this Interim Order.

(b)    Fees and Expenses.  The Debtors are authorized and directed under

sections 361, 363 and 364 of the Bankruptcy Code to make adequate protection payments

which shall include (a) ongoing payments, when due or as soon as practicable thereafter, of all

reasonable and documented fees, costs, expenses and disbursements incurred either prior to or

after the Petition Date, including (i) $[__] in fees and expenses payable to the ad hoc group of

Prepetition Secured Noteholders' primary prepetition counsel and (ii) the ad hoc group's

postpetition primary counsel, Paul, Weiss, Rifkind, Wharton & Garrison LLP, local counsel,

including, without limitation, in Virginia, Kutak Rock LLP, and Canada, Fasken Martineau

Dumoulin LLP, and financial advisor, Houlihan Lokey Capital, Inc., each in its capacity as

advisor, to the Prepetition Secured Noteholders, and in each case, incurred in connection with the Debtors, the Chapter 11 Cases or the transactions contemplated hereby; and (b) continued maintenance and insurance of the Prepetition Notes Collateral and the DIP Collateral as required under the Prepetition Documents and the DIP Documents (collectively, the "Prepetition Noteholders Adequate Protection Payments", and together with the Prepetition Lenders Adequate Protection Payments, the "Adequate Protection Payments").

(c)   Prepetition Secured Noteholders' Section 507(b) Claim.  The Prepetition Indenture Trustee, on behalf of itself and the Prepetition Secured Noteholders, is hereby granted, subject to the Carve-Out, a superpriority claim as provided for in section 507(b) of the Bankruptcy Code, immediately junior to the Superpriority Claims held by the DIP Agent and the DIP Lenders and the Prepetition Lenders Adequate Protection Claim; provided that, unless otherwise expressly agreed to in writing by the DIP Agent, the Prepetition Lenders (until consummation of the Refinancing and expiration of the Challenge Period with no challenge having been brought or, if such a challenge is brought, upon the entry of a final judgment resolving such challenge in favor of the Prepetition Lenders), the Prepetition Indenture Trustee and the Prepetition Secured Noteholders shall not receive or retain any payments, property or other amounts in respect of the superpriority claims granted hereunder or under the Prepetition Documents unless and until the DIP Obligations and Prepetition Term Loan Debt have indefeasibly been paid in cash in full in accordance with the DIP Documents and this Interim Order (the "Prepetition Noteholders Adequate Protection Claim", and together with the Prepetition Lenders Adequate Protection Claim, the "Adequate Protection Claims").

13.     <u>Sufficiency of Adequate Protection</u>.

(a)     Under the circumstances and given that the Adequate Protection Liens, the Adequate Protection Claims and the Adequate Protection Payments (collectively, the "<u>Adequate Protection Obligations</u>") are consistent with the Bankruptcy Code, the Bankruptcy Court finds that such adequate protection is reasonable and sufficient to protect the interests of the Prepetition Secured Parties.  Except as expressly provided herein, nothing contained in this Interim Order (including, without limitation, the authorization of the use of any Cash Collateral) shall impair or modify any rights, claims or defenses available in law or equity to any Prepetition Secured Party, the DIP Agent or any DIP Lenders.

(b)     Notwithstanding anything in paragraphs 11 and 12 to the contrary, following delivery of a Carve-Out Trigger Notice and prior to the payment to the Prepetition Secured Parties on account of any adequate protection or otherwise, the DIP Obligations shall have been paid in full.

(c)     The Adequate Protection Obligations (A) shall not be subject to sections 510, 549, 550 or 551 of the Bankruptcy Code or, subject to entry of the Final Order, section 506(c) of the Bankruptcy Code or the "equities of the case" exception of section 552 of the Bankruptcy Code, (B) shall not be subordinate to, or pari passu with, (x) any lien that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or otherwise or (y) any intercompany or affiliate liens or claims of the Debtors, and (C) shall be valid and enforceable against any trustee, any other estate representative or litigation trust appointed in these Cases or any successor cases, and/or upon the dismissal of any of these Cases.

14. **Proceeds of Subsequent Financing**. If the Debtors, any trustee, any examiner with enlarged powers, any responsible officer or any other estate representative subsequently appointed in these Cases or any successor cases, shall obtain credit or incur debt pursuant to Bankruptcy Code sections 364(b), 364(c) or 364(d) in violation of the DIP Documents at any time prior to the indefeasible repayment in full in cash of all DIP Obligations and the termination of the DIP Agent's and the DIP Lenders' obligation to extend credit under the DIP Facility, including subsequent to the confirmation of any plan with respect to the Debtors and the Debtors' estates, and such financing is secured by any DIP Collateral, then all the cash proceeds derived from such credit or debt shall immediately be turned over to the DIP Agent to be applied as set forth the DIP Documents.

15. **Refinancing of the Prepetition Term Loan Debt**. Following the entry of this Interim Order and as part of the initial borrowing under the DIP Facility, the Debtors shall use a portion of the proceeds from the DIP Facility, which portion shall be designated as "All-Asset Priority Lien Debt" (as such term is defined in the Prepetition Collateral Trust Agreement), in accordance with the DIP Documents and this Interim Order to consummate the Refinancing, upon which, the existing liens on the Prepetition Term Loan Collateral shall be released and terminated (which shall be deemed to have occurred upon the expiration of the Challenge Period (as defined below) with no challenge having been brought or, if such a challenge is brought, upon the entry of a final judgment resolving such challenge in favor of the Prepetition Lenders). After the Refinancing, the Debtors and the DIP Agent are authorized to execute and file any termination statements, releases or other documents necessary to effectuate and/or evidence the release and termination of the Prepetition Lenders' liens on or security interests in any portion of the Prepetition Term Loan Collateral, and the Prepetition Lenders shall deliver or cause to be

delivered, at the Debtors' cost and expense, any termination statements, releases and/or

assignments in favor of the DIP Agent, the DIP Lenders or other documents, in each case as

reasonably requested by the Debtors or the DIP Agent in order to effectuate and/or evidence the

release and termination of the Prepetition Liens.  Notwithstanding anything to the contrary in this

Order or in any other order of this Court, the Prepetition Term Loan Debt, including, without

limitation, All-Asset Priority Lien Debt, All-Asset Priority Obligations and All-Asset Priority

Liens (as such terms are defined in the Prepetition Collateral Trust Agreement) shall not be

deemed discharged or the Refinancing deemed consummated until the expiration of the

Challenge Period with no challenge having been brought or, if such a challenge is brought, upon

the entry of a final judgment resolving such challenge in favor of the Prepetition Lenders.

16.    <u>Disposition of DIP Collateral; Rights of DIP Agent and DIP Lenders</u>.  The

Debtors shall not sell, transfer, lease, encumber or otherwise dispose of any portion of the DIP

Collateral without the prior written consent of the DIP Agent (and no such consent shall be

implied, from any other action, inaction or acquiescence), except as expressly permitted in the

DIP Documents.

17.    <u>Protection of DIP Lenders' Rights</u>.

(a)    The automatic stay provisions of section 362 of the Bankruptcy Code shall

be vacated and modified (and any stay of such vacation or modification under Bankruptcy Rule

4001(a)(3) is waived) without further order of the Bankruptcy Court to the extent necessary to

permit the DIP Agent and the DIP Lenders to exercise all rights and remedies provided for in

the DIP Documents and Interim Order without further order of or application or motion to the

Bankruptcy Court, <u>provided</u> <u>that</u>, such rights and remedies that are exercisable only upon the

occurrence of an Event of Default (as defined in the DIP Documents and as set forth in this

Interim Order), but subject in all respects to the Carve-Out Cap, shall require the DIP Agent to give five (5) days' prior written notice (which five days' notice period (the "Default Notice Period") shall run concurrently with any notice provided under the DIP Documents) to the U.S. Trustee, the Debtors, the Prepetition Lenders, the Prepetition Indenture Trustee, the Prepetition Secured Noteholders, and the Creditors' Committee, if any, of such DIP Agent's intent to exercise such rights and remedies; provided that, the Debtors shall not have the right to contest the enforcement of the remedies set forth in this Interim Order and the DIP Documents on any basis other than an assertion that an Event of Default has not occurred or has been cured within the cure periods expressly set forth herein or in the applicable DIP Documents; and provided further that during the Default Notice Period, the Debtors shall have no authority to borrow under the DIP Facility unless the DIP Agent otherwise consents, and the DIP Agent may terminate the DIP Facility and declare the DIP Obligations to be immediately due and payable, and the Debtors' authority to use Cash Collateral shall be as set forth in the Budget and limited solely to payment of expenses critical to preservation of the Debtors' estates and the payment of the fees, costs and expenses to administer these Chapter 11 Cases, as agreed by the DIP Agent in its sole discretion.  The Debtors and the Prepetition Secured Parties shall waive any right to seek relief under the Bankruptcy Code, including under section 105 thereof, to the extent such relief would restrict or impair the rights and remedies of the DIP Agent and the DIP Lenders set forth in this Interim Order and in the DIP Documents.

(b)    The DIP Agent's or any DIP Lender's delay or failure to exercise rights and remedies under the applicable DIP Documents or this Interim Order shall not constitute a waiver of such DIP Agent's or such DIP Lender's rights hereunder, thereunder or otherwise,

unless any such waiver is pursuant to a written instrument executed in accordance with the terms of the applicable DIP Documents.

(c)    Except as otherwise expressly set forth in this Interim Order, the Debtors irrevocably waive any right, without the prior written consent of the DIP Agent, (a) to grant or impose, under section 364 of the Bankruptcy Code or otherwise, liens or security interests in any DIP Collateral, whether senior, equal or subordinate to the DIP Agent's liens and security interests; (b) to use, or seek to use, Cash Collateral or (c) to modify or affect any of the rights of the DIP Agent or the DIP Lenders under this Interim Order or the DIP Documents by any plan of reorganization proposed or confirmed in these Chapter 11 Cases or subsequent order entered in these Chapter 11 Cases.

18.    <u>Approved Budget</u>.

(a)    For purposes of this Order, the term "<u>Budget</u>" means the following: (a) the budget, attached hereto as <u>Exhibit A</u>, the "<u>Initial Budget</u>," which is an initial 13-week budget delivered by the Debtors to the DIP Agent prior to the Petition Date and commencing with the week during which the Petition Date occurs, containing line items of sufficient detail to reflect the Debtors' consolidated projected receipts and disbursements for such 13-week period, including, without limitation, the anticipated weekly uses of the DIP Facility and cash collateral for such period, and which shall provide, among other things, for the payment of the fees and expenses, including professional fees relating to the DIP Facility (whether incurred pre-or post-petition), ordinary course expenses, fees and expenses related to the Cases, and working capital and other general corporate needs, which Initial Budget shall be in form and substance acceptable and approved by the DIP Agent and Majority Lenders (as defined in the DIP Facility), in their sole discretion (as such Initial Budget shall be amended, supplemented

and/or extended in the manner set forth herein and in the Final Order (the "Budget"); and (b) on or before 5:00 p.m. prevailing Eastern Time on the first Business Day (as defined in the DIP Facility) of each month following the Petition Date, commencing with May 1, 2015, the Debtors shall furnish a monthly supplement to the Initial Budget (or the previously supplemented Budget, as the case may be), covering a 13-week period that commences with the week such supplement is delivered, together with a variance analysis from the Budget (or the previously supplemented Budget, as the case may be). Such monthly supplements to the Budget shall become the Budget upon the earlier of (a) written acknowledgement from the DIP Agent that the proposed supplement is substantially in the form of the Initial Budget (or the previously supplemented Budget, as the case may be) and is otherwise in form and substance acceptable to and is approved by the DIP Agent and Majority Lenders (provided that any proposed changes in the proposed supplement to any of the Budget figures already covered by the Initial Budget (or the previously supplemented Budget, as the case may be) must be satisfactory to the DIP Agent in its sole discretion) or (b) within 10 Business Days after receipt of such proposed supplement by the DIP Agent, provided that the DIP Agent has not provided a written objection to the proposed supplement; the Initial Budget (or the previously supplemented Budget, as the case may be) shall remain the Budget if the DIP Agent objects to the proposed supplement and until such time as the DIP Agent provides written acknowledgement that a revised version of the proposed supplement is otherwise in form and substance acceptable to and is approved by the DIP Agent. Notwithstanding anything herein or in the DIP Documents to the contrary, unless specifically authorized hereunder or in writing by the DIP Agent or as may be provided in the Budget, no cash collateral may be paid or transferred to any non-Debtor subsidiary or affiliate of the Debtors.

(b)     The Debtors shall also deliver to the DIP Agent (i) no later than 5:00 p.m.
on Friday of each calendar week commencing on April 10, 2015, (x) an updated variance
report (the "Variance Report") on a weekly basis setting forth (1) actual cash receipts and
disbursements for the prior week, (2) all variances, on an individual line item basis and an
aggregate basis, as compared to the previously delivered Budget on a weekly and cumulative
basis, and an explanation, in reasonable detail, for any material variance, certified by a Senior
Officer (as defined in the DIP Facility) of Parent and (y) a report detailing fees and expenses
for professional services incurred by the Debtors during the preceding week and (ii) no later
than 5:00 p.m. on the first Business Day (as defined in the DIP Facility) of each calendar
month, an updated Budget and a variance report on a monthly basis setting forth (x) actual cash
receipts and disbursements for the applicable month, (y) all variances, on an individual line
item basis and an aggregate basis, as compared to the previously delivered Budget on a
monthly basis, and (z) an explanation, in reasonable detail, for any material variance, certified
by a Senior Officer (as defined in the DIP Facility) of Parent (the "Budget Variance Report")
for the previous calendar month.  As of the last day of each calendar month beginning with
April 30, 2015, (a) aggregate disbursements of the Debtors (other than professional fees) listed
in the current Budget for such month shall not be greater than 115% of the aggregate amount
specified for expenditures in such month in the then current Budget; and (b) the aggregate
revenues of the Debtors shall be at least 85% of those projected in the current Budget.

19.     Limitation on Charging Expenses Against Collateral.  Subject to and
effective only upon entry of the Final Order, except to the extent of the Carve-Out, no expenses
of administration of the Cases or any future proceeding that may result therefrom, including a
case under chapter 7 of the Bankruptcy Code, shall be charged against or recovered from the

Collateral pursuant to section 506(c) of the Bankruptcy Code, the enhancement of collateral provisions of section 552 of the Bankruptcy Code, or any other legal or equitable doctrine (including, without limitation, unjust enrichment) or any similar principle of law, without the prior written consent of the DIP Agent and the DIP Lenders, as the case may be with respect to their respective interests, and no consent shall be implied from any action, inaction or acquiescence by the DIP Agent or the DIP Lenders.  In no event shall the DIP Agent or the DIP Lenders be subject to (i) the "equities of the case" exception contained in section 552(b) of the Bankruptcy Code or (ii) the equitable doctrine of "marshaling" or any other similar doctrine with respect to the Collateral.

20.    Payment of Fees and Expenses.  No payments (including professional fees and expenses) with respect to the DIP Obligations or the Adequate Protection Obligations shall be subject to Bankruptcy Court approval or required to be maintained in accordance with the U.S. Trustee Guidelines, and no recipient of any such payments shall be required to file any interim or final fee applications with the Bankruptcy Court or otherwise seek Bankruptcy Court's approval of any such payments.

21.    Credit Bid.  The DIP Agent and the DIP Lenders, shall have the right to credit bid a portion of or all of their respective claims in connection with a sale of the Debtors' assets under section 363 of the Bankruptcy Code or under a plan of reorganization.  The Prepetition Lenders and the Prepetition Secured Noteholders (subject to the terms of the Prepetition Documents) shall have the right to credit bid a portion of or all of their respective claims in connection with a sale of the Debtors' assets under section 363 of the Bankruptcy Code or under a plan of reorganization, unless the Bankruptcy Court, for cause, orders otherwise.

22.    <u>Perfection of DIP Liens</u>.

(a)    The DIP Agent and the DIP Lenders are hereby authorized, but not required, to file or record (and to execute in the name of the Debtors, as its true and lawful attorney, with full power of substitution, to the maximum extent permitted by law) financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments in any jurisdiction, or take possession of or control over deposit accounts and securities accounts or any other asset, in each case, to validate and perfect the liens and security interests granted to them in the DIP Documents and this Interim Order.  Whether or not the DIP Agent on behalf of the DIP Lenders, each in its discretion, chooses to file such financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments, or take possession of or control over deposit accounts and securities accounts or any other assets, such liens and security interests shall be deemed valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge dispute or subordination, at the time and on the date of entry of this Interim Order.  Upon the reasonable request of the DIP Agent, without any further consent of any party, the DIP Agent, the Debtors, each DIP Lender and the Prepetition Secured Parties are authorized and directed to take, execute, deliver and file such instruments (in each case, without representation or warranty of any kind) to enable the DIP Agent to further perfect the DIP Liens.

(b)    A certified copy of this Interim Order may, in the discretion of the DIP Agent, be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, notices of lien or similar instruments, and all filing offices are hereby authorized to accept such certified copy of this Interim Order for filing and recording. For the avoidance of doubt, the automatic stay provisions of section 362(a) of the Bankruptcy

Code shall be modified (and any stay of such modification under Bankruptcy Rule 4001(a)(3) is waived) to the extent necessary to permit the DIP Agent to take all actions, as applicable, referenced in this subparagraph (b) and in the immediately preceding subparagraph (a).

(c)     Any provision of any lease or other license, contract or other agreement that requires (i) the consent or approval of one or more landlords or other parties or (ii) the payment of any fees or obligations to any governmental entity, in order for any Debtor to pledge, grant, sell, assign, or otherwise transfer any such leasehold interest, or the proceeds thereof, or other Collateral related thereto, is hereby deemed to be inconsistent with the applicable provisions of the Bankruptcy Code.  Any such provision shall have no force and effect with respect to the granting of post-petition liens on such leasehold interest or the proceeds of any assignment and/or sale thereof by any Debtor in favor of the DIP Lenders in accordance with the terms of the DIP Documents or this Interim Order.

23.     Preservation of Rights Granted Under the Order.

(a)     Except as expressly provided herein or in the DIP Documents, no claim or lien having a priority senior to or pari passu with those granted by this Interim Order and the DIP Documents to the DIP Agent, the DIP Lenders and the Prepetition Secured Parties shall be granted or allowed while any portion of the DIP Obligations or the Adequate Protection Obligations (with respect to the Prepetition Term Loan Debt, until the expiration of the Challenge Period with no challenge having been brought or, if such a challenge is brought, upon the entry of a final judgment resolving such challenge in favor of the Prepetition Lenders) remain outstanding, and the DIP Liens and the Adequate Protection Liens (with respect to the Prepetition Term Loan Liens, until the expiration of the Challenge Period with no challenge having been brought or, if such a challenge is brought, upon the entry of a final judgment

42

resolving such challenge in favor of the Prepetition Lenders) shall not (i) be subject to or junior to (A) any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or (B) any liens arising after the Petition Date, including, without limitation, any liens or security interests granted in favor of any federal, state, municipal or other domestic or foreign governmental unit (including any regulatory body), commission, board or court for any liability of the Debtors, or (ii) subordinate to or made pari passu with any other lien or security interest, whether under sections 363 or 364 of the Bankruptcy Code or otherwise.

(b)     In addition to the Events of Default set forth in the DIP Documents, unless all DIP Obligations and all Adequate Protection Obligations shall have been indefeasibly paid in full in cash, the Debtors shall not seek, and it shall constitute an Event of Default under the DIP Documents and terminate the right of the Debtors to use Cash Collateral hereunder if any of the Debtors seek, or if there is entered, unless the DIP Agent has otherwise consented: (i) any modification or extension of this Interim Order without the prior written consent of the DIP Agent, the Prepetition Lenders, the Prepetition Indenture Trustee, and the Prepetition Secured Noteholders, and no such consent shall be implied by any other action, inaction or acquiescence by the DIP Agent, the Prepetition Lenders, the Prepetition Indenture Trustee, and the Prepetition Secured Noteholders, (ii) an order converting or dismissing these Chapter 11 Cases; (iii) an order appointing a Chapter 11 trustee in these Chapter 11 Cases or any other representative or other similar appointment, (iv) an order appointing an examiner with enlarged powers in these Chapter 11 Cases, (v) an order providing for a change of venue with respect to these Chapter 11 Cases and such order shall not have been reversed or vacated within ten (10) days; (vi) an order approving a plan of reorganization or the sale of all or substantially all of

the DIP Collateral (except to the extent permitted under the DIP Documents) or the Prepetition

Collateral (except to the extent permitted under the Prepetition Documents) shall have been

entered which does not provide for the repayment in full in cash of all DIP Obligations (other

than any contingent obligations not yet due and payable) and all Contingent Obligations and

Adequate Protection Obligations (with respect to the Prepetition Lenders Contingent

Obligations and Adequate Protection Obligations, until the expiration of the Challenge Period

with no challenge having been brought or, if such a challenge is brought, upon the entry of a

final judgment resolving such challenge in favor of the Prepetition Lenders) upon the

consummation thereof.  If an order dismissing these Chapter 11 Cases under section 1112 of

the Bankruptcy Code or otherwise is at any time entered, such order shall provide (in

accordance with sections 105 and 349 of the Bankruptcy Code) that (x) the Superpriority

Claims, 507(b) claims, priming liens, security interests and replacement security interests

granted to the DIP Agent, the DIP Lenders and the Prepetition Secured Parties, including,

without limitation, the DIP Liens, the Adequate Protection Liens, the Adequate Protection

Claims and Adequate Protection Payments, the 507(b) claims, and the other administrative

expense claims granted pursuant to this Interim Order shall continue in full force and effect and

shall maintain their priorities as provided in this Interim Order (and that such Superpriority

Claims, priming liens, security interests and replacement security interests granted to the DIP

Agent, the DIP Lenders and the Prepetition Secured Parties, including, without limitation, the

DIP Liens, the Adequate Protection Liens, the Adequate Protection Claims and Adequate

Protection Payments, the 507(b) claims, and the other administrative expense claims, liens and

security interests, shall, notwithstanding such dismissal, remain binding on all parties in

interest, including the priorities set forth herein and in the DIP Documents) until all DIP

Obligations and all Adequate Protection Obligations (with respect to the Prepetition Lenders

Adequate Protection Obligations, until the expiration of the Challenge Period with no

challenge having been brought or, if such a challenge is brought, upon the entry of a final

judgment resolving such challenge in favor of the Prepetition Lenders) shall have been paid

and satisfied in full and (y) the Bankruptcy Court shall retain jurisdiction, notwithstanding such

dismissal, for the purposes of enforcing the claims, liens and security interests referred to in

clause (x) above; provided that the Prepetition Secured Parties shall not receive or retain any

payments, property or other amounts in respect of the Prepetition Debt or under the Prepetition

Documents unless and until the DIP Obligations have indefeasibly been paid in cash in full in

accordance with the DIP Documents.

(c)    If any or all of the provisions of this Interim Order are hereafter reversed,

modified, vacated or stayed, such reversal, modification, vacation or stay shall not affect (i) the

validity, priority or enforceability of any DIP Obligations or the Adequate Protection

Obligations incurred prior to the actual receipt of written notice by the DIP Agent, the

Prepetition Lenders or the Prepetition Indenture Trustee, as applicable, of the effective date of

such reversal, modification, vacation or stay or (ii) the validity, priority or enforceability of any

lien or priority authorized or created hereby or pursuant to the DIP Documents with respect to

any DIP Obligations or the Adequate Protection Obligations.  Notwithstanding any such

reversal, modification, vacation or stay, any use of Cash Collateral, the DIP Obligations or the

Adequate Protection Obligations incurred by the Debtors to the DIP Agent, the DIP Lenders,

or the Prepetition Secured Parties, as the case may be, prior to the actual receipt of written

notice by the DIP Agent, the Prepetition Lenders or the Prepetition Indenture Trustee of the

effective date of such reversal, modification, vacation or stay shall be governed in all respects

by the original provisions of this Interim Order, and the DIP Agent, the DIP Lenders, and the

Prepetition Secured Parties shall be entitled to all the rights, remedies, privileges and benefits

granted in section 364(e) of the Bankruptcy Code (including, without limitation, with respect to

any payments received in connection with the Refinancing), this Interim Order and pursuant to

the DIP Documents.

(d)    Except as expressly provided in this Interim Order or in the DIP

Documents, the DIP Obligations and the Adequate Protection Obligations, including the DIP

Liens, the Superpriority Claims, the 507(b) claims, the Adequate Protection Liens, the

Adequate Protection Claims, the Adequate Protection Payments and all other rights and

remedies of the DIP Agent, the DIP Lenders and the Prepetition Secured Parties granted by the

provisions of this Interim Order and the DIP Documents shall survive, and shall not be

modified, impaired or discharged by (i) the entry of an order converting any of these Chapter

11 Cases to a case under Chapter 7, dismissing these Chapter 11 Cases, approving the sale of

any DIP Collateral pursuant to section 363(b) of the Bankruptcy Code (except to the extent

permitted by the DIP Documents, or except to the extent that a release of such liens is

authorized under the Prepetition Collateral Trust Agreement) or by any other act or omission or

(ii) the entry of an order confirming a plan of reorganization in these Chapter 11 Cases (except

an Acceptable Reorganization Plan (as defined in the DIP Facility)) and, pursuant to section

1141(d)(4) of the Bankruptcy Code, the Debtors have waived any discharge as to any

remaining DIP Obligations or Adequate Protection Obligations.  The terms and provisions of

this Interim Order and the DIP Documents shall continue in the Chapter 11 Cases, in any

successor cases, or in any superseding Chapter 7 cases under the Bankruptcy Code, and the

DIP Obligations and the Adequate Protection Obligations, including the DIP Liens, the

Superpriority Claims, the Adequate Protection Liens, the Adequate Protection Claims, the

Adequate Protection Payments, the other administrative expense claims granted pursuant to

this Interim Order and all other rights and remedies of the DIP Agent, the DIP Lenders and the

Prepetition Secured Parties granted under the DIP Documents and this Interim Order shall

continue in full force and effect and shall be binding on any Chapter 7 trustee, Chapter 11

trustee, any litigation trust representative, other or similar party hereinafter appointed or

elected for the Debtors' estates until all DIP Obligations and all Adequate Protection

Obligations are indefeasibly paid in full in cash as set forth herein and in the DIP Documents.

24.     _Exculpation_.  Nothing in this Interim Order, the DIP Documents, or any

other documents related to the transactions contemplated hereby shall in any way be construed or

interpreted to impose or allow the imposition upon the DIP Agent or any DIP Lender of any

liability for any claims arising from the prepetition or postpetition activities of the Debtors in the

operation of their businesses, or in connection with their restructuring efforts.  In addition, (a) the

DIP Agent and the DIP Lenders shall not, in any way or manner, be liable or responsible for (i)

the safekeeping of the Collateral, (ii) any loss or damage thereto occurring or arising in any

manner or fashion from any cause, (iii) any diminution in the value thereof, or (iv) any act or

default of any carrier, servicer, bailee, custodian, forwarding agency, or other person, and (b) all

risk of loss, damage, or destruction of the Collateral shall be borne by the Debtors; _provided that_,

(i) the foregoing shall not apply to any act or omission by the DIP Agent or the DIP Lenders that

constitutes gross negligence or willful misconduct by the DIP Agent or the DIP Lenders as

finally determined by a court of competent jurisdiction.

25.     _Effect of Stipulations On Third Parties_.

47

(a)    The stipulations and admissions contained in this Interim Order, including, without limitation, in paragraph 4 of this Interim Order, shall be binding upon each Debtor and their subsidiaries and any of their respective successors and assigns (including, without limitation, any Chapter 7 or Chapter 11 trustee appointed or elected for a Debtor), and each person or entity party to the DIP Documents in accordance with their respective terms and the terms of this Interim Order, in all circumstances.

(b)    The stipulations and admissions contained in this Interim Order, including without limitation, in paragraph 4 of this Interim Order, shall be binding on a permanent basis upon all other parties in interest, including any statutory or non-statutory committees appointed or formed in the Chapter 11 Cases (including the Creditors' Committee, if any) and any other person or entity acting on behalf of the Debtors' estates, unless (a) such committee or any other party-in-interest, in each case, with requisite standing granted by the Bankruptcy Court, has timely and properly filed an adversary proceeding or contested matter (subject to the limitations contained herein, including, inter alia, in paragraph 26) by no later than the date that is the later of (i) in the case of any such adversary proceeding or contested matter filed by a party-in-interest with requisite standing other than the Creditors' Committee, 60 days after the Petition Date, (ii) in the case of any such adversary proceeding or contested matter filed by the Creditors' Committee, 45 days after the appointment of the Creditors' Committee, (iii) any such later date agreed to in writing by the Prepetition Lenders or the Prepetition Indenture Trustee, as applicable, and (iv) such longer period as the Bankruptcy Court orders for cause shown prior to the expiration of such period (the "Challenge Period"), (1) challenging the validity, enforceability, priority, extent, or amount of the obligations under the Prepetition Documents (the "Prepetition Obligations") or the liens, subject to valuation under section 506 of the

48

Bankruptcy Code, on the Prepetition Collateral securing the Prepetition Obligations or (2) otherwise asserting or prosecuting any avoidance actions or any other claims, counterclaims or causes of action, objections, contests or defenses (collectively, the "Claims and Defenses") against the Prepetition Secured Parties or their respective agents, affiliates, subsidiaries, directors, officers, representatives, attorneys or advisors in connection with any matter related to the Prepetition Obligations or the Prepetition Collateral, and (b) an order is entered by a court of competent jurisdiction and becomes final and non-appealable in favor of the plaintiff sustaining any such challenge or claim in any such duly filed adversary proceeding or contested matter; provided that, (i) as to the Debtors, all such Claims and Defenses are hereby irrevocably waived and relinquished as of the Petition Date and (ii) any challenge or claim shall set forth with specificity the basis for such challenge or claim and any challenges or claims not so specified prior to the expiration of the Challenge Period shall be forever deemed waived, released and barred.  If no such adversary proceeding or contested matter is timely and properly filed in respect of the Prepetition Obligations, (x) the Prepetition Term Loan Debt to the extent not heretofore repaid and the other Prepetition Obligations shall constitute allowed claims, not subject to counterclaim, setoff, subordination, recharacterization, subordination, defense or avoidance, for all purposes in the Chapter 11 Cases and any subsequent Chapter 7 cases, (y) the liens on the Prepetition Collateral securing the Prepetition Obligations, as the case may be, shall be deemed to have been, as of the Petition Date, and to be, legal, valid, binding, perfected and of the priority specified in paragraph 4, not subject to defense, counterclaim, recharacterization, subordination or avoidance and (z) the Prepetition Obligations, the Prepetition Secured Parties, and the liens on the Prepetition Collateral granted to secure the Prepetition Obligations, as the case may be, shall not be subject to any other or further challenge by any statutory or non-

statutory committees appointed or formed in the Chapter 11 Cases or any other party-in-interest, and such committees and parties-in-interest shall be enjoined from seeking to exercise the rights of the Debtors' estates, including without limitation, any successor thereto (including, without limitation, any estate representative or a Chapter 7 or 11 trustee appointed or elected for any of the Debtors) with respect thereto.  If any such adversary proceeding or contested matter is timely and properly filed, the stipulations and admissions contained in paragraph 4 of this Interim Order shall nonetheless remain binding and preclusive (as provided in the second sentence of this subparagraph) on any statutory or non-statutory committees appointed or formed in the Chapter 11 Cases and any other party-in-interest, except as to any such findings and admissions that were expressly and successfully challenged in such adversary proceeding as set forth in a final, non-appealable order of a court of competent jurisdiction.  In the event that there is a timely successful challenge, pursuant and subject to the limitations contained in this paragraph 25, to the validity, enforceability, extent, perfection or priority of the Prepetition Term Loan Debt, the Bankruptcy Court shall have the power to unwind or otherwise modify, after notice and hearing, the Refinancing or a portion thereof (which might include payment of the Disgorged Amount or re-allocation of interest, fees, principal or other incremental consideration paid in respect of the Prepetition Term Loan Debt or the avoidance of liens and/or guarantees with respect to the Debtors), as the Bankruptcy Court shall determine.  Nothing in this Interim Order vests or confers on any Person (as defined in the Bankruptcy Code), including any statutory or non-statutory committees appointed or formed in the Chapter 11 Cases, standing or authority to pursue any cause of action belonging to the Debtors or their estates, including, without limitation, Claims and Defenses with respect to the Prepetition Documents or the Prepetition Obligations or any liens granted by any Debtor to secure any of the foregoing.

26. <u>Limitation on Use of Financing Proceeds and Collateral</u>. Notwithstanding anything herein or in any other order by this Court to the contrary, no party may use borrowings under the DIP Facility, Prepetition Collateral, cash collateral, DIP Collateral, the Carve-Out, the Carve-Out Cap or any portion or proceeds of the foregoing in connection with (a) objecting to, contesting or raising any defense to, the validity, perfection, priority, extent or enforceability of any amount due under the DIP Documents or the Prepetition Documents, or the liens or claims granted under this Interim Order, the DIP Documents or the Prepetition Documents, (b) asserting any Claims and Defenses or causes of action against the DIP Agent, the DIP Lenders, the Prepetition Lenders or the Prepetition Secured Parties or their respective agents, affiliates, representatives, attorneys or advisors, (c) preventing, hindering or otherwise delaying the DIP Agent's or the DIP Lenders' assertion, enforcement or realization on the Collateral once an Event of Default has occurred and is continuing in accordance with the DIP Documents or this Interim Order, <u>provided</u> <u>that</u> the Debtors may contest or dispute whether an Event of Default has occurred as provided for in paragraph 17(a) of this Interim Order, (d) seeking to modify any of the rights granted to the DIP Agent, the DIP Lenders, the Prepetition Agents or the Prepetition Secured Parties hereunder or under the DIP Documents or the Prepetition Documents, in each of the foregoing cases, without such parties' prior written consent, (e) paying any amount on account of any claims arising prior to the Petition Date unless such payments are (i) approved by an order of this Court and (ii) in accordance with the DIP Documents and the Budget, (f) using or seeking to use cash collateral except to the extent permitted under the DIP Documents and not otherwise prohibited hereunder, (g) selling or otherwise disposing of the Collateral except as permitted by the DIP Documents or otherwise with the consent of the DIP Agent or the DIP Lenders, or (h) using or seeking to use any insurance proceeds related to the Collateral, except as

permitted by the DIP Documents or otherwise with the consent of the DIP Agent or the DIP

Lenders.  Notwithstanding the foregoing, advisors to the Creditors' Committee, if any, may

investigate claims and issues with respect to the liens granted pursuant to the Prepetition

Documents during the Challenge Period at an aggregate expense for such investigation, but not

litigation, prosecution, objection or challenge thereto, not to exceed $25,000.

27.    <u>Priorities Among Prepetition Secured Parties</u>.  Notwithstanding anything

to the contrary herein or in any other order of this Court, in determining the relative priorities and

rights of the Prepetition Secured Parties (including, without limitation, the relative priorities and

rights of the Prepetition Secured Parties with respect to the Adequate Protection Obligations

granted hereunder), such priorities and rights shall continue to be governed by the Prepetition

Documents, including, without limitation, the Prepetition Collateral Trust Agreement.

28.    <u>Payments Held in Trust</u>.  Except as expressly permitted in this Interim

Order or the DIP Documents, in the event that any person or entity receives any payment on

account of a security interest in DIP Collateral, receives any proceeds of DIP Collateral or

receives any other payment with respect thereto from any other source prior to indefeasible

satisfaction of all DIP Obligations under the DIP Documents, and termination of the

Commitment Amount (as defined in the DIP Documents) in accordance with the DIP

Documents, such person or entity shall be deemed to have received, and shall hold, any such

payment or proceeds of Collateral in trust for the benefit of the DIP Agent and DIP Lenders and

shall immediately turn over such proceeds to the DIP Agent, or as otherwise instructed by this

Court, for application in accordance with the DIP Documents and this Interim Order.

29.    <u>Proofs of Claim</u>.  None of the DIP Agent, DIP Lenders, or the Prepetition

Secured Parties will be required to file proofs of claim in any of Chapter 11 Cases or any

successor case.  Any order entered by the Bankruptcy Court in connection with the establishment

of a bar date for any claim (including without limitation administrative claims) in the Chapter 11

Cases or any successor case shall not apply to the DIP Agent, the DIP Lenders, or the Prepetition

Secured Parties.

30.    <u>Right of Access and Information</u>.  Without limiting the rights of access

and information afforded the DIP Agent and DIP Lenders under the DIP Documents or the

Prepetition Secured Parties under the Prepetition Documents, the Debtors shall be, and hereby

are, required to afford representatives, agents and/or employees of the DIP Agent and the

Prepetition Secured Parties reasonable access to the Debtors' premises and their books and

records in accordance with the DIP Documents and the Prepetition Documents, as the case may

be, and shall reasonably cooperate, consult with, and provide to such persons all such

information as may be reasonably requested.  In addition, the Debtors authorize their

independent certified public accountants, financial advisors, restructuring advisers, investment

bankers and consultants to cooperate, consult with, and provide to the DIP Agent, the Prepetition

Lenders and the Prepetition Indenture Trustee (and so long as an Event of Default has occurred

and is continuing, each Prepetition Secured Party and DIP Lender) all such information as may

be reasonably requested with respect to the business, results of operations and financial condition

of the Debtors.

31.    <u>Retention of Jurisdiction</u>.  This Court has and will retain exclusive

jurisdiction with respect to any and all disputes or matters under, or arising out of or in

connection with, either the DIP Documents or this Interim Order.

32.    <u>Order Governs</u>.  In the event of any inconsistency between the provisions

of this Interim Order or Final Order, if and when entered, and the DIP Documents, the provisions

of this Interim Order or Final Order, as applicable, shall govern.  Additionally, to the extent that

there may be an inconsistency between the terms of this Interim Order or Final Order, if and

when entered, and the Order Establishing Certain Notice, Case Management and Administrative

Procedures, the terms of this Interim Order or Final Order, as applicable, shall govern.

      33.    <u>Binding Effect; Successors and Assigns</u>.  The DIP Documents and the

provisions of this Interim Order, including all findings herein, shall be binding upon all parties-

in-interest in the Chapter 11 Cases on a permanent basis, including without limitation, the DIP

Agent, the DIP Lenders, the Prepetition Secured Parties, any statutory or non-statutory

committees appointed or formed in the Chapter 11 Cases, and the Debtors and their respective

successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or

elected for any of the Debtors, an examiner appointed pursuant to section 1104 of the

Bankruptcy Code, or any other fiduciary appointed as a legal representative of any of the

Debtors, or similar responsible person or similar designee or litigation trust hereinafter appointed

or elected for the estates of the Debtors) and shall inure to the benefit of the DIP Agent, the DIP

Lenders and the Prepetition Secured Parties and their respective successors and assigns,

including after conversion or dismissal of any of the Chapter 11 Cases; provided that, except to

the extent expressly set forth in this Interim Order, the DIP Agent, the DIP Lenders, and the

Prepetition Secured Parties shall have no obligation to permit the use of Cash Collateral or

extend any financing to any chapter 7 trustee, chapter 11 trustee or similar responsible person or

similar designee or litigation trust hereunder appointed for the estates of the Debtors.

      34.    <u>Limitation on Liability</u>.  In determining to make any loan under the DIP

Documents, permitting the use of Cash Collateral or in exercising any rights or remedies as and

when permitted pursuant to this Interim Order or the DIP Documents, the DIP Agent, the DIP

Lenders and the Prepetition Secured Parties shall not be deemed to be in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S.C. §§ 9601 et seq. as amended, or any similar federal or state statute).  Furthermore, nothing in this Interim Order or in the DIP Documents shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Agent, the DIP Lenders, or the Prepetition Secured Parties of any liability for any claims arising from the prepetition or postpetition activities of any of the Debtors and their affiliates (as defined in section 101(2) of the Bankruptcy Code).

35.     <u>Effectiveness</u>.  This Order shall constitute findings of fact and conclusions of law and shall take effect immediately upon execution hereof, and there shall be no stay of execution of effectiveness of this Order.

36.     <u>Final Hearing</u>.  The Final Hearing is scheduled for [_____] at _____ (EST) before this Court.  The Debtors shall promptly mail copies of this Order (which shall constitute adequate notice of the Final Hearing to the parties having been given notice of the Interim Hearing, and to any other party that has filed a request for notices with this Court and to any Committee after the same has been appointed, or Committee counsel, if the same shall have been appointed.  Any party in interest objecting to the relief sought at the Final Hearing shall serve and file written objections; which objections shall be served no later than _____, at 4:00 p.m. (ET) upon:  (a) the U.S. Trustee; (b) the Debtors; (c) counsel to the Debtors, Hunton & Williams LLP; (d) counsel to the DIP Agent, Paul, Weiss, Rifkind, Wharton & Garrison LLP, 1285 Avenue of the Americas, New York, New York 10019-6064 (Attn:  Brian S. Hermann, Esq., Oksana Lashko, Esq., and Sarah Harnett, Esq.); (e) counsel to the Prepetition Lenders; (f)

counsel to the Prepetition Indenture Trustee; (g) counsel to the Prepetition Secured Noteholders;

and (h) counsel to any official committee then appointed in these Cases.


Dated:    April ___, 2015
          Roanoke, Virginia


_____
          UNITED STATES BANKRUPTCY JUDGE

## **Exhibit B**

DIP Credit Agreement

**PWRW&G LLP DRAFT 4/6/15**

SUPERPRIORITY SECURED
DEBTOR-IN-POSSESSION CREDIT AGREEMENT

by and among

XINERGY CORP.,
as the Borrower,

THE PERSONS PARTY HERETO FROM TIME TO TIME AS GUARANTORS,

WBOX 2014-4 LTD., HIGHBRIDGE INTERNATIONAL LLC, and HIGHBRIDGE
TACTICAL CREDIT & CONVERTIBLES MASTER FUND, L.P.,
as Lenders,

THE OTHER PERSONS PARTY HERETO FROM TIME TO TIME AS LENDERS,

and

WBOX 2014-4 LTD.,
as DIP Agent

April [●], 2015

# INDEX

**Page**

ARTICLE 1 DEFINITIONS, ACCOUNTING PRINCIPLES AND OTHER
INTERPRETIVE MATTERS ............................................................1
    Section 1.1   Definitions .........................................................................1
    Section 1.2   Accounting Principles........................................................30
    Section 1.3   Other Interpretive Matters ................................................30

ARTICLE 2 THE LOANS .................................................................31
    Section 2.1   Initial Term Loans; Delayed Draw Term Loans.................31
    Section 2.2   Manner of Borrowing and Disbursement of Term Loans ..................32
    Section 2.3   Interest ..............................................................................32
    Section 2.4   Fees ...................................................................................33
    Section 2.5   Voluntary Prepayment ......................................................35
    Section 2.6   Repayment ........................................................................35
    Section 2.7   Loan Accounts ..................................................................36
    Section 2.8   Manner of Payment...........................................................36
    Section 2.9   Reserved ...........................................................................38
    Section 2.10  Application of Payments...................................................38
    Section 2.11  Use of Proceeds ...............................................................39
    Section 2.12  All Obligations to Constitute One Obligation ....................39
    Section 2.13  Maximum Rate of Interest................................................39
    Section 2.14  Incremental Term Loans...................................................40
    Section 2.15  Extension of the Stated Maturity Date...............................41

ARTICLE 3 GUARANTY .................................................................42
    Section 3.1   Guaranty ...........................................................................42
    Section 3.2   Special Provisions Applicable to Subsidiary Guarantors ..................46
    Section 3.3   Special Provisions Applicable to Parent.............................46

ARTICLE 4 CONDITIONS PRECEDENT .........................................47
    Section 4.1   Conditions Precedent to the Making of the Initial Term Loans .........47
    Section 4.2   Conditions Precedent to All Term Loans ...........................50
    Section 4.3   Conditions Precedent to Delayed Draw Term Loans .........51

ARTICLE 5 REPRESENTATIONS AND WARRANTIES .........................52
    Section 5.1   General Representations and Warranties.............................52
    Section 5.2   Survival of Representations and Warranties, etc.................61

ARTICLE 6 GENERAL COVENANTS................................................61
    Section 6.1   Preservation of Existence and Similar Matters...................61
    Section 6.2   Compliance with Applicable Law ......................................61
    Section 6.3   Maintenance of Properties ................................................62
    Section 6.4   Accounting Methods and Financial Records......................62
    Section 6.5   Insurance...........................................................................62

Section 6.6     Payment of Taxes and Claims ...........................................................63
Section 6.7     Visits and Inspections ......................................................................63
Section 6.8     Conduct of Business .........................................................................63
Section 6.9     ERISA................................................................................................63
Section 6.10    Lien Perfection..................................................................................63
Section 6.11    Priority of Liens ...............................................................................64
Section 6.12    Location of Collateral .......................................................................65
Section 6.13    Protection of Collateral.....................................................................66
Section 6.14    Reserved ...........................................................................................67
Section 6.15    Administration of Accounts...............................................................67
Section 6.16    The Blocked Accounts.......................................................................68
Section 6.17    Further Assurances ............................................................................68
Section 6.18    Broker's Claims ................................................................................68
Section 6.19    Indemnity ..........................................................................................68
Section 6.20    Environmental Matters ......................................................................69
Section 6.21    Additional Collateral; Additional Guarantors and Formation of
                Subsidiaries.......................................................................................69
Section 6.22    Use of Proceeds ................................................................................71
Section 6.23    Post-Closing Matters ........................................................................71
Section 6.24    Bankruptcy Related Matters ..............................................................71
Section 6.25    Milestones.........................................................................................72
Section 6.26    Chief Restructuring Officer ..............................................................73

ARTICLE 7 INFORMATION COVENANTS ....................................................................73
Section 7.1     Reports...............................................................................................74
Section 7.2     Compliance Certificates....................................................................75
Section 7.3     Access to Accountants.......................................................................76
Section 7.4     Notice of Litigation and Other Matters .............................................76
Section 7.5     Platform for Disclosure.....................................................................78

ARTICLE 8 NEGATIVE COVENANTS ...........................................................................78
Section 8.1     Funded Debt.......................................................................................78
Section 8.2     Guaranties .........................................................................................80
Section 8.3     Liens .................................................................................................80
Section 8.4     Restricted Payments..........................................................................80
Section 8.5     Investments .......................................................................................81
Section 8.6     Affiliate Transactions .......................................................................82
Section 8.7     Liquidation; Disposition or Acquisition of Assets; Merger or
                Consolidation; Change in Name or Year; Etc. ...................................83
Section 8.8     Conduct of Business ..........................................................................84
Section 8.9     Amendment and Waiver ....................................................................84
Section 8.10    ERISA Liability ................................................................................84
Section 8.11    [Reserved]..........................................................................................85
     .          85
Section 8.12    Negative Pledge ................................................................................85
Section 8.13    Inconsistent Agreements....................................................................85
Section 8.14    Certain Bankruptcy Matters...............................................................85

ii

Section 8.15    Minimum Liquidity ....................................................................86
Section 8.16    Variance from Budget...............................................................86
Section 8.17    Capital Expenditures.................................................................86
Section 8.18    Sale / Leaseback Transactions .................................................86

ARTICLE 9 DEFAULT .................................................................................86
Section 9.1    Events of Default .......................................................................86
Section 9.2    Remedies.....................................................................................92

ARTICLE 10 MISCELLANEOUS .................................................................94
Section 10.1    Notices .....................................................................................94
Section 10.2    Expenses ..................................................................................95
Section 10.3    Waivers ....................................................................................95
Section 10.4    Set-Off .....................................................................................96
Section 10.5    Assignment ..............................................................................96
Section 10.6    Counterparts.............................................................................98
Section 10.7    Governing Law ........................................................................99
Section 10.8    Severability ..............................................................................99
Section 10.9    Headings ..................................................................................99
Section 10.10    Appointment of Collateral Agent .........................................99
Section 10.11    Entire Agreement ..................................................................99
Section 10.12    Amendments and Waivers.....................................................99
Section 10.13    Other Relationships ...............................................................99
Section 10.14    Pronouns ................................................................................99
Section 10.15    Disclosure ..............................................................................99
Section 10.16    Confidentiality .....................................................................100
Section 10.17    Revival and Reinstatement of Obligations .........................100
Section 10.18    Electronic Transmission ......................................................100
Section 10.19    Conflicts with DIP Orders ..................................................101
Section 10.20    Contribution ........................................................................101

ARTICLE 11 YIELD PROTECTION............................................................102
Section 11.1    Reserved .................................................................................102
Section 11.2    Illegality.................................................................................102
Section 11.3    Increased Costs ......................................................................103
Section 11.4    Reserved .................................................................................104
Section 11.5    Capital Adequacy...................................................................104

ARTICLE 12 JURISDICTION, VENUE AND WAIVER OF JURY TRIAL ...............105
Section 12.1    Jurisdiction and Service of Process ......................................105
Section 12.2    Consent to Venue...................................................................105
Section 12.3    Waiver of Jury Trial...............................................................105

ARTICLE 13 DIP AGENT ............................................................................106
Section 13.1    Authorization and Action .....................................................106
Section 13.2    DIP Agent's Reliance, Etc.....................................................107
Section 13.3    Rights of the DIP Agent as a Lender ....................................108

Section 13.4    Lender Credit Decision ..................................................................108
Section 13.5    Indemnification ...........................................................................108
Section 13.6    Rights and Remedies to Be Exercised by the DIP Agent Only .........109
Section 13.7    Agency Provisions Relating to Collateral; Release of Liens and
                Guaranties ......................................................................................109
Section 13.8    DIP Agent's Right to Purchase Commitments ..................................110
Section 13.9    Resignation of the DIP Agent; Appointment of Successor ...............110

ARTICLE 14 COLLATERAL ....................................................................................111
Section 14.1    Grant of Security Interest ..................................................................111
Section 14.2    Lien Perfection; Further Assurances .................................................113

SCHEDULES

Schedule 4.1(v)        -        Consents
Schedule 5.1(c)-1      -        Subsidiaries
Schedule 5.1(c)-2      -        Partnerships/Joint Ventures
Schedule 5.1(d)        -        Outstanding Equity Interests Ownership
Schedule 5.1(h)        -        Material Contracts
Schedule 5.1(i)        -        Labor and Employment Matters
Schedule 5.1(j)        -        Taxes
Schedule 5.1(m)        -        Investments/Guaranties as of the Agreement Date
Schedule 5.1(n)        -        Litigation
Schedule 5.1(o)        -        ERISA
Schedule 5.1(p)        -        Intellectual Property; Licenses and Certifications
Schedule 5.1(v)        -        Insurance
Schedule 5.1(x)-1      -        Leased Real Property
Schedule 5.1(x)-2      -        Owned Real Property
Schedule 5.1(y)        -        Environmental Matters
Schedule 5.1(aa)       -        Name Change of Borrower Parties
Schedule 5.1(ee)       -        Capitalized Lease Obligations
Schedule 6.11          -        Location of Collateral
Schedule 6.15          -        Bank and Investment Accounts
Schedule 6.22          -        Post-Closing Matters
Schedule 8.1           -        Outstanding Funded Debt as of the Agreement Date
Schedule 8.5           -        Existing Investments
Schedule 8.6           -        Affiliate Transactions

EXHIBITS

Exhibit A        -        Form of Compliance Certificate
Exhibit B        -        Form of Guaranty Supplement
Exhibit C        -        Form of Term Note

ANNEXES

Annex I                 Commitments
Annex II                Addresses
Annex III               Initial Budget
Annex IV                Form of Interim Order

CREDIT AGREEMENT

THIS SUPERPRIORITY SECURED DEBTOR-IN-POSSESSION CREDIT AGREEMENT, dated as of April [●] 2015 (as amended, restated, supplemented or otherwise modified from time to time, this "Agreement"), is by and among Xinergy Ltd., a corporation existing under the laws of Ontario ("Parent"), Xinergy Corp., a corporation existing under the laws of Tennessee (the "Borrower"), the other Persons party hereto from time to time as Guarantors, WBOX 2014-4 Ltd., Highbridge International LLC, Highbridge Tactical Credit & Convertibles Master Fund, L.P., as Lenders, the other Persons party hereto from time to time as Lenders, and WBOX 2014-4 Ltd., as DIP Agent.

W I T N E S S E T H:

WHEREAS, on April 6, 2015 (the "Petition Date"), the Borrower and each of the Subsidiary Guarantors (each an "Obligor," and collectively, the "Obligors;" the Obligors in such capacity, each a "Debtor" and collectively, the "Debtors") filed voluntary petitions with the Bankruptcy Court (as defined below) initiating cases pending under Chapter 11 of the Bankruptcy Code (collectively, the "Cases" and each a "Case") and have continued in the possession of their assets and in the management of their businesses pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

WHEREAS, the Borrower has requested that the Lenders make the Term Loans (as defined below) to refinance the Prepetition Loan Facility (as defined below) and to provide working capital; and

WHEREAS, the Lenders are willing to make the Term Loans available to the Borrower upon the terms and conditions set forth herein;

NOW, THEREFORE, in consideration of the premises and the covenants and agreements contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

ARTICLE 1

DEFINITIONS, ACCOUNTING PRINCIPLES AND
OTHER INTERPRETIVE MATTERS

Section 1.1    Definitions.  For the purposes of this Agreement:

"Acceptable Reorganization Plan" means a Reorganization Plan in form and substance acceptable to the Borrower and Majority Lenders.

"Account Debtor" shall mean any Person who is obligated to make payments in respect of an Account.

1

"<u>Accounts</u>" shall mean all "<u>accounts</u>", as such term is defined in Article 9 of the UCC, of each Borrower Party whether now existing or hereafter created or arising, including (a) all accounts receivable, other receivables, book debts and other forms of obligations (other than forms of obligations evidenced by chattel paper (as defined in the UCC) or instruments (as defined in the UCC)) (including any such obligations that may be characterized as an account or contract right under the UCC), (b) all of each Borrower Party's rights in, to and under all purchase orders or receipts for goods or services, (c) all of each Borrower Party's rights to any goods represented by any of the foregoing (including unpaid sellers' rights of rescission, replevin, reclamation and stoppage in transit and rights to returned, reclaimed or repossessed goods), (d) all rights to payment due to a Borrower Party for property sold, leased, licensed, assigned or otherwise disposed of, for a policy of insurance issued or to be issued, for a secondary obligation incurred or to be incurred, for energy provided or to be provided, for the use or hire of a vessel under a charter or other contract, arising out of the use of a credit card or charge card, or for services rendered or to be rendered by such Borrower Party or in connection with any other transaction (whether or not yet earned by performance on the part of such Borrower Party), (e) all health care insurance receivables and (f) all collateral security of any kind, given by any Account Debtor or any other Person with respect to any of the foregoing.

"<u>Additional Amount</u>" shall have the meaning specified in <u>Section 2.8(b)(i)</u>.

"<u>Advance</u>" or "<u>Advances</u>" shall mean the amount of the Term Loans advanced by a Lender to, or on behalf of, the Borrower pursuant to <u>Section 2.1</u> on the occasion of any borrowing.

"<u>Affiliate</u>" shall mean, with respect to any Person, any other Person that, directly or indirectly, is in control of, is controlled by, or is under common control with such Person, or that is a director, officer, manager or partner of such Person.  For purposes of this definition, "control" means, when used with respect to any Person, Control of such Person or the direct or indirect beneficial ownership of ten percent (10%) or more of the outstanding Equity Interests of such Person.

"<u>Agreement</u>" has the meaning specified in the preamble, together with all Exhibits and Schedules hereto.

"<u>Agreement Date</u>" shall mean the date as of which this Agreement is dated.

"<u>Applicable Accounting Standard</u>" shall mean the international accounting standards promulgated by the International Accounting Standards Board and its predecessors, or IFRS, as adopted in Canada, as in effect from time to time; <u>provided</u> that at any time after the Agreement Date, Parent may elect, in its sole discretion, that for purposes of this Agreement "Applicable Accounting Standard" shall mean generally accepted accounting principles in the United States as set forth in the opinions and pronouncements of the Accounting Principles Board of the American Institute of

Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or in such other statements by such other entity as have been approved by a significant segment of the accounting profession in the United States, as in effect from time to time; provided, further, that any such election, once made, will be irrevocable.

"Applicable Cash Rate" shall mean a rate *per annum* equal to ten percent (10.0%).

"Applicable Law" shall mean, in respect of any Person, all provisions of (a) constitutions, treaties, statutes, rules and regulations including, without limitation, all Mining Laws, and (b) to the extent binding on such Person, policies, procedures, decisions and orders of governmental bodies or regulatory agencies applicable, whether by law or by virtue of contract, to such Person, and (c) all orders and decrees of all courts and arbitrators in proceedings or actions to which the Person in question is a party or by which it is bound.

"Applicable PIK Rate" means a *per annum* rate of interest equal to four percent (4.0%).

"Applicable Rate" means a cumulative *per annum* rate equal to fourteen percent (14.0%).  The applicable rate is composed of the Applicable Cash Rate and the Applicable PIK Rate.

"Approved Fund" shall mean any Person that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its business that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity that administers or manages a Lender.

"Authorized Signatory" shall mean, with respect to any Borrower Party, such senior personnel of such Borrower Party as may be duly authorized and designated in writing to the Lender by such Borrower Party to execute documents, agreements, and instruments on behalf of such Borrower Party.

"Avoidance Action" means the Debtors' claims and causes of action that constitute avoidance actions under sections 502(d), 544, 545, 547, 548, 549, 550 and 553 of the Bankruptcy Code and any other avoidance actions under the Bankruptcy Code.

"Avoidance Proceeds" means any proceeds or property recovered, unencumbered or otherwise the subject of successful Avoidance Actions, whether by judgment, settlement or otherwise.

"Bankruptcy Code" shall mean the United States Bankruptcy Code (11 U.S.C. Section 101 *et seq*.), as now or hereafter amended, and any successor statute.

"Bankruptcy Court" means the United States Bankruptcy Court for the Western District of Virginia, Roanoke Division, or any appellate court having jurisdiction over the Cases from time to time.

"Blocked Account" shall mean a deposit account or securities account subject to a Blocked Account Agreement.

"Blocked Account Agreement" shall mean any agreement executed by a depository bank and the DIP Agent, for the benefit of the Lenders, and acknowledged and agreed to by the applicable Borrower Party, in form and substance satisfactory to the Majority Lenders.

"Board of Directors" means:

(a)     with respect to a corporation, the board of directors of the corporation or any committee thereof duly authorized to act on behalf of such board;

(b)     with respect to a partnership, the board of directors of the general partner of the partnership;

(c)     with respect to a limited liability company, the managing member or members or any controlling committee of managing members thereof; and

(d)     with respect to any other Person, the board or committee of such Person serving a similar function.

"Borrower" shall have the meanings specified in the preamble.

"Borrower Parties" shall mean, collectively, the Borrower, the Parent, and the other Guarantors; and "Borrower Party" shall mean any one of the foregoing Borrower Parties.

"Borrower Payments" shall have the meaning specified in Section 2.8(b)(i).

"Budget" the weekly statement of receipts and disbursements of Parent and its domestic subsidiaries on a consolidated basis for the 13 weeks commencing with the week during which the Petition Date occurs, containing line items of sufficient detail to reflect the Debtors' consolidated projected receipts and disbursements for such 13-week period, including, without limitation, the anticipated weekly uses of the DIP Term Loan Facility and cash collateral for such period, and which shall provide, among other things, for the payment of the fees and expenses, including professional fees relating to the DIP Facility (whether incurred pre-or post-petition), ordinary course expenses, fees and expenses related to the Cases, and working capital and other general corporate needs, which Initial Budget shall be in form and substance acceptable and approved by the DIP Agent and Majority Lenders, in their sole discretion (as such Budget shall be amended, supplemented and/or extended in the manner set forth herein and in the DIP Order (the "Initial Budget"); provided that on or before 5:00 p.m. prevailing Eastern Time on the

first Business Day of each month following the Petition Date, commencing with May 1, 2015, the Debtors shall furnish a monthly supplement to the Budget (or the previously supplemented Budget, as the case may be), covering a 13-week period that commences with the week such supplement is delivered, together with a variance analysis from the Budget (or the previously supplemented Budget, as the case may be).  Such monthly supplements to the Budget shall become the Budget upon the earlier of (a) written acknowledgement from the DIP Agent that the proposed supplement is substantially in the form of the Initial Budget (or the previously supplemented Budget, as the case may be) and is otherwise in form and substance acceptable to and is approved by the DIP Agent and Majority Lenders (provided that any proposed changes in the proposed supplement to any of the Budget figures already covered by the Initial Budget (or the previously supplemented Budget, as the case may be) must be satisfactory to the DIP Agent in its sole discretion) or (b) within 10 Business Days after receipt of such proposed supplement by the DIP Agent, provided that the DIP Agent has not provided a written objection to the proposed supplement; the Initial Budget (or the previously supplemented Budget, as the case may be) shall remain the Budget if the DIP Agent objects to the proposed supplement and until such time as the DIP Agent provides written acknowledgement that a revised version of the proposed supplement is otherwise in form and substance acceptable to and is approved by the DIP Agent.   Notwithstanding anything herein or in the DIP Documents to the contrary, unless specifically authorized hereunder or in writing by the DIP Agent or as may be provided in the Budget, no cash collateral may be paid or transferred to any non-Debtor subsidiary or affiliate of the Debtors.  The Budget in effect on the Agreement Date is attached hereto as <u>Annex III</u>.

"<u>Budget Variance Report</u>" means a variance report on a monthly basis setting forth (1) actual cash receipts and disbursements for the applicable month, (2) all variances, on an individual line item basis and an aggregate basis, as compared to the previously delivered Budget on a monthly basis, and (3) an explanation, in reasonable detail, for any material variance, certified by a Senior Officer of Parent.

"<u>Business Day</u>" shall mean any day excluding Saturday, Sunday and any day which is a legal holiday under the laws of the State of New York or is a day on which banking institutions located in such jurisdiction are closed.

"<u>Canadian PPSL</u>" shall mean applicable Canadian personal or movable property security legislation as in effect from time to time in any province or territory of Canada.

"<u>Canadian Restricted Subsidiary</u>" has the meaning given to such term in the definition of Excluded Foreign Subsidiary.

"<u>Capital Expenditures</u>" shall mean, for any period, on a consolidated basis for the Borrower Parties, the aggregate of all expenditures made by the Borrower Parties during such period that, in conformity with the Applicable Accounting Standard, are required to be included in or reflected on the consolidated balance sheet as a capital asset of the Borrower Parties, including, without limitation, Capitalized Lease Obligations of the Borrower Parties.

"Capitalized Lease Obligation" shall mean that portion of any obligation of a Person as lessee under a lease which at the time would be required to be capitalized on the balance sheet of such lessee in accordance with the Applicable Accounting Standard.

"Carve-Out" shall have the meaning assigned to such term in the DIP Order.

"Case" or "Cases" has the meaning specified in the recitals to this Agreement.

"Cash Equivalents" shall mean, collectively, (a) marketable, direct obligations of the US and its agencies maturing within three hundred sixty-five (365) days of the date of purchase, (b) commercial paper issued by corporations, each of which shall (i) have a consolidated net worth of at least $500,000,000 and (ii) conduct substantially all of its business in the United States, which commercial paper will mature within one hundred eighty (180) days from the date of the original issue thereof and is rated "P-1" or better by Moody's or "A-1" or better by S&P, (c) certificates of deposit maturing within three hundred sixty-five (365) days of the date of purchase and issued by a US national or state bank having deposits totaling more than $500,000,000, and whose short-term debt is rated "P-1" or better by Moody's or "A-1" or better by S&P, and (d) up to $250,000 per institution and up to $5,000,000 in the aggregate in (i) short-term obligations issued by any local commercial bank or trust company located in those areas where the Borrower conducts its business, whose deposits are insured by the Federal Deposit Insurance Corporation, or (ii) commercial bank-insured money market funds, or any combination of the types of investments described in this clause (d).

"Cash Interest" shall mean interest calculated at the Applicable Cash Rate.

"Cash Management Bank" means one or more banks at which the Borrower Parties establish and maintain one or more deposit accounts pursuant to arrangements acceptable to the Majority Lenders.

"Cash Management Obligations" shall mean obligations in respect of cash management services (including treasury, depository, overdraft, credit or debit card, electronic funds transfer and other cash management arrangements), including obligations for the payment of fees, interest, charges, expenses and disbursements in connection therewith to the extent provided for in the documents evidencing such cash management services.

"Change of Control" shall mean the occurrence of one or more of the following events:  (a) any Person or two or more Persons acting in concert shall have acquired beneficial ownership (within the meaning of Rule 13d-3 of the SEA) of fifty percent (50%) or more of the outstanding shares of the voting Equity Interests of Parent; (b) as of any date a majority of the Board of Directors of Parent consists (other than vacant seats) of individuals who were not either (i) directors of Parent as of the Agreement Date, (ii) selected or nominated to become directors by the Board of Directors

6

of Parent of which a majority consisted of individuals described in <u>clause (i)</u>, or (iii) selected or nominated to become directors by the Board of Directors of Parent of which a majority consisted of individuals described in <u>clause (i)</u> and individuals described in <u>clause (ii)</u>, (c) except as specifically permitted hereunder, Parent ceases to Control or directly or indirectly own one hundred percent (100%) of the outstanding Equity Interests of all of the Borrower Parties, (d) the direct or indirect sale, lease, transfer, conveyance or other disposition (other than by way of merger, amalgamation or consolidation permitted under <u>Section 8.7(c)(xii)</u>), in one or a series of related transactions, of all or substantially all of the properties or assets of the Parent and its Subsidiaries taken as a whole to any Person, (e) the adoption of a plan relating to the liquidation, winding-up or dissolution of the Parent or the Borrower, and (f) a "Change of Control" as defined in the Indenture as of the date hereof.

"<u>Chapter 11 Order</u>" means any order entered in the Cases.

"<u>Chief Restructuring Officer</u>" shall have the meaning set forth in <u>Section 6.26</u>.

"<u>Code</u>" shall mean the Internal Revenue Code of 1986, as amended from time to time.

"<u>Collateral</u>" has the meaning set forth in <u>Section 14.1</u>.

"<u>Collateral Access Agreement</u>" shall mean any agreement of any lessor, warehouseman, processor, consignee or other Person in possession of, having a Lien upon or having rights or interests in, any of the Collateral, made in favor of the DIP Agent, for the benefit of the Lenders, in form and substance satisfactory to the Majority Lenders in their reasonable discretion, waiving or subordinating Liens or certain other rights or interests such Person may hold in regard to the property of any of the Borrower Parties and providing the DIP Agent, for the benefit of the Lenders, access to its Collateral.

"<u>Collateral Records</u>" means books, records, ledger cards, files, correspondence, customer lists, supplier lists, blueprints, technical specifications, manuals, computer software and related documentation, computer printouts, tapes, disks and other electronic storage media and related data processing software and similar items that at any time evidence or contain information relating to any of the Collateral or are otherwise necessary or helpful in the collection thereof or realization thereupon.

"<u>Collateral Support</u>" means all property (real or personal) assigned, hypothecated or otherwise securing any Collateral and Loans and shall include any security agreement or other agreement granting a Lien or security interest in such real or personal property.

"<u>Commitments</u>" shall mean the Term Loan Commitments.

"<u>Commitment Expiration Date</u>" shall mean the earliest to occur of (i) the date on which the Commitments are fully drawn in accordance with the terms hereof, (ii)

the date upon which all undrawn Commitments are permanently reduced and terminated in accordance with this Agreement, (iii) the date on which the Term Loan Commitments are terminated pursuant to Section 9.2 and (iv) the Maturity Date.

"Commitment Schedule" means the Schedule attached hereto identified as such.

"Compliance Certificate" shall mean a certificate executed by an Authorized Signatory of the Borrower substantially in the form of Exhibit A.

"Confidential Information" shall have the meaning specified in Section 10.16.

"Consummation Date" means the date of the substantial consummation (as defined in section 1101 of the Bankruptcy Code) of an Acceptable Reorganization Plan or a plan of reorganization that is confirmed pursuant to an order of the Bankruptcy Court.

"Contributing Borrower Party" shall have the meaning specified in Section 10.20(b).

"Control" shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise.  "Controlling" and "Controlled" have meanings correlative thereto.

"Core Mining Property" shall mean (a) all or substantially all of the property and assets associated with (1) the surface, highwall and underground mines located on the real property commonly known as Raven Crest and Brier Creek, along with the Bull Creek loadout and the preparation plant at Bull Creek, all being contiguous tracts located in Boone and Kanawha Counties, West Virginia; and (2) all now or in the future surface, highwall and underground mines, and the loadout existing or to be built, in each case located on the real property in Greenbrier County, West Virginia; and (b) the Equity Interests of any Restricted Subsidiary that, directly or indirectly, owns or controls any of the property or assets referred to in clause (a).

"Default" shall mean any Event of Default, and any of the events specified in Section 9.1 regardless of whether there shall have occurred any passage of time or giving of notice (or both) that would be necessary in order to constitute such event an Event of Default.

"Defaulting Lender" shall mean any Lender that (a) has failed (which failure has not been cured) to fund any portion of any Term Loans required to be funded by it hereunder on the date required to be funded by it hereunder, (b) has otherwise failed (which failure has not been cured) to pay to the DIP Agent or any other Lender any other amount required to be paid by it hereunder on the date when due, unless the subject of a good faith dispute, (c) has notified the DIP Agent and/or the Borrower that it does not

intend to comply with its obligations under Section 2.1 or (d) that has admitted in writing that it is insolvent or is the subject of a Lender-Related Distress Event.

"Default Rate" shall mean a per annum interest rate equal to the sum of (i) the Applicable Rate, plus (ii) two percent (2.0%), payable in cash.

"Delayed Draw Term Loan Commitment" means the commitment of a Lender to make or otherwise fund any Delayed Draw Term Loan, and "Delayed Draw Term Loan Commitments" means such commitments of all Lenders in the aggregate. The amount of each Lender's Delayed Draw Term Loan Commitment is set forth on the Commitment Schedule, or, if such Lender's Delayed Draw Term Loan Commitment has been assigned in accordance with this Agreement, subject to any adjustment pursuant to the terms and conditions hereof. The amount of each Lender's Delayed Draw Term Loan Commitment as of the Agreement Date is set forth on the Commitment Schedule.

"Delayed Draw Term Loan" has the meaning set forth in Section 2.1(b).

"DIP Agent" means WBOX 2014-4 Ltd. in its capacity as agent for the Lenders under this Agreement and the other Loan Documents and any successor in that capacity appointed pursuant to Section 13.9.  WBOX 2014-4 Ltd. is an Affiliate of Whitebox Advisors.

"DIP Liens" shall mean the Liens granted hereunder and under the other Loan Documents to secure the Obligations.

"DIP Orders" means the Interim Order or the Final Order or both, as the context may require.

"DIP Term Loan Facility" means the credit facility contemplated by this Agreement.

"Direction Letter" shall mean that certain direction letter, dated as of the Agreement Date, by and between the Borrower and the Lenders, in form and substance satisfactory to the DIP Agent and Majority Lenders, with respect to the distribution of the proceeds of the Term Loans and the other sources and uses of funds occurring on the Agreement Date.

"Disposition" shall mean: (a) the sale, lease, conveyance or other disposition of any assets or rights by the Parent or any of the Parent's Restricted Subsidiaries; and (b) the issuance of Equity Interests by any of the Parent's Restricted Subsidiaries or the sale by any of Parent or any of the Parent's Restricted Subsidiaries of Equity Interests in any of the Parent's Restricted Subsidiaries.  Notwithstanding the preceding, none of the following items will be deemed to be a Disposition:

(i)     any single transaction or series of related transactions that involve assets having a Fair Market Value of less than $500,000, up to $1,000,000 in the aggregate in any calendar year;

(ii)     [Reserved];

(iii)    a transfer of assets between or among the Borrower and its Restricted Subsidiaries (other than a transfer to a Foreign Subsidiary), or from the Parent or a Domestic Subsidiary to a Borrower Party;

(iv)     an issuance of Equity Interests by a Restricted Subsidiary of the Parent to the Borrower or any of its Restricted Subsidiaries;

(v)      the sale, lease or other transfer of products, services or accounts receivable in the ordinary course of business and consistent with prior practice (excluding long-term forward contracts for the sale and delivery of Inventory) and any sale or other disposition of damaged, worn-out, surplus or obsolete assets in the ordinary course of business (including the abandonment or other disposition of intellectual property that is, in the reasonable judgment of the Parent, no longer economically practicable to maintain or useful in the conduct of the business of the Borrower Parties taken as whole);

(vi)     licenses and sublicenses by any Borrower Party of software or intellectual property in the ordinary course of business;

(vii)    any surrender or waiver of contract rights or settlement, release, recovery on or surrender of contract, tort or other claims in the ordinary course of business;

(viii)   the granting of Liens permitted by Section 8.3;

(ix)     the sale or other disposition of cash or Cash Equivalents or the factoring or discounting of accounts receivables in the ordinary course of business;

(x)      a Restricted Payment permitted under Section 8.4 or an Investment permitted under Section 8.5; and

(xi)     the sale by any Borrower Party of Equity Interests in any Unrestricted Subsidiary.

"Dividends" shall mean any direct or indirect distribution, dividend, or payment of cash or other property of any kind to any Person on account of any Equity Interests of any Borrower Party.

"Dollars" or "$" shall mean the lawful currency of the United States.

"Domestic Subsidiary" shall mean any Subsidiary of a Borrower Party that is organized and existing under the laws of the US or any state or commonwealth thereof or under the laws of the District of Columbia.

"Electronic Transmission" shall mean each document, instruction, authorization, file, information and any other communication transmitted, posted or

otherwise made or communicated by e-mail, facsimile, or otherwise to or from an E-System or any other equivalent service.

"Eligible Assignee" shall mean (a) a Lender; (b) an Affiliate of a Lender; (c) an Approved Fund; or (d) any other Person approved by the DIP Agent and Majority Lenders.

"Environmental Laws" shall mean, collectively, any and all applicable federal, state, local or municipal laws, rules, orders, regulations, statutes, ordinances, codes, decrees or requirements of any Governmental Authority regulating, relating to or imposing liability or standards of conduct concerning environmental protection matters, including without limitation, Hazardous Materials or human health, as now or may at any time during the term of this Agreement be in effect.

"Equity Interests" shall mean, as applied to any Person, any capital stock, membership interests, partnership interests or other equity interests of such Person, regardless of class or designation, and all warrants, options, purchase rights, conversion or exchange rights, voting rights, calls or claims of any character with respect thereto.

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as in effect on the Agreement Date and as such Act may be amended thereafter from time to time.

"ERISA Affiliate" shall mean, with respect to any Borrower Party, any trade or business (whether or not incorporated) that together with such Borrower Party, are treated as a single employer under Section 52 or 414 of the Code.

"ERISA Event" shall mean, with respect to any Borrower Party or any ERISA Affiliate, (a) any "reportable event" within the meaning of Section 4043 of ERISA with respect to a Title IV Plan for which the thirty (30) day notice period has not been waived; (b) the withdrawal of any Borrower Party or ERISA Affiliate from a Title IV Plan subject to Section 4063 of ERISA during a plan year in which it was a substantial employer, as defined in Section 4001(a)(2) of ERISA; (c) the complete or partial withdrawal of any Borrower Party or any ERISA Affiliate from any Multiemployer Plan; (d) the filing of a notice of intent to terminate a Title IV Plan or the treatment of a plan amendment as a termination under Section 4041 of ERISA; (e) the institution, or threatened institution, of proceedings to terminate a Title IV Plan or Multiemployer Plan by the PBGC; (f) the reorganization or insolvency of a Multiemployer Plan under Section 4241 or 4245 of ERISA; (g) the failure by any Borrower Party or ERISA Affiliate to make when due required contributions to a Multiemployer Plan or Title IV Plan; (h) any other event or condition that could be expected to constitute grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Title IV Plan or Multiemployer Plan or for the imposition of liability under Section 4069 or 4212(c) of ERISA; (i) the revocation or any action which could threaten revocation of a Plan's tax-qualified status under Code Section 401(a); or (j) the imposition, or threatened imposition, of any liability under the Coal Act.

"E-System" shall mean any electronic system, including Intralinks®, SyndTrak Online and any other internet or extranet-based site, whether such electronic system is owned, operated or hosted by the Lender, any of its Affiliates or any other Person, providing for access to data protected by passcodes or other security system.

"Event of Default" shall mean any of the events specified in Section 9.1, provided that any requirement for notice or lapse of time, or both, has been satisfied.

"Excluded Account" means a Securities Account or Deposit Account that (i) has an average daily balance or less than $100,000; provided that the aggregate average daily balance of all Excluded Accounts shall not exceed $1,000,000, or (ii) is used exclusively to fund payroll, withholding tax, workers' compensation or employment claims or is funded solely with funds held on behalf of or in trust for the benefit of any third party that is not an Affiliate of Parent.

"Excluded Assets" shall mean each of the following:

(a) any of the outstanding capital stock of a controlled foreign corporation in excess of 66⅔% of the voting power of all classes of capital stock of such controlled foreign corporation entitled to vote;

(b) any general intangibles or other rights arising under contracts or other documents, in each case, solely to the extent that a grant of a security interest therein would either (i) require any government approval (unless such approval has been received or is excused by operation of the Bankruptcy Code) or (ii) violate any applicable law; and

(c) Avoidance Actions.

"Excluded Foreign Subsidiary" means any Restricted Subsidiary of Parent other than (i) any Domestic Subsidiary and (ii) any Restricted Subsidiary of Parent formed under the laws of Canada or any province or territory thereof (a "Canadian Restricted Subsidiary") at least 50.1% of whose Equity Interests are owned, directly or indirectly, solely by Parent and/or one or more other Canadian Restricted Subsidiaries; provided, however, that any of Parent's Subsidiaries that guarantees or otherwise provides direct credit support for any Funded Debt of Parent, a Domestic Subsidiary or a Canadian Restricted Subsidiary will not be an "Excluded Foreign Subsidiary" for purposes of this Agreement.

"Excluded Joint Venture" means any joint venture that is prohibited, by the terms of the organizational documents from Guaranteeing the Term Loans; provided that any such joint venture will cease to be an Excluded Joint Venture if it, directly or indirectly, Guarantees any Funded Debt of Parent or any of its Restricted Subsidiaries.

"Fair Market Value" shall mean the value (which, for the avoidance of doubt, will take into account any liabilities associated with related assets) that would be paid by a willing buyer to an unaffiliated willing seller in a transaction not involving

12

distress or necessity of either party, determined in good faith by the Board of Directors of the Parent. Except as otherwise provided in this Agreement, any determination of Fair Market Value in respect of a transaction or series of related transactions involving aggregate consideration in excess of (a) $10,000,000 shall be evidenced by a resolution of the Board of Directors of the Parent and shall be approved by a majority of the disinterested members of the Board of Directors of the Parent and (b) $20,000,000 shall be accompanied by an opinion supporting such valuation from a financial point of view issued by an accounting, appraisal or investment banking firm of national standing.

"Fee Letters" means the Fee Letter, dated as of the Agreement Date, by and among the Borrower Parties and the Lenders and the Fee Letter, dated as of the Agreement Date, by and among the Borrower Parties and the DIP Agent.

"Final Order" means a final order of the Bankruptcy Court in substantially the form of the Interim Order (with only such modifications thereto as are necessary to convert the Interim Order to a final order and such other modifications are satisfactory in form and substance to DIP Agent and Majority Lenders in their sole discretion) and authorizing the Term Loans.

"Final Order Entry Date" means the date on which the Final Order is entered by the Bankruptcy Court.

"Final Term Funding Date" has the meaning set forth in Section 2.1(b).

"First Day Orders" means all orders entered by the Bankruptcy Court on, or within five days of, the Petition Date or based on motions filed on or about the Petition Date.

"Financial Covenants" shall mean the financial covenants applicable to the Borrower Parties from time to time pursuant to Section 8.15, and Section 8.16.

"Foreign Subsidiary" shall mean any Subsidiary of a Borrower Party that does not constitute a Domestic Subsidiary.

"Funded Debt" shall mean, with respect to the Borrower Parties on a consolidated basis and without duplication, as of any calculation date, any obligations (excluding accrued expenses and trade payables), whether or not contingent, (a) for borrowed money, including, without limitation, all of the Obligations, (b) evidenced by bonds, debentures, notes or other similar instruments, (c) constituting reimbursement obligations with respect to letters of credit, bankers acceptances and similar instruments issued for the account of any such Person, (d) to pay the deferred purchase price of property or for services (other than in the ordinary course of business) due more than six months after such property is acquired or such services are completed, (e) constituting Capitalized Lease Obligations, (f) constituting debt, liability or obligations arising from or in connection with any Hedge Agreements, (g) constituting obligations or liabilities of others secured by a Lien on property owned by any such Person, whether or not such obligation or liability is assumed, (h) to the extent not otherwise included, constituting Guaranties of another Person's Funded Debt, (i) constituting financial obligations of any

such Person under purchase money mortgages, (j) constituting financial obligations of any such Person under asset securitization vehicles, (k) constituting obligations of any such Person under conditional sales contracts and similar title retention instruments with respect to property acquired, or (l) constituting financial obligations of any such Person as the issuer of Equity Interests redeemable in whole or in part at the option of a Person other than such issuer, at a fixed and determinable date or upon the occurrence of an event not solely within the control of such issuer; provided, however, that Funded Debt shall be calculated without giving effect to the effects of International Accounting Standard No. 32 or Accounting Standards Codification 815 and related interpretations to the extent such effects would otherwise increase or decrease an amount of Funded Debt for any purpose under this Agreement as a result of accounting for any embedded derivatives created by the terms of such Funded Debt; and provided, further, that the items in clauses (a) through (f) shall constitute Funded Debt if and to the extent any of such items (other than letters of credit and Hedge Agreements) would appear as a liability upon a balance sheet of the specified Person prepared in accordance with the Applicable Accounting Standard.

"Funding Borrower Party" shall have the meaning specified in Section 10.20(b).

"Funding Date" means the date of funding of a Term Loan.

"Governmental Authority" shall mean any nation or government, any state or other political subdivision thereof and any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to any government.

"Guarantors" shall mean, collectively, Parent, the Subsidiary Guarantors and any other Person that has executed a Guaranty Supplement or other document guaranteeing the Obligations; and "Guarantor" shall mean any one of the foregoing Guarantors.

"Guaranty" or "Guaranteed," as applied to an obligation (each a "primary obligation"), shall mean and include (a) any guaranty, direct or indirect, in any manner, of any part or all of such primary obligation, and (b) any agreement, direct or indirect, contingent or otherwise, the practical effect of which is to assure in any way the payment or performance (or payment of damages in the event of non-performance) of any part or all of such primary obligation, including, without limiting the foregoing, any reimbursement obligations as to amounts drawn down by beneficiaries of outstanding letters of credit, and any obligation of any Person, whether or not contingent, (i) to purchase any such primary obligation or any property or asset constituting direct or indirect security therefor, (ii) to advance or supply funds (A) for the purchase or payment of such primary obligation or (B) to maintain working capital, equity capital or the net worth, cash flow, solvency or other balance sheet or income statement condition of any other Person, (iii) to purchase property, assets, securities or services primarily for the purpose of assuring the owner or holder of any primary obligation of the ability of the primary obligor with respect to such primary obligation to make payment thereof or (iv) otherwise to assure or hold harmless the owner or holder of such primary obligation

against loss in respect thereof, but in all events excluding the endorsement of instruments for collection in the ordinary course of business.  All references in this Agreement to "this Guaranty" shall be to the Guaranty provided for pursuant to the terms of <u>Article 3</u>.

"<u>Guaranty Supplement</u>" shall have the meaning specified in <u>Section 6.20(b)</u>.

"<u>Hazardous Materials</u>" shall mean any hazardous materials, hazardous wastes, hazardous constituents, hazardous or toxic substances, petroleum products (including crude oil or any fraction thereof), friable asbestos containing materials defined or regulated as such in or under any Environmental Law.

"<u>Hedge Agreement</u>" shall mean any and all transactions, agreements or documents now existing or hereafter entered into between or among any Borrower Party, on the one hand, and a third party, on the other hand, which provides for an interest rate, credit or equity swap, cap, floor, collar, forward foreign exchange transaction, currency swap, cross currency rate swap, currency option, or any combination of, or option with respect to, these or similar transactions, for the purpose of hedging such Borrower Party's exposure to fluctuations in interest or exchange rates, loan, credit exchange, security or currency valuations.

"<u>Immaterial Subsidiary</u>" means, as of any date, any Restricted Subsidiary whose total assets, as of that date, are less than $100,000 and whose total revenues for the most recent 12-month period do not exceed $100,000; <u>provided</u> that a Restricted Subsidiary will not be considered to be an Immaterial Subsidiary if it, directly or indirectly, guarantees or otherwise provides direct credit support for any Indebtedness of any Borrower Party.

"<u>Incremental Term Loan</u>" has the meaning set forth in <u>Section 2.14</u>.

"<u>Incremental Term Loan Assumption Agreement</u>" means an Incremental Term Loan Assumption Agreement among the Borrower and Lenders that make Incremental Term Loans, in form and substance reasonably satisfactory to the Borrower and Majority Lenders.

"<u>Incremental Term Loan Commitment</u>" means the commitment of any Lender, established pursuant to <u>Section 2.14</u>, to make Incremental Term Loans to the Borrower.

"<u>Indemnified Person</u>" shall mean each Lender, each Affiliate of a Lender and each of their respective partners, employees, representatives, officers, agents, directors, legal counsel, advisors and consultants.

"<u>Indenture</u>" shall mean that certain note indenture dated as of May 6, 2011 among the Parent, the Borrower, certain guarantors, and Wells Fargo Bank, National Association, as trustee, pursuant to which the Company issued the Second Lien Notes.

15

"Initial Funding Date" shall mean the date of funding of the Initial Term Loans.

"Initial Term Loan Commitment" means the commitment of a Lender to make or otherwise fund any Initial Term Loan on the Agreement Date, and "Initial Term Loan Commitments" means such commitments of all Lenders in the aggregate on the Agreement Date (before giving effect to the Initial Term Loans made on the Agreement Date). The amount of each Lender's Initial Term Loan Commitment as of the Agreement Date is set forth on the Commitment Schedule.

"Initial Term Loans" has the meaning set forth in Section 2.1(a).

"Insolvency Proceeding" shall mean any proceeding commenced by or against any Person under any provision of the Bankruptcy Code or under any other state, federal or non-US bankruptcy or insolvency law, assignments for the benefit of creditors, formal or informal moratoria, compositions, extensions generally with creditors, or proceedings seeking reorganization, arrangement, or other similar relief.

"Intellectual Property" shall mean all patents, trademarks, tradenames, copyrights, technology, software, know-how and processes used in or necessary for the conduct of the business of the Borrower Parties.

"Interest Expense" shall mean, with respect to the Borrower Parties for any period, determined on a consolidated basis in accordance with the Applicable Accounting Standard, the sum, without duplication, of: (a) the consolidated interest expense of any such Person for such period, whether paid or accrued, including, without limitation, amortization of debt issuance costs and original issue discount, non-cash interest payments, the interest component of any deferred payment obligations, the interest component of all payments associated with Capitalized Lease Obligations, commissions, discounts and other fees and charges incurred in respect of letter of credit or bankers' acceptance financings, and net of the effect of all payments made or received pursuant to Hedge Agreements in respect of interest rates; *plus* (b) the consolidated interest expense of any such Person that was capitalized during such period; *plus* (c) any interest on Funded Debt of another Person that is guaranteed by any such Person or secured by a Lien on the assets of any such Person, whether or not such Guarantee or Lien is called upon; *plus* (d) the product of (1) all Dividends, whether paid or accrued, on any series of preferred stock of any such Person, other than Dividends payable solely in Equity Interests of the Parent or to the Parent or a Restricted Subsidiary of the Parent, times (2) a fraction, the numerator of which is one and the denominator of which is one minus the then current combined federal, state and local statutory tax rate of such Person, expressed as a decimal, in each case, determined on a consolidated basis in accordance with the Applicable Accounting Standard.

"Interim Order" means an interim order of the Bankruptcy Court (as the same may be amended, supplemented, or modified from time to time after entry thereof in accordance with the terms hereof) approving the Loan Documents, in the form set

forth as Annex IV with changes to such form as are satisfactory to DIP Agent and Majority Lenders in their sole discretion.

"Interim Order Entry Date" means the date on which the Interim Order is entered by the Bankruptcy Court.

"Interim Period" means the period from and including the Interim Order Entry Date to but not including the Final Order Entry Date.

"Inventory" shall mean all "inventory," as such term is defined in the UCC, of each Borrower Party, whether now existing or hereafter acquired, wherever located, and in any event including inventory, merchandise, goods and other personal property that are held by or on behalf of a Borrower Party for sale or lease or are furnished or are to be furnished under a contract of service, goods that are leased by a Borrower Party as lessor, or that constitute raw materials, samples, work-in-process, finished goods, returned goods, promotional materials or materials or supplies of any kind, nature or description used or consumed or to be used or consumed in such Borrower Party's business or in the processing, production, packaging, promotion, delivery or shipping of the same, including all supplies and embedded software.

"Investments" means, with respect to any Person, all direct or indirect investments by such Person in other Persons (including Affiliates) in the forms of loans (including Guarantees or other obligations), advances or capital contributions (excluding commission, travel and similar advances to officers and employees made in the ordinary course of business), purchases or other acquisitions for consideration of Indebtedness, Equity Interests or other securities, together with all items that are or would be classified as investments on a balance sheet prepared in accordance with the Applicable Accounting Standard. If Parent or any Restricted Subsidiary of Parent sells or otherwise disposes of any Equity Interests of any direct or indirect Restricted Subsidiary of Parent such that, after giving effect to any such sale or disposition, such Person is no longer a Restricted Subsidiary of Parent, Parent will be deemed to have made an Investment on the date of any such sale or disposition equal to the Fair Market Value of Parent's Investments in such Subsidiary that were not sold or disposed of. The acquisition by Parent or any Restricted Subsidiary of Parent of a Person that holds an Investment in a third Person will be deemed to be an Investment by Parent or such Restricted Subsidiary in such third Person in an amount equal to the Fair Market Value of the Investments held by the acquired Person in such third Person. Except as otherwise provided in this Agreement, the amount of an Investment will be determined at the time the Investment is made and without giving effect to subsequent changes in value and net of any dividends, distributions, repayments or redemptions in cash received in respect of such Investment.

"Lender-Related Distress Event" shall mean, with respect to any Lender (each, a "Distressed Person"), a voluntary or involuntary case with respect to such Distressed Person under any debt relief law, or a custodian, conservator, receiver or similar official is appointed for such Distressed Person or any substantial part of such Distressed Person's assets, or such Distressed Person makes a general assignment for the

benefit of creditors or is otherwise adjudicated as, or determined by any Governmental Authority having regulatory authority over such Distressed Person to be, insolvent or bankrupt; provided that a Lender-Related Distress Event shall not be deemed to have occurred solely by virtue of the ownership or acquisition of any equity interests in any Agent or Lender or any person that directly or indirectly controls such Lender by a Governmental Authority or an instrumentality thereof.

"Lenders" shall mean each of the financial institutions identified as a Lender on the signature pages hereto and any assignee of a Lender who hereafter becomes a party hereto pursuant to and in accordance with Section 10.5.

"Lender's Office" shall mean the office of the applicable Lender noted on the signature pages hereto, or such other office as may be designated by the relevant Lender from time to time pursuant to the provisions of Section 10.1.

"License Agreement" shall mean any license agreement or other agreement between a Borrower Party and a Person duly holding rights in a trademark, trade name or service mark pursuant to which such Borrower Party is granted a license to use such trademark, trade name or service mark on Inventory of such Borrower Party or otherwise in the conduct of such Borrower Party's business.

"Lien" shall mean, with respect to any property, any mortgage, lien, pledge, negative pledge agreement, assignment for security purposes, charge, option, security interest, title retention agreement, levy, execution, seizure, attachment, garnishment, any documents, notice, instruments or other filings under the Federal Assignment of Claims Act of 1940 or other encumbrance of any kind in respect of such property, whether or not choate, vested, or perfected.

"Loan Account" shall have the meaning specified in Section 2.7(b).

"Loan Documents" shall mean this Agreement, the Fee Letter, the Security Documents, the Guaranty Supplements, any Direction Letter, the Term Notes, any Collateral Access Agreements, all Compliance Certificates, all documents executed by a Borrower Party in connection with the Federal Assignment of Claims Act of 1940 (if any), and all other documents, lockbox agreements, instruments, certificates, and agreements executed or delivered by a Borrower Party in connection with or contemplated by this Agreement, including, without limitation, any security, ancillary or guaranty agreements from any of the Borrower Parties' Restricted Subsidiaries to the Lenders or the DIP Agent and amendments to any Loan Document.

"Majority Lenders" means, at any time, the Lenders holding greater than 50% of the sum of (i) the aggregate outstanding principal amount of the Term Loans and (ii) the unfunded Term Loan Commitments, at such time; provided, that the outstanding Term Loans and the Term Loan Commitments held or deemed held by any Defaulting Lender at such time shall be excluded for purposes of making a determination of Majority Lenders.

"Margin Stock" shall have the meaning specified in Section 5.1(t).

18

"Material Contracts" shall mean, collectively, (i) all contracts, leases, instruments, guaranties, licenses or other arrangements (other than the Loan Documents) to which any Borrower Party is or becomes a party and as to which the breach, nonperformance, cancellation or failure to renew by any party thereto could have a Material Adverse Effect and (ii) all contracts and agreements that, at any time of determination, contributed more than $500,000 to the revenue or expenses of the Borrower Parties in the immediately preceding twelve months (or, if such agreement or contract was acquired or became effective within twelve months from such date, then the actual revenue contributed from such agreement or contract, on an annualized basis).

"Material Adverse Effect" shall mean, with respect to any event, act, condition or occurrence of whatever nature (including any adverse determination in any litigation, arbitration or governmental investigation or proceeding, any change in Applicable Law, but excluding any event affecting the entire coal mining industry, a general economic downturn or any change arising out of or relating to acts of terrorism, war (whether or not declared) or other hostilities, or any change arising out of or relating to natural catastrophe events, except in each case where such events have a disproportionate adverse effect on the Borrower Parties), a material adverse change in, or a material adverse effect on: (a) the business, operations, prospects, properties, condition (financial or otherwise), assets or income of a Borrower Party; (b) the ability of a Borrower Party to perform any material obligations under this Agreement or any other Loan Documents to which it is a party; or (c) (i) the validity, binding effect or enforceability of any Loan Document, (ii) the rights, remedies or benefits available to the Lender under the Loan Documents, taken as a whole, or (iii) the attachment, perfection or priority of any Lien of the Lender under the Loan Documents or any DIP Order on a material portion of the Collateral.  In determining whether any individual event, act, condition or occurrence of the foregoing types could result in a Material Adverse Effect, notwithstanding that a particular event, act, condition or occurrence does not itself have such effect, a Material Adverse Effect shall be deemed to have occurred if the cumulative effect of such event, act, condition or occurrence and all other events, acts, conditions or occurrences of the foregoing types which have occurred could result in a Material Adverse Effect.

"Maturity Date" shall mean the earlier of (i) the Stated Maturity Date (as extended in accordance with Section 2.15), (ii) the date of the acceleration of the Term Loans and the termination of the Commitments pursuant to Section 9.2, (iii) 45 days after the Petition Date if the Final Order has not been entered by the Bankruptcy Court prior to the expiration of such 45-day period, and (iv) the substantial consummation (as defined in Section 1101(2) of the Bankruptcy Code, which for purposes hereof shall be no later than the effective date thereof) of an Acceptable Reorganization Plan or any other plan of reorganization that is confirmed pursuant to an order entered by the Bankruptcy Court.

"Maximum Guaranteed Amount" shall have the meaning specified in Section 3.1(g).

"Milestones" or "Milestone" shall have the meaning specified in Section 6.25.

19

"<u>Mining Financial Assurances</u>" shall mean performance bonds for reclamation or otherwise, surety bonds or escrow agreements and any payment or prepayment made with respect to, or certificates of deposit or other sums or assets required to be posted by the Borrower under Mining Laws for reclamation or otherwise.

"<u>Mining Laws</u>" shall mean any and all current or future foreign or domestic, federal, state or local statutes, ordinances, orders, rules, regulations, judgments, governmental authorizations, or any other requirements of governmental authorities relating to surface or subsurface mining operations and activities, including, but not be limited to, the Federal Coal Leasing Amendments Act; the Surface Mining Control and Reclamation Act; all other applicable land reclamation and use statutes and regulations; the Federal Mine Safety Act of 1977; the Black Lung Act; and the Coal Act; each as amended, and any comparable state and local laws or regulations.

"<u>Moody's</u>" shall mean Moody's Investors Service, Inc., or any successor thereto.

"<u>Mortgage</u>" shall mean, collectively, any mortgage, deed of trust or deed to secure debt entered into by a Borrower Party in favor of the DIP Agent, for the benefit of Lenders, in form and substance satisfactory to DIP Agent and Majority Lenders.

"<u>Multiemployer Plan</u>" shall mean a "multiemployer plan" as defined in Section 4001(a)(3) of ERISA, and to which any Borrower Party or ERISA Affiliate is making, is obligated to make or has made or been obligated to make at any time within the past five (5) years, contributions on behalf of participants who are or were employed by any of them.

"<u>Necessary Authorizations</u>" shall mean all authorizations, consents, permits, approvals, licenses, certificates and exemptions from, and all filings, reports and registrations with, and all reports to, any Governmental Authority whether federal, state, local, and all agencies thereof, which are required for the transactions contemplated by the Loan Documents and the conduct of the businesses and the ownership (or lease) of the properties and assets of the Borrower Parties.

"<u>Net Cash Proceeds</u>" shall mean, with respect to any Disposition (including the issuance of Equity Interests) or the incurrence by any Borrower Party of any Funded Debt (other than the Obligations), the aggregate amount of cash and Cash Equivalents received for such assets or Equity Interests, or as a result of such Funded Debt, net of necessary and documented transaction costs properly attributable to such transaction and payable by a Borrower Party to a non-Affiliate in connection with such sale, lease, transfer or other disposition of assets or the issuance of any Equity Interests or the incurrence of any Funded Debt, including, without limitation, sales commissions and underwriting discounts, any relocation expenses incurred as a result of such Disposition, taxes paid or payable as a result of such Disposition, in each case, after taking into account any available tax credits or deductions and any tax sharing arrangements, and repayment of any Funded Debt (other than the Obligations) or other obligations secured by a Permitted Lien on the assets subject to such Disposition.

"Net Income" shall mean, for any period, the consolidated net income (or loss) of the Borrower Parties for such period determined in accordance with the Applicable Accounting Standard and without any reduction in respect of preferred stock dividends, provided, however, that: (a) all extraordinary gains (but not losses) and all gains (but not losses) realized in connection with any Disposition or the early extinguishment of Funded Debt, together with any related provision for taxes on any such gain, will be excluded; (b) the net income (but not loss) of any Restricted Subsidiary will be excluded to the extent that the declaration or payment of Dividends or similar distributions by that Restricted Subsidiary of that net income is not at the date of determination permitted without any prior governmental approval (that has not been obtained) or, directly or indirectly, by operation of the terms of its charter or any agreement, instrument, judgment, decree, order, statute, rule or governmental regulation applicable to that Restricted Subsidiary or its shareholders; (c) non-cash gains and losses attributable to movement in the mark-to-market valuation of Hedge Agreements in accordance with the Applicable Accounting Standard will be excluded; (d) the net income (but not loss) of any Person that is not a Restricted Subsidiary or that is accounted for by the equity method of accounting will be included only to the extent of the amount of dividends or similar distributions paid in cash to the specified Person or a Restricted Subsidiary of the Person; and (e) the cumulative effect of a change in accounting principles will be excluded.

"Non-Recourse Debt" shall mean Funded Debt (a) as to which neither the Parent nor any of its Restricted Subsidiaries (1) provides credit support of any kind (including any undertaking, agreement or instrument that would constitute Funded Debt) or (2) is directly or indirectly liable as a guarantor or otherwise; and (b) as to which the lenders have been notified in writing that they will not have any recourse to the stock or assets of the Parent or any of its Restricted Subsidiaries.

"Obligations" shall mean (a) all payment and performance obligations as existing from time to time of the Borrower Parties to the Lenders or their Affiliates under this Agreement and the other Loan Documents (including any interest, fees and expenses that, but for the provisions of the Bankruptcy Code, would have accrued), or as a result of making the Term Loans, (b) the obligation to pay an amount equal to the amount of any and all damages which the Lenders may suffer by reason of a breach by any Borrower Party of any obligation, covenant, or undertaking with respect to this Agreement or any other Loan Document and (c) all fees and expenses incurred by the DIP Agent on behalf of the Lenders under the Loan Documents.

"OFAC" shall mean the Office of Foreign Assets Control of the United States Department of the Treasury, or any successor agency.

"Other Taxes" shall have the meaning specified in Section 2.8(b)(ii).

"Parent" shall have the meaning specified in the preamble.

"Participant" shall have the meaning specified in Section 10.5(c).

"Patent Security Agreements" shall mean, collectively, the Patent Security Agreements made in favor of the DIP Agent for the benefit of the Lenders from time to time.

"Payment in Full" means (a) the payment in full in cash of all Term Loans and other Obligations, other than contingent indemnification and contingent expense reimbursement obligations, in each case, for which no claims have been asserted and (b) the termination of all Term Loan Commitments.

"PBGC" shall mean the Pension Benefit Guaranty Corporation or any entity succeeding to any or all of its functions under ERISA.

"Permitted Business" shall mean any business that is the same as, or reasonably related, ancillary or complementary to, or a reasonable extension of, the principal business in which the Borrower Parties are engaged on the date of this Agreement.

"Permitted Liens" shall mean, as applied to any Person, the following Liens, provided in each case that any Funded Debt secured by such Liens is permitted by Section 8.1 of this Agreement:

(a)     Liens held by the DIP Agent, for the benefit of the Lenders, securing the Obligations;

(b)     Liens on the Collateral securing obligations under the Prepetition Loan Facility to the extent not repaid in full, provided that such Liens shall at all times rank subordinate to any and all Liens securing the Term Loans;

(b)     Liens securing the Second Lien Notes, provided that all such Liens shall at all times rank subordinate to any and all Liens securing the Term Loans;

(c)     [intentionally omitted];

(d)     [intentionally omitted];

(e)     Liens on property (including Equity Interest) existing at the time of acquisition of the property by any Borrower Party; provided that such Liens were in existence prior to such acquisition and not incurred in contemplation of such acquisition;

(f)     Liens to secure the performance of Mining Financial Assurances, statutory obligations, insurance, performance, return of money bonds, surety or appeal bonds (including surety bonds obtained as required in connection with federal coal leases), workers compensation obligations, unemployment insurance and other types of social security and deposits securing liability to insurance carriers under insurance or self-insurance arrangements, performance bonds or other obligations of a like nature incurred in the ordinary course of business (including Liens to secure letters of credit issued to assure payment of such obligations);

(g)     Liens to secure Capitalized Lease Obligations, single-property mortgage financings, purchase money obligations or other Funded Debt, in each case, incurred for the purpose of financing all or any part of the purchase price or cost of design, construction, installation or improvement of property (real or personal), plant or equipment used in the business of the Borrower or any of its Restricted Subsidiaries, <u>provided</u> that such Liens attach only to the asset (which asset shall not constitute Inventory) so purchased, leased or improved, but only to the extent permitted by <u>Section 8.1(c)</u>.

(h)     Liens for taxes, assessments or governmental charges or claims that are not yet delinquent or that are being contested in good faith by appropriate proceedings promptly instituted and diligently pursued; <u>provided</u> that any reserve or other appropriate provision as is required in conformity with the Applicable Accounting Standard has been made therefor;

(i)     Liens imposed by law, such as carriers', warehousemen's, landlord's and mechanics' Liens, in each case, incurred in the ordinary course of business;

(j)     survey exceptions, easements or reservations of, or rights of others for, licenses, rights-of-way, sewers, electric lines, telegraph and telephone lines and other similar purposes, or zoning or other restrictions as to the use of real property that were not incurred in connection with Funded Debt and that do not in the aggregate have a Material Adverse Effect on the value of said properties or materially impair their use in the operation of the business of such Person;

(k)     Liens on insurance policies and proceeds thereof, or other deposits, to secure insurance premium financings;

(l)     bankers' Liens, rights of setoff, Liens arising out of judgments or awards not constituting an Event of Default under <u>Section 9.1(h)</u> and notices of *lis pendens* and associated rights related to litigation being contested in good faith by appropriate proceedings and for which adequate reserves have been made;

(m)     grants of software and other technology licenses in the ordinary course of business;

(n)     contract mining agreements and leases granted to third parties that do not interfere with the ordinary conduct of business of the Borrower Parties;

(o)     Liens arising out of conditional sale, title retention, consignment or similar arrangements for the sale of goods entered into in the ordinary course of business;

(p)     Liens securing judgments for the payment of money not constituting an Event of Default, so long as such Liens are adequately bonded;

(q)     Liens in favor of banking institutions arising as a matter of law or contract encumbering deposits (including the right of set off) which are within the general parameters customary in the banking industry;

(r)     Liens to secure any Permitted Refinancing of Funded Debt permitted hereunder where such Funded Debt is, prior to such Permitted Refinancing, subject to a Permitted Lien; provided, however, that: (1) the new Lien is limited to all or part of the same property and assets that secured or, under the written agreements pursuant to which the original Lien arose, could secure the original Lien (plus improvements and accessions to, such property or proceeds or distributions thereof); (2) the Funded Debt secured by the new Lien is not increased to any amount greater than the sum of (x) the outstanding principal amount, or, if greater, committed amount, of the Funded Debt renewed, refunded, refinanced, replaced, defeased or discharged with such Permitted Refinancing and (y) an amount necessary to pay any fees and expenses, including premiums and accrued and unpaid interest, related to such renewal, refunding, refinancing, replacement, defeasance or discharge; and (3) the new Lien is either of equal and ratable or junior priority relative to the original lien;

(s)     Liens on specific items of Inventory or other goods (and the proceeds thereof) of any Person securing such Person's obligations in respect of bankers' acceptances issued or created in the ordinary course of business for the account of such Person to facilitate the purchase, shipment or storage of such Inventory or other goods;

(t)     Liens arising from protective filings of UCC financing statements (or the equivalent) regarding operating leases entered into by the Borrower and its Restricted Subsidiaries in the ordinary course of business;

(u)     Liens on real property incurred by the Borrower or any of its Restricted Subsidiaries with respect to royalties derived from such real property, the dedication of reserves under supply agreements or similar rights or interests granted, taken subject to, or otherwise imposed on properties consistent with the ordinary course of business for the Borrower and its Restricted Subsidiaries and normal practices in the mining industry; provided that such Liens shall not extend to any Inventory, equipment or other personal property of any Borrower Party or any of its Restricted Subsidiaries;

(v)     Liens to secure Cash Management Obligations with an aggregate principal amount that does not exceed $500,000 at any one time outstanding; and

(w)     Liens permitted under a DIP Order.

"Permitted Refinancing" shall mean any modification, refinancing, refunding, renewal or extension of any Funded Debt so long as (a) the aggregate principal amount thereof does not exceed the principal amount of the Funded Debt so modified, refinanced, refunded, renewed or extended plus the amount of accrued and unpaid interest thereon, (b) the modified, refinanced, refunded, renewed or extended Funded Debt has a later than or equal to final maturity and a longer than or equal to weighted average life to maturity than the Funded Debt being modified, refinanced, refunded,

renewed or extended, (c) the modified, refinanced, refunded, renewed or extended Funded Debt does not bear a rate of interest that exceeds a market rate (as reasonably determined in good faith by an Authorized Signatory of the Borrower Parties and reasonably acceptable to the Lender) as of the date of such modification, refinancing, refunding, renewal or extension, (d) the covenants contained in any instrument or agreement relating to the modified, refinanced, refunded, renewed or extended Funded Debt are not less favorable in any material respect to Borrower Parties than those relating to the Funded Debt being modified, refinanced, refunded, renewed or extended, and the modified, refinanced, refunded, renewed or extended Funded Debt shall not be secured by a Lien on any assets that did not secure the Funded Debt being extended, renewed or refinanced, (e) the Funded Debt shall be subordinated to the Obligations to the same extent, if any, as the Funded Debt being extended, renewed or refinanced, (f) at the time of and after giving effect to such extension, renewal or refinancing, no Default or Event of Default shall exist and (g) the modified, refinanced, refunded, renewed or extended Funded Debt shall not require any additional borrower or guarantor except for the Borrower Parties obligated under the Funded Debt being modified, refinanced, refunded, renewed or extended.

"Person" shall mean an individual, corporation, partnership, trust, joint stock company, limited liability company, unincorporated organization, other legal entity or joint venture or a government or any agency or political subdivision thereof, whether foreign or domestic.

"Petition Date" has the meaning set forth in the first recital of this Agreement.

"PIK Interest" means interest calculated by reference to the Applicable PIK Rate.

"Plan" shall mean an employee benefit plan within the meaning of Section 3(3) of ERISA that any Borrower Party or ERISA Affiliate maintains, sponsors, contributes to or has an obligation to contribute to or has maintained, contributed to or had an obligation to contribute to at any time within the past six (6) years on behalf of participants who were employed by any Borrower Party or ERISA Affiliate.

"Pledge and Security Agreement" shall mean a Pledge and Security Agreement among the Borrower Parties and the DIP Agent, for the benefit of the Lenders, in form and substance satisfactory to DIP Agent and Majority Lenders.

"Prepetition Loan Facility" shall mean the financing facility evidenced by the Prepetition Loan Documents.

"Prepetition Loan Documents" shall mean the Credit Agreement, dated December 21, 2012, among the Borrower, certain of its affiliates and Bayside Finance LLC (or its successors or assigns), together with all security and ancillary documents related thereto (as amended, restated, supplemented or modified from time to time).

"Primed Liens" shall have the meaning specified in Section 6.11(c).

"Pro Forma Basis" shall mean for purposes of determining compliance with the Financial Covenants and the defined terms relating thereto, giving pro forma effect to any acquisition or sale of a Person, all or substantially all of the business or assets of a Person, and any related incurrence, repayment or refinancing of Funded Debt, Capital Expenditures or other related transactions which would otherwise be accounted for as an adjustment permitted by the rules and regulations under the Applicable Accounting Standard as if such acquisition or sale and related transactions were realized on the first day of the relevant period.

"Property" shall mean any real property or personal property, plant, building, facility, structure, underground storage tank or unit, equipment, Inventory or other asset owned, leased or operated by the Borrower Parties or any of them (including, without limitation, any surface water thereon or adjacent thereto, and soil and groundwater thereunder).

"Reorganization Plan" means a Chapter 11 plan in any or all of the Cases of the Obligors.

"Representative" of a Person shall mean that Person's Affiliates and that Person's and its Affiliate's respective officers, directors, employees, shareholders, members, managers, partners, agents and advisors (including, for the avoidance of doubt, accountants, auditors and attorneys).

"Restricted Payment" shall mean (a) Dividends, (b) loans to any Affiliate by any Borrower Party, (c) any payment of management, consulting, investment banking or similar fees payable by any Borrower Party to any Affiliate, (d) any redemption, purchase, retirement, defeasance, sinking fund or similar payment, any claim of rescission or other acquisition or retirement of or with respect to any Equity Interest of any Borrower Party and (e) any payment on or with respect to, or purchase, redemption, defeasance or other acquisition or retirement for value of any Funded Debt of the Borrower or any Guarantor that is contractually subordinated to the Term Loans.

"Restricted Subsidiary" of a Person shall mean any Subsidiary of the referent Person that is not an Unrestricted Subsidiary.

"Retiree Welfare Plan" shall mean a Plan that is an "employee welfare benefit plan" within the meaning of Section 3(1) of ERISA that provides for continuing coverage or benefits for any participant or any beneficiary of a participant after such participant's termination of employment, other than continuation coverage provided pursuant to Code Section 4980B (or applicable state law mandating health insurance continuation coverage for employees) and at the sole expense of the participant or the beneficiary.

"Sanctioned Country" shall mean a country subject to a sanctions program identified on the list maintained by OFAC and available at http://www.ustreas.gov/offices/enforcement/ofac/programs/, as amended or as otherwise published from time to time.

"Sanctioned Person" shall mean (i) a Person named on the list of "Specially Designated Nationals and Blocked Persons" or any similar list, maintained by OFAC and available at http://www.ustreas.gov/offices/enforcement/ofac/sdn/, as amended or as otherwise published from time to time, or (ii) (A) an agency of the government of a Sanctioned Country, (B) an organization controlled or Controlled by a Sanctioned Country, or (C) a person resident in a Sanctioned Country, to the extent subject to a sanctions program administered by OFAC.

"S&P" shall mean Standard & Poor's Ratings Group, a division of McGraw-Hill, Inc., or any successor thereto.

"SEA" shall mean the Securities and Exchange Act of 1934 and the rules promulgated thereunder by the Securities and Exchange Commission, as amended from time to time or any similar Federal law in force from time to time.

"Second Day Orders" means all orders entered by the Bankruptcy Court after the Petition Date or based on motions filed after the Petition Date, other than the First Day Orders.

"Second Lien Notes" shall mean the 9.25% Senior Secured Notes due 2019 in the original principal amount of $200,000,000 issued pursuant to the Indenture.

"Secured Parties" means the DIP Agent, the Lenders, and the other holders of the Obligations.

"Securities Act" shall mean the Securities Act of 1933, as amended, or any similar Federal law then in force.

"Security Documents" shall mean, collectively, any Mortgages, any Pledge and Security Agreement, all documents executed in connection with the Federal Assignment of Claims Act of 1940 (if any), all UCC-1 financing statements and any other document, instrument or agreement granting Collateral for the Obligations, in each case, as the same may be amended or modified from time to time.

"Senior Officer" means the chairman of the board, president, chief executive officer or chief financial officer of a Borrower or, if the context requires, an Obligor, in each case as certified to DIP Agent in a certificate of incumbency from time to time.

"Stated Maturity Date" means the first Business Day that is 270 days after the Interim Order Entry Date.

"Subsidiary" shall mean, as applied to any Person, (a) any corporation of which more than fifty percent (50%) of the outstanding stock (other than directors' qualifying shares) having ordinary voting power to elect a majority of its board of directors (or equivalent governing body), regardless of the existence at the time of a right of the holders of any class or classes of securities of such corporation to exercise such voting power by reason of the happening of any contingency, or any partnership or

limited liability company of which more than fifty percent (50%) of the outstanding partnership interests or membership interests, as the case may be, is at the time owned by such Person, or by one or more Subsidiaries of such Person, or by such Person and one or more Subsidiaries of such Person, and (b) any other entity which is Controlled or capable of being Controlled by such Person, or by one or more Subsidiaries of such Person, or by such Person and one or more Subsidiaries of such Person.

"Subsidiary Guarantors" shall mean all Restricted Subsidiaries (other than Immaterial Subsidiaries, Excluded Foreign Subsidiaries and Excluded Joint Ventures) of any Borrower Party that are signatory to this Agreement, and all Restricted Subsidiaries (other than Immaterial Subsidiaries, Excluded Foreign Subsidiaries and Excluded Joint Ventures) of any Borrower Party that have executed and delivered a Guaranty Supplement.  For greater certainty, each Person that is from time to time a Restricted Subsidiary (other than an Immaterial Subsidiary, Excluded Foreign Subsidiary and Excluded Joint Venture) shall be required to be a Subsidiary Guarantor.

"Superpriority Claim" means a claim against any Obligor in any of the Cases which is an administrative expense claim having priority over any and all administrative expenses, diminution claims and all other priority claims against the Obligors, subject only to the Carve-Out, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 365, 503(b), 506(c) (subject only to and effective upon entry of the Final Order), 507(a), 507(b), 726, 1113 or 1114 of the Bankruptcy Code.

"Taxes" shall have the meaning specified in Section 2.8(b)(i).

"Term Loan Commitments" means the Initial Term Loan Commitments, the Delayed Draw Term Loan Commitments and (if any) the Incremental Term Loan Commitments.

"Term Loans" means the Initial Term Loans and the Delayed Draw Term Loans (including any Incremental Term Loans).

"Term Note" shall mean a promissory note evidencing the Term Loans made by a Lender to the Borrower in substantially the form of Exhibit C.

"Title IV Plan" shall mean a Plan that is an "employee pension benefit plan," within the meaning of Section 3(2) of ERISA, that is covered by Title IV of ERISA.

"UCC" shall mean the Uniform Commercial Code as the same may, from time to time, be enacted and in effect in the State of New York; provided, that to the extent that the UCC is used to define any term herein and such term is defined differently in different Articles or Divisions of the UCC, the definition of such term contained in Article or Division 9 shall govern; provided further, that in the event that, by reason of mandatory provisions of law, any or all of the attachment, perfection or priority of, or

remedies with respect to, the Lender's Lien on any Collateral is governed by the Uniform Commercial Code as enacted and in effect in a jurisdiction other than the New York, the term "UCC" shall mean the Uniform Commercial Code as enacted and in effect in such other jurisdiction solely for purposes of the provisions thereof relating to such attachment, perfection, priority or remedies and for purposes of definitions related to such provisions, and provided further, that in the event that, by reason of mandatory provisions of law, any or all of the attachment, perfection or priority of, or remedies with respect to, the Lender's Lien on any Collateral is governed by the Personal Property Security Act as enacted and in effect in any jurisdiction of Canada, the term "UCC" shall mean, to the extent applicable, the Personal Property Security Act as enacted and in effect in such other jurisdiction solely for purposes of the provisions thereof relating to such attachment, perfection, priority or remedies and for purposes of definitions related to such provisions.

"Unfunded Pension Liability" shall mean at any time, the aggregate amount, if any, of the sum of (a) the amount by which the present value of all accrued benefits under each Title IV Plan exceeds the fair market value of all assets of such Title IV Plan allocable to such benefits in accordance with Title IV of ERISA, all determined as of the most recent valuation date for each such Title IV Plan using the actuarial assumptions for funding purposes in effect under such Title IV Plan, and (b) for a period of five (5) years following a transaction which might be expected to be covered by Section 4069 of ERISA, the liabilities (whether or not accrued) that could be avoided by any Borrower Party or any ERISA Affiliate as a result of such transaction.

"Uniform Customs" shall mean the Uniform Customs and Practice for Documentary Credits (2007 Revision), International Chamber of Commerce Publication No. 600, as the same may be amended from time to time.

"Unrestricted Subsidiary" shall mean any Subsidiary of the Parent (other than the Borrower and any Subsidiary that, directly or indirectly, owns or operates any Core Mining Property or any successor to any of them) that is designated by the Board of Directors of the Parent as an Unrestricted Subsidiary pursuant to a resolution of the Board of Directors, but only to the extent that such Subsidiary:

(a)        has no Funded Debt other than Non-Recourse Debt;

(b)        is not party to any agreement, contract, arrangement or understanding with the Borrower or any Restricted Subsidiary of the Parent unless the terms of any such agreement, contract, arrangement or understanding are no less favorable to the Parent or such Restricted Subsidiary than those that might be obtained at the time from Persons who are not Affiliates of the Parent;

(c)        is a Person with respect to which neither the Parent nor any of its Restricted Subsidiaries has any direct or indirect obligation (a) to subscribe for additional Equity Interests or (b) to maintain or preserve such Person's financial condition or to cause such Person to achieve any specified levels of operating results; and

(d)      has not guaranteed or otherwise directly or indirectly provided credit support for any Funded Debt of the Parent or any of its Restricted Subsidiaries.

"US" or "United States" shall mean the United States of America, including the District of Columbia and its possessions and territories.

"USA Patriot Act" shall mean the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT ACT) Act of 2001, Pub. L. No. 107-56, 115 Stat. 272 (2001), as the same has been, or shall hereafter be, renewed, extended, amended or replaced.

"Variance Report" means a variance report on a weekly basis setting forth (1) actual cash receipts and disbursements for the prior week, (2) all variances, on an individual line item basis and an aggregate basis, as compared to the previously delivered Budget on a weekly and cumulative basis, and (3) an explanation, in reasonable detail, for any material variance, certified by a Senior Officer of Parent.

"Voidable Transfer" shall have the meaning specified in Section 10.17.

Section 1.2     Accounting Principles.   The classification, character and amount of all assets, liabilities, capital accounts and reserves and of all items of income and expense to be determined, and any consolidation or other accounting computation to be made, and the interpretation of any definition containing any financial term, pursuant to this Agreement shall be determined and made in accordance with the Applicable Accounting Standard consistently applied and consistent with past practices, unless such principles are inconsistent with the express requirements of this Agreement; provided that if because of a change in the Applicable Accounting Standard after the date of this Agreement any Borrower Party would be required to alter a previously utilized accounting principle, method or policy in order to remain in compliance with the Applicable Accounting Standard, such determination shall continue to be made in accordance with such Borrower Party's previous accounting principles, methods and policies.   All accounting terms used herein without definition shall be used as defined under the Applicable Accounting Standard.   All financial calculations hereunder shall, unless otherwise stated, be determined for the Parent on a consolidated basis with its Restricted Subsidiaries.

Section 1.3     Other Interpretive Matters.    Each definition of an agreement in this Article 1 shall include such instrument or agreement as amended, restated, supplemented or otherwise modified from time to time with, if required, the prior written consent of the Lender to the extent permitted under this Agreement and the other Loan Documents.   Except where the context otherwise requires, definitions imparting the singular shall include the plural and vice versa.   The words "hereof", "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement, unless otherwise specifically provided herein.   References in this Agreement to "Articles", "Sections", "Schedules" or "Exhibits" shall be to Articles, Sections, Schedules or Exhibits of or to this Agreement unless otherwise specifically provided.

The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation", whether or not so expressly stated in each such instance, and the term "or" has, except where otherwise indicated, the inclusive meaning represented by the phrase "and/or". The word "will" shall be construed to have the same meaning and effect as the word "shall". "Writing", "written" and comparable terms refer to printing, typing, computer disk, e-mail and other means of reproducing words in a visible form. "Ordinary course", "normal course" or comparable terms shall be deemed to refer to the ordinary course of business, consistent with historical practices, in each context. Except where otherwise specifically restricted, reference to a party to a Loan Document includes that party and its successors and assigns. All terms used herein which are defined in Article 9 of the UCC and which are not otherwise defined herein shall have the same meanings herein as set forth therein.

## ARTICLE 2

## THE LOANS

Section 2.1    Initial Term Loans; Delayed Draw Term Loans; Exit Term Facility.

(a)    Initial Term Loans. Each Lender having an Initial Term Loan Commitment agrees, severally and not jointly, to make, on the first Business Day after entry of the Interim Order by the Bankruptcy Court, subject to satisfaction (or waiver by all such Lenders having Initial Term Loan Commitments identified on the Commitment Schedule in Annex I) of the conditions precedent set forth in Section 4.1 and Section 4.2, Term Loans to the Borrower in a principal amount equal to such Lender's Initial Term Loan Commitment (collectively, the "Initial Term Loans"). Amounts prepaid or repaid in respect of the Initial Term Loans may not be reborrowed.

(b)    Delayed Draw Term Loans. Each Lender having a Delayed Draw Term Loan Commitment agrees, severally and not jointly, to make, subject to satisfaction (or waiver by all such Lenders having Delayed Draw Term Loan Commitments identified on the Commitment Schedule) of the conditions precedent set forth in Section 4.2 and Section 4.3 and in accordance with the procedures set forth in Section 2.2, upon written request by the Borrower, after the entry of the Final Order, Term Loans to Borrower in a principal amount equal to such Lender's Delayed Draw Term Loan Commitment (collectively, the "Delayed Draw Term Loans"; the date of the making of the Delayed Draw Term Loans, which may be no later than two (2) Business Days following the Final Order Entry Date, the "Final Term Funding Date"). Amounts prepaid or repaid in respect of Delayed Draw Term Loans may not be reborrowed.

(c)    The Delayed Draw Term Loans and Initial Term Loans shall constitute a single class of Term Loans for all purposes of this Agreement and the other Loan Documents.

(d)      The outstanding principal amount of the Term Loans, together with accrued and unpaid interest thereon and any other accrued amounts in respect thereof, shall be due and payable on the Maturity Date.

(e)      The Initial Term Loan Commitments shall terminate on the Initial Funding Date immediately following the funding of the Initial Term Loans. The Delayed Draw Term Loan Commitments shall terminate on the Final Term Funding Date immediately following the funding of the Delayed Draw Term Loans to be made on the Final Term Funding Date.  The Initial Term Loan Commitments and the Delayed Draw Term Loan Commitments shall also terminate in the event the conditions precedent thereto are not met within two (2) Business Days following the Interim Order Entry Date and the Final Order Entry Date, as applicable.

(f)      <u>Converted Term Loans</u>.  Subject to approval of the Bankruptcy Court and payment of fees pursuant to <u>Section 2.4</u> and in accordance with the Fee Letters, Majority Lenders may in their sole discretion agree, after written request by the Borrower, to the conversion of all of the outstanding Term Loans, on the Consummation Date, on a dollar-for-dollar basis, into term loans under an exit term loan facility on terms acceptable to the DIP Agent and Majority Lenders, including without limitation in connection with the Acceptable Reorganization Plan.

Section 2.2      <u>Manner of Borrowing and Disbursement of Term Loans</u>. To request the borrowing of the Term Loans on a Funding Date, the Borrower shall, no later than 9:00 a.m. Eastern Time on the date that is 3 Business Days before such Funding Date and 1 Business Day with respect to the funding of the Initial Term Loans, deliver to the Lenders a written Direction Letter.  On a Funding Date, the Lenders shall, subject to the satisfaction of the conditions set forth in <u>Section 4.1</u>, disburse the Term Loans to be made hereunder on such date by wire transfer pursuant to and in accordance with the applicable Direction Letter.  The Direction Letter for the Initial Term Loans shall request deposit of the Initial Term Loans into a Deposit Account under the control (within the meaning of Section 9-104 of the UCC) of Wells Fargo, National Association, as Collateral Trustee under the Indenture.

Section 2.3      <u>Interest</u>.

(a)      <u>Rate</u>.      Interest on the Term Loans, subject to <u>Sections 2.3(c)</u> and <u>(d)</u>, shall accrue and be payable on the outstanding principal amount of the Term Loans at the Applicable Rate, and shall be computed for the actual number of days elapsed on the basis of a hypothetical year of three hundred sixty (360) days.  Accrued Cash Interest shall be payable in cash monthly in arrears on the first day of each calendar month for the prior calendar month, commencing on May 1, 2015.  Accrued PIK Interest shall be paid by Borrower to the Lenders in arrears on the first day of each calendar month for the prior calendar month (each, a "<u>PIK Interest Payment Date</u>") of each calendar year beginning January 1, 2015, in accordance with <u>Section 2.3(b)</u> hereof.  Interest on Term Loans then outstanding shall also be due and payable on the Maturity Date (or the date of any earlier prepayment of the Obligations).

(b) <u>Capitalization of PIK Interest</u>.  Borrower shall pay all accrued PIK Interest on each PIK Interest Payment Date by capitalizing such amount on a monthly basis (and any PIK Interest so capitalized shall bear interest as provided in this <u>Section 2.3</u> from such PIK Interest Payment Date and shall otherwise be treated as a portion of the Term Loans for all purposes of the Loan Documents thereafter).  Notwithstanding the foregoing, the Borrower may elect (and shall elect any time the Borrower is prohibited from capitalizing any such accrued PIK Interest) to pay any accrued PIK Interest on any PIK Interest Payment Date in cash.  To the extent any PIK Interest is not able to be capitalized and is not paid in cash on any PIK Interest Payment Date as provided in the preceding sentence, then, for the avoidance of doubt, such PIK Interest shall continue to accrue and be payable on the Maturity Date.

(c) <u>Upon Default</u>.  Immediately upon the occurrence and during the continuance of an Event of Default, interest on the outstanding Obligations shall, upon election by the DIP Agent (as directed by Majority Lenders), accrue at the Default Rate; <u>provided</u>, <u>however</u>, that if the DIP Agent (as directed by Majority Lenders) elects to not impose the Default Rate at any point in time, it may at any later point in time elect to do so, without impairing any of its rights hereunder or available under Applicable Law and, without limiting the foregoing, may later elect to have the Obligations accrue interest during the continuance of an Event of Default at the Default Rate retroactively to the first occurrence of an unwaived Event of Default.  Interest accruing at the Default Rate shall be payable on demand and in any event on the Maturity Date (or the date of any earlier prepayment in full of the Obligations) and shall accrue until the earliest to occur of (i) waiver of the applicable Event of Default in accordance with <u>Section 10.12</u>, (ii) agreement by the DIP Agent (as directed by Majority Lenders) to rescind the charging of interest at the Default Rate, (iii) the date on which the Event of Default is no longer continuing, or (iv) payment in full of the Obligations.  Neither the DIP Agent nor Majority Lenders shall be required to (A) accelerate the maturity of the Term Loans or (B) exercise any other rights or remedies under the Loan Documents in order to charge interest hereunder at the Default Rate.

(d) <u>Computation of Interest</u>.  In computing interest on any Advance, the date of making the Advance shall be included and the date of payment shall be excluded; <u>provided</u>, <u>however</u>, that if an Advance is repaid on the date that it is made, one (1) day of interest shall be due with respect to such Advance.

Section 2.4    <u>Fees</u>.  Each Borrower Party agrees, jointly and severally, to pay to the DIP Agent and the Lenders and their Affiliates when due all of the following fees:

(a)  <u>Commitment Amount Fees</u>.  All fees and other amounts in accordance with the terms of the Fee Letters.

(b)  <u>Prepayment Premiums</u>.

(i)  If the Borrower prepays the Term Loans in any amount and for any reason (including, without limitation, (A) mandatory prepayments, (B) prepayments after the acceleration of the Obligations pursuant to <u>Section 9.2</u>, (C) foreclosure and sale of, or collection of, the Collateral, (D) sale of the Collateral in any Insolvency Proceeding, (E) the restructure, reorganization, or compromise of the Obligations by the confirmation of a plan of reorganization or any other plan of compromise, restructure, or arrangement in any Insolvency Proceeding, (F) voluntary prepayment by the Borrower pursuant to <u>Section 2.5</u> or (G) a Change of Control), then the Borrower shall pay to the Lenders a prepayment premium equal to one percent (1.00%) of the principal amount of the Term Loans prepaid at such time.

(ii)  The Borrower Parties agree that the fees required under this <u>Section 2.4(a)</u> are a reasonable calculation of the Lenders' lost profits in view of the difficulties and impracticality of determining actual damages resulting from a voluntary prepayment and/or an early repayment of the Term Loans.  All prepayment premiums under this <u>Section 2.4(a)</u> shall be in addition to all other amounts which may be due to the Lenders from time to time pursuant to the terms of this Agreement and the other Loan Documents.  All of the Term Loans are subject to the prepayment premiums set forth in this <u>Section 2.4(a)</u> and the payment of one prepayment premium shall not excuse or reduce the payment of a prepayment premium on any subsequent prepayment.

(c)  <u>Bank Charges</u>.  The Borrower Parties shall pay to the DIP Agent, on demand, any and all fees, costs or expenses which the DIP Agent or any Lender pays to a bank or other similar institution arising out of or in connection with (i) the forwarding to any Borrower Party or any other Person on behalf of any Borrower Party, by DIP Agent or any Lender, of proceeds of Term Loans made to Borrower pursuant to this Agreement and (ii) the depositing for collection by DIP Agent or any Lender of any check or item of payment received or delivered to DIP Agent or any Lender on account of the Obligations.

(d)  <u>Collateral Protection Expenses</u>.  All out-of-pocket expenses incurred in protecting, storing, warehousing, insuring, handling, maintaining and shipping the Collateral, and any and all excise, property, sales, and use taxes imposed by any state, federal, or local authority on any of the Collateral or in respect of the sale thereof shall be borne and paid by Borrower Parties.  If Borrower Parties fail to promptly pay any portion thereof when due, DIP Agent may, at its option, but shall not be required to, pay the same and charge Borrower Parties therefor.

(e)  <u>Reimbursement of Costs and Expenses</u>.  In addition to all fees, charges, costs and expenses described in this Section 2.4, all reasonable and documented out-of-pocket costs and expenses incurred by any Indemnified Person shall be paid pursuant to Section 6.19.

(f)   Treatment of Fees.   Without limitation, all fees payable under this Section 2.4 shall be fully earned when due, non-refundable when paid and shall be in addition to all other amounts which may be due to the Lenders from time to time pursuant to the terms of this Agreement and the other Loan Documents.

Section 2.5   Voluntary Prepayment.   Subject to Section 2.4(b), the principal amount of the Term Loans may be repaid in full or in part at any time, upon not less than three (3) Business Days' prior written notice to DIP Agent, provided that the amount of any such partial prepayment is in integral multiples of $100,000 (plus accrued and unpaid interest on the amount of Term Loans prepaid on such date), it being understood and agreed that no amounts so prepaid may be reborrowed.

Section 2.6   Repayment.

(a)   Change of Control.   Any principal and interest on the Term Loans, and any other amounts owing hereunder, remaining unpaid upon the occurrence of a Change of Control shall be due and payable immediately upon such Change of Control, together with the prepayment premium due under Section 2.4(a) hereof.

(b)   The Term Loans.   Any principal and interest on the Term Loans remaining unpaid on the Maturity Date shall be due and payable in full and in cash on the Maturity Date.   In addition to the foregoing, the Borrower hereby promises to pay all other Obligations, including, without limitation, any fees or prepayment premiums, as the same become due and payable hereunder and, in any event, on the Maturity Date (or such earlier date as the Term Loans are required to be repaid in full).

(c)   Other Mandatory Repayments.

(i)   Upon a Disposition permitted by Section 8.7, the applicable Borrower Party shall apply such Net Cash Proceeds:

(A)   To repay the Obligations;

(B)   Subject to the consent of Majority Lenders, to purchase other assets that would constitute Collateral that are not classified as current assets under the Applicable Accounting Standard and that are used or useful in a Permitted Business so long as the Borrower Party confirms that such Net Cash Proceeds have been deposited into an account that is subject to a Blocked Account Agreement, which Net Cash Proceeds when so deposited (i) shall constitute Collateral, securing the payment of the Obligations then outstanding, (ii) may be withdrawn by the applicable Borrower Party solely to reinvest in such assets that are useful in the business of such Borrower Party and (iii) shall, upon the occurrence and during the continuance of an Event of Default, be applied (or an amount equal to such Net Cash Proceeds shall be applied) to the repayment of the Obligations as set forth above; or

(C)   Subject to the consent of Majority Lenders, to acquire all or substantially all of the assets of a Person, or any Equity Interests,

permitted under Section 8.7(c), so long as the Borrower Party confirms that such Net Cash Proceeds have been deposited into an account that is subject to a Blocked Account Agreement, which Net Cash Proceeds when so deposited (i) shall constitute Collateral, securing the payment of the Obligations then outstanding, (ii) may be withdrawn by the applicable Borrower Party solely to reinvest in such identified long term assets that are useful in the business of such Borrower Party and (iii) shall, upon the occurrence and during the continuance of an Event of Default, be applied (or an amount equal to such Net Cash Proceeds shall be applied) to the repayment of the Obligations as set forth above;

(ii)    Any payments due under this Section 2.6(c) shall be applied in the manner set forth in Section 2.10 and shall be subject to any prepayment premiums provided for in Section 2.4(b) or otherwise.  Nothing in this Section 2.6(c) shall be deemed to allow the Borrower Parties to issue Equity Interests, dispose of assets or incur Funded Debt except as otherwise permitted by this Agreement and the other Loan Documents.  Notwithstanding anything contained in this Section 2.6(c) to the contrary, the Lenders shall be permitted in their sole discretion to decline all or any portion of any mandatory prepayment required pursuant to the terms hereof.

Section 2.7    Loan Accounts.

(a)    The Term Loans shall be repayable in accordance with the terms and provisions set forth herein. At the request of a Lender, a Term Note shall be issued by the Borrower to such Lender on account of its Term Loans and shall be duly executed and delivered by an Authorized Signatory of the Borrower.

(b)    Each Lender shall open and maintain on its books in the name of the Borrower a loan account with respect to the Term Loans made by it and interest thereon (the "Loan Account").  Each Lender shall debit such Loan Account for the principal amount of each Advance made by it, accrued interest thereon, and all other amounts which shall become due from the Borrower to such Lender pursuant to this Agreement and shall credit the Loan Account for each payment which the Borrower shall make in respect to the Obligations.  The records of the Lenders with respect to such Loan Accounts shall be conclusive evidence of the Term Loans and accrued interest thereon, absent manifest error.

Section 2.8    Manner of Payment.

(a)    When Payments Due.

(i)    Each payment (including any prepayment) by the Borrower on account of the principal of or interest on the Term Loans, fees, and any other amount owed to the Lenders under this Agreement or the other Loan Documents shall be made not later than 2:00 p.m. (New York, New York time) on the date specified for payment under this Agreement or any other Loan Document to the relevant Lender at its Lender's Office in Dollars in immediately available funds.  Any payment received by

a Lender after 2:00 p.m. (New York, New York time) shall be deemed received on the next Business Day.

(ii)     If any payment under this Agreement or any other Loan Document shall be specified to be made on a day which is not a Business Day, it shall be made on the next succeeding day which is a Business Day, and such extension of time shall in such case be included in computing interest and fees, if any, in connection with such payment.

(b)   No Deduction.

(i)     Any and all payments of principal and interest, or of any fees or indemnity or expense reimbursements by any Borrower Party hereunder or under any other Loan Documents (the "Borrower Payments") shall be made without setoff or counterclaim and free and clear of and without deduction for any and all current or future taxes, levies, imposts, deductions, charges or withholdings with respect to such Borrower Payments and all interest, penalties or similar liabilities with respect thereto, excluding taxes imposed on the net income of a Lender by the jurisdiction under the laws of which such Lender is organized or conducts business or any political subdivision thereof (all such nonexcluded taxes, levies, imposts, deductions, charges or withholdings and liabilities collectively or individually "Taxes").   If any Borrower Party shall be required to deduct any Taxes from or in respect of any sum payable to a Lender hereunder or under any other Loan Document, (A) the sum payable shall be increased by the amount (an "Additional Amount") necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section 2.8(b)(i)) such Lender shall receive an amount equal to the sum it would have received had no such deductions been made, (B) such Borrower Party shall make such deductions, and (C) such Borrower Party shall pay the full amount deducted to the relevant Governmental Authority in accordance with Applicable Law.

(ii)     In addition, the Borrower shall pay to the relevant Governmental Authority in accordance with Applicable Law any current or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies that arise from any payment made hereunder or from the execution, delivery or registration of, or otherwise with respect to, this Agreement or any other Loan Document (such taxes being "Other Taxes").

(iii)     The Borrower shall indemnify the Lenders for the full amount of Taxes and Other Taxes with respect to Borrower Payments paid by such Person, and any liability (including penalties, interest and expenses (including attorney's fees and expenses)) arising therefrom or with respect thereto, whether or not such Taxes or Other Taxes were correctly or legally asserted by the relevant Governmental Authority.   An explanation of the manner in which such amount shall have been determined and the amount of such payment or liability prepared by a Lender, absent manifest error, shall be final, conclusive and binding for all purposes.   Such indemnification shall be made within thirty (30) days after the date such Lender makes written demand therefor.  If any Taxes or Other Taxes for which a Lender has received

37

indemnification from the Borrower hereunder shall be finally determined to have been incorrectly or illegally asserted and are refunded to such Lender, such Lender shall promptly forward to the Borrower any such refunded amount (after deduction of any Tax or Other Tax paid or payable by such Lender as a result of such refund), not exceeding the increased amount paid by the Borrower pursuant to this Section 2.8(b).

(iv)    As soon as practicable after the date of any payment of Taxes or Other Taxes by the Borrower to the relevant Governmental Authority, the Borrower will deliver to the Lender, at its address, the original or a certified copy of a receipt issued by such Governmental Authority evidencing payment thereof.

(v)    Nothing contained in this Section 2.8(b) shall require a Lender to make available to the Borrower any of such Lender's tax returns (or any other information) that the Lender deems confidential or proprietary.

Section 2.9    Reserved.

Section 2.10    Application of Payments.

(a)    Payments Prior to Event of Default.  At all times during which an Event of Default is not continuing, all amounts paid by the Borrower to the Lenders in respect of the Obligations (other than payments specifically earmarked for application to certain principal, interest, fees or expenses hereunder), shall be applied in the following order of priority:

FIRST, *pro rata*, to the payment of out-of-pocket costs and expenses (including attorneys' fees) of the Lenders and the DIP Agent in connection with the enforcement of the rights of the Lenders and/or the DIP Agent under the Loan Documents;

SECOND, *pro rata* to the payment of any fees then due and payable to the Lenders hereunder or under any other Loan Documents;

THIRD, *pro rata*, to the payment of all Obligations consisting of accrued interest then due and payable to the Lenders hereunder;

FOURTH, *pro rata*, to the payment of principal then due and payable on the Term Loans and any prepayment premiums owing in connection with such payment, if any;

FIFTH, *pro rata*, to the payment of all other Obligations not otherwise referred to in this Section 2.10(a) then due and payable; and

SIXTH, upon satisfaction in full of all Obligations, to the Borrower or as otherwise required by law.

(b)    Payments Subsequent to Event of Default.  Notwithstanding anything in this Agreement or any other Loan Document which may

38

be construed to the contrary, subsequent to the occurrence and during the continuance of an Event of Default, payments and prepayments with respect to the Obligations (from realization on Collateral or otherwise) shall be applied as provided in Section 2.10(a) or as otherwise determined by the Majority Lenders in their reasonable discretion.

Section 2.11   Use of Proceeds.   In accordance with the Budget then in effect and the cash management order entered in connection with the Cases, the proceeds of (a) the Initial Term Loans shall be used by the Borrower on the Initial Funding Date to repay the Prepetition Loan Facility in full and for working capital purposes during the pendency of the Cases; and (b) the Delayed Draw Term Loans for general corporate purposes and for fees and expenses associated with the Cases of the Borrower permitted under this Agreement.   Notwithstanding anything to the contrary, no portion of the Loans, the Collateral (including any cash collateral) or the Carve-Out shall be used (i) to challenge the validity, perfection, priority, extent or enforceability of the Loans, any other Obligations or any Liens or security interests securing the Obligations, (ii) to investigate or assert any other claims or causes of action against the DIP Agent or any Lender or any other holder of any Obligations or (iii) for any act which has the effect of materially or adversely modifying or compromising the rights and remedies of the DIP Agent or any Lender as set forth in any Loan Document.

Section 2.12   All Obligations to Constitute One Obligation.   All Obligations shall constitute one general obligation of the Borrower and shall be secured by the DIP Agent's security interest and Lien upon all of the Collateral, and by all other security interests and Liens heretofore, now or at any time hereafter granted by any Borrower Party to the DIP Agent or the Lenders to the extent provided in the Loan Documents or DIP Order under which such Liens arise.

Section 2.13   Maximum Rate of Interest.   The Borrower and the Lenders hereby agree and stipulate that the only charges imposed upon the Borrower for the use of money in connection with this Agreement are and shall be the specific interest and fees described in this Article 2 and in any other Loan Document.   Notwithstanding the foregoing, the Borrower and the Lenders further agree and stipulate that all closing fees, agency fees, facility fees, underwriting fees, default charges, late charges, funding or "breakage" charges, increased cost charges, attorneys' fees and reimbursement for costs and expenses paid by any Lender to third parties or for damages incurred by any Lender are charges to compensate such Lender for underwriting and administrative services and costs or losses performed or incurred, and to be performed and incurred, by such Lender in connection with this Agreement and the other Loan Documents and shall under no circumstances be deemed to be charges for the use of money pursuant to any Applicable Law.   In no event shall the amount of interest and other charges for the use of money payable under this Agreement exceed the maximum amounts permissible under any law that a court of competent jurisdiction shall, in a final determination, deem applicable. The Borrower and the Lenders, in executing and delivering this Agreement, intend legally to agree upon the rate or rates of interest and other charges for the use of money and manner of payment stated within it; provided, however, that, anything contained in this Agreement to the contrary notwithstanding, if the amount of such interest and other

charges for the use of money or manner of payment exceeds the maximum amount allowable under Applicable Law, then, *ipso facto* as of the Agreement Date, the Borrower is and shall be liable only for the payment of such maximum amount as allowed by law, and payment received from the Borrower in excess of such legal maximum amount, whenever received, shall be applied <u>first</u> to reduce the principal balance of the Term Loans, <u>second</u> to the payment of all other Obligations then due and payable, and <u>finally</u>, if such excess is greater than the foregoing, the relevant Lender shall promptly refund the remainder thereof to the Borrower Parties.

Section 2.14    <u>Incremental Term Loans.</u>

(a)    The Borrower may at any time after the Initial Funding Date, by notice to the DIP Agent (whereupon the DIP Agent shall promptly deliver a copy to each of the Lenders), request one (and only one) increase of the Delayed Draw Term Loan Commitments by up to $10,000,000 (the "<u>Incremental Term Loan Commitments</u>"; and such Term Loan, "<u>Incremental Term Loans</u>"); provided, that at the time of any such request and after giving pro forma effect to the Incremental Term Loans, (i) no Default or Event of Default shall exist; (ii) the representations and warranties set forth in Article 5 and in each other Loan Document shall be true and correct (or true and correct in all material respects, in the case of any such representation or warranty that is not qualified as to materiality) on and as of the date of such borrowing (except to the extent such representations and warranties expressly relate to an earlier date, in which case such representations and warranties shall be true and correct (or true and correct in all material respects, in the case of any such representation or warranty that is not qualified as to materiality) as of such earlier date); (iii) the making of such Incremental Term Loans shall be authorized by Bankruptcy Court order and shall not violate any requirement of law and shall not be enjoined, temporarily, preliminarily or permanently; (iv) the Final Order shall be in full force and effect and shall not have been vacated or reversed, shall not be subject to a stay, and shall not have been modified or amended in any material respect without the written consent of the Majority Lenders; and (v) the Borrower shall have delivered to the DIP Agent and the Lenders an updated Budget and Variance Reports, which shall be satisfactory to the DIP Agent and Majority Lenders.

(b)    If one or more Lenders, in their sole discretion, agree to provide Incremental Term Loan Commitments in any principal amount in accordance with this <u>Section 2.14</u>, the Borrower and each such Lender shall execute and deliver to the DIP Agent an Incremental Term Loan Assumption Agreement and such other documentation as the DIP Agent shall reasonably specify to evidence the Incremental Term Loan Commitment of each such Lender. Except in respect of the upfront fees, the terms and provisions of the Incremental Term Loans shall be identical to those of the then existing Delayed Draw Term Loans. The DIP Agent shall promptly notify each Lender as to the effectiveness of each Incremental Term Loan Assumption Agreement.

(c)      Each of the parties hereto hereby agrees that, upon the effectiveness of any Incremental Term Loan, this Agreement shall be amended to the extent (but only to the extent) necessary to reflect the existence of such Incremental Facility and the Loans evidenced thereby, and any joinder agreement or amendment (an "Incremental Amendment") may without the consent of the other Lenders effect such amendments to this Agreement and the other Loan Documents as may be necessary or appropriate, in the reasonable opinion of DIP Agent, Majority Lenders and Borrower, to effectuate the provisions of this Section 2.14, and, for the avoidance of doubt, this Section 2.14 shall supersede any provisions in Section 10.12. From and after such effectiveness, the Loans and Commitments established pursuant to this Section 2.14 shall constitute Loans and Commitments under, and shall be entitled to all the benefits afforded by, this Agreement and the other Loan Documents, and shall, without limiting the foregoing, benefit equally and ratably from the guarantees and security interests created by any DIP Order and the Loan Documents. The Loan Parties shall take any actions reasonably required by the DIP Agent or Majority Lenders to ensure and/or demonstrate that the Liens and security interests granted by any DIP Order or Loan Documents continue to be perfected under the UCC or otherwise after giving effect to the establishment of any such new Term Loans and Commitments.

(d)      The aggregate original principal amount of Incremental Term Loans shall not exceed $10,000,000, and an Incremental Term Loan may be made only once under this Section 2.14.

Section 2.15    Extension of the Stated Maturity Date.

The Borrower may, by notice to the DIP Agent no later than five (5) days prior to the Stated Maturity Date (as amended by this Section 2.15), whereupon the DIP Agent shall promptly notify the Lenders of such notice, elect to extend the then current Stated Maturity Date by up to three months; provided, (i) that at the time of any such request no Default or Event of Default shall exist and (ii) the Borrower shall have delivered an updated Budget and Variance Report, which shall be satisfactory to the DIP Agent and Majority Lenders; provided, further, that the Borrower may make no more than two elections under this Section 2.15 each for up to three (3) months.  An election under this Section 2.15 shall become effective, and the Stated Maturity Date shall be deemed amended by this Section 2.15, once the Borrower has paid the DIP Agent a fee for each such extension in the amount of ½ of 1% of the aggregate outstanding principal amount of the Obligations outstanding.  The DIP Agent shall distribute such fees to the Lenders ratably in accordance with the aggregate outstanding principal amount of their Term Loans.

## ARTICLE 3

## GUARANTY

Section 3.1    Guaranty.

(a)   Each Guarantor hereby guarantees to the Lenders the full and prompt payment of the Obligations, including, without limitation, any interest thereon (including, without limitation, interest as provided in this Agreement, accruing after the filing of a petition initiating any Insolvency Proceedings, whether or not such interest accrues or is recoverable against the Borrower after the filing of such petition for purposes of the Bankruptcy Code or is an allowed claim in such proceeding), plus attorneys' fees and expenses if the obligations represented by this Guaranty are collected by law, through an attorney-at-law, or under advice therefrom.

(b)   Regardless of whether any proposed guarantor or any other Person shall become in any other way responsible to the Lenders for or in respect of the Obligations or any part thereof, and regardless of whether or not any Person now or hereafter is responsible to the Lenders for the Obligations or any part thereof, whether under this Guaranty or otherwise, shall cease to be so liable, each Guarantor hereby declares and agrees that this Guaranty shall be a joint and several obligation of each Guarantor, shall be a continuing guaranty and shall be operative and binding until the Obligations shall have been indefeasibly paid in full in cash and the Commitments shall have been terminated.

(c)   Each Guarantor absolutely, unconditionally and irrevocably waives any and all right to assert any defense (other than the defense of payment in cash in full, to the extent of its obligations hereunder, or a defense that such Guarantor's liability is limited as provided in Section 3.1(g)), set-off, counterclaim or cross-claim of any nature whatsoever with respect to this Guaranty or the obligations of the Guarantors under this Guaranty or the obligations of any other Person or party (including, without limitation, the Borrower) relating to this Guaranty or the obligations of any of the Guarantors under this Guaranty or otherwise with respect to the Obligations in any action or proceeding brought by the Lenders to collect the Obligations or any portion thereof, or to enforce the obligations of any of the Guarantors under this Guaranty.

(d)   The Lenders may (or may direct the DIP Agent to) from time to time, without exonerating or releasing any Guarantor in any way under this Guaranty, (i) take such further or other security or securities for the Obligations or any part thereof as they may deem proper, or (ii) release, discharge, abandon or otherwise deal with or fail to deal with any Guarantor of the Obligations or any security or securities therefor or any part thereof now or hereafter held by any of the Lenders, or (iii) amend, modify, extend, accelerate or waive in any manner any of the provisions, terms, or conditions of the Loan Documents, all as it may consider expedient or appropriate in its reasonable discretion.   Without limiting the generality of the foregoing, or of Section 3.1(e), it is understood that the Lenders may, without

exonerating or releasing any Guarantor, give up, modify or abstain from perfecting or taking advantage of any security for the Obligations and accept or make any compositions or arrangements, and realize upon any security for the Obligations when, and in such manner, and with or without notice, all as such Person may deem expedient.

(e)   Each Guarantor acknowledges and agrees that no change in the nature or terms of the Obligations or any of the Loan Documents, or other agreements, instruments or contracts evidencing, related to or attendant with the Obligations (including any novation), shall discharge all or any part of the liabilities and obligations of such Guarantor pursuant to this Guaranty; it being the purpose and intent of the Guarantors and the Lenders that the covenants, agreements and all liabilities and obligations of each Guarantor hereunder are absolute, unconditional and irrevocable under any and all circumstances.  Without limiting the generality of the foregoing, each Guarantor agrees that until each and every one of the covenants and agreements of this Guaranty is fully performed, and without possibility of recourse, whether by operation of law or otherwise, such Guarantor's undertakings hereunder shall not be released, in whole or in part, by any action or thing which might, but for this paragraph of this Guaranty, be deemed a legal or equitable discharge of a surety or guarantor, or by reason of any waiver, omission of any Lender, or its failure to proceed promptly or otherwise, or by reason of any action taken or omitted by such Lender, whether or not such action or failure to act varies or increases the risk of, or affects the rights or remedies of, such Guarantor or by reason of any further dealings between the Borrower, on the one hand, and any Lender, on the other hand, or any other guarantor or surety, and such Guarantor hereby expressly waives and surrenders any defense to its liability hereunder, or any right of counterclaim or offset of any nature or description which it may have or may exist based upon, and shall be deemed to have consented to, any of the foregoing acts, omissions, things, agreements or waivers.

(f)   The Lenders may, without demand or notice of any kind upon or to any Guarantor, at any time or from time to time when any amount shall be due and payable hereunder by any Guarantor upon the occurrence and during the continuance of an Event of Default, if the Borrower shall not have timely paid any of the Obligations, set-off and appropriate and apply to any portion of the Obligations hereby Guaranteed, and in such order of application as the Lenders may from time to time elect in accordance with this Agreement, any deposits, property, balances, credit accounts or moneys of any Guarantor in the possession of a Lender or under its control for any purpose.  If and to the extent that any Guarantor makes any payment to the Lenders or any other Person pursuant to or in respect of this Guaranty, any claim which such Guarantor may have against the Borrower by reason thereof shall be subject and subordinate to the prior payment in full of the Obligations to the satisfaction of the Lenders.

(g)   The creation or existence from time to time of Obligations in excess of the amount committed to or outstanding on the date of this Guaranty is hereby authorized, without notice to any Guarantor, and shall in no way impair or affect this Guaranty or the rights of the Lenders herein.  It is the intention of each

Guarantor and the Lenders that each Guarantor's obligations hereunder shall be, but not in excess of, the Maximum Guaranteed Amount (as herein defined). The "Maximum Guaranteed Amount" with respect to any Guarantor, shall mean the maximum amount which could be paid by such Guarantor without rendering this Guaranty void or voidable as would otherwise be held or determined by a court of competent jurisdiction in any action or proceeding involving any state, provincial or Federal bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance or other similar laws relating to the insolvency of debtors.

(h)  Upon the bankruptcy or winding up or other distribution of assets of the Borrower, or of any surety or guarantor (other than the applicable Guarantor) for any Obligations of the Borrower to the Lenders, the rights of the Lenders against any Guarantor shall not be affected or impaired by the omission of any Lender to prove its claim, or to prove the full claim, as appropriate, against the Borrower or any such other guarantor or surety, and the Lenders may prove such claims as they see fit and may refrain from proving any claim and in their discretion may value as they see fit or refrain from valuing any security held by them without in any way releasing, reducing or otherwise affecting the liability to the Lenders of each of the Guarantors.

(i)  Each Guarantor hereby absolutely, unconditionally and irrevocably expressly waives, except to the extent such waiver would be expressly prohibited by Applicable Law, the following:  (i) notice of acceptance of this Guaranty, (ii) notice of the existence or creation of all or any of the Obligations, (iii) presentment, demand, notice of dishonor, protest and all other notices whatsoever (other than notices expressly required hereunder or under any other Loan Document to which any Guarantor is a party), (iv) all diligence in collection or protection of or realization upon the Obligations or any part thereof, any obligation hereunder, or any security for any of the foregoing, (v) all rights to enforce any remedy which the Lender may have against the Borrower and (vi) until the Obligations shall have been paid in full in cash, all rights of subrogation, indemnification, contribution and reimbursement from the Borrower for amounts paid hereunder and any benefit of, or right to participate in, any collateral or security now or hereinafter held by the DIP Agent on behalf of the Lenders in respect of the Obligations.  If a claim is ever made upon the Lenders for the repayment or recovery of any amount or amounts received by such Person in payment of any of the Obligations and such Person repays all or part of such amount by reason of (A) any judgment, decree or order of any court or administrative body having jurisdiction over such Person or any of its property, or (B) any settlement or compromise of any such claim effected by such Person with any such claimant, including the Borrower, then in such event each Guarantor agrees that any such judgment, decree, order, settlement or compromise shall be binding upon such Guarantor, notwithstanding any revocation hereof or the cancellation of any promissory note or other instrument evidencing any of the Obligations, and such Guarantor shall be and remain obligated to such Person hereunder for the amount so repaid or recovered to the same extent as if such amount had never originally been received by such Person.

(j)   This Guaranty is a continuing guaranty of the Obligations and all liabilities to which it applies or may apply under the terms hereof and shall be conclusively presumed to have been created in reliance hereon.  No failure or delay by the Lenders in the exercise of any right, power, privilege or remedy shall operate as a waiver thereof, and no single or partial exercise by the Lenders of any right or remedy shall preclude other or further exercise thereof or the exercise of any other right or remedy and no course of dealing between any Guarantor and the Lenders shall operate as a waiver thereof.  No action by the Lenders permitted hereunder shall in any way impair or affect this Guaranty.  For the purpose of this Guaranty, the Obligations shall include, without limitation, all Obligations of the Borrower to the Lenders, notwithstanding any right or power of any third party, individually or in the name of the Borrower and the Lenders to assert any claim or defense as to the invalidity or unenforceability of any such Obligation, and no such claim or defense shall impair or affect the obligations of any Guarantor hereunder.

(k)   This is a guaranty of payment and not of collection.  In the event any Lender makes a demand upon any Guarantor in accordance with the terms of this Guaranty, such Guarantor shall be held and bound to the Lenders directly as debtor in respect of the payment of the amounts hereby Guaranteed.  All costs and expenses, including, without limitation, attorneys' fees and expenses, incurred by the Lenders in obtaining performance of or collecting payments due under this Guaranty shall be deemed part of the Obligations Guaranteed hereby.

(l)   Each Subsidiary Guarantor is (i) a direct or indirect wholly owned Domestic Subsidiary of the Borrower, or (ii) a direct or indirect wholly owned Restricted Subsidiary of the Parent that is not a direct or indirect Restricted Subsidiary of the Borrower.  Each Guarantor expressly represents and acknowledges that any financial accommodations by the Lenders to the Borrower, including, without limitation, the extension of credit, are and will be of direct interest, benefit and advantage to such Guarantor.

(m)  Each Guarantor shall be entitled to subrogation and contribution rights from and against the Borrower to the extent any Guarantor is required to pay to the Lenders any amount in excess of the Term Loans advanced directly to, or other Obligations incurred directly by, such Guarantor or as otherwise available under Applicable Law; provided, however, that such subrogation and contribution rights are and shall be subject to the terms and conditions of this Section 3.1 and Section 10.20.  The payment obligation of a Guarantor to any other Guarantor under any Applicable Law regarding contribution rights among co-obligors or otherwise shall be subordinate and subject in right of payment to the prior payment in full of the obligations of such Guarantor under the other provisions of this Guaranty, and such Guarantor shall not exercise any right or remedy with respect to such rights until payment and satisfaction in full of all such obligations.   Notwithstanding anything to the contrary contained in this Guaranty, no Guarantor shall exercise any rights of subrogation, contribution, indemnity, reimbursement or other similar rights against, nor shall proceed or seek recourse against or with respect to any property or asset of, the Borrower, any other Guarantor or any other guarantor (including after

payment in full of the Obligations), if all or any portion of the Obligations have been satisfied in connection with an exercise of remedies in respect of the Equity Interests of the Borrower, any other Guarantor or any other guarantor whether pursuant to a Loan Document, or otherwise.

(n)  Each Guarantor has independently, and without reliance on any information supplied by the Lenders, taken, and will continue to take, whatever steps it deems necessary to evaluate the financial condition and affairs of the Borrower or any Collateral, and the Lenders shall have no duty to advise the Guarantors of information at any time known to it regarding such financial condition or affairs or any Collateral.

Section 3.2    Special Provisions Applicable to Subsidiary Guarantors. Pursuant to Section 6.20 of this Agreement, any new Restricted Subsidiary, other than an Immaterial Subsidiary, an Excluded Foreign Subsidiary or Excluded Joint Venture, of the Parent is required to enter into this Agreement by executing and delivering to the Lender a Guaranty Supplement.  Upon the execution and delivery of a Guaranty Supplement by such new Restricted Subsidiary, such Restricted Subsidiary shall become a Guarantor and Borrower Party hereunder with the same force and effect as if originally named as a Guarantor or Borrower Party herein.  The execution and delivery of any Guaranty Supplement (or any other supplement to any Loan Document delivered in connection therewith) adding an additional Guarantor as a party to this Agreement or any other applicable Loan Document shall not require the consent of any other party hereto.  The rights and obligations of each party hereunder shall remain in full force and effect notwithstanding the addition of any new Guarantor hereunder.

Section 3.3    Special Provisions Applicable to Parent. The following provisions shall apply to any interest payable by the Parent and any other Borrower Party organized or existing under the laws of Canada or any political subdivision thereof:

(a)  For the purposes of the Interest Act (Canada) and disclosure thereunder, whenever any interest or any fee to be paid hereunder or in connection herewith is to be calculated on the basis of a 360-day or 365-day year, the yearly rate of interest to which the rate used in such calculation is equivalent is the rate so used multiplied by the actual number of days in the calendar year in which the same is to be ascertained and divided by 360 or 365, as applicable.  The rates of interest under this Agreement are nominal rates, and not effective rates or yields.  The principle of deemed reinvestment of interest does not apply to any interest calculation under this Agreement.

(b)  If any provision of this Agreement would oblige the Parent to make any payment of interest or other amount payable to a Lender in an amount or calculated at a rate which would be prohibited by Applicable Law or would result in a receipt by that Lender of "interest" at a "criminal rate" (as such terms are construed under the *Criminal Code* (Canada)), then, notwithstanding such provision, such amount or rate shall be deemed to have been adjusted with retroactive effect to the maximum amount or rate of interest, as the case may be, as would not be so prohibited

by Applicable Law or so result in a receipt by such Lender of "interest" at a "criminal rate".

## ARTICLE 4

## CONDITIONS PRECEDENT

Section 4.1     <u>Conditions Precedent to the Making of the Initial Term Loans</u>.  The obligations of the Lenders to undertake their respective Initial Term Loan Commitments and to make the Initial Term Loans as contemplated hereunder are subject to the prior fulfillment of each of the following conditions on or prior to the Initial Funding Date:

(a)   Each Lender (or, if applicable, the DIP Agent) shall have received each of the following, in form and substance satisfactory to such Lender:

(i)     Copies of counterparts of each of the following, together with all exhibits and schedules thereto, as applicable, in each case, duly authorized, executed and delivered by each of the parties thereto, and each shall be in full force and effect: (i) this Agreement executed by each of the parties hereto, (ii) appropriate notes executed by the Borrowers for the account of each Lender which has requested a note at least one (1) Business Day prior to the Initial Funding Date, and (iii) such other forms, certificates, documents, instruments and agreements as DIP Agent or Lenders shall reasonably request in connection with the transactions contemplated by this Agreement and the other Loan Documents;

(ii)     Evidence of the delivery to the DIP Agent of UCC and Personal Property Security Act financing statements, certificates representing all of the certificated Equity Interests of the Borrower and the Restricted Subsidiaries of the Borrower Parties, and all other original Collateral to be delivered to the DIP Agent for the benefit of the Lenders pursuant to any Loan Document or as otherwise requested by the DIP Agent (as directed by Majority Lenders), and transfer powers with respect thereto duly endorsed in blank;

(iii)     A Direction Letter duly executed by the Borrower;

(iv)     Complete and correct copies of all leases listed on <u>Schedule 5.1(x)-1</u>;

(v)     Other than as contemplated by <u>Section 6.22</u>, certificates of insurance and additional insured and loss payable endorsements, as applicable, with respect to the Borrower Parties and copies of all insurance policies of the Borrower Parties, in each case, meeting the requirements of <u>Section 6.5</u>;

(vi)     All of the Liens described in Section 14.1 of this Agreement shall have been created and perfected upon entry of the Interim Order without the necessity of the execution, recordation of filings by the Debtors of, security agreements, control agreements, pledge agreements, financing statements or other similar

documents, or the possession or control by Agent of, or over, any Collateral, as set forth in the Interim Order.  The Interim Order shall have been effective to create the relative priorities of the Liens described in Section 6.11 with respect to the Collateral.  The automatic stay under the Bankruptcy Code shall have been automatically vacated, subject to the terms of the Interim Order, to permit enforcement of the Secured Parties' rights and remedies under this Agreement and the other Loan Documents;

(vii)    The DIP Agent shall have received the Initial Budget, in form and substance reasonably acceptable to the DIP Agent and Majority Lenders;

(viii)    A closing certificate executed by an Authorized Signatory of the Borrower, certifying as to the satisfaction of the closing conditions contained herein;

(ix)    Term Notes, if requested;

(x)    Evidence that all applicable stamp tax or other tax related to the Loan Documents have been paid;

(xi)    The Petition Date shall have occurred and each Borrower and Guarantor shall be a debtor and debtor-in-possession in the Cases.

(xii)    The Interim Order Entry Date shall have occurred prior to the Agreement Date and not later than five (5) Business Days following the Petition Date, and the Interim Order shall be in full force and effect, shall not (in whole or in part) have been vacated or reversed, shall not have been modified or amended other than as acceptable to the DIP Agent and Majority Lenders in their sole discretion and shall not be subject to a stay, and the DIP Agent shall have received a certified copy of the Interim Order entered by the Bankruptcy Court.

(xiii)    The Borrower Parties shall be in compliance with the Interim Order in all respects.

(xiv)    The First Day Orders and Second Day Orders sought by the Borrower (including a cash management order) shall be satisfactory in form and substance to DIP Agent and Majority Lenders in their sole discretion.  All orders entered by the Bankruptcy Court and arrangements pertaining to cash management and adequate protection, and all motions and documents filed or to be filed with, and submitted to, the Bankruptcy Court in connection therewith, shall be in form and substance satisfactory to the Majority Lenders, including a finding that the DIP Term Loan Facility was entered into in good faith and otherwise complies with Section 364(e) of the Bankruptcy Code, and authorizing and approving (x) the DIP Term Loan Facility on an interim basis, including the refinancing in full of the Prepetition Loan Facility using proceeds of Initial Term Loans, (y) the reimbursement of the DIP Agent and the Lenders' fees and expenses in accordance with Section 10.2, including, without limitation, of Paul, Weiss, Rifkind, Wharton & Garrison, LLP, Kutak Rock LLP, Fasken

Martineau and one financial advisor, and (y) the scheduling of the final hearing on the DIP Term Loan Facility;

(xv)   The Lenders and DIP Agent shall have received all fees and expenses required to be paid under the Fee Letters and the other Loan Documents, and all expenses for which invoices have been presented (including the reasonable fees and expenses of legal counsel to DIP Agent and Lenders, including, without limitation, of Paul, Weiss, Rifkind, Wharton & Garrison, Kutak Rock LLP, Fasken Martineau and one financial advisor) to the Borrower, whether incurred pre-or-post-petition; and

(xvi)   All such other certificates, agreements, reports, confirmations, statements, opinions of counsel and other documents as the Lenders may require, certified, as applicable and if so requested, by an appropriate governmental official or an Authorized Signatory.

(b)   The Lenders shall be satisfied in all regards with the results of their due diligence investigation of the Borrower Parties and their respective assets. The Lenders shall be further satisfied that no change in the business assets, management, operations, financial condition or prospects of the Borrower Parties, other than the filing of the Cases, shall have occurred since September 30, 2014, which change has had or could be expected to have a Material Adverse Effect, and the Lenders shall have received a certificate of an Authorized Signatory of the Borrower so stating.

(c)   The Lenders shall have received evidence satisfactory to it that all Necessary Authorizations are in full force and effect and are not subject to any pending or threatened reversal or cancellation, that no other consents or approvals are required and that no Default exists, after giving effect to the making of the Term Loans hereunder, and the Lenders shall have received a certificate of an Authorized Signatory of the Borrower so stating.

(d)   The Lenders shall have received UCC and Personal Property Security Act financing statements naming each Borrower Party as a debtor and naming the DIP Agent, for the benefit of the Lenders, as secured party in form for filing in all appropriate jurisdictions, in such form as shall be satisfactory to the Lenders (with the filing thereof to occur on or before the effectiveness of this Agreement).

(e)   The Lenders shall have obtained such information about the Borrower Parties sufficient to allow it to comply to its satisfaction with all applicable bank regulatory, "know your customer," and anti-money laundering matters including, for the avoidance of doubt, with respect to the USA Patriot Act and OFAC.

(f)   The Lenders shall be satisfied that all of the representations and warranties of the Borrower Parties under this Agreement and the other Loan Documents shall be true and correct in all material respects both before and after

giving effect to the application of the proceeds of the Term Loans and the Lenders shall have received a certificate of an Authorized Signatory of the Borrower so stating.

(g)   There shall not exist on the date of the advance of the Term Loans, and after giving effect thereto, a Default.

Section 4.2   <u>Conditions Precedent to All Term Loans</u>.  No Lender shall be required to make any Term Loan unless and until the following conditions are satisfied:

(a)   <u>No Default or Event of Default</u>.  At the time of and immediately after giving effect to such Term Loan, no Default or Event of Default shall have occurred and be continuing.

(b)   <u>Representations and Warranties</u>.   The representations and warranties of the Obligors set forth in the Loan Documents shall be true and correct in all material respects with the same effect as though made on and as of the date of such Advance (it being understood and agreed that any representation or warranty which by its terms is made as of a specified date shall be required to be true and correct in all material respects only as of such specified date, and that any representation or warranty which is subject to any materiality qualifier shall be required to be true and correct in all respects).

(c)   <u>DIP Orders</u>.

(i)   During the Interim Period, the Interim Order shall be in full force and effect and shall not have been vacated or reversed, shall not be subject to a stay, and shall not have been modified or amended in any respect without the prior written consent of Majority Lenders; and

(ii)   On and after the Final Order Entry Date and prior to the Consummation Date, the Final Order shall be in full force and effect and shall not have been vacated or reversed, shall not be subject to a stay, and shall not have been modified or amended in any respect without the prior written consent of DIP Agent and Majority Lenders.

(d)   <u>No Injunction</u>.  The making of the Term Loans shall not violate any requirement of law and shall not be enjoined, temporarily, preliminarily or permanently.

(e)   <u>Milestones</u>.   The Obligors shall be in compliance with the Milestones, to the extent applicable at the time of such Advance.

(f)   <u>Chief Restructuring Officer</u>.  If a Chief Restructuring Officer has been retained pursuant to <u>Section 6.26</u>, such Chief Restructuring Officer shall continue to be retained by the Debtors unless otherwise agreed by the DIP Agent and Majority Lenders.

Each Term Loan shall be deemed to constitute a representation and warranty by Borrowers on the date thereof as to the matters specified in this <u>Section 4.2</u>.

Section 4.3    <u>Conditions Precedent to Delayed Draw Term Loans</u>.  The occurrence of the Final Term Funding Date and the obligations of each Lender to make its Delayed Draw Term Loans provided for in this Agreement is subject to satisfaction of each Lender (or waiver in accordance with Section 13.1) of each of the following conditions precedent:

(a)    <u>Loan Request</u>.  The DIP Agent shall have received a loan request in form satisfactory to DIP Agent and Majority Lenders in accordance with <u>Section 2.1(b)</u> executed and delivered by the Borrower to the DIP Agent regarding the Delayed Draw Term Loans to be made on the Final Term Funding Date.

(b)    <u>Final Order</u>.  The Final Order Entry Date shall have occurred concurrently with or prior to the Final Term Funding Date and not more than 45 days after the Petition Date (unless such period is extended by the DIP Agent at the direction of Majority Lenders) and the Final Order shall approve the DIP Term Loan Facility, shall be reasonably satisfactory to the Majority Lenders, shall be in full force and effect, shall not have been vacated or reversed, shall not have been modified or amended other than as reasonably acceptable to the DIP Agent and Majority Lenders in their sole discretion and shall not be subject to a stay, and the DIP Agent shall have received a certified copy of the Final Order entered by the Bankruptcy Court.

(c)    <u>Fees</u>.  The Lenders and DIP Agent shall have received all fees required to be paid under the Fee Letters, and all expenses for which invoices have been presented (including the reasonable fees and expenses of legal counsel to DIP Agent and Lenders, including, without limitation, of Paul, Weiss, Rifkind, Wharton & Garrison, LLP, Kutak Rock LLP and Fasken Martineau) to the Borrower at least one (1) Business Day prior to the Final Term Funding Date.  All such amounts will be paid with proceeds of Delayed Draw Term Loans made on the Final Term Funding Date and will be reflected in the funding instructions given by the Borrower to the DIP Agent on or before the Final Order Entry Date.

(d)    <u>No Material Adverse Effect</u>.  Since the Petition Date, no event, change, condition or development has occurred that has had or could reasonably be expected to have a Material Adverse Effect.

(e)    <u>Delivery of updated Budget</u>.  The DIP Agent shall have received updated (x) Budget and (x) Variance Reports, in each case, in form and substance reasonably acceptable to Majority Lenders;

(f)    <u>Second Day Orders</u>.  The Second Day Orders sought by the Debtors shall be satisfactory in form and substance to the DIP Agent and Majority Lenders in their sole discretion.

(g)    <u>Chief Restructuring Officer</u>.  If a Chief Restructuring Officer has been retained pursuant to <u>Section 6.26</u>, such Chief Restructuring Officer shall continue to

be retained by the Debtors unless otherwise agreed by the DIP Agent and Majority Lenders.

<div align="center">ARTICLE 5</div>

<div align="center">REPRESENTATIONS AND WARRANTIES</div>

Section 5.1    <u>General Representations and Warranties</u>.    In order to induce the Lenders to enter into this Agreement and to extend the Term Loans, each Borrower Party hereby represents, and warrants that:

(a)    <u>Organization; Power; Qualification</u>.    Each Borrower Party and each Subsidiary of a Borrower Party (i) is a corporation, partnership or limited liability company duly organized, validly existing, and in active status or good standing under the laws of its state or province of incorporation or formation, (ii) has the corporate or other company power and authority to own or lease and operate its properties and to carry on its business as now being and hereafter proposed to be conducted, and (iii) is duly qualified and is in active status or good standing as a foreign corporation or other company, and authorized to do business, in each jurisdiction in which the character of its properties or the nature of its business requires such qualification or authorization.

(b)    <u>Authorization; Enforceability</u>.    Subject to the entry of the Interim Order, (x) each Borrower Party has the power and has taken all necessary action, corporate or otherwise, to authorize it to execute, deliver, and perform its obligations under this Agreement and each of the other Loan Documents to which it is a party in accordance with the terms thereof and to consummate the transactions contemplated hereby and thereby and (y) each of this Agreement and each other Loan Document to which a Borrower Party is a party has been duly executed and delivered by such Borrower Party, and (except for UCC financing statements solely to the extent they do not contain any affirmative obligations of the Borrower Parties) is a legal, valid and binding obligation of such Borrower Party, enforceable in accordance with its terms except to the extent that the enforceability thereof may be limited by applicable bankruptcy, insolvency, reorganization or similar laws affecting the enforcement of creditor's rights generally or by general principles of equity (regardless of whether such enforcement is considered in a proceeding in equity or at law).

(c)    <u>Partnerships; Joint Ventures; Subsidiaries</u>.    Except as disclosed on <u>Schedule 5.1(c)-1</u>, as of the Agreement Date, no Borrower Party or any Subsidiary of a Borrower Party has any Subsidiaries, which Subsidiaries are identified on such Schedule as Domestic Subsidiaries or Foreign Subsidiaries.    As of the Agreement Date, no Borrower Party or any Subsidiary of a Borrower Party is a partner or joint venturer in any partnership or joint venture other than (i) the Subsidiaries listed on <u>Schedule 5.1(c)-1</u> and (ii) the partnerships and joint ventures (that are not Subsidiaries) listed on <u>Schedule 5.1(c)-2</u>.  <u>Schedule 5.1(c)-1</u> and <u>Schedule 5.1(c)-2</u> set forth, for each Person set forth thereon, a complete and accurate statement of (i) the percentage ownership of each such Person by the applicable Borrower Party or

<div align="center">52</div>

Subsidiary of a Borrower Party as of the Agreement Date, (ii) the state or other jurisdiction of incorporation or formation, as appropriate, of each such Person as of the Agreement Date, (iii) each state in which each such Person is qualified to do business as of the Agreement Date and (iv) all of each such Person's trade names, trade styles or doing business forms which such Person has used or under which such Person has transacted business during the five (5) year period immediately preceding the Agreement Date.

(d) <u>Equity Interests and Related Matters</u>.   The authorized Equity Interests as of the Agreement Date of each Borrower Party and each Subsidiary of a Borrower Party that is a corporation and the number of shares of such Equity Interests that are issued and outstanding as of the Agreement Date are as set forth on <u>Schedule 5.1(d)</u>. All of the shares of such Equity Interests in each Borrower Party and each Subsidiary of a Borrower Party that are issued and outstanding have been duly authorized and validly issued and are fully paid and non-assessable. None of such Equity Interests in each Borrower Party and each Subsidiary of a Borrower Party have been issued in violation of the Securities Act, or the securities, "Blue Sky" or other Applicable Laws of any applicable jurisdiction. As of the Agreement Date, the Equity Interests of each such Borrower Party and each such Subsidiary of a Borrower Party are owned by the parties listed on <u>Schedule 5.1(d)</u> in the amounts set forth on such schedule and a description of the Equity Interests of each such party is listed on <u>Schedule 5.1(d)</u>.   Except as described on <u>Schedule 5.1(d)</u>, no Borrower Party or any Subsidiary of a Borrower Party has outstanding any stock or securities convertible into or exchangeable for any shares of its Equity Interests, nor are there any preemptive or similar rights to subscribe for or to purchase, or any other rights to subscribe for or to purchase, or any options for the purchase of, or any agreements providing for the issuance (contingent or otherwise) of, or any calls, commitments, or claims of any character relating to, any Equity Interests or any stock or securities convertible into or exchangeable for any Equity Interests.   Except as set forth on <u>Schedule 5.1(d)</u>, (i) no Borrower Party or any Subsidiary of any Borrower Party is subject to any obligation (contingent or otherwise) to repurchase or otherwise acquire or retire any shares of its Equity Interests or to register any shares of its Equity Interests, (ii) except as provided in the First Day Orders, there are no agreements restricting the transfer of any shares of such Borrower Party's or such Subsidiary's Equity Interests or restricting the ability of any Subsidiary of the Borrower from making distributions, dividends or other Restricted Payments to such Borrower and (iii) there are no shareholders or share purchase agreements relating to the Equity Interests of any of the Borrower Parties.

(e) <u>Compliance with Law, Loan Documents, and Contemplated Transactions</u>.   The execution, delivery, and performance of this Agreement and each of the other Loan Documents in accordance with their respective terms and the consummation of the transactions contemplated hereby and thereby do not and will not (i) violate any Applicable Law, (ii) conflict with, result in a breach of or constitute a default under the certificate of incorporation or formation, by-laws, partnership agreement, operating agreement or other governing documents of any Borrower Party or under any indenture, agreement, or other instrument to which any Borrower Party is a party or by which any Borrower Party or any of its properties may

be bound, or (iii) result in or require the creation or imposition of any Lien upon or with any assets or property of any Borrower Party except Permitted Liens.

(f) <u>Necessary Authorizations</u>.  Subject to entry of the Interim Order, each Borrower Party has obtained all material Necessary Authorizations, and all such Necessary Authorizations are in full force and effect.  None of such Necessary Authorizations is the subject of any pending or, to the best of each Borrower Party's knowledge, threatened attack, amendment, termination, revocation or adverse judgment, decree or order issued by the grantor of the Necessary Authorization. Each Borrower Party has duly and timely filed all material reports, certificates, notices, statements and filings, and paid all material required regulatory fees in accordance with Applicable Law, and are in all respects in material compliance therewith.

(g) <u>Title to Properties</u>.  Each Borrower Party has good, marketable and legal title to, or a valid leasehold interest in, all of its properties and assets and none of such properties or assets is subject to any Liens, other than Permitted Liens.

(h) <u>Material Contracts</u>.  <u>Schedule 5.1(h)</u> contains a complete list, as of the Agreement Date, of each Material Contract, true, correct and complete copies of which have been delivered to the Lenders.  <u>Schedule 5.1(h)</u> further identifies, as of the Agreement Date, each Material Contract that requires consent to the granting of a Lien in favor of the Lenders on the rights of any Borrower Party thereunder.  No Borrower Party is in default under or with respect to any Material Contract to which it is a party or by which it or any of its properties are bound which default gives rise to a right of termination by the non-defaulting party.

(i) <u>Labor and Employment Matters</u>.  Except as disclosed on <u>Schedule 5.1(i)</u>, (i) no Borrower Party is engaged in any unfair labor practice; (ii) there is no unfair labor practice complaint pending against any Borrower Party before the National Labor Relations Board and no grievance or arbitration proceeding arising out of or under any collective bargaining agreement that is so pending against any Borrower Party; and (iii) no strike or work stoppage is in existence involving any employees of any Borrower Party.  No Borrower Party is aware of any of their officers or directors (a) who have an intention to terminate their employment with such Person during the term of this Agreement, (b) whose employment is expected to be terminated by such Person during the term of this Agreement or (c) whose position is expected to be demoted or eliminated or with respect to which any such Person expects to request or require that such officer or director no longer act in such position.  None of the Borrower Parties nor any officers or directors of any of the foregoing have been arrested, indicted or are currently under investigation by any Governmental Authority.

(j) <u>Taxes</u>.  Except as set forth on <u>Schedule 5.1(j)</u>, all federal, state and other tax returns of each Borrower Party required by law to be filed have been duly filed, all such tax returns are true, complete and correct in all material respects, and all federal, state, and other taxes (including without limitation, all real estate and personal property, income, franchise, transfer and gains taxes), all general or

special assessments, and other governmental charges or levies upon each Borrower Party and any of their respective properties, income, profits, and assets, which are shown thereon as due and payable, have been paid, except any payment of any of the foregoing which such Borrower Party is currently reasonably and diligently contesting in good faith by appropriate proceedings and with respect to which reserves in conformity with the Applicable Accounting Standard have been provided on the books of such Borrower Party.  No adjustment relating to any tax returns has been proposed formally or informally by any Governmental Authority and, to the knowledge of each Borrower Party no basis exists for any such adjustment, except as reflected in the charges, accruals and reserves on the books of the Borrower Parties.  The charges, accruals, and reserves on the books of the Borrower Parties in respect of taxes are, in the reasonable judgment of the Borrower Parties, adequate.  Except as set forth on Schedule 5.1(j), as of the Agreement Date, no Borrower Party has been audited, or has knowledge of any pending audit, by the Canadian Revenue Agency, the Internal Revenue Service or any other taxing authority.  Except as described in Schedule 5.1(j), no Borrower Party has executed or filed with the Internal Revenue Service or any other Governmental Authority any agreement or other document extending, or having the effect of extending, the period for assessment or collection of any taxes.  Except as set forth on Schedule 5.1(j), none of the Borrower Parties and their respective predecessors are liable for any taxes:  (i) under any agreement (including any tax sharing agreements) or (ii) to each Borrower Party's knowledge, as a transferee.  No Borrower Party has agreed, or been requested, to make any adjustment under Code Section 481(a), by reason of a change in accounting method or otherwise.  Parent has filed tax returns since the time of its acquisition of the Borrower on the basis that it is both resident in Canada for the purposes of the Income Tax Act (Canada) and a domestic corporation pursuant to Section 7874(b) of the Code.

(k)    <u>Financial Statements</u>.  The Borrower has furnished, or has caused to be furnished, to the Lenders (i) the consolidated audited financial statements of the Parent which are complete and correct in all material respects and present fairly in accordance with the Applicable Accounting Standard the respective financial positions of the Parent for the fiscal years ending on December 31, 2011, December 31, 2012 and December 31, 2013 and the results of operations for the fiscal years then ended, and (ii) the unaudited consolidated financial statements of the Parent which are complete and correct in all material respects and present fairly in accordance with the Applicable Accounting Standard, subject to normal year-end adjustments, the financial position of the Parent as at September 30, 2014, and the results of operations for the nine-month period then ended.  Except as disclosed in such financial statements, no Borrower Party has any liabilities, contingent or otherwise, and there are no unrealized or anticipated losses of such Borrower Party which have not heretofore been disclosed in writing to the Lender.

(l)    <u>No Adverse Change</u>.  Since September 30, 2014, other than the filing of the Cases, there has occurred no event which has had or could be expected to have a Material Adverse Effect, other than the filing of the Cases.

(m) <u>Investments and Guaranties</u>.  As of the Agreement Date, no Borrower Party owns any Equity Interests of any Person except as disclosed on <u>Schedules 5.1(c)-1</u> and <u>5.1(c)-2</u>, or has outstanding loans or advances to, or Guaranties of the obligations of, any Person, except as reflected in the financial statements referred to in <u>Section 5.1(k)</u> or disclosed on <u>Schedule 5.1(m)</u>.

(n) <u>Liabilities, Litigation, etc.</u>  As of the Agreement Date, except for liabilities incurred in the ordinary course of business, no Borrower Party has any (individually or in the aggregate) liabilities, direct or contingent, except as disclosed or referred to in the financial statements referred to in <u>Section 5.1(k)</u> or with respect to the Obligations under the Loan Documents.  As of the Agreement Date, except for the Cases and as described on <u>Schedules 5.1(n)</u> and <u>5.1(y)</u>, there is no litigation, legal or administrative proceeding, investigation, or other action of any nature pending or, to the knowledge of the Borrower Parties, threatened against or affecting any Borrower Party or any of their respective properties which could be expected to result in any judgment against or liability of such Borrower Party in excess of $500,000 individually or in the aggregate with respect to all Borrower Parties, or the loss of any certification or license material to the operation of such Borrower Party's business.  None of such litigation disclosed on <u>Schedules 5.1(n)</u> and <u>5.1(y)</u>, individually or collectively, could be expected to have a Material Adverse Effect.

(o) <u>ERISA</u>.  <u>Schedule 5.1(o)</u> lists (i) all ERISA Affiliates and (ii) all Plans and separately identifies all Title IV Plans, Multiemployer Plans, and Retiree Welfare Plans.  Copies of all such listed Plans, together with a copy of the latest IRS/DOL 5500-series form for each such Plan, have been delivered to the Lender.  Except with respect to Multiemployer Plans, each Plan intended to be qualified under Code Section 401 has been determined by the Internal Revenue Service to qualify under Section 401 of the Code, the trusts created thereunder have been determined to be exempt from tax under the provisions of Sections 501 of the Code, and nothing has occurred that would cause the loss of such qualification or tax-exempt status.  Each Borrower Party and each ERISA Affiliate and each of their respective Plans are in compliance in all respects with ERISA and the Code and no Borrower Party nor any of its ERISA Affiliates has incurred any accumulated funding deficiency with respect to any Plan within the meaning of ERISA or the Code.  No Borrower Party or, to each Borrower Party's knowledge, any of its ERISA Affiliates has made any promises of retirement or other benefits to employees, except as set forth in the Plans.  No Borrower Party or ERISA Affiliate has incurred any liability to the PBGC in connection with any Plan (other than the payment of premiums that are not past due).  No Title IV Plan has any Unfunded Pension Liability.  No ERISA Event or event described in Section 4062(e) of ERISA has occurred and is continuing with respect to any Plan.  There are no pending, or to the knowledge of any Borrower Party, threatened claims (other than claims for benefits in the ordinary course), sanctions, actions or lawsuits, asserted or instituted against any Plan or any Person as fiduciary (as defined in Section 3(21) of ERISA) or sponsor of any Plan.  No Plan or trust created thereunder, or party in interest (as defined in Section 3(14) of ERISA) of such Plan, or any fiduciary (as defined in Section 3(21) of ERISA) of such Plan, has engaged in a non-exempt "prohibited transaction" (as such term is defined in

Section 406 of ERISA or Section 4975 of the Code) which could subject such Plan or any other Plan of any Borrower Party or any of its ERISA Affiliates, any trust created thereunder, or any such party in interest or fiduciary, or any party dealing with any such Plan or any such trust to any penalty or tax on "prohibited transactions" imposed by Section 502 of ERISA or Section 4975 of the Code.  No Borrower Party is a party to any Multiemployer Plan, or has had any direct or contingent liability under any Multiemployer Plan within the last six (6) years.

(p)  <u>Intellectual Property; Licenses; Certifications</u>.  As of the Agreement Date, except as set forth on <u>Schedule 5.1(p)</u>, no Borrower Party owns any registered patents, trademarks, service marks or copyrights, and has no pending registration applications with respect to any of the foregoing. No other patents, trademarks, service marks or copyrights are necessary for the operation of the business of the Borrower Parties.  Except as set forth on <u>Schedule 5.1(p)</u>, no licenses or certifications are necessary for the operation of the Borrower Parties' business. The Borrower Parties own or have the right to use, all Intellectual Property, licenses and certifications necessary for the conduct of their business. No claim has been asserted and is pending by any Person challenging the use of any such Intellectual Property by any Borrower Party or the validity or effectiveness of any such Intellectual Property. The use of such Intellectual Property by the Borrower Parties does not infringe on the rights of any Person.

(q)  <u>Compliance with Law; Absence of Default</u>.  Each Borrower Party is in material compliance with all Applicable Laws and with all of the provisions of its certificate of incorporation or formation and by-laws or other governing documents, and no event has occurred or has failed to occur which has not been remedied or waived, the occurrence or non-occurrence of which constitutes (i) a Default, or (ii) except with respect to Funded Debt in an aggregate principal amount equal to or less than $500,000, a default, other than as a result of filing of the Cases, under any other indenture, agreement, or other instrument, or any judgment, decree, or order to which such Borrower Party is a party or by which such Borrower Party or any of their respective properties may be bound.

(r)  <u>Obligations Constitute Senior Secured Debt</u>.  Subject to the entry of the DIP Orders and to the terms thereof, (i) the Obligations constitute first-priority senior secured indebtedness of the Borrower and there is no other Funded Debt that ranks senior in right of payment to the Obligations or is pari passu in right of payment with the Obligations, and (ii) the Liens securing the Second Lien Notes are junior to the Liens securing the Obligations.

(s)  <u>Accuracy and Completeness of Information</u>.  All written information, reports, other papers and data relating to the Borrower Parties furnished by or at the direction of the Borrower Parties to the Lenders were, at the time furnished, complete and correct in all material respects and did not fail to include any information, the omission of which could cause such written information, reports, other papers and data to be misleading in any respect.  Other than the filing of the Cases, no fact is currently known to any Borrower Party which has, or could be

expected to have, a Material Adverse Effect.  With respect to projections, estimates and forecasts given to the Lenders, such projections, estimates and forecasts are based on the Borrower Parties' good faith assessment of the future of the business at the time made, based upon their exercise of due diligence and review of all relevant information.  The Borrower Parties had a reasonable basis for such assessment.

(t)   Compliance with Regulations T, U, and X.  No Borrower Party is engaged principally in the business of, or has as one of its important activities the business of, extending credit for the purpose of purchasing or carrying, and no Borrower Party owns or presently intends to acquire, any "margin security" or "margin stock" as defined in Regulations T, U and X of the Board of Governors of the Federal Reserve System (herein called "Margin Stock").   None of the proceeds of the Term Loans will be used, directly or indirectly, for the purpose of purchasing or carrying any Margin Stock or for the purpose of reducing or retiring any Funded Debt which was originally incurred to purchase or carry Margin Stock or for any other purpose which might constitute this transaction a "purpose credit" within the meaning of said Regulations T, U and X.  No Borrower Party nor any bank acting on its behalf has taken or will take any action which might cause this Agreement or any other Loan Documents to violate Regulation T, U or X or any other regulation of the Board of Governors of the Federal Reserve System or to violate the SEA, in each case as now in effect or as the same may hereafter be in effect.  If so requested by a Lender, the Borrower Parties will furnish such Lender with (i) a statement or statements in conformity with the requirements of Federal Reserve Form U-1 referred to in Regulation U of said Board of Governors and (ii) other documents evidencing its compliance with the margin regulations requested by the Lender, including without limitation an opinion of counsel in form and substance satisfactory to such Lender. Neither the making of the Term Loans nor the use of proceeds thereof will violate, or be inconsistent with, the provisions of Regulation T, U or X of said Board of Governors.

(u)   Budget.  (a) On and as of the Agreement Date, the Budget of Parent and its Subsidiaries for the 13-week period from the week ending April 11, 2015 through and including the week ending July 4, 2015, copies of which have heretofore been furnished to DIP Agent and the Lenders and (b) following the Agreement Date, the 13-Week Projections delivered pursuant to Section 7.1.(a)(iv), in each case are based on good faith estimates and assumptions made by the management of Parent; provided that the Budget is not to be viewed as facts and that actual results during the period or periods covered by the Budget may differ from the Budget, and that the differences may be material; provided, further, the Budget was based in good faith on assumptions believed by the management of Parent to be reasonable at the time made and (1) in the case of the Budget in clause (a) above, on the Agreement Date and (2) in the case of the Budget delivered pursuant to clause (b) above, the date of delivery of the same (it being understood that with respect to projections, estimates, forecasts given to the Lenders, such projections, estimates and forecasts are based on the Borrower Parties' good faith assessment of the future of the business at the time made, based upon their exercise of due diligence and review of all relevant information and the Borrower Parties had a reasonable basis for such assessment).

(v) <u>Insurance</u>. The Borrower Parties have insurance meeting the requirements of <u>Section 6.5</u>, and such insurance policies are in full force and effect. As of the Agreement Date, all insurance maintained by the Borrower Parties is fully described on <u>Schedule 5.1(v)</u>.

(w) <u>Broker's or Finder's Commissions</u>. No broker's or finder's fee or commission will be payable with respect to the execution and delivery of this Agreement and the other Loan Documents, and no other similar fees or commissions will be payable by the Borrower Parties for any other services rendered to the Borrower Parties ancillary to the credit transactions contemplated herein.

(x) <u>Real Property</u>. All real property leased by each Borrower Party as of the Agreement Date, and the name of the lessor of such real property, is set forth in <u>Schedule 5.1(x)-1</u>. The leases of each Borrower Party are valid, enforceable and in full force and effect, have not been modified or amended and are not the subject of any side agreement or omnibus amendment, in each case, except for lease modification and amendments otherwise disclosed on <u>Schedule 5.1(x)-1</u>. No Borrower Party has made any pledge, mortgage, assignment or sublease of any of its rights under such leases except pursuant to the Loan Documents and as set forth in <u>Schedule 5.1(x)-1</u> and, there is no default or condition which, with the passage of time or the giving of notice, or both, could constitute a default on the part of any party under such leases and the Borrower Parties have paid all rents, royalties and other charges due and payable under such leases, other than as set forth on <u>Schedule 5.1(x)</u>. None of the Borrower Parties have agreed with the lessor to defer the payment of any such rents, royalties or other payments.

(y) All real property owned by each Borrower Party as of the Agreement Date is set forth in <u>Schedule 5.1(x)-2</u>. As of the Agreement Date, no Borrower Party owns, leases or uses any real property other than as set forth on <u>Schedules 5.1(x)-1</u> or <u>5.1(x)-2</u>. Each Borrower Party owns good and marketable fee simple title to all of its owned real property, and none of its respective owned real property is subject to any Liens, except Permitted Liens. No Borrower Party owns or holds, or is obligated under or a party to, any option, right of first refusal or any other contractual right to purchase, acquire, sell, assign or dispose of any real property owned or leased by it.

(z) <u>Environmental Matters</u>.

(i) Except as specifically disclosed in <u>Schedule 5.1(y)</u>, no Borrower Party thereof (A) has failed to comply in any material respect with any Environmental Law or to obtain, maintain or comply with any material permit, license or other approval required under any Environmental Law, (B) has received notice of any material claim with respect to any Environmental Law or (C) knows of any basis for any material liability under any Environmental Law.

(ii) Except as set forth in <u>Schedule 5.1(y)</u>, (A) there are no and never have been any underground or above-ground storage tanks or any surface

impoundments, septic tanks, pits, sumps or lagoons in which Hazardous Materials are being or have been treated, stored or disposed on any Property currently owned or, to the knowledge of any Borrower Party, operated by any Borrower Party; (B) there is no asbestos or asbestos-containing material on any Property currently owned or, to the knowledge of any Borrower Party, operated by any Borrower Party or; and (C) to the knowledge of the Borrower Parties, Hazardous Materials have not been released, discharged or disposed of on any Property currently or formerly owned or operated by any Borrower Party.

(iii)    Except as set forth on Schedule 5.1(y), (i) no Borrower Party is undertaking, either individually or together with other potentially responsible parties, any investigation or assessment or remedial or response action relating to any actual or threatened release, discharge or disposal of Hazardous Materials at any site, location or operation, either voluntarily or pursuant to the order of any Governmental Authority or the requirements of any Environmental Law; and (ii) all Hazardous Materials generated, used, treated, handled or stored at, or transported to or from, any Property currently or formerly owned or operated by any Borrower Party have been disposed of in a manner which could not be expected to result in liability to any Borrower Party.

(aa) OSHA.    All of the Borrower Parties' operations are conducted in compliance, in all material respects, with all applicable rules and regulations promulgated by the Occupational Safety and Health Administration of the United States Department of Labor.

(bb) Name of Borrower Party.    Except as set forth on Schedule 5.1(aa), no Borrower Party has changed its name within the five (5) years prior to the Agreement Date, nor has any Borrower Party transacted business under any other name or trade name.

(cc) Investment Company Act.    No Borrower Party is required to register under the provisions of the Investment Company Act of 1940, as amended, and the entering into or performance by the Borrower Parties of this Agreement does not violate any provision of such Act or require any consent, approval, or authorization of, or registration with, any governmental or public body or authority pursuant to any of the provisions of such Act.

(dd) Patriot Act; FCPA.    Each Borrower Party is in material compliance with (i) the Trading with the Enemy Act, as amended, and each of the foreign assets control regulations of the United States Treasury Department (31 CFR, Subtitle B, Chapter V, as amended) and any other enabling legislation or executive order relating thereto, and (ii) the USA Patriot Act.   No part of the proceeds of the Term Loans will be used, directly or indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended.

(ee) <u>OFAC</u>.  No Borrower Party (i) is a person whose property or interest in property is blocked or subject to blocking pursuant to Section 1 of Executive Order 13224 of September 23, 2001 Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism (66 Fed. Reg. 49079 (2001)), (ii) engages in any dealings or transactions prohibited by Section 2 of such executive order, or is otherwise associated with any such person in any manner violative of Section 2, or (iii) is a person on the list of Specially Designated Nationals and Blocked Persons or subject to the limitations or prohibitions under any other U.S. Department of Treasury's Office of Foreign Assets Control regulation or executive order.

(ff) <u>Capitalized Lease Obligations</u>.  As of the Agreement Date, no Borrower Party has any Capitalized Lease Obligations except as disclosed on <u>Schedule 5.1(ee)</u>.  There is no default or condition which, with the passage of time or the giving of notice, or both, could constitute a default on the part of any party under the leases underlying such Capitalized Lease Obligations and the Borrower Parties have paid all charges due and payable under such leases.

Section 5.2   <u>Survival of Representations and Warranties, etc.</u>   All representations and warranties made under this Agreement and the other Loan Documents shall be deemed to be made, and shall be true and correct in all material respects (without duplication of any materiality qualifier contained therein), on the Agreement Date.  All representations and warranties made under this Agreement and the other Loan Documents shall survive, and not be waived by, the execution hereof by the Lenders, any investigation or inquiry by the Lenders or the making of the Term Loans.

ARTICLE 6

GENERAL COVENANTS

Until the Obligations are repaid and performed in full and unless the DIP Agent and Majority Lenders shall otherwise give their prior consent in writing in accordance herewith:

Section 6.1   <u>Preservation of Existence and Similar Matters</u>.   Each Borrower Party will, and will cause each of its Restricted Subsidiaries to (i) except as expressly permitted by <u>Section 8.7</u>, preserve and maintain its due organization, valid existence and good standing, in each case in its jurisdiction of incorporation or organization, (ii) qualify and remain qualified and authorized to do business in each jurisdiction in which the character of its properties or the nature of its business requires such qualification or authorization, and (iii) maintain all Necessary Authorizations.

Section 6.2   <u>Compliance with Applicable Law</u>.   Each Borrower Party will, and will cause each of its Restricted Subsidiaries to, comply, with the material requirements of all Applicable Law.

Section 6.3    <u>Maintenance of Properties</u>.  Each Borrower Party will, and will cause each of its Restricted Subsidiaries to, maintain or cause to be maintained in the ordinary course of business in good repair, working order and condition, normal wear and tear and disposal of obsolete equipment excepted, all properties used or useful in its business (whether owned or held under lease), and from time to time make or cause to be made all needed and appropriate repairs, renewals, replacements, additions, betterments, and improvements thereto.

Section 6.4    <u>Accounting Methods and Financial Records</u>.  Parent and its Restricted Subsidiaries shall maintain, on a consolidated basis, a system of accounting established and administered in accordance with the Applicable Accounting Standard and will keep adequate records and books of account in which complete entries will be made in accordance with such accounting principles consistently applied and reflecting all transactions required to be reflected by such accounting principles.

Section 6.5    <u>Insurance</u>.  Each Borrower Party will, and will cause each of its Restricted Subsidiaries to, maintain insurance including, but not limited to, property insurance, public liability, business interruption and fidelity coverage insurance, in such amounts and against such risks as would be customary, in the Majority Lenders' reasonable opinion, for companies in the same industry and of comparable size as the Borrower Parties from financially sound and reputable insurance companies having and maintaining an A.M. Best rating of "A minus" or better and being in a size category of VI or larger or otherwise acceptable to the Majority Lenders.  In addition to the foregoing, each Borrower Party further agrees to maintain and pay for insurance upon all goods constituting Collateral wherever located, in storage or in transit in vehicles, vessels or aircraft, including goods evidenced by documents, covering casualty, hazard, public liability and such other risks and in such amounts as would be customary, in the Majority Lenders' reasonable opinion, for companies in the same industry and of comparable size as the Borrower Parties, from financially sound and reputable insurance companies having and maintaining an A.M. Best rating of "A minus" or better and being in a size category of VI or larger or otherwise acceptable to the Majority Lenders to insure the DIP Agent and/or the Lenders' interest in such Collateral.   All such property insurance policies covering goods that constitute Collateral shall name the DIP Agent, for the benefit of the Lenders, as loss payee and all liability insurance policies shall name the DIP Agent, for the benefit of the Lenders, as additional insured.  Each Borrower Party shall deliver certificates of insurance evidencing that the required insurance is in force together with satisfactory lender's loss payable and additional insured, as applicable, endorsements.  Each policy of insurance or endorsement shall contain a clause requiring the insurer to give not less than thirty (30) days' prior written notice to the Lenders in the event of cancellation or modification of the policy for any reason whatsoever (other than non-payment of premiums, which notice may be less than thirty (30) days but shall be at least ten (10) days). If any Borrower Party fails to provide and pay for such insurance, the Lenders may, at the Borrower's expense, procure the same, but shall not be required to do so.   Each Borrower Party agrees to deliver to the Lenders, promptly as rendered, true copies of all reports made in any reporting forms to insurance companies.

Section 6.6    <u>Payment of Taxes and Claims</u>.  Each Borrower Party will, and will cause each of its Restricted Subsidiaries to, pay and discharge all taxes, assessments, and governmental charges or levies imposed upon it or its income or profit or upon any properties belonging to it prior to the date on which penalties attach thereto, and all lawful claims for labor, materials and supplies which have become due and payable and which by law have or may become a Lien upon any of its property; except that, no such tax, assessment, charge, levy, or claim need be paid which is being reasonably and diligently contested in good faith by appropriate proceedings and for which adequate reserves shall have been set aside on the appropriate books, but only so long as such tax, assessment, charge, levy, or claim does not become a Lien or charge other than a Permitted Lien and no foreclosure, distraint, sale, or similar proceedings shall have been commenced and remain unstayed for a period thirty (30) days after such commencement.  Each Borrower Party shall, and shall cause each of its Restricted Subsidiaries to, timely file all information returns required by federal, state, or local tax authorities.

Section 6.7    <u>Visits and Inspections</u>.  Each Borrower Party will, and will permit each of its Restricted Subsidiaries to, permit representatives of the DIP Agent to (a) visit and inspect the properties of the Borrower Parties during normal business hours, (b) inspect and make extracts from and copies of the Borrower Parties' books and records, (c) conduct appraisals, field examinations and audits of Inventory and other personal property of the Borrower Parties and (d) discuss with the Borrower Parties' respective principal officers the Borrower Parties' businesses, assets, liabilities, financial positions, results of operations, and business prospects relating to the Borrower Parties.

Section 6.8    <u>Conduct of Business</u>.  Each Borrower Party shall, and shall cause each of its Restricted Subsidiaries to, continue to engage in business of the industry and type as conducted by it as of the Agreement Date.

Section 6.9    <u>ERISA</u>.  Each Borrower Party shall at all times make, or cause to be made, prompt payment of contributions required to meet the minimum funding standards set forth in ERISA with respect to each Borrower Party's and its ERISA Affiliates' Plans that are subject to such funding requirements; furnish to the Lenders, promptly upon any Lender's request therefor, copies of any annual report required to be filed pursuant to ERISA in connection with each Plan of each Borrower Party and its ERISA Affiliates; notify the Lenders as soon as practicable of any ERISA Event regarding any Plan that could be expected to have a Material Adverse Effect or give rise to a pension Lien on any Borrower Party or on any of the assets thereof; and furnish to the Lenders, promptly upon any Lender's request therefor, such additional information concerning any Plan as may be requested by a Lender.

Section 6.10    <u>Lien Perfection</u>.  Each Borrower Party agrees to take such action as may be requested by a Lender or the DIP Agent to perfect or continue the perfection of the DIP Agent's security interest, for the benefit of the Lenders, in the Collateral.  Each Borrower Party hereby authorizes the DIP Agent to file or transmit for filing, at any time, any financing statements and amendments in any jurisdiction and in any filing office (i) describing the Collateral as "all assets of the debtor" or "all personal

property of the debtor" or words of similar effect, in each case, at the option of the DIP Agent (as directed by Majority Lenders), indicating such Collateral includes such assets or property "whether now owned or hereafter acquired", (ii) describing the Collateral as being of equal or lesser scope or with greater detail, or (iii) that contains any information required by part 5 of Article 9 of the UCC for the sufficiency or filing office acceptance. Each Borrower Party also hereby ratifies any and all financing statements or amendments previously filed by or on behalf of the DIP Agent for the benefit of the Lenders in any jurisdiction.

Section 6.11   <u>Priority of Liens</u>.   Each Obligor hereby covenants, represents and warrants that, upon the execution of this Agreement and upon entry of the Interim Order (and when applicable, the Final Order), the Obligations of each Obligor hereunder and under the Loan Documents:

(a)   pursuant to Section 364(c)(1) of the Bankruptcy Code, shall at all times constitute an allowed Superpriority Claim in the Cases (excluding a claim on Avoidance Actions but including a claim on Avoidance Proceeds upon entry of the Final Order), subject only to the Carve-Out to the extent provided in the applicable DIP Order, and any payments or proceeds on account of such Superpriority Claim shall be distributed in accordance with <u>Section 2.10</u>;

(b)   pursuant to Section 364(c)(2) of the Bankruptcy Code and subject to the Carve-Out to the extent provided in the applicable DIP Order, shall be secured by a perfected first priority Lien on all of the assets of the Obligors, whether consisting of real, personal, tangible or intangible property (including all of the outstanding shares of Equity Interests of Subsidiaries and proceeds of the foregoing other than any of the Voting Stock of a first tier Foreign Subsidiary in excess of 66 2/3% of the outstanding Voting Stock of such first tier Foreign Subsidiary) that is not subject to valid, perfected and non-avoidable liens as of the Petition Date, excluding Avoidance Actions but including Avoidance Proceeds upon entry of the Final Order;

(c)   pursuant to section 364(d)(1) of the Bankruptcy Code and subject only to the Carve-Out to the extent provided in the applicable DIP Order, shall at all times be secured by a valid, binding, continuing, enforceable, fully-perfected senior priming security interest in and Lien upon all pre- and post-petition property of the Obligors, whether now existing or hereafter acquired, of the same nature, scope and type as the Collateral securing the obligations under the Prepetition Loan Facility and the Second Lien Notes. Such security interests and Liens shall be senior in all respects to the interests in such property of the lenders under the Prepetition Loan Facility and holders of the Second Lien Notes (collectively, the "<u>Primed Liens</u>"), in each case arising from their respective current and future Liens;

(d)   pursuant to Section 364(c)(3) of the Bankruptcy Code and subject only to the Carve-Out to the extent provided in the applicable DIP Order, shall be secured by a valid, binding, continuing, enforceable, fully-perfected junior Lien on all of the assets of the Obligors that are subject to (x) valid, perfected and non-avoidable Liens in existence at the time of the commencement of the Cases (other than the Primed Liens) or

(y) valid Liens (other than Primed Liens) in existence at the time of such commencement that are perfected subsequent to such commencement as permitted by Section 546(b) of the Bankruptcy Code;

(e)     shall not be subject or subordinate to (i) any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or (ii) unless otherwise provided for in the Loan Documents, any liens arising after the Petition Date including, without limitation, any liens or security interests granted in favor of any federal, state, municipal or other domestic or foreign governmental unit (including any regulatory body), commission, board or court for any liability of the Debtors; and

(f)     for the avoidance of doubt, the Collateral shall exclude Avoidance Actions, but, subject only to and effective upon entry of the Final Order, shall include Avoidance Proceeds.

Subject to and effective only upon entry of the Final Order, except to the extent of the Carve-Out, no expenses of administration of the Cases or any future proceeding that may result therefrom, including a case under chapter 7 of the Bankruptcy Code, shall be charged against or recovered from the Collateral pursuant to sections 105 or 506(c) of the Bankruptcy Code, the enhancement of collateral provisions of section 552 of the Bankruptcy Code, or any other legal or equitable doctrine (including, without limitation, unjust enrichment) or any similar principle of law, without the prior written consent of the DIP Agent and the Lenders, as the case may be with respect to their respective interests, and no consent shall be implied from any action, inaction or acquiescence by the DIP Agent or the Lenders.  In no event shall the DIP Agent or the DIP Lenders be subject to (i) the "equities of the case" exception contained in section 552(b) of the Bankruptcy Code or (ii) the equitable doctrine of "marshaling" or any other similar doctrine with respect to the Collateral.

Except for the Carve-Out, the Superpriority Claims shall at all times be senior to the rights of each Borrower Party, any chapter 11 trustee and, subject to section 726 of the Bankruptcy Code, any chapter 7 trustee, or any other creditor (including, without limitation, post petition counterparties and other post petition creditors) in the Chapter 11 Cases or any subsequent proceedings under the Bankruptcy Code, including, without limitation, any chapter 7 cases (if any of the Borrower Party's cases are converted to cases under chapter 7 of the Bankruptcy Code).

Section 6.12   <u>Location of Collateral</u>.  All tangible property owned by a Borrower Party constituting Collateral, other than Inventory in transit, Inventory sold in the ordinary course of business and raw materials and work-in-process located at manufacturing sites operated by a third party, will at all times be kept by the Borrower Parties at one or more of the business locations of the Borrower Parties set forth in <u>Schedule 6.11</u>.   The Inventory shall not, without the prior written approval of the Lenders, be moved from the locations set forth on <u>Schedule 6.11</u> except as permitted in the immediately preceding sentence and except for, in the absence of a continuing Event of Default, (a) sales or other dispositions of assets permitted pursuant to <u>Section 8.7</u> and

(b) the storage of Inventory at locations within the continental US other than those specified in the first sentence of this <u>Section 6.11</u> if (i) the Borrower gives the Lenders written notice of the new storage location at least thirty (30) days prior to storing Inventory at such location, (ii) the DIP Agent and/or the Lenders' security interest in such Inventory is and continues to be a duly perfected, first priority Lien thereon, (iii) neither any Borrower Party's nor the Lenders' right of entry upon the premises where such Inventory is stored or its right to remove the Inventory therefrom, is in any way restricted, (iv) the Borrower Parties shall have used commercially reasonable efforts to notify any owner of such premises, and any bailee, warehouseman or similar party that will be in possession of such Inventory, of the Liens made in favor of the DIP Agent for the benefit of the Lenders, and shall have used commercially reasonable efforts to cause any such owner of such premises, or any such bailee, warehouseman or similar party that will be in possession of such Inventory, to have executed and delivered to the DIP Agent, for the benefit of the Lenders, a Collateral Access Agreement, and (v) all negotiable documents and receipts in respect of any Collateral maintained at such premises are promptly delivered to the DIP Agent, for the benefit of the Lenders, and any non-negotiable documents and receipts in respect of any Collateral maintained at such premises are issued to the DIP Agent, for the benefit of the Lenders, and promptly delivered to the DIP Agent, for the benefit of the Lenders.

Section 6.13 <u>Protection of Collateral</u>. All insurance expenses and expenses of protecting, storing, warehousing, insuring, handling, maintaining and shipping the Collateral (including, without limitation, all rent payable by any Borrower Party to any landlord of any premises where any of the Collateral may be located), and any and all excise, property, sales, and use taxes imposed by any state, federal, or local authority on any of the Collateral or in respect of the sale thereof, shall be borne and paid by the Borrower Parties. If the Borrower Parties fail to promptly pay any portion thereof when due, after giving effect to any applicable grace periods, the Lenders may, at its option during the existence of an Event of Default, but shall not be required to, direct the DIP Agent to pay the same directly to the appropriate Person. Each Borrower agrees, jointly and severally, to reimburse the DIP Agent promptly therefor with interest accruing thereon daily at the Default Rate provided in this Agreement. All sums so paid or incurred by the Lenders for any of the foregoing and all costs and expenses (including attorneys' fees, legal expenses, and court costs) which the DIP Agent may incur in enforcing or protecting the Lien on or rights and interest in the Collateral or any of their rights or remedies under this or any other agreement between the parties hereto or in respect of any of the transactions to be had hereunder until paid by the Borrower to the Lenders with interest at the Default Rate, shall be considered Obligations owing by the Borrower to the Lenders hereunder. Such Obligations shall be secured by all Collateral and by any and all other collateral, security, assets, reserves, or funds of the Borrower Parties in or coming into the hands or inuring to the benefit of the Lenders. The Lenders shall not be liable or responsible in any way for the safekeeping of any of the Collateral or for any loss or damage thereto (and specifically disclaims any liability or responsibility with respect thereto) or for any diminution in the value thereof, or for any act or default of any warehouseman, carrier, forwarding agency, or other person whomsoever, but the same shall be at the Borrower Parties' sole risk.

Section 6.14    Reserved.

Section 6.15    Administration of Accounts.

(a)  The Lenders retain the right upon the occurrence and during the continuance of an Event of Default to direct the DIP Agent to notify the Account Debtors that the Accounts have been assigned to the DIP Agent for the benefit of the Lenders, and to collect the Accounts directly in its own name and to charge the collection costs and expenses, including attorneys' fees, to the Borrower. The Lenders have no duty to protect, insure, collect or realize upon the Accounts or preserve rights in them.  Each Borrower Party irrevocably makes, constitutes and appoints the DIP Agent as such Borrower Party's true and lawful attorney and agent-in-fact to endorse such Borrower Party's name on any checks, notes, drafts or other payments relating to, the Accounts which come into any Lender's, the DIP Agent's or any DIP Agent's possession or under such Person's control as a result of its taking any of the foregoing actions.  Additionally, upon the occurrence and during the continuance of an Event of Default, the Lenders shall have the right to direct the DIP Agent to collect and settle or adjust all disputes and claims directly with the Account Debtors and to compromise the amount or extend the time for payment of the Accounts upon such terms and conditions as the DIP Agent may deem advisable, and to charge the deficiencies, costs and expenses thereof, including attorney's fees, to the Borrower.

(b)  If an Account includes a charge for any tax payable to any governmental taxing authority, upon the occurrence and during the continuance of an Event of Default, the Lenders are authorized, in their reasonable discretion, to direct the DIP Agent to pay the amount thereof to the proper taxing authority for the account of the applicable Borrower Party.  Each Borrower agrees, jointly and severally, to reimburse the Lenders or the DIP Agent promptly therefor with interest accruing thereon daily at the Default Rate provided in this Agreement.  The Borrower Parties shall notify the Lenders if any Account includes any tax due to any governmental taxing authority and, in the absence of such notice, the Lenders shall have the right to direct the DIP Agent to retain the full proceeds of the Account and shall not be liable for any taxes to any governmental taxing authority that may be due by any Borrower Party by reason of the sale and delivery creating the Account.

(c)  Whether or not a Default has occurred, any Lender's officers, employees or agents (or through the DIP Agent (acting at the direction of Majority Lenders) shall have the right after prior notice to the Borrower (provided no prior notice shall be required if an Event of Default shall have occurred and be continuing), at any time or times hereafter, in the name of the Lenders or the DIP Agent, or any designee thereof or the Borrower Parties, to verify the validity, amount or other matter relating to any Accounts by mail, telephone, telegraph or otherwise. The Borrower Parties shall cooperate fully with the Lenders in an effort to facilitate and promptly conclude any such verification process.

Section 6.16   <u>The Blocked Accounts</u>.  On or before the Agreement Date, and at all times thereafter:

(a)   [Reserved];

(b)   As of the Agreement Date, all bank accounts, deposit accounts, securities accounts and investment accounts of the Borrower Parties are listed on <u>Schedule 6.15</u>.   Except as otherwise expressly permitted under this Agreement and the other Loan Documents, no Borrower Party shall open or maintain any other bank account, deposit account, securities account or investment account unless the depository bank or financial institution for such account shall have entered into an agreement with the DIP Agent, for the benefit of the Lenders, substantially in the form of the Blocked Account Agreement and satisfying the requirements of this <u>Section 6.15</u>.

Section 6.17   <u>Further Assurances</u>.  Upon the request of a Lender, each Borrower Party will promptly cure, or cause to be cured, defects in the execution and delivery of the Loan Documents (including this Agreement), resulting from any act or failure to act by any Borrower Party or any employee or officer thereof.  Each Borrower Party at its expense will promptly execute and deliver to the Lenders, or cause to be executed and delivered to the Lenders, all such other and further documents, agreements, and instruments in compliance with or accomplishment of the covenants and agreements of the Borrower Parties in the Loan Documents (including this Agreement) or to correct any omissions in the Loan Documents, or more fully to state the obligations set out herein or in any of the Loan Documents, or to obtain any consents, all as may be necessary or appropriate in connection therewith as may be requested by the Lenders.

Section 6.18   <u>Broker's Claims</u>.  Each Borrower Party hereby indemnifies and agrees to hold the Lenders harmless from and against any and all losses, liabilities, damages, costs and expenses which may be suffered or incurred by any Lender in respect of any claim, suit, action or cause of action now or hereafter asserted by a broker or any Person acting in a similar capacity arising from or in connection with the execution and delivery of this Agreement or any other Loan Document or the consummation of the transactions contemplated herein or therein.  This <u>Section 6.17</u> shall survive termination of this Agreement.

Section 6.19   <u>Indemnity</u>.  Each Borrower Party will indemnify and hold harmless each Indemnified Person from and against any and all claims, liabilities, investigations, losses, damages, actions, demands, penalties, judgments, suits, investigations and costs, expenses (including fees and expenses of experts, agents, consultants and counsel) and disbursements, in each case, of any kind or nature (whether or not the Indemnified Person is a party to any such action, suit, investigation or proceeding) whatsoever which may be imposed on, incurred by, or asserted against an Indemnified Person resulting from any breach or alleged breach by the Borrower Parties of any representation or warranty made hereunder, or otherwise in any way relating to or arising out of the Commitments, the Term Loans, this Agreement, the other Loan Documents or any other document contemplated by this Agreement, the making,

68

administration or enforcement of the Loan Documents and the Term Loans, any transaction contemplated hereby or any related matters unless, with respect to any of the above, such Indemnified Person's acts or omissions are determined by a final non-appealable judgment of a court of competent jurisdiction to constitute gross negligence or willful misconduct. NO INDEMNIFIED PERSON SHALL BE RESPONSIBLE OR LIABLE TO ANY OTHER PARTY TO ANY LOAN DOCUMENT, ANY SUCCESSOR, ASSIGNEE OR THIRD PARTY BENEFICIARY OF SUCH PERSON OR ANY OTHER PERSON ASSERTING CLAIMS DERIVATIVELY THROUGH SUCH PARTY, FOR INDIRECT, PUNITIVE, EXEMPLARY OR CONSEQUENTIAL DAMAGES WHICH MAY BE ALLEGED AS A RESULT OF CREDIT HAVING BEEN EXTENDED, SUSPENDED OR TERMINATED UNDER ANY LOAN DOCUMENT OR AS A RESULT OF ANY OTHER TRANSACTION CONTEMPLATED HEREUNDER OR UNDER ANY OTHER LOAN DOCUMENT. This Section 6.18 shall survive termination of this Agreement.

Section 6.20 <u>Environmental Matters</u>. Each Borrower Party shall (a) conduct its operations and keep and maintain its Properties in compliance in all material respects with all Environmental Laws; (b) obtain and renew all environmental permits necessary for its operations and Properties; and (c) implement any and all investigation, remediation, removal and response actions that are appropriate or necessary to maintain the value and marketability of its Properties or to otherwise comply in all material respects with Environmental Laws pertaining to the presence, generation, treatment, storage, use, disposal, transportation or release of any Hazardous Materials on, at, in, under, above, to, from or about any of its Properties, <u>provided</u>, <u>however</u>, that no Borrower Party shall be required to undertake any such investigation, remediation, removal or response action to the extent that its obligation to do so is being reasonably and diligently contested in good faith and by proper proceedings and adequate reserves have been set aside and are being maintained by the Borrower Parties with respect to such circumstances in accordance with the Applicable Accounting Standard.

Section 6.21 <u>Additional Collateral; Additional Guarantors and Formation of Subsidiaries</u>

(a) Subject to this <u>Section 6.20</u> and in addition to <u>Section 6.22</u> and  <u>Section 6.16</u>, with respect to any property acquired after the Agreement Date by any Borrower Party that is intended to be subject to the Lien created by any of the Loan Documents or any DIP Order but is not so subject, at the time of the acquisition thereof, such Borrower Party shall (i) execute and deliver to the DIP Agent such Loan Documents or such other documents as the DIP Agent  or Majority Lenders shall deem necessary to grant to the DIP Agent, for the benefit of the Lenders, a Lien on such property subject only to Permitted Liens, and (ii) take all actions necessary to cause such Liens to be duly perfected to the extent required by such Loan Document in accordance with all requirements of Applicable Law, including the filing of UCC financing statements in such jurisdictions as may be requested by the Lenders. The Borrower Parties shall otherwise take such actions and execute and deliver to the DIP Agent, for the benefit of the Lenders, such documents as the Lenders shall require to

confirm the validity, perfection and priority of the Liens created under the Loan Documents against such after-acquired properties.

(b)   At the time of the formation of any direct or indirect Restricted Subsidiary of any Borrower Party after the Agreement Date or the acquisition of any direct or indirect Restricted Subsidiary of any Borrower Party after the Agreement Date, the Borrower Parties, as appropriate, shall (i) to the extent such Restricted Subsidiary is a Domestic Subsidiary, cause such Domestic Subsidiary to provide to the Lenders a joinder and supplement to this Agreement substantially in the form of Exhibit B (each, a "Guaranty Supplement"), pursuant to which such Domestic Subsidiary shall agree to join as a Guarantor of the Obligations under Article 3 and as a Borrower Party under this Agreement, Security Documents, together with appropriate UCC and *Personal Property Security Act* financing statements, all in form and substance satisfactory to the Lenders, (ii) provide to the DIP Agent, for the benefit of the Lenders, appropriate certificates and powers or UCC financing statements, pledging all direct or beneficial ownership interest in any such Restricted Subsidiary, in form and substance satisfactory to the Lenders, provided, however, such pledge shall exclude any Excluded Asset, and (iii) provide to the Lenders all other documentation, including one or more opinions of counsel satisfactory to the Lenders, which in its opinion is appropriate with respect to such formation and the execution and delivery of the applicable documentation referred to above.   Nothing in this Section 6.20 shall authorize any Borrower Party to form or acquire any Restricted Subsidiary absent express authorization to so form or acquire such Restricted Subsidiary pursuant to Article 8.   Any document, agreement or instrument executed or issued pursuant to this Section 6.20 shall be a "Loan Document" for purposes of this Agreement.

(c)   At the time of the acquisition of any fee interest in real property by any Borrower Party after the Agreement Date, such Borrower Party shall grant to the DIP Agent for the benefit of the Lenders a first priority security interest in such real property (subject to, but not necessarily as to priority, Permitted Liens) and execute and deliver a Mortgage for each parcel of such real property encumbering the fee interest of the applicable Borrower Party in such real property, together with (i) to the extent commercially practicable, a chain of title opinion issued by legal counsel reasonably acceptable to the Lenders and the DIP Agent and opining as to all matters of record affecting title to such real property, (ii) duly authorized UCC fixture financing statements to be filed in connection with each such Mortgage, and (iii) a legal opinion of local counsel to the Borrower Parties with respect to the Mortgage, addressed to the Lenders and the DIP Agent.

(d)   At the time of the acquisition of any leasehold interests in any real property by any Borrower Party after the Agreement Date, (i) promptly deliver to the Lenders a complete and correct copy of the lease agreement evidencing such leasehold interests, and (ii) if requested by the DIP Agent (acting at the direction of Majority Lenders), execute and deliver a Mortgage with respect to such Borrower Party's leasehold interest in each parcel of such real property, together with (1) to the extent commercially practicable, a chain of title opinion issued by legal counsel

reasonably acceptable to the Lenders and opining as to all matters of record affecting title to such real property, (2) duly authorized UCC fixture financing statements to be filed in connection with each such Mortgage, (3) a legal opinion of local counsel to the Borrower Parties with respect to the Mortgage, addressed to the Lenders, and (4) to the extent required under any lease to be subject to a leasehold Mortgage, the consent of the lessor under such lease to such Mortgage, <u>provided</u> that if the Borrower Parties have used commercially reasonable efforts to obtain all such consents, this condition shall be satisfied.

Section 6.22   <u>Use of Proceeds</u>.  Use the proceeds of the Term Loans only for the purposes set forth in <u>Section 2.11</u>.  No Borrower Party shall withdraw proceeds of the Term Loans from the Deposit Account listed in the Direction Order in respect of such Term Loans, except in accordance with <u>Section 8.16</u>.

Section 6.23   <u>Post-Closing Matters</u>.  Execute and deliver the documents and complete the tasks set forth on <u>Schedule 6.23</u>, in each case within the time limits specified on such schedule.[1]

Section 6.24   <u>Bankruptcy Related Matters</u>.   Each Borrower Party will, and will cause each of the Guarantors and Restricted Subsidiaries to:

(a)   Comply with the DIP Order.

---

[1]   Schedule 6.23 shall include:  "in form, scope and substance satisfactory to DIP Agent and Majority Lenders in their reasonable discretion, one or more legal opinions of counsel to the Obligors, addressed to DIP Agent and each of the Lenders and dated as of the Initial Funding Date with respect to the entry into the DIP Term Loan Facility;"; "The Borrower Parties shall establish and maintain one or more deposit accounts pursuant to arrangements acceptable to the Majority Lenders.  Except for Excluded Accounts, the Borrower Parties shall use commercially reasonable efforts to cause each such Cash Management Bank to enter into a Blocked Account Agreement with the DIP Agent, for the benefit of the Lenders within 45 days of the Initial Funding Date, in form and substance mutually satisfactory to the Majority Lenders, the DIP Agent and such Cash Management Bank."; and "Within 10 days of the Initial Funding Date, with respect to each Borrower Party, a loan certificate signed by the secretary or assistant secretary of such Person (or, in the case of a Person that is a partnership, the general partner of such Person or, in the case of a Person that is a limited liability company, the members or manager, as appropriate, of such Person), in form and substance satisfactory to the Lenders, including a certificate of incumbency with respect to each Authorized Signatory of such Person, together with appropriate attachments which shall include the following: (A) a copy of the certificate of incorporation or formation of such Person certified to be true, complete and correct by the Secretary of State of the State of such Person's incorporation or formation within 10 days of the Agreement Date, (B) a true, complete and correct copy of the By-Laws, partnership agreement or operating agreement of such Person, (C) a true, complete and correct copy of the resolutions of such Person (or its general partner, members or manager, as applicable) authorizing the execution, delivery and performance by such Person of the Loan Documents and, with respect to the Borrower, authorizing the borrowings hereunder, (D) certificates of good standing from such Person's jurisdiction of formation, provided that to the extent such copy is issued more than 10 days prior to the Agreement Date, the Lenders shall have received a verbal bring down certificate affirming such good standing, and each other jurisdiction in which such Person does business, dated within 30 days of the Agreement Date, and (E) copies of all shareholders or share purchase agreements relating to the Equity Interests of such Person;" "delivery of Schedules to the Agreement in form and substance acceptable to Majority Lenders."

(b)  Comply in all material respects with each Chapter 11 Order (other than the DIP Order) except where failure to comply could not reasonably be expected to have a Material Adverse Effect.

(c)  Provide the DIP Agent and the Lenders with reasonable access to non-privileged information (including historical information) and relevant personnel regarding strategic planning, cash and liquidity management, operational and restructuring activities, in each case subject to customary confidentiality restrictions.

(d)  Deliver to the DIP Agent (for distribution to the Lenders) and to counsel to the DIP Agent promptly as soon as available but no later than three (3) Business Days prior to filing, copies of all proposed pleadings, motions, applications, orders, financial information and other documents to be filed by or on behalf of the Obligors or any other Borrower Party with the Bankruptcy Court in the Cases, or distributed by or on behalf of the Obligors or any other Loan Party to any official or unofficial committee appointed or appearing in the Cases or any other party in interest.

(e)  If not otherwise provided through the Bankruptcy Court's electronic docketing system, as soon as available, deliver to the DIP Agent (for distribution to the Lenders) and to counsel to the DIP Agent and Lenders promptly as soon as available, copies of all final pleadings, motions, applications, orders, financial information and other documents filed by or on behalf of the Obligors or any other Borrower Party with the Bankruptcy Court in the Cases, or distributed by or on behalf of the Obligors or any other Loan Party to any official or unofficial committee appointed or appearing in the Cases.

(f)  Provide the Lenders with advance copies of, and a reasonable opportunity to comment on, any press release in which a Lender or any affiliate of a Lender is mentioned or describing or mentioning Acceptable Reorganization Plan.

Section 6.25  _Milestones_.   The Obligors shall ensure the satisfaction of the following milestones (collectively, the "_Milestones_" and individually a "_Milestone_"), (unless waived or extended with the consent of DIP Agent and Majority Lenders):

(i)  by no later than five (5) days following the Petition Date, entry by the Bankruptcy Court of the Interim Order;

(ii)  by no later than forty-five (45) days following the Petition Date, entry by the Bankruptcy Court of the Final Order;

(iii)  by no later than seventy-five (75) days following the Petition Date, the Debtors shall file with the Bankruptcy Court in the Cases a proposed Acceptable Reorganization Plan and a motion seeking approval of a disclosure statement for such Acceptable Reorganization Plan and solicitation procedures contemplating completion of a confirmation hearing which disclosure

statement and solicitation procedures must otherwise be in form and substance reasonably acceptable to the DIP Agent and Majority Lenders;

(iv)   by no later than one hundred and twenty (120) days following the Petition Date, the Bankruptcy Court shall have entered an order approving a disclosure statement for an Acceptable Reorganization Plan and solicitation procedures contemplating completion of a confirmation hearing, which disclosure statement and solicitation procedures must otherwise be in form and substance reasonably acceptable to the DIP Agent and Majority Lenders, and the Bankruptcy Court's approval of such disclosure statement and solicitation procedures shall not have been amended, modified or supplemented (or any portions thereof reversed, stayed or vacated) other than as agreed in writing by Majority Lenders;

(v)   by no later than one hundred and eighty (180) days following the Petition Date, the Bankruptcy Court shall have entered an order confirming an Acceptable Reorganization Plan, which order shall be in form and substance acceptable to DIP Agent and Majority Lenders in their sole discretion and shall not have been amended, modified or supplemented (or any portions thereof reversed, stayed or vacated) other than as agreed in writing by DIP Agent and Majority Lenders; and

(vi)   by no later than two hundred and ten (210) days following the Petition Date, the effective date of an Acceptable Reorganization Plan shall have occurred, and the order confirming the Acceptable Reorganization Plan shall not have been amended, modified or supplemented (or any portions thereof reversed, stayed or vacated) other than as agreed in writing by DIP Agent and Majority Lenders.

Section 6.26   Chief Restructuring Officer.  Within 15 days of a written request by the Majority Lenders (which request may be given upon the earlier of (i) 60 days from the Petition Date or (ii) upon the occurrence of any Event of Default), the Debtors in consultation with the Majority Lenders shall retain a consultant or other professional (a "Chief Restructuring Officer") reasonably acceptable to the Majority Lenders, and with a scope of responsibility to be mutually agreed upon, and such Chief Restructuring Officer shall be made reasonably accessible to respond to inquiries by the DIP Agent.

ARTICLE 7

INFORMATION COVENANTS

Until the Obligations are repaid and performed in full and unless the Lenders shall otherwise give their prior consent in writing, the Borrower Parties will furnish or cause to be furnished to the DIP Agent, but subject to Section 7.5:

73

Section 7.1      <u>Reports</u>.

(a)    So long as any Obligations are outstanding, whether or not the Parent is a reporting company listed on the Toronto Stock Exchange or otherwise subject to reporting requirements under Canadian securities laws, the Parent will furnish to the Lenders:

(i)      on or before 90 days after the end of each fiscal year, all annual information that the Parent is required to file with the Canadian Securities Administrators under National Instrument 51-102—Continuous Disclosure Obligations, including (A) "Management's discussion and analysis of financial condition and results of operations," (B) a report on the annual financial statements by the Parent's independent chartered accountants, and (C) the annual information form;

(ii)      on or before 45 days after the end of each of the first three fiscal quarters of each fiscal year, all quarterly financial information that the Parent is required to file with the Canadian Securities Administrators under National Instrument 51-102—Continuous Disclosure Obligations, including (A) "Management's discussion and analysis of financial condition and results of operations" and (B) unaudited interim financial statements;

(iii)      on or before 10 days after the occurrence of a material change as specified in the Securities Act (Ontario), the material change report required to be filed with the Canadian Securities Administrators under National Instrument 51-102—Continuous Disclosure Obligations;

(iv)      no later than 5:00 p.m. on Friday of each calendar week, commencing on April 10, 2015, an updated Variance Report;

(v)      no later than 5:00 p.m. on the first Business Day of each calendar month, an updated Budget pursuant to terms of the definition thereof and a Budget Variance Report for the previous calendar month;

(vi)      no later than 5:00 p.m. on Friday of each calendar week, commencing with April 10, 2015, a report detailing fees and expenses for professional services incurred by the Obligors during the preceding week.

(b)    [intentionally omitted];

(c)    So long as any Obligations are outstanding, the Parent will furnish to the Lenders a notice of (i) any change or event which has had or could be expected to have a Material Adverse Effect, within 2 Business Days after the occurrence of such change or event and (ii) any Default, immediately upon the occurrence thereof.

(d)    So long as any Obligations are outstanding, the DIP Agent (acting at the direction of Majority Lenders) may, by 10 Business Days' advance written notice to the Borrower, with specific reference to this <u>Section 7.1(d)</u>, require

74

that the Borrower provide to the Lenders, either on a one-time or regular ongoing basis, such additional financial and other information about the Collateral and about the business, operations, prospects, properties, condition (financial or otherwise), assets or income of the Borrower Parties, as may be required or desirable in the commercially reasonable judgment of the DIP Agent (acting at the direction of Majority Lenders), exercised in good faith in accordance with customary business practices for comparable term lending transactions to allow the Lenders to administer, monitor and assess compliance with this Agreement, and evaluate the credit risk of lending to the Borrower Parties or the security of the Collateral.

(e)    At any time that any of Parent's Subsidiaries are Unrestricted Subsidiaries with combined consolidated net assets exceeding 5% of Parent's consolidated net assets, then the quarterly and annual reports required pursuant to either clause (a) or (b) above, as the case may be, will include a reasonably detailed presentation, either on the face of the financial statements or in the footnotes thereto, and in "Management's discussion and analysis of financial condition and results of operations" or other comparable section, of the financial condition and results of operations of Parent and its Restricted Subsidiaries separate from the financial condition and results of operations of the Unrestricted Subsidiaries of Parent.

(f)    [intentionally omitted];

(g)    In addition, Parent shall furnish to Lenders, upon their request, any information required to be delivered to holders of Second Lien Notes pursuant to Rule 144A(d)(4) under the Securities Act so long as the Second Lien Notes are not freely transferable under the Securities Act.

Delivery of any reports, information and documents under this Section 7.1, as well as any such reports, information and documents pursuant to this Agreement, to the Lenders is for informational purposes only and the Lenders' receipt of such shall not constitute constructive notice of any information contained therein or determinable from information contained therein, including the Borrower's compliance with any of its covenants hereunder (as to which the Lenders are entitled to rely exclusively on the Compliance Certificates).  The Lenders shall have no responsibility or liability for the filing, timeliness or content of any report required under this Section 7.1 or any other reports, information and documents required under this Agreement (aside from any report that is expressly the responsibility of the Lenders subject to the terms hereof).

Section 7.2    Compliance Certificates.    At the time any financial statements are furnished pursuant to Section 7.1, a Compliance Certificate:

(a)    Stating whether any material change in the Applicable Accounting Standard or the application thereof has occurred since the date of the Parent's audited financial statements delivered on the Agreement Date, and, if any change has occurred, specifying the effect of such change on the financial statements accompanying such certificate;

(b)  Stating that, to the best of his or her knowledge, no Default or Event of Default has occurred as at the end of such period, or, if a Default or Event of Default has occurred, disclosing each such Default and/or Event of Default, as applicable, its nature, when it occurred, whether it is continuing and what actions the Borrower Parties have taken or propose to take with respect thereto;

(c)  So long as not contrary to the then current recommendations of the American Institute of Certified Public Accountants, the year-end financial statements delivered pursuant to <u>Section 7.1(a)(i)</u> above shall be accompanied by a written statement of the Borrower's independent public accountants (who shall be a firm of established national reputation) that in making the examination necessary for certification of such financial statements, nothing has come to their attention that would lead them to believe that the Borrower has violated any provisions of <u>Article 8</u> hereof or, if any such violation has occurred, specifying the nature and period of existence thereof, it being understood that such accountants shall not be liable directly or indirectly to any Person for any failure to obtain knowledge of any such violation; and

(d)  Simultaneous with the delivery of the Compliance Certificate requested under this <u>Section 7.2</u>, the Borrower shall deliver to the Lenders an Officers' Certificate stating that all Liens and security interests created and granted to the DIP Agent on behalf of the Lenders in connection herewith and the transactions contemplated hereunder remain in full force and effect and continue to be perfected.

Section 7.3  <u>Access to Accountants</u>.  Each Borrower Party hereby authorizes the Lenders and the DIP Agent to communicate directly with the Borrower Parties' independent public accountants and authorizes these accountants to disclose to the Lenders and the DIP Agent any and all financial statements and other supporting financial data, including matters relating to the annual audit and copies of any management letter with respect to its business, financial condition and other affairs.

Section 7.4  <u>Notice of Litigation and Other Matters</u>.

(a)  Promptly upon (and in any event within three (3) Business Days of) any Borrower Party's obtaining knowledge of the institution of, or a written threat of, any action, suit, governmental investigation or arbitration proceeding against any Borrower Party or any Property, which action, suit, governmental investigation or arbitration proceeding, if adversely determined, is reasonably likely to, in such Borrower Party's reasonable judgment, result in a Default or a Material Adverse Effect, such Borrower Party shall notify the Lenders of the occurrence thereof, and the Borrower Parties shall provide such additional information with respect to such matters as any Lender may request.

(b)  Promptly upon (and in any event within three (3) Business Days of) any Borrower Party's obtaining knowledge of the occurrence of any default (whether or not any Borrower Party has received notice thereof from any other Person) on Funded Debt of any Borrower Party which singly, or in the aggregate, is reasonably

likely to, in such Borrower Party's reasonable judgment, result in a Default or a Material Adverse Effect, such Borrower Party shall notify the Lenders of the occurrence thereof.

(c)  Promptly upon (and in any event within three (3) Business Days of) any Borrower Party's receipt of notice of the pendency of any proceeding for the condemnation or other taking of any Property of any Borrower Party, that is reasonably likely to, in such Borrower Party's reasonable judgment, result in a Default or a Material Adverse Effect, such Borrower Party shall notify the Lenders of the occurrence thereof.

(d)  Promptly upon (and in any event within three (3) Business Days of) any Borrower Party's receipt of notice of any other event that is reasonably likely to result in a Material Adverse Effect, such Borrower Party shall notify the Lenders of the occurrence thereof.

(e)  Promptly (but in any event within three (3) Business Days) following the occurrence of (i) any ERISA Event, (ii) a "prohibited transaction" (as such term is defined in Section 406 of ERISA or Section 4975 of the Code) with respect to any Plan of any Borrower Party or any of its ERISA Affiliates which is reasonably likely to subject any Borrower Party to any penalty or tax on "prohibited transactions" imposed by Section 502 of ERISA or Section 4975 of the Code or (iii) the commencement or threatened commencement of any litigation regarding any Plan or naming it or the trustee of any such Plan with respect to such Plan (other than claims for benefits in the ordinary course of business), the Borrower Parties shall notify the Lenders of the occurrence thereof; provided such occurrence, proceeding, or failure is reasonably likely to, in the DIP Agent's reasonable judgment (with the concurrence of Majority Lenders), result in a Default or a Material Adverse Effect.

(f)  Promptly after (and in any event within three (3) Business Days of) the occurrence of any Governmental Authority having regulatory authority over Parent or any of its Restricted Subsidiaries imposing upon any Borrower Party (i) any restriction on the payment of dividends or other payments by Parent or any such Restricted Subsidiary to a Borrower Party or (ii) any required capital or equity contribution to such Restricted Subsidiary by a Borrower Party that is reasonably likely to, in such Borrower Party's reasonable judgment, result in a Default or a Material Adverse Effect, the Borrower Parties shall, and shall cause their Restricted Subsidiaries to, deliver to the Lenders copies of all such notices, reports and other information received or submitted with respect to such action.

(g)  Promptly after (and in any event within two (2) Business Days of) receipt of notice by any of the Borrower Parties that any warehouseman, bailee or similar person which has executed a Collateral Access Agreement in favor of the Lenders will move or has moved Inventory of the Borrower Parties to a location no longer subject to a Collateral Access Agreement in favor of the DIP Agent or the Lenders.

Section 7.5   <u>Platform for Disclosure</u>.   The Borrower hereby acknowledges and agrees that (a)  it will make available to the Lenders materials and/or information provided by or on behalf of the Borrower and the Borrower Parties hereunder (collectively, "<u>Borrower Materials</u>") by posting the Borrower Materials on IntraLinks or another similar electronic system (the "<u>Platform</u>"), and (b) certain of the Lenders may be "public-side" Lenders (i.e., Lenders that do not wish to receive material non-public information (or, in the case of a company that is not a public-reporting company, material information of a type that would not be reasonably expected to be publicly available if such company were a public-reporting company) with respect to the Parent, the Borrower or any of their Subsidiaries or any of their respective securities) (each, a "<u>Public Lender</u>").  The Borrower hereby agrees that it will use commercially reasonable efforts to identify that portion of the Borrower Materials that may be distributed to the Public Lenders and that (i) all such Borrower Materials shall be clearly and conspicuously marked "PUBLIC" which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first page thereof, (ii) by marking Borrower Materials "PUBLIC," the Borrower shall be deemed to have authorized the DIP Agent and the Lenders to treat such Borrower Materials as solely containing information that is either (A) of a type that would reasonably be expected to be publicly available for a public-reporting company or (B) not material (although it may be sensitive and proprietary) with respect to the Parent, the Borrower, any of their Subsidiaries or any of their respective securities for purposes of United States Federal and state securities laws (<u>provided</u>, <u>however</u>, that such Borrower Materials shall be treated as set forth in Section 10.16, to the extent such Borrower Materials constitute information subject to the terms thereof), (iii) all Borrower Materials marked "PUBLIC" are permitted to be made available through a portion of the Platform designated "Public Investor;" and (iv) the DIP Agent and the Lenders shall be entitled to treat any Borrower Materials that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not designated "Public Investor."

## ARTICLE 8

## <u>NEGATIVE COVENANTS</u>

Until the Obligations are repaid and performed in full and unless the Lenders shall otherwise give their prior consent in writing in accordance herewith:

Section 8.1   <u>Funded Debt</u>.  No Borrower Party will, or will permit any of its Restricted Subsidiaries to, create, assume, incur, or otherwise become or remain obligated in respect of, or permit to be outstanding, any Funded Debt except:

(a)   Funded Debt incurred under this Agreement;

(b)   Funded Debt existing or committed on the Agreement Date and described on <u>Schedule 8.1</u>, including, without limitation, the Second Lien Notes;

(c)   Funded Debt of a Borrower Party that is secured by Permitted Liens described in <u>clause (g)</u> of the definition of Permitted Liens (including,

without limitation, Capitalized Lease Obligations), in an aggregate principal amount, including all Funded Debt incurred as a result of a Permitted Refinancing to renew, refund, refinance, replace, defease or discharge any Funded Debt incurred pursuant to this clause (c), not to exceed $1,500,000 at any time outstanding;

(d)   [intentionally omitted];

(e)   Funded Debt incurred by a Borrower Party in respect of Mining Financial Assurances, reclamation liabilities, water treatment, workers' compensation claims, payment obligations in connection with health or social security benefits, unemployment or other insurance obligations, statutory obligations, bankers' acceptances, performance, letter of credit or completion or performance guarantees (including, without limitation, performance guarantees pursuant to coal supply agreements or equipment leases) and surety bonds, in each case, in the ordinary course of business;

(f)   Funded Debt of a Borrower Party arising from the honoring by a bank or other financial institution of a check, draft or similar instrument inadvertently drawn against insufficient funds, so long as such Funded Debt is covered within five Business Days;

(g)   Funded Debt incurred by a Borrower Party arising from agreements providing for indemnification, adjustment of purchase price or similar obligations, incurred in connection with the disposition of any business, assets or Restricted Subsidiary of the Borrower Parties (other than Guaranties made in favor of any Person acquiring all or any portion of such business, assets or Restricted Subsidiary for the purpose of financing such acquisition), so long as the principal amount does not exceed the gross proceeds actually received by the Borrower Parties in connection with such disposition;

(h)   Funded Debt incurred by a Borrower Party in respect of netting services, overdraft protections and otherwise in respect of deposit accounts;

(i)   Guaranties of a Borrower Party permitted by Section 8.2;

(j)   unsecured obligations under Hedge Agreements entered into for bona fide risk management reasons, not entered into for speculative purposes, and approved by the Lender; and

(k)   [intentionally omitted];

(l)   [intentionally omitted];

(m)   the incurrence by the Borrower or any of its Restricted Subsidiaries of intercompany Funded Debt between or among the Borrower and any of its Restricted Subsidiaries; provided, however, that (1) if the Borrower or any Subsidiary Guarantor is the obligor on such Funded Debt and the payee is not the Borrower or a Subsidiary Guarantor, such Funded Debt must be unsecured junior debt

subordinated in all respects to the prior payment of the Obligations, and (2) (i) any subsequent issuance or transfer of Equity Interests that results in any such Funded Debt being held by a Person other than the Borrower or a Restricted Subsidiary of the Borrower and (ii) any sale or other transfer of any such Funded Debt to a Person that is not either the Borrower or a Restricted Subsidiary of the Borrower will be deemed, in each case, to constitute an incurrence of such Funded Debt by the Borrower or a Restricted Subsidiary of the Borrower, as the case may be, that was not permitted by this clause (m);

(n) the issuance by any of the Borrower's Restricted Subsidiaries to the Borrower or to any of its Restricted Subsidiaries of Equity Interests constituting Funded Debt; provided, however, that (1) any subsequent issuance or transfer of Equity Interests that results in any such Equity Interest being held by a Person other than the Borrower or a Restricted Subsidiary of the Borrower, and (2) any sale or other transfer of any such Equity Interest to a Person that is not either the Borrower or a Restricted Subsidiary of the Borrower will be deemed, in each case, to constitute an issuance of such Equity Interest by such Restricted Subsidiary that was not permitted by this clause (n); and

(o) Funded Debt of a Borrower Party incurred in connection with any Permitted Refinancing of any of the foregoing;

provided that no such Funded Debt permitted under Section 8.1 (other than Funded Debt permitted by Section 8.1(a)) shall, except with the express prior written consent of the DIP Agent and Majority Lenders and the lenders under the Prepetition Loan Facility, be, or be designated as, All-Asset Priority Lien Debt (as defined in the DIP Order).

Section 8.2    Guaranties.   Other than Guaranties of the Obligations, no Borrower Party will, or will permit any Restricted Subsidiary of a Borrower Party to, at any time Guaranty or enter into or assume any Guaranty, or be obligated with respect to, or permit to be outstanding, any Guaranty, other than, so long as done in the ordinary course of business, (a) Guaranties by any Borrower Party of obligations under agreements of any other Borrower Party entered into in connection with the acquisition of services, supplies, and equipment, (b) endorsements of instruments and (c) Guaranties by a Borrower Party of any Funded Debt permitted by Section 8.1 and Section 8.5(k).

Section 8.3    Liens.   No Borrower Party will, or will permit any Restricted Subsidiary of a Borrower Party to, create, assume, incur, or permit or suffer to exist or to be created, assumed, or permitted or suffered to exist, directly or indirectly, any Lien on any of its property, real or personal, now owned or hereafter acquired, except for Permitted Liens.

Section 8.4    Restricted Payments.

(a) No Borrower Party shall, or shall permit any Restricted Subsidiary of a Borrower Party to, directly or indirectly declare or make any Restricted Payment, or set aside any funds for any such purpose; provided, however,

that the Restricted Subsidiaries of the Parent may make Restricted Payments to the Borrower or any of its Restricted Subsidiaries that is a Borrower Party.

(b)   The provisions of Section 8.4(a) will not prohibit payments to the Parent to permit the Parent to pay reasonable and bona fide accounting, legal and administrative expenses and taxes of the Parent when due, in accordance with the Budget.

Section 8.5   Investments.  No Borrower Party will, or will permit any Restricted Subsidiary of a Borrower Party to, make Investments, except that:

(a)   the Borrower may purchase or otherwise acquire and own and may permit any of its Restricted Subsidiaries to purchase or otherwise acquire and own Cash Equivalents;

(b)   the Borrower may hold the Investments in existence on the Agreement Date and described on Schedule 5.1(c)-2;

(c)   the Borrower may hold the Investments in existence on, or made pursuant to binding commitments existing on, the Agreement Date and described on Schedule 8.5, and any Investment consisting of an extension, modification or renewal of any Investments existing on, or made pursuant to a binding commitment existing on, the Agreement Date, provided that the amount of any such Investment may only be increased (i) as required by the terms of such Investment as in existence on the Agreement Date or (ii) as otherwise permitted under this Agreement;

(d)   so long as no Event of Default exists, the Borrower may convert any of its Accounts that are in excess of ninety (90) days past due into notes or Equity Interests from the applicable Account Debtor so long as the DIP Agent for the benefit of Lenders is granted a first priority security interest in such Equity Interests or notes which Lien is perfected contemporaneously with the conversion of such Account to Equity Interests or notes;

(e)   the Borrower Parties may hold the Equity Interests of their respective Restricted Subsidiaries in existence as of the Agreement Date;

(f)   without limiting Section 8.1, any Borrower Party may make Investments in any other Borrower Party (other than the Parent or any of the Parent's Subsidiaries that is not a Restricted Subsidiary of the Borrower);

(g)   the Borrower Parties may hold Investments resulting from the receipt of non-cash consideration from a Disposition that was made pursuant to and in compliance with Section 8.7;

(h)   the Borrower Parties may hold Investments arising out of Hedge Agreements not entered into for speculative purposes;

(i)   [intentionally omitted];

81

(j)   the Borrower Parties may make Investments consisting of certificates of deposit and similar instruments with any commercial bank formed under the laws of the United States or any state of the United States or the District of Columbia or under the laws of Canada or any province or territory thereof having capital and surplus in excess of $500,000,000 and a rating at the time of acquisition thereof of "P-1" or better from Moody's or "A-1" or better from S&P which are used, in each case, by the Borrower or any of its Restricted Subsidiaries for Mining Financial Assurances;

(k)  the Borrower Parties may incur any guarantee of Funded Debt, provided that both the guarantee and the Funded Debt are permitted to be incurred by Section 8.1, other than a guarantee of Funded Debt of an Affiliate of the Parent that is not a Restricted Subsidiary of the Borrower;

(l)   [intentionally omitted]; and

(m) the Borrower Parties may make Investments consisting of purchases and acquisitions of Inventory or supplies or the licensing or contribution or intellectual property pursuant to joint marketing arrangements with other Persons, in each case in the ordinary course of business.

Section 8.6    Affiliate Transactions.

(a)   No Borrower Party shall, or shall permit any Restricted Subsidiary of a Borrower Party to, enter into or be a party to any agreement or transaction with any Affiliate (other than a Borrower Party) except to the extent such agreement or transaction (i) if entered into on or prior to the Agreement Date, is described on Schedule 8.6 or, if entered into after the Agreement Date, is fully disclosed to the Lender, to the satisfaction thereof, and (ii) occurs upon fair and reasonable terms that are no less favorable, as determined by the Lender, to such Borrower Party than it would obtain in a comparable arm's length transaction with a Person not an Affiliate of such Borrower Party or such Restricted Subsidiary.

(b)   The following items will not be deemed to be an agreement or transaction with an Affiliate and, therefore, will not be subject to the provisions of Section 8.6(a):

(i)      any employment agreement, consulting agreement, severance agreement, employee benefit plan, payment of directors' fees, officer or director indemnification agreement or any similar arrangement entered into by the Parent or any of its Restricted Subsidiaries in effect on the Agreement Date or, if entered into after the Agreement Date, in the ordinary course of business, and payments pursuant thereto;

(ii)     transactions between or among the Parent and/or its Restricted Subsidiaries expressly permitted hereunder;

(iii)    [Reserved];

(iv)    payment of reasonable and customary fees and reimbursements of expenses (pursuant to indemnity arrangements or otherwise) of officers, directors, employees or consultants of the Parent or any of its Restricted Subsidiaries;

(v)    [intentionally omitted];

(vi)    Restricted Payments permitted under Section 8.4;

(vii)    [intentionally omitted];

(viii)    payments to the Parent to permit the Parent to pay reasonable and bona fide accounting, legal and administrative expenses and taxes of the Parent when due, in accordance with the Budget; and

(ix)    to the extent the Borrower and any of its Restricted Subsidiaries, or the Parent and any of its Foreign Subsidiaries, are properly treated as members of the same group filing a consolidated or combined tax return, any payments from any such Restricted Subsidiary to the Borrower or from any such Foreign Subsidiary to the Parent (as the case may be) pursuant to a tax-sharing agreement among the members of such group.

Section 8.7    Liquidation; Disposition or Acquisition of Assets; Merger or Consolidation; Change in Name or Year; Etc.    No Borrower Party shall, or shall permit any Restricted Subsidiary to, at any time:

(a)    Liquidate or dissolve itself (or suffer any liquidation or dissolution) or otherwise wind up its business;

(b)    Consummate a Disposition, except for a Disposition that complies with Section 2.6 hereof and with each of the following: (i) immediately prior to and immediately after giving effect to such transaction, no Default or Event of Default shall have occurred and be continuing, and (ii) if any such sale or related sales of assets or other Disposition has a Fair Market Value in excess of $500,000 (or in excess of $1,000,000 for all such sales or Dispositions occurring during any twelve-month period), the DIP Agent acting at the direction of the Majority Lenders have approved such sale.

(c)    Merge or consolidate with any other Person, or complete the acquisition by the Borrower or any Restricted Subsidiary of the Borrower of another Person, or of all or substantially all of the assets of another Person, or any other transaction by way of a merger, amalgamation or consolidation with or into the Borrower or any of its Restricted Subsidiaries, except for, if at the time thereof and immediately after giving effect thereto no Event of Default, including a Change of Control, shall have occurred and be continuing and no Funded Debt *pari passu* or junior to the Obligations shall be repaid or purchased, in whole or in part, in connection therewith:

(i)      mergers into or consolidations or amalgamations of any Subsidiary with any Borrower in a transaction in which such Borrower is the surviving corporation;

(ii)      mergers, consolidations or amalgamations of any Subsidiary or any Obligor (other than, in each case, a Borrower or Parent) into or with any Obligor in a transaction in which the surviving entity is an Obligor;

(iii)      mergers, consolidations or amalgamations of any Subsidiary (other than an Obligor) into or with any other wholly-owned Subsidiary (other than an Obligor);

(iv)      such transaction shall, to the satisfaction of counsel and the Lender, be upon such terms that preserve and not impair any of the rights and powers of the DIP Agent or the Lenders;

(v)      the Borrower has notified the DIP Agent and the Lenders, in writing in advance, as certified by the Board of Directors of the Parent and the Borrower, that such transaction would not have a Material Adverse Effect; and

(vi)      such surviving entity shall continue to be solely engaged in a Permitted Business.

(d)   Change its legal name, state of incorporation or formation or structure without giving the Lender at least thirty (30) days prior written notice of its intention to do so and complying with all requirements of the Lender in regard thereto;

(e)   Change its year-end for accounting purposes from the fiscal year ending December 31; or

(f)   Create any Restricted Subsidiary unless the requirements set forth in Section 6.20(b) shall have been satisfied substantially concurrently therewith.

Section 8.8   Conduct of Business.   The Borrower Parties shall not engage substantially in any line of business substantially different from a Permitted Business.

Section 8.9   Amendment and Waiver.   Except as permitted hereunder, no Borrower Party shall, or shall permit any Restricted Subsidiary of a Borrower Party to, enter into any amendment of, or agree to or accept any waiver, which could adversely affect the rights of such Borrower Party or the Lenders, of its articles or certificate of incorporation or formation and by-laws, partnership agreement or other governing documents.

Section 8.10   ERISA Liability.   No Borrower Party shall fail to meet all of the applicable minimum funding requirements of ERISA and the Code, without regard

to any waivers thereof, to the extent that the assets of any of their Plans would be less (by $500,000 or more) than an amount sufficient to provide all accrued benefits payable under such Plans, the Borrower Parties shall make the maximum deductible contributions allowable under the Code (based on the Borrower's current actuarial assumptions). No Borrower Party shall, or shall cause or permit any ERISA Affiliate to, (a) cause or permit to occur any event that could result in the imposition of a Lien under Section 430 of the Code or Section 302 or 4068 of ERISA, or (b) cause or permit to occur an ERISA Event.

Section 8.11    [Reserved].

Section 8.12    Negative Pledge.  No Borrower Party shall, or shall permit any Restricted Subsidiary of any Borrower Party to, directly or indirectly, enter into any agreement (other than the Loan Documents or the Indenture) with any Person that prohibits or restricts or limits the ability of any Borrower Party to create, incur, pledge, or suffer to exist any Lien upon any of its respective assets (other than Excluded Assets), or restricts the ability of any Restricted Subsidiary of Parent to pay Dividends to such Borrower.

Section 8.13    Inconsistent Agreements.  No Borrower Party shall, or shall permit any Restricted Subsidiary of any Borrower Party to, enter into any contract or agreement which would violate the terms hereof or of any other Loan Document.

Section 8.14    Certain Bankruptcy Matters.  No Borrower Party shall, or shall permit any Restricted Subsidiary of any Borrower Party to at any time:

(a)    except as otherwise permitted or provided hereunder or under the DIP Order or agreed to by DIP Agent and Majority Lenders, create or permit to exist (i) any administrative expense, unsecured claim, or Superpriority Claim (except for the Carve-Out) or a Lien that is *pari passu* with or senior to the Obligations and/or the DIP Liens (other than in respect of the Carve-Out), or apply to the Bankruptcy Court for authority to do so, or (ii) any obligation to make adequate protection payments, or otherwise provide adequate protection, other than as provided in the DIP Order;

(b)    make or permit to be made any change, amendment or modification, or make an application or motion for any change, amendment or modification, to any Chapter 11 Order which could reasonably be expected to have a Material Adverse Effect in each case, without the prior written consent of DIP Agent and Majority Lenders;

(c)    except as otherwise permitted under the Acceptable Reorganization Plan or consented to by Majority Lenders, (i) assume any executory contract or unexpired lease or reject any executory contract or unexpired lease, (ii) pursue a sale of all or substantially all of the Obligors' assets, (iii) consent to termination or reduction of the Obligors' exclusive plan filing and plan solicitation periods under section 1121 of the Bankruptcy Code (the "Exclusivity Periods") or fail to object to any motion by a party-in-interest (other than a Lender or the DIP Agent) seeking to terminate or reduce the Exclusivity Periods, in each case other than a motion filed by or with the

consent of DIP Agent and Majority Lenders or (iv) file a chapter 11 plan of reorganization without the consent of DIP Agent and Majority Lenders, other than an Acceptable Reorganization Plan;

(d)     file a motion or plan with the Bankruptcy Court, or otherwise seek or consent to an action requesting substantive consolidation of any of the Obligors' bankruptcy estates without the prior written consent of the DIP Agent and Majority Lenders; and

(e)     assert any right of subrogation or contribution against any other Borrower Party until all Obligations are paid or satisfied in full as provided herein.

Section 8.15    Minimum Liquidity.   The aggregate amount of cash and cash equivalents of the Borrower Parties after the Initial Funding Date shall be at least $500,000 at all times on and after April 30, 2015.

Section 8.16    Variance from Budget and Projected Revenues.   As of the last day of each calendar month beginning with April 30, 2015: (a) aggregate disbursements of the Borrower Parties (other than professional fees) listed in the current Budget for such month shall not be greater than 115% of the aggregate amount specified for expenditures in such month in the then current Budget; and (b) the aggregate revenues of the Borrower Parties shall be at least 85% of those projected in the current Budget.

Section 8.17    Capital Expenditures.   The aggregate amount of Capital Expenditures of the Borrower Parties in any fiscal year shall not exceed $5,000,000 [(except to the extent such Capital Expenditures are funded entirely by Net Cash Proceeds as permitted under Section 2.6(c))].

Section 8.18    Sale / Leaseback Transactions.   Borrower Parties shall not directly or indirectly become or remain liable as lessees and/or guarantors in respect of one or more sale / leaseback transactions in an aggregate amount in excess of $5,000,000.

ARTICLE 9

DEFAULT

Section 9.1    Events of Default.   Each of the following shall constitute an Event of Default, whatever the reason for such event and whether it shall be voluntary or involuntary or be effected by operation of law or pursuant to any judgment or order of any court or any order, rule, or regulation of any governmental or non-governmental body:

(a)   Any representation, warranty or certification made under this Agreement or any other Loan Document shall be incorrect or misleading (including by omission) in any respect when made or deemed to have been made pursuant to Article IV.

(b)  Any payment of any interest or fees payable hereunder or under the other Loan Documents by any Borrower Party shall not be received by the Lender to which it is owed within two (2) Business Days after the date such payment is due;

(c)  Any payment of any principal or any premium thereon payable hereunder or under the other Loan Documents by any Borrower Party shall not be received by the Lender to which it is owed on the date such payment is due (including, without limitation, any prepayments required under the Loan Documents);

(d)  Any Borrower Party shall default in the performance or observance of any agreement or covenant contained in [Section 2.6, Section 2.11, Section 6.22, Section 6.23, Article 7, or Article 8];

(e)  Any Borrower Party shall default for ten (10) Business Days after notice by the DIP Agent (acting at the direction of Majority Lenders) in the performance or observance of any of the other agreements or covenants contained in herein or in the other Loan Documents;

(f)  There shall occur any Change of Control;

(g)  A final judgment or order (other than a money judgment or judgments fully covered (except for customary deductibles or copayments in an amount not to exceed $100,000 in the aggregate) by insurance as to which the insurance company has acknowledged coverage) shall be entered by any court against any Borrower Party or any Subsidiary (other than an Immaterial Subsidiary) of any Borrower Party for the payment of money which exceeds $250,000 in the aggregate, or (ii) a warrant of attachment or execution or similar process shall be issued or levied against property of any Borrower Party or any Subsidiary (other than an Immaterial Subsidiary) of a Borrower Party pursuant to a final judgment which, exceeds in value $250,000 in the aggregate, and, in the case of each of clauses (i) and (ii), if, within thirty (30) days after the entry, issue, or levy thereof, such judgment, warrant, or process shall not have been paid or discharged or stayed pending appeal, or if, after the expiration of any such stay, such judgment, warrant, or process shall not have been paid or discharged, or (iii) a final judgment or order (other than a money judgment or judgments fully covered (except for customary deductibles or copayments in an amount not to exceed $100,000 in the aggregate) by insurance as to which the insurance company has acknowledged coverage) shall be entered by any court against any Borrower Party or any Subsidiary (other than an Immaterial Subsidiary) of any Borrower Party for the payment of money which exceeds, together with all such other judgments of the Borrower Parties and their Subsidiaries (other than an Immaterial Subsidiary), $1,000,000 in the aggregate provided that, for the purposes of calculating any aggregate threshold in this Section 9.1(i), a customary deductibles or copayments shall be included only with reference to the amount of such customary deductibles or copayments that is in excess of $100,000;

(h)   There shall be at any time (i) any "accumulated funding deficiency," as defined in ERISA or in Section 412 of the Code, with respect to any Plan maintained by any Borrower Party or any ERISA Affiliate of a Borrower Party, or to which any Borrower Party or any of its ERISA Affiliates has any liabilities; (ii) a trustee shall be appointed by a United States District Court to administer any Plan maintained by any Borrower Party or any ERISA Affiliate of a Borrower Party, or to which any Borrower Party or any of its ERISA Affiliates has any liabilities; (iii) the PBGC shall institute proceedings to terminate any Plan; (iv) any Borrower Party or any ERISA Affiliate of any Borrower Party shall incur any liability to the PBGC in connection with the termination of any such Plan; (v) any Plan or trust created under any Plan of any Borrower Party or any ERISA Affiliate of any Borrower Party shall engage in a non-exempt "prohibited transaction" (as such term is defined in Section 406 of ERISA or Section 4975 of the Code) which could subject any Plan, any trust created thereunder, any trustee or administrator thereof, or any party dealing with any such Plan or trust to any tax or penalty on "prohibited transactions" imposed by Section 502 of ERISA or Section 4975 of the Code; (vi) any Borrower Party or any ERISA Affiliate of any Borrower Party shall enter into or become obligated to contribute to a Multiemployer Plan; (vii) there shall be at any time a Lien imposed against the assets of a Borrower Party or ERISA Affiliate under Code Section 430, or ERISA Sections 302 or 4068; or (viii) there shall occur at any time an ERISA Event; provided, however that no Event of Default shall occur as a result of an event described in clauses (i), (ii), (iii), (iv), (v), (vii) or (viii) of this Section 9.1(i) unless such event either individually or in the aggregate with other events described therein could be expected result in an aggregate liability greater than $500,000 or otherwise have a Material Adverse Effect or give rise to a pension Lien on any Borrower Party or on any of the assets thereof;

(i)   [intentionally omitted];

(j)   Except as permitted by this Agreement, all or any portion of any Loan Document shall at any time and for any reason be declared to be null and void, the effect of which is to render any such Loan Document inadequate for the practical realization of the rights and benefits afforded thereby, or a proceeding shall be commenced by any Borrower Party or any Affiliate thereof, or by any Governmental Authority having jurisdiction over any Borrower Party or any Affiliate thereof, seeking to establish the invalidity or unenforceability thereof (exclusive of questions of interpretation of any provision thereof), or any Borrower Party or any Affiliate thereof shall deny that it has any liability or obligation for the payment of any Obligation provided under any Loan Document or any such liability or obligation shall be terminated as a result of a default or event of default thereunder by any Borrower Party;

(k)   Except as permitted by this Agreement, the obligation of any Guarantor under Article 3 shall be limited or terminated by operation of law or by such Guarantor;

(l)   Except as permitted by this Agreement, any Lien purported to be created by any DIP Order or any Loan Document shall cease to be in full force and effect, or shall cease to give the DIP Agent, for the benefit of the Lenders, the Liens, rights, powers and privileges purported to be created and granted under such DIP Orders or Loan Documents (including a perfected first priority security interest in and Lien on, any portion of the Collateral thereunder (except as otherwise expressly provided in this Agreement or such DIP Order or Loan Document)) in favor of the DIP Agent, for the benefit of the Lenders, or shall be asserted by any Borrower Party not to be valid, perfected, first priority (except as expressly provided in this Agreement or such DIP Order or Loan Document) security interest in or Lien on any portion of the Collateral covered thereby;

(m) There shall occur any event which has had or could be expected to have a Material Adverse Effect; or

(n)   Any of Gregory L. "Bernie" Mason and Michael R. Castle ceases to hold the office or position with Parent or any other Borrower Party held by such Person on the Agreement Date, and such Person is not replaced by a Person acceptable to the DIP Agent (acting at the direction of Majority Lenders), acting reasonably, within 45 days of such cessation.

(o)   Dismissal or Conversion of Cases; Appointment of Trustee or Examiner; Cash Collateral Use.

(i)   Any of the Cases of the Obligors shall be dismissed or converted to a case under Chapter 7 of the Bankruptcy Code;

(ii)   A trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code or an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code) under section 1106(b) of the Bankruptcy Code shall be appointed in any of the Cases of the Obligors;

(iii)   An order of the Bankruptcy Court shall be entered denying or terminating use of cash collateral by the Obligors;

(iv)   Any Obligor, or any person on behalf of any Obligor, shall file a motion or other pleading seeking, or otherwise consenting to, any of the matters set forth in clauses (i) through (iii) above or the granting of any other relief that if granted would give rise to an Event of Default; or

(v)   Any Obligor or any of its Subsidiaries, or any person claiming by or through any Obligor or any of its Subsidiaries, with any Obligor's or any Subsidiary's consent, shall obtain court authorization to commence, or shall commence, join in, assist or otherwise participate as an adverse party in any suit or other proceeding against the DIP Agent or any of the Lenders relating to the DIP Term Loan Facility.

(p)  Superpriority Claims.  The existence of any claims or charges, or the entry of any order of the Bankruptcy Court authorizing any claims or charges, other than in respect of the DIP Term Loan Facility and the Carve-Out or as otherwise permitted under the applicable Loan Documents, entitled to superpriority administrative expense claim status in any Chapter 11 Case pursuant to Section 364(c)(1) of the Bankruptcy Code *pari passu* with or senior to the claims of the DIP Agent and the Lenders under the DIP Term Loan Facility, or there shall arise or be granted by the Bankruptcy Court (i) any claim having priority over any or all administrative expenses of the kind specified in clause (b) of Section 503 or clause (b) of Section 507 of the Bankruptcy Code (other than the Carve-Out) or (ii) any Lien on the Collateral having a priority senior to or *pari passu* with the Liens and security interests granted herein, except, in each case, as expressly provided in the Loan Documents or in the DIP Order then in effect (but only in the event specifically consented to by the DIP Agent), whichever is in effect.

(q)  Relief from Stay.  The Bankruptcy Court shall enter an order or orders granting relief from any stay of proceeding (including, the automatic stay applicable under Section 362 of the Bankruptcy Code to the holder or holders of any security interest) to (i) permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any assets of any of the Obligors which have a value in excess of $250,000 in the aggregate or (ii) permit other actions that would have a Material Adverse Effect on the Obligors or their estates (taken as a whole).

(r)  Certain Orders.

(i)  an order of the Bankruptcy Court shall be entered reversing, amending, supplementing, staying, vacating or otherwise amending, supplementing or modifying the Interim Order or the Final Order, without the prior written consent of Majority Lenders;

(i)  the Interim Order (prior to Final Order Entry Date) or Final Order (on and after the Final Order Entry Date) shall cease to create a valid and perfected Lien on the Collateral or to be in full force and effect, shall have been reversed, modified, amended, stayed, vacated, or subject to stay pending appeal, in the case of modification or amendment, without prior written consent of the DIP Agent and Majority Lenders;

(ii)  any of the Obligors shall fail to comply with the Interim Order (prior to Final Order Entry Date) or Final Order (on and after the Final Order Entry Date);

(iii)  an order in the Cases shall be entered charging any of the Collateral under Section 506(c) of the Bankruptcy Code against the Lenders or the commencement of other actions that is materially adverse to DIP Agent, the Lenders or their respective rights and remedies under the DIP Term Loan Facility in any of the Cases or inconsistent with any of the Loan Documents; or

(iv) if the Final Order does not include a waiver, in form and substance satisfactory to DIP Agent and Majority Lenders, of the right to surcharge the Collateral under Section 506(c) of the Bankruptcy Code.

(s) <u>Invalid Plan</u>. A Reorganization Plan that is not an Acceptable Reorganization Plan shall be confirmed in any of the Cases of the Obligors, or any order shall be entered which dismisses any of the Cases of the Obligors and which order does not provide for payment in full in cash of the Obligations under the Loan Documents (other than contingent indemnification obligations not yet due and payable), or any of the Obligors and their Subsidiaries shall seek, support or fail to contest in good faith the filing or confirmation of any such Reorganization Plan or entry of any such order.

(t) <u>Milestones</u>. Failure to satisfy any of the Milestones in accordance with the terms relating to such Milestone (unless waived or extended with the consent of DIP Agent and Majority Lenders).

(u) <u>Supportive Actions</u>. Any Obligor or any Subsidiary thereof shall take any action in support of any matter set forth in <u>clauses</u> (p) through <u>(t)</u> (inclusive) of this <u>Section 9.01</u> or any other Person shall do so and such application is not contested in good faith by the Obligors and the relief requested is granted in an order that is not stayed pending appeal.

(v) <u>Other Actions</u>. Any Obligor or any Subsidiary thereof shall obtain court authorization to commence, or shall commence, join in, assist or otherwise participate as an adverse party in any suit or other proceeding seeking, or otherwise consenting to (i) the invalidation, subordination or other challenging of the Superpriority Claims and Liens granted to secure the Obligations or any other rights granted to the DIP Agent and the Lenders in the DIP Orders or this Agreement or (ii) any relief under section 506(c) of the Bankruptcy Code with respect to any Collateral.

(w) <u>Challenges</u>. Any Obligor shall challenge, support or encourage a challenge of any payments made to the DIP Agent or any Lender with respect to the Obligations or any lender under the Prepetition Loan Facility with respect to the obligations thereunder, other than to challenge the occurrence of a Default or Event of Default.

(x) <u>Adequate Protection Motion</u>. Without the consent of DIP Agent and Majority Lenders, the filing of any motion by the Obligors seeking approval of (or the entry of an order by the Bankruptcy Court approving) adequate protection to any prepetition agent, trustee or lender that is inconsistent with the Interim Order (prior to the Final Order Entry Date) or the Final Order (on and after the Final Order Entry Date).

(y) <u>Section 364 Financing</u>. Without Majority Lenders' consent, the entry of any order by the Bankruptcy Court granting, or the filing by any Obligor or any of its Subsidiaries of any motion or other request with the Bankruptcy

Court (in each case, other than the DIP Orders and motions seeking entry thereof or permitted amendments or modifications thereto) seeking, authority to use any cash proceeds of any of the Collateral without DIP Agent's and Majority Lenders' consent or to obtain any financing under section 364 of the Bankruptcy Code other than the facility hereunder unless such motion or order contemplates Payment in Full in cash of the Obligations immediately upon consummation of the transactions contemplated thereby.

(z)    <u>Asset Sale Motion</u>.  Any Obligor or any person on behalf of any Obligor shall file any motion seeking authority to consummate a sale of assets of the Obligors or the Collateral having a value in excess of $250,000 outside the ordinary course of business and not otherwise permitted hereunder;

(aa)    <u>Restriction on Business</u>.  If any Obligor or any of its Subsidiaries (other than Excluded Subsidiaries) is enjoined, restrained, or in any way prevented by court order from continuing to conduct all or any part of the business affairs of Obligors and their Subsidiaries, taken as a whole, which could reasonably be expected to have a Material Adverse Effect; provided, that the Obligors shall have five (5) Business Days after the entry of such an order to obtain a court order vacating, staying or otherwise obtaining relief from the Bankruptcy Court or another court to address any such court order.

(bb)    <u>Prepetition Indebtedness Payment</u>.  Any Obligor shall make any payment (whether by way of adequate protection or otherwise) of principal or interest or otherwise on account of any prepetition Indebtedness or payables other than payments in respect of the repayment of the Prepetition Loan Facility or as otherwise permitted under this Agreement, in each case, to the extent authorized by one or more First Day Orders or Second Day Orders and consistent with the Budget.

(cc)    <u>Change of Venue</u>.  If, unless otherwise approved by DIP Agent and Majority Lenders, an order of the Bankruptcy Court shall be entered providing for a change in venue with respect to the Cases and such order shall not be reversed or vacated within 10 days.

(dd)    <u>Other Motions or Requests Affecting Certain Rights and Liens</u>. Without Majority Lenders' consent, any Obligor or any Subsidiary thereof shall file any motion or other request with the Bankruptcy Court seeking (a) to grant or impose, under section 364 of the Bankruptcy Code or otherwise, liens or security interests in any Collateral, whether senior, equal or subordinate to the DIP Agent's liens and security interests; (b) to use, or seek to use, Cash Collateral (as defined in the DIP Orders) or; (c) to modify or affect any of the rights of the DIP Agent, or the Lenders under the DIP Orders or the Loan Documents, by any Reorganization Plan confirmed in the Cases or subsequent order entered in the Cases.

Section 9.2    <u>Remedies</u>.  If an Event of Default shall have occurred and shall be continuing, in addition to the rights and remedies set forth elsewhere in this

Agreement and the other Loan Documents and as otherwise available to the Lenders by any Applicable Laws:

(a)  With the exception of an Event of Default specified in Section 9.1(f) or (g), the Lenders (or the DIP Agent acting at the direction of the Lenders) may declare the principal of and interest on the Term Loans and all other Obligations, including any prepayment premium, to be forthwith due and payable without presentment, demand, protest, or notice of any kind, all of which are hereby expressly waived, anything in this Agreement or in any other Loan Document to the contrary notwithstanding.

(b)  Upon the occurrence and continuance of an Event of Default specified in Section 9.1(f) or (g), such principal, interest, and other Obligations, including any prepayment premium, shall thereupon and concurrently therewith become due and payable, all without any action by the Lenders, and without presentment, demand, protest, or other notice of any kind, all of which are expressly waived, anything in this Agreement or in any other Loan Document to the contrary notwithstanding.

(c)  The DIP Agent, for the benefit of the Lenders, shall at the direction of the Lenders exercise any or all of the post-default rights granted to the DIP Agent, for the benefit of the Lenders, under the Loan Documents or under Applicable Law.  The DIP Agent, for the benefit of the Lenders, shall have the right to the appointment of a receiver for the Property of the Borrower Parties, and the Borrower Parties hereby consent to such rights and such appointment and hereby waive any objection the Borrower Parties may have thereto or the right to have a bond or other security posted by the Lenders in connection therewith.

(d)  The Lenders may in their discretion require the Borrower Parties to engage a consulting firm or chief restructuring officer, reasonably satisfactory to the Lenders, and deliver to the Lenders a copy of the fully-executed engagement letter with such consultant, which engagement letter shall be in form and substance reasonably acceptable to the Lenders, and, among other things, (A) require such consulting firm or chief restructuring officer to cooperate with any financial advisor to the Lenders in regard to the monthly reporting of covenants and (B) provide for such engagement to have a term ending on or after the Maturity Date (or a shorter term if agreed to in writing by the Lenders).

(e)  The DIP Agent, for the benefit of the Lenders, may in its discretion require each Borrower Party to use its best efforts to assist the DIP Agent in the sale of Collateral, and each Borrower Party further agrees to use its best efforts to cause such employees or agents of such Borrower Party, which Persons shall be licensed to dispose of such Collateral, as are reasonably necessary to accomplish the disposition of such Collateral to the DIP Agent's satisfaction to assist in such disposition.  In connection with the sale of such Collateral, each Borrower Party agrees to use its best efforts to obtain sales of such Collateral at commercially reasonable prices and terms.

(f)   The Lenders (or the DIP Agent acting at the direction of the Lenders) may terminate the Commitments with immediate effect.

(g)   The rights and remedies of the Lenders and the DIP Agent hereunder shall be cumulative, and not exclusive.

ARTICLE 10

MISCELLANEOUS

Section 10.1    Notices.

(a)   All notices and other communications under this Agreement shall be in writing and shall be deemed to have been given five (5) days after deposit in the mail, designated as certified mail, return receipt requested, postage-prepaid, or one (1) day after being entrusted to a reputable commercial overnight delivery service, or when delivered to the telegraph office or sent out (with receipt confirmed) by telex or telecopy addressed to the party to which such notice is directed at its address determined as in this Section 10.1.    All notices and other communications under this Agreement shall be given to the parties hereto at the following addresses:

(i)      If to any Borrower Party, to such Borrower Party in care of the Borrower at:

8531 East Walker Springs Lane, Suite 400
Knoxville, TN 37923
Attn: Michael R. Castle, Chief Financial Officer
Telecopy No.: 865-474-7020
Email: mcastle@xinergycorp.com

with a copy to:

Stubbs Alderton & Markiles, LLP
Attn: John McIlvery
Telecopy:  818-444-6302
Email:  jmcilvery@stubbsalderton.com

(ii)     If to a Lender or the DIP Agent, to it at its address for notices set forth on Annex I hereto (or as designated in writing to the Borrower from time to time):

with a copy to:

Paul, Weiss, Rifkind, Wharton & Garrison, LLP
1285 Avenue of the Americas
New York, NY  10019-6064
Attn:  Brian S. Hermann, Esq.

Oksana Lashko, Esq.
Sarah Harnett, Esq.
Telecopy:  (212) 492-0158
Email:  arosenberg@paulweiss.com

(b)   Any party hereto may change the address to which notices shall be directed under this Section 10.1 by giving ten (10) days' written notice of such change to the other parties.

(c)   All notices and other items to be, or which may be from time to time, delivered by and among the Borrower Parties, the DIP Agent and the Lenders (including the delivery of the items required by Sections 7.1 and 7.2), may be made via Electronic Transmission.

Section 10.2   Expenses.  Each Borrower agrees, jointly and severally, to promptly pay or promptly reimburse:

(a)   All costs and expenses of the Lenders, the DIP Agent and each of their Affiliates in connection with the Cases and the preparation, negotiation, execution, delivery of this Agreement and the other Loan Documents and post-closing assignments of the Term Loans and Commitments, the transactions contemplated hereunder and thereunder, and the making of the Term Loans hereunder, including, but not limited to, the fees, charges and disbursements of outside counsel for the Lenders and their Affiliates;

(b)   All costs and expenses of the Lenders and the DIP Agent in connection with the administration of the transactions contemplated in this Agreement and the other Loan Documents and the preparation, negotiation, execution, and delivery of any waiver, amendment, or consent by the Lenders relating to this Agreement or the other Loan Documents, and the fees and disbursements of counsel for the Lenders;

(c)   All costs and expenses of the Lenders in connection with any restructuring, refinancing, or "work out" of the transactions contemplated by this Agreement, and of obtaining performance under this Agreement and the other Loan Documents, and all costs and expenses of collection if default is made in the payment of the Obligations, which in each case shall include fees, charges and expenses of outside counsel for the Lenders, and the fees and expenses of any experts of the Lenders, or consultants of the Lenders; and

(d)   All taxes, assessments, general or special, and other charges levied on, or assessed, placed or made against any of the Collateral or the Obligations.

Section 10.3   Waivers.  The rights and remedies of the Lenders under this Agreement and the other Loan Documents shall be cumulative and not exclusive of any rights or remedies which they would otherwise have.  No failure or delay by the Lenders

in exercising any right shall operate as a waiver of such right. The Lenders expressly reserves the right to require strict compliance with the terms of this Agreement in connection with any funding of the Term Loans. In the event any Lender decides to fund a request for the Term Loans at a time when the Borrower Parties are not in strict compliance with the terms of this Agreement, such decision by a Lender shall not be deemed to constitute an undertaking by such Lender to fund any further requests or preclude any Lender from exercising any rights available to the Lenders under the Loan Documents or at law or equity. Any waiver or indulgence granted by the Lenders shall not constitute a modification of this Agreement, except to the extent expressly provided in such waiver or indulgence, or constitute a course of dealing by the Lenders at variance with the terms of the Agreement such as to require further notice by the Lenders of the Lenders' intent to require strict adherence to the terms of the Agreement in the future. Any such actions shall not in any way affect the ability of the Lenders, in its discretion, to exercise any rights available to them under this Agreement or under any other agreement, whether or not any Lender is party, relating to the Borrower.

Section 10.4    Set-Off. In addition to any rights now or hereafter granted under Applicable Law and not by way of limitation of any such rights, except to the extent limited by Applicable Law or any DIP Order, at any time that an Event of Default exists, the Lenders and each subsequent holder of the Obligations is hereby authorized by the Borrower Parties at any time or from time to time, without notice to the Borrower Parties or to any other Person, any such notice being hereby expressly waived, to set-off and to appropriate and apply any and all deposits (general or special, time or demand, including, but not limited to, Funded Debt evidenced by certificates of deposit, in each case whether matured or unmatured, but not including any amounts held by the Lenders or any of its Affiliates in any escrow account) and any other Funded Debt at any time held or owing by the Lenders or any such holder to or for the credit or the account of any Borrower Party, against and on account of the obligations and liabilities of the Borrower Parties, to the Lenders or any such holder under this Agreement and any other Loan Document, including, but not limited to, all claims of any nature or description arising out of or connected with this Agreement or any other Loan Document, irrespective of whether or not (a) the Lenders shall have made any demand hereunder or (b) the Lenders shall have declared the principal of and interest on the Term Loans and other amounts due hereunder to be due and payable as permitted by Section 9.2 and although said obligations and liabilities, or any of them, shall be contingent or unmatured. Any sums obtained by a Lender or by any subsequent holder of the Obligations shall be subject to the application of payments provisions of Article 2.

Section 10.5    Assignment.

(a) The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that no Borrower Party may assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Lenders (and any attempted assignment or transfer by any Borrower Party without such consent shall be null and void). Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their

96

respective successors and assigns permitted hereby and, to the extent expressly contemplated hereby, the Affiliates of a Lender) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)   Each Lender may, with the prior written consent of the DIP Agent and the Borrower (not to be unreasonably withheld or delayed), assign to one or more Eligible Assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitments (provided such Lender's obligations under this Agreement with respect to any such Commitment shall remain unchanged and such Lender shall remain responsible to the other parties hereto for the funding of such Commitment until the earlier of the funding thereof and the expiration of such Commitment) and the Term Loans at the time owing to it); provided, however, that (A) the consent of the Borrower shall not be required to any such assignment (x) in connection with the initial post-closing assignments of the Term Loans and Commitments pursuant to the DIP Order, (y) made to another Lender or an Affiliate or an Approved Fund of a Lender or (z) after the occurrence and during the continuance of any Event of Default and (B) the Borrower shall be deemed to have consented to any such assignment unless it shall have objected thereto by written notice to the DIP Agent within 5 Business Days after having received written notice thereof from the DIP Agent.  From and after the effective date specified in each such assignment, the Eligible Assignee thereunder shall be a party hereto and, to the extent of the interest assigned, have the rights and obligations of a Lender under this Agreement, and the assigning Lender shall, to the extent of the interest assigned, be released from its obligations under this Agreement (and, in the case of an assignment covering all of a Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 2.8(b), 6.18, 11.3 and 11.5).  Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this paragraph shall be treated for purposes of this Agreement as a sale by a Lender of a participation in such rights and obligations in accordance with paragraph (c) of this Section 10.5.  Concurrently with the first assignment of any of the initial Lenders' rights and obligations under this Agreement, the Borrower Parties and the Lenders (which shall include all Persons who are assignees of such assigning Lender), shall execute a supplement to this Agreement and an assignment agreement, each in form and substance satisfactory to the Borrower and the Lenders, with respect to the respective rights of assignees under the Loan Documents.

(c)   Each Lender may, without the consent of, or notice to, the Borrower, sell participations to one or more banks or other entities (a "Participant") in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of its portion of the Commitments and/or the Term Loans owing to it); provided that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, (iii) the Borrower shall continue to deal solely and directly with the Lender in connection with such Lender's rights and obligations under this Agreement, (iv) any agreement or instrument pursuant to which a Lender sells such a participation shall provide that the Lender shall retain the sole

right to enforce this Agreement and the other Loan Documents in respect thereof and to approve any amendment, modification or waiver of any provision of this Agreement and the Loan Documents (except with respect to (A) any sale or release of, or the subordination of the DIP Agent's security interest in, any material Collateral except in conjunction with sales or transfers of Collateral permitted hereunder, (B) except in conjunction with transactions permitted hereunder, any release of any guarantor of the Obligations, (C) any extensions, postponements or delays of the Maturity Date or the scheduled date of payment of interest or principal (other than payments of principal required to be made pursuant to Section 2.6(c)) or fees, or any reduction of principal (without a corresponding payment with respect thereto), or reduction in the rate of interest or fees due to such Lender hereunder or under any other Loan Documents, (D) any amendment of this Section 10.5 or any other provision of the Loan Documents specifying the parties required to waive, amend or modify any rights thereunder or make any determination or grant any consent thereunder; (E) any amendment increasing such Lender's Commitments (it being understood and agreed that a waiver of any Default or Event of Default or modification of any of the defined terms contained herein (other than those defined terms specifically addressed in this Section 10.5) shall not constitute a change in the terms of the Commitments); and (F) any amendment to Section 2.10).  The Borrower agrees that each Participant shall be entitled to the benefits of Sections 2.8(b), 6.18 and 11.3 as if it were a Lender, to the extent of its participation.  To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 10.4 as though it were a Lender, provided such Participant agrees to be subject to Section 2.8(b) as though it were a Lender.

(d)  A Participant shall not be entitled to receive any greater payment under Section 2.8(b) or Section 11.3 than the relevant Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrower's prior written consent.

(e)  Each Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including without limitation any pledge or assignment to secure obligations to a Federal Reserve Bank; provided that no such pledge or assignment of a security interest shall release the Lender from any of its obligations hereunder or substitute any such pledgee or assignee for the Lender as a party hereto.

Section 10.6   Counterparts.  This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, but all such separate counterparts shall together constitute but one and the same agreement.  In proving this Agreement or any other Loan Document in any judicial proceedings, it shall not be necessary to produce or account for more than one such counterpart signed by the party against whom such enforcement is sought.  Any signatures hereto delivered by Electronic Transmission shall be deemed an original signature hereto.  The foregoing shall apply to each other Loan Document mutatis mutandis.

Section 10.7   <u>Governing Law</u>.   This Agreement and the other Loan Documents are intended to be, and shall be, construed in accordance with and governed by the laws of the State of New York.

Section 10.8   <u>Severability</u>.   Any provision of this Agreement which is prohibited or unenforceable shall be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof in that jurisdiction or affecting the validity or enforceability of such provision in any other jurisdiction.

Section 10.9   <u>Headings</u>.   Headings used in this Agreement are for convenience only and shall affect the interpretation of any provision hereof.

Section 10.10   <u>Appointment of Collateral Agent</u>.   Each Lender, by signing or otherwise becoming a party hereto, hereby appoints the Collateral Agent or any of its successors) to act as collateral agent on behalf of the Lenders under the Loan Documents.

Section 10.11 <u>Entire Agreement</u>.   **THIS WRITTEN AGREEMENT, TOGETHER WITH THE OTHER LOAN DOCUMENTS, REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.   THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.**   Each Borrower Party represents and warrants to the Lenders that it has read the provisions of this <u>Section 10.11</u> and discussed the provisions of this <u>Section 10.11</u> and the rest of this Agreement with counsel for such Borrower Party, and such Borrower Party acknowledges and agrees that the Lenders are expressly relying upon such representations and warranties of such Borrower Party (as well as the other representations and warranties of such Borrower Party set forth in this Agreement and the other Loan Documents) in entering into this Agreement.

Section 10.12   <u>Amendments and Waivers</u>.   Subject to the last sentence of <u>Section 10.5(b)</u>, neither this Agreement, any other Loan Document nor any term hereof or thereof may be amended orally, nor may any provision hereof be waived orally but only by an instrument in writing signed by each Lender and the Borrower Parties.

Section 10.13   <u>Other Relationships</u>.   No relationship created hereunder or under any other Loan Document shall in any way affect the ability of the Lenders to enter into or maintain business relationships with the Borrower, or any of its Affiliates, beyond the relationships specifically contemplated by this Agreement and the other Loan Documents.

Section 10.14   <u>Pronouns</u>.   The pronouns used herein shall include, when appropriate, either gender and both singular and plural, and the grammatical construction of sentences shall conform thereto.

Section 10.15   <u>Disclosure</u>.   The Borrower Parties consent to the Lenders' issuance of press releases and preparation and distribution of other marketing materials regarding the Commitments hereunder and the making of the Term Loans pursuant to the

terms of this Agreement and the disclosure of such information in the Lenders' sole discretion, subject to Section 10.16.

Section 10.16 <u>Confidentiality</u>.   No Lender shall disclose any material non-public confidential information received from or on behalf of the Borrower Parties in connection herewith regarding the Borrower Parties ("<u>Confidential Information</u>") to any other Person without the consent of the Borrower, other than (i) to a Lender's Representatives and to actual or prospective assignees and participants, and then only on a confidential basis, (ii) as required by any law, rule or regulation or judicial process, (iii) to any rating agency when required by it, <u>provided</u> that, prior to any such disclosure, such rating agency shall undertake to preserve the confidentiality of any Confidential Information relating to the Borrower Parties received by it from the Lender, (iv) as requested or required by any state, federal or foreign authority or examiner regulating banks or banking and (v) in connection with the exercise of any remedy hereunder or any suit, action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder.   The term "Confidential Information" shall be deemed to exclude information customarily placed on 'tombstones' or similar marketing materials and does not include any information that (i) was or becomes generally available to the public, other than as a result of a disclosure by a Lender or its Representative in breach of this Agreement, (ii) was or becomes available to the Lender on a non-confidential basis from a source other than a Borrower Party or its Representatives, <u>provided</u> that such source was not known by such Recipient or its Representatives to be bound by any agreement with a Borrower Party to keep such information confidential, (iii) was in a Lender's or its Representatives' possession prior to disclosure by a Borrower Party or its Representatives, or (iv) was or is independently developed by a Lender or its Representative without use of or reference to the Confidential Information.

Section 10.17 <u>Revival and Reinstatement of Obligations</u>.   If the incurrence or payment of the Obligations by the Borrower or any Guarantor, or the transfer to any Lender of any property, should for any reason subsequently be declared to be void or voidable under any state or federal law relating to creditors' rights, including provisions of the Bankruptcy Code relating to fraudulent conveyances, preferences or other voidable or recoverable payments of money or transfers of property (collectively, a "<u>Voidable Transfer</u>"), and if any Lender is required to repay or restore, in whole or in part, any such Voidable Transfer, or elects to do so upon the advice of its counsel, then, as to any such Voidable Transfer, or the amount thereof that any Lender is required or elects to repay or restore, and as to all costs, expenses and attorneys' fees of the Lender related thereto, the liability of the Borrower or such Guarantor, as applicable, automatically shall be revived, reinstated and restored and shall exist as though such Voidable Transfer had never been made.

Section 10.18 <u>Electronic Transmission</u>.

(a)   <u>Authorization</u>.   Subject to the provisions of this Section 10.18(a), the Lenders, the Borrower Parties and each of their Affiliates are authorized (but not required) to transmit, post or otherwise make or communicate, in

its sole discretion, Electronic Transmissions in connection with any Loan Document and the transactions contemplated therein. The Borrower and each of the other Borrower Parties hereby acknowledges and agrees, and the Borrower and each of the other Borrower Parties shall cause each of their Restricted Subsidiaries to acknowledge and agree, that the use of Electronic Transmissions is not necessarily secure and that there are risks associated with such use, including risks of interception, disclosure and abuse and each indicates it assumes and accepts such risks by hereby authorizing the transmission of Electronic Transmissions.

(b)  <u>Separate Agreements</u>.  All uses of an E-System shall be governed by and subject to, in addition to the terms and conditions of this Agreement, separate terms and conditions posted or referenced in such E-System and related contractual obligations executed by Borrower Parties or the Lenders in connection with the use of such E-System.

(c)  <u>Limitation of Liability</u>.  All E-Systems and Electronic Transmissions shall be provided "as is" and "as available".  None of the Lender or any of its Affiliates warrants the accuracy, adequacy or completeness of any E-Systems or Electronic Transmission, and each disclaims all liability for errors or omissions therein.  No warranty of any kind is made by the Lenders or any of their Affiliates in connection with any E Systems or Electronic Transmission, including any warranty of merchantability, fitness for a particular purpose, non-infringement of third-party rights or freedom from viruses or other code defects.  Each of Borrower Party agrees that no Lender or any of its Affiliates has any responsibility for maintaining or providing any equipment, software, services or any testing required in connection with any Electronic Transmission or otherwise required for any E-System.

Section 10.19  <u>Conflicts with DIP Orders</u>. To the extent one or more Loan Document are inconsistent with any DIP Order, the terms of the most recently entered DIP Order shall supersede the terms of such Loan Documentss.

Section 10.20  <u>Contribution</u>.

(a)  [Reserved]

(b)  In the event any Borrower Party (a "<u>Funding Borrower Party</u>") shall make any payment or payments under this Agreement or shall suffer any loss as a result of any realization upon any collateral granted by it to secure its obligations hereunder, such Funding Borrower Party shall have the right to seek contribution payments from each other Borrower Party (each, a "<u>Contributing Borrower Party</u>") to the extent permitted by Applicable Law.  Nothing in this <u>Section 10.20(b)</u> shall affect any Borrower Party's joint and several liability to the Lenders for the entire amount of its Obligations.  Each Borrower Party covenants and agrees that (i) its right to receive any contribution hereunder from a Contributing Borrower Party shall be subordinate and junior in right of payment to all obligations of the Borrower Parties to the Lenders hereunder and (ii) it shall not exercise any such contribution rights unless and until the Obligations shall have been paid in full in cash.

(c)  Nothing in this <u>Section 10.20</u> shall affect the Borrower's joint and several liability to the Lenders for the entire amount of its Obligations.  Each Borrower Party covenants and agrees that its right to receive any contribution hereunder from a contributing Borrower Party shall be subordinate and junior in right of payment to all Obligations of the Borrower to the Lenders hereunder.  No Borrower Party will exercise any rights that it may acquire by way of subrogation hereunder or under any other Loan Document or at law by any payment made hereunder or otherwise, nor shall any Borrower Party seek or be entitled to seek any contribution or reimbursement from any other Borrower Party in respect of payments made by such Borrower Party hereunder or under any other Loan Document, until all amounts owing to the Lenders on account of the Obligations are paid in full in cash.  If any amounts shall be paid to any Borrower Party on account of such subrogation or contribution rights at any time when all of the Obligations shall not have been paid in full, such amount shall be held by such Borrower Party in trust for the Lender segregated from other funds of such Borrower Party, and shall, forthwith upon receipt by such Borrower Party, be turned over to the Lender in the exact form received by such Borrower Party (duly endorsed by such Borrower Party to the Lenders, if required), to be applied against the Obligations, whether matured or unmatured, as provided for herein.

## ARTICLE 11

## <u>YIELD PROTECTION</u>

Section 11.1  <u>Reserved</u>.

Section 11.2  <u>Illegality</u>.  If any change in Applicable Law, any change in the interpretation or administration of any Applicable Law by any Governmental Authority, central bank, or comparable agency charged with the interpretation or administration thereof, or any change in compliance with Applicable Law as a result of any request or directive (whether or not having the force of law) of any such authority, central bank, or comparable agency after the Agreement Date, shall make it unlawful for any Lender to make, maintain, or fund a Term Loan, such Lender shall so notify the Borrower.  Before giving any notice pursuant to this <u>Section 11.2</u>, such Lender shall designate a different lending office if such designation will avoid the need for giving such notice and will not, in the judgment of the Lender, be otherwise disadvantageous to the Lender.  Upon receipt of such notice, notwithstanding anything contained in <u>Article 2</u>, the Borrower shall repay in full (without prepayment premium) the then outstanding principal amount of each affected Term Loan, together with accrued interest thereon, either (a) on the last day of the then current calendar quarter if the relevant Lender may lawfully continue to maintain and fund such Term Loan to such day or (b) immediately if the relevant Lender may not lawfully continue to fund and maintain such Term Loan to such day.

Section 11.3     Increased Costs.

(a)     If any change in Applicable Law, any change in the interpretation or administration of any Applicable Law by any Governmental Authority, central bank, or comparable agency charged with the interpretation or administration thereof or any change in compliance with Applicable Law as a result of any request or directive (whether or not having the force of law) of such Governmental Authority, central bank, or comparable agency after the Agreement Date (and, for purposes of this Section 11.3, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act (including regulations promulgated with respect thereto), and all requests, guidelines or directives in connection therewith, and (ii) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States of America or foreign regulatory authorities, in each case in respect of this clause (ii), pursuant to Basel III, are, in the case of each of clauses (i) and (ii), deemed to have gone into effect and been adopted after the Agreement Date):

(i)     Shall subject a Lender to any tax, duty, or other charge with respect to its obligation to make the Term Loans, or shall change the basis of taxation of payments to such Lender of the principal of or interest on the Term Loans or in respect of any other amounts due under this Agreement in respect of the Term Loans or its obligation to make Term Loans (except for changes in the rate of tax on the overall net income of the Lender);

(ii)     Shall impose, modify, or deem applicable any reserve (including, without limitation, any imposed by the Board of Governors of the Federal Reserve System), special deposit, assessment, or other requirement or condition against assets of, deposits (other than as described in Section 11.5) with or for the account of, or commitments or credit extended by a Lender, or shall impose on a Lender any other condition affecting its obligation to make such Term Loans; and the result of any of the foregoing is to increase the cost to such Lender of making or maintaining any such Term Loans, or to reduce the amount of any sum received or receivable by the Lender under this Agreement with respect thereto, and such increase is not given effect in the determination of the Applicable Rate; or

(iii)     Shall impose, modify, or deem applicable any reserve (including, without limitation, any imposed by the Board of Governors of the Federal Reserve System), special deposit, assessment, or other requirement or condition against assets of, deposits (other than as described in Section 11.5) with or for the account of, or commitments or credit extended by a Lender,

then promptly upon demand by the affected Lender, each Borrower agrees, jointly and severally, to pay, without duplication of amounts due under Section 2.8(b), to such Lender such Additional Amount or amounts as will compensate the Lender for such increased costs.  The affected Lender will promptly notify the Borrower of any event of which it has knowledge, occurring after the date hereof, which will entitle the Lender to compensation pursuant to this Section 11.3 and will designate a different lending office if

such designation will avoid the need for, or reduce the amount of, such compensation and will not, in the reasonable judgment of the Lender, be otherwise disadvantageous to the Lender. Failure or delay on the part of the Lender to demand compensation pursuant to this Section 11.3 shall not constitute a waiver of such Lender's right to demand such compensation

(b)   A certificate of the affected Lender claiming compensation under this Section 11.3 and setting forth the Additional Amount or amounts to be paid to it hereunder and calculations therefor shall be conclusive in the absence of manifest error.  In determining such amount, the Lender may use any averaging and attribution methods.  If the Lender demands compensation under this Section 11.3, the Borrower may at any time, upon at least five (5) Business Days' prior notice to such Lender, prepay in full the then outstanding affected Term Loans, together with accrued interest thereon to the date of prepayment.

Section 11.4   Reserved.

Section 11.5   Capital Adequacy.  If after the Agreement Date, a Lender (or any Affiliate of the Lender) shall have determined that the adoption of any Applicable Law, governmental rule, regulation or order regarding the capital adequacy of banks or bank holding companies, or any change therein, or any change in the interpretation or administration thereof by any Governmental Authority, central bank or comparable agency charged with the interpretation or administration thereof, or compliance by such Lender (or any Affiliate of such Lender) with any request or directive regarding capital adequacy (whether or not having the force of law) of any such Governmental Authority, central bank or comparable agency (but only if such adoption, change, request or directive occurs after the Agreement Date), has or would have the effect of reducing the rate of return on such Lender's (or any Affiliate of such Lender) capital as a consequence of the Commitment or obligations hereunder to a level below that which it could have achieved but for such adoption, change or compliance (taking into consideration such Lender's (or any Affiliate of such Lender) policies with respect to capital adequacy immediately before such adoption, change or compliance and assuming that such Lender's (or any Affiliate of such Lender) capital was fully utilized prior to such adoption, change or compliance), then, promptly upon demand by the affected Lender, the Borrower shall immediately pay to such Lender such Additional Amount or amounts as shall be sufficient to compensate such Lender for any such reduction actually suffered; provided, however, that there shall be no duplication of amounts paid to such Lender pursuant to this sentence and Section 11.3.  A certificate of the affected Lender setting forth the amount to be paid to such Lender by the Borrower as a result of any event referred to in this paragraph shall, absent manifest error, be conclusive.  For purposes of this Section 11.5, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act (including regulations promulgated with respect thereto), and all requests, guidelines or directives in connection therewith, and (ii) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States of America or foreign regulatory authorities, in each case in respect of this clause (ii), pursuant to

Basel III, are, in the case of each of <u>clauses (i)</u> and <u>(ii)</u>, deemed to have gone into effect and been adopted after the Agreement Date.

ARTICLE 12

<u>JURISDICTION, VENUE AND WAIVER OF JURY TRIAL</u>

Section 12.1    <u>Jurisdiction and Service of Process</u>.    CONSENT TO JURISDICTION, SERVICE OF PROCESS AND VENUE. ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT SHALL BE BROUGHT EXCLUSIVELY IN THE BANKRUPTCY COURT AND, IF THE BANKRUPTCY COURT DOES NOT HAVE (OR ABSTAINS FROM) JURISDICTION, IN THE COURTS OF THE STATE OF NEW YORK IN THE BOROUGH OF MANHATTAN, COUNTY OF NEW YORK OR OF THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK, AND, BY EXECUTION AND DELIVERY OF THIS AGREEMENT, THE CREDIT PARTIES HEREBY IRREVOCABLY ACCEPT IN RESPECT OF ITS PROPERTY, GENERALLY AND UNCONDITIONALLY, THE JURISDICTION OF THE AFORESAID COURTS. THE CREDIT PARTIES FURTHER IRREVOCABLY CONSENT TO THE SERVICE OF PROCESS OUT OF ANY OF THE AFOREMENTIONED COURTS AND IN ANY SUCH ACTION OR PROCEEDING BY THE MAILING OF COPIES THEREOF BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID, TO THE CREDIT PARTIES AT THEIR ADDRESS FOR NOTICES SET FORTH ABOVE, SUCH SERVICE TO BECOME EFFECTIVE FIVE (5) DAYS AFTER SUCH MAILING. NOTHING HEREIN SHALL AFFECT THE RIGHT OF THE LENDERS OR THE AGENTS TO SERVICE OF PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO COMMENCE LEGAL PROCEEDINGS OR OTHERWISE PROCEED AGAINST THE CREDIT PARTIES IN ANY OTHER JURISDICTION. THE CREDIT PARTIES HEREBY EXPRESSLY AND IRREVOCABLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE JURISDICTION OR LAYING OF VENUE OF ANY SUCH LITIGATION BROUGHT IN ANY SUCH COURT REFERRED TO ABOVE AND ANY CLAIM THAT ANY SUCH LITIGATION HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

Section 12.2    <u>Consent to Venue</u>.    EACH BORROWER PARTY HEREBY IRREVOCABLY WAIVES ANY OBJECTION IT WOULD MAKE NOW OR HEREAFTER FOR THE LAYING OF VENUE OF ANY SUIT, ACTION, OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT BROUGHT IN THE BANKRUPTCY COURT OR IF THE BANKRUPTCY COURT ABSTAINS, FEDERAL COURTS OF THE UNITED STATES SITTING IN NEW YORK COUNTY, NEW YORK, AND HEREBY IRREVOCABLY WAIVES ANY CLAIM THAT ANY SUCH SUIT, ACTION, OR PROCEEDING HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

Section 12.3    <u>Waiver of Jury Trial</u>.  EACH BORROWER PARTY AND EACH LENDER, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE

LAW, WAIVES, AND OTHERWISE AGREES NOT TO REQUEST, A TRIAL BY JURY IN ANY COURT AND IN ANY ACTION, PROCEEDING OR COUNTERCLAIM OF ANY TYPE IN WHICH ANY BORROWER PARTY, ANY LENDER OR ANY OF THEIR RESPECTIVE SUCCESSORS OR ASSIGNS IS A PARTY, AS TO ALL MATTERS AND THINGS ARISING DIRECTLY OR INDIRECTLY OUT OF THIS AGREEMENT, THE OTHER LOAN DOCUMENTS, AND THE RELATIONS AMONG THE PARTIES LISTED IN THIS ARTICLE 12.

ARTICLE 13

DIP AGENT

Section 13.1    Authorization and Action.  Each Lender hereby irrevocably appoints WBOX 2014-4 Ltd. as DIP Agent hereunder and authorizes the DIP Agent to take such action on its behalf, including execution of the Loan Documents, as applicable, and to exercise such powers under this Agreement and the other Loan Documents as agreed by Majority Lenders, together with such actions and powers as are reasonably incidental thereto.  Each Lender hereby acknowledges that the DIP Agent shall not have by reason of this Agreement assumed a fiduciary relationship in respect of any Lender, regardless of whether an Event of Default has occurred or is continuing. Without limiting the generality of the foregoing, the DIP Agent shall, at the direction of Majority Lenders, have the sole and exclusive authority to (a) act as the disbursing and collecting agent for Lenders with respect to all payments and collections arising in connection with the Loan Documents, (b) execute and deliver as DIP Agent each Loan Document, including any intercreditor or subordination agreements, and accept delivery of each Loan Document from any Obligor or other Person and to perform all of its undertakings and obligations thereunder, (c) act as DIP Agent for the Secured Parties for purposes of perfecting and administering Liens under the Loan Documents, and for all other purposes stated therein, (d) manage, supervise or otherwise deal with Collateral, and (e) take any action or otherwise exercise any rights or remedies with respect to any Collateral under the Loan Documents, requirements of Applicable Law or otherwise.  In performing its functions and duties under this Agreement, the DIP Agent shall act solely as agent of Lenders, and shall not assume, or be deemed to have assumed, any obligation toward, or relationship of agency or trust with or for, Obligors.  As to any matters not expressly provided for by this Agreement and the other Loan Documents, the DIP Agent shall act or refrain from acting (and shall be fully protected in so acting or refraining from acting) upon the instructions of Majority Lenders (accompanied by indemnity satisfactory to the DIP Agent and subject to the indemnification set forth in Section 13.5), whenever such instruction shall be requested by the DIP Agent or required hereunder, or a greater or lesser number of Lenders if so required hereunder or under any other Loan Document, and such instructions shall be binding upon all Lenders; provided, that the DIP Agent shall be fully justified in failing or refusing to take any action which exposes the DIP Agent to any liability or which is contrary to this Agreement, the other Loan Documents or applicable law, unless the DIP Agent is indemnified to its satisfaction by the other Lenders against any and all liability and expense which it may incur by reason of taking or continuing to take any such action.  When the DIP Agent seeks the consent or approval of Majority Lenders (or a greater or lesser number of Lenders as required in this

Agreement or any other Loan Document), with respect to any action hereunder, the DIP Agent shall send notice thereof to each Lender and shall notify each Lender at any time that Majority Lenders (or such greater or lesser number of Lenders) have instructed the DIP Agent to act or refrain from acting pursuant hereto.

Section 13.2 <u>DIP Agent's Reliance, Etc</u>.   Neither the DIP Agent, any Affiliate of the DIP Agent, nor any of their respective directors, officers, agents or employees shall be liable for any action taken or omitted to be taken by it or them under or in connection with this Agreement or the other Loan Documents, except for its or their own gross negligence or willful misconduct, as determined by a final non-appealable order of a court of competent jurisdiction   Without limitation of the generality of the foregoing, the DIP Agent:   (i) may treat each Lender party hereto as the holder of Obligations until the DIP Agent receives an executed assignment and acceptance agreement from such Lender; (ii) may consult with legal counsel (who may be counsel for the Obligors), independent public accountants and other experts selected by it and shall not be liable for any action taken or omitted to be taken in good faith by it in accordance with the advice of such counsel, accountants or experts; (iii) makes no warranties or representations to any Lender and shall not be responsible to any Lender for any recitals, statements, warranties or representations made in or in connection with this Agreement or any other Loan Documents; (iv) shall not be responsible to any Lender for the due execution, legality, validity, enforceability, genuineness, sufficiency or value of this Agreement or the other Loan Documents or any other instrument or document furnished pursuant hereto or thereto; (v) shall not be liable to any Lender for any action taken, or inaction, by the DIP Agent pursuant to the terms hereof upon the instructions of Majority Lenders (or a greater or lesser number of Lenders if so required hereunder or under any other Loan Document) or refraining to take any action pending such instructions; (vi) shall not be liable for any apportionment or distributions of payments made by it in good faith pursuant to this Agreement; (vii) shall incur no liability under or in respect of this Agreement or the other Loan Documents by acting upon any notice, consent, certificate, message or other instrument or writing (which may be by telephone, facsimile, telegram, cable, e-mail or other electronic transmission) believed in good faith by it to be genuine and signed or sent by the proper party or parties; and (viii) may assume that no Default or Event of Default has occurred and is continuing, unless the DIP Agent has actual knowledge of the Default or Event of Default, has received notice from any Obligor or Parent's independent certified public accountants stating the nature of the Default or Event of Default, or has received notice from a Lender stating the nature of the Default or Event of Default and that such Lender considers the Default or Event of Default to have occurred and to be continuing.   In the event any apportionment or distribution described in clause (vi) above is determined to have been made in error, the sole recourse of any Person to whom payment was due but not made shall be to recover from the recipients of such payments any payment in excess of the amount to which they are determined to have been entitled.   The DIP Agent shall not be responsible or liable for special, indirect, punitive or consequential loss or damage of any kind whatsoever (including, but not limited to, loss of profit) irrespective of whether the DIP Agent has been advised of the likelihood of such loss or damage and regardless of the form of action.   In no event shall the DIP Agent be responsible or liable for any failure or delay in the performance of its obligations hereunder arising out of or caused by, directly or

indirectly, forces beyond its control, including without limitation, strikes, work stoppages, accidents, acts of war or terrorism, civil or military disturbances, nuclear or natural catastrophes or acts of God, future changes in applicable law or regulation, and interruptions, loss or malfunctions of utilities, communications or computer (software and hardware) services; *it being understood* that the DIP Agent shall use reasonable efforts consistent with accepted practices in the banking industry to resume performance as soon as practicable under the circumstances.

Section 13.3   Rights of the DIP Agent as a Lender.  The Person serving as the DIP Agent hereunder shall have the same rights and powers under this Agreement and the other Loan Documents in its capacity as a Lender, if any, as any other Lender and may exercise the same as though it were not the DIP Agent; and the terms "Lender," "Lenders," and "Majority Lenders" shall, unless otherwise expressly indicated, include such Person in its individual capacity as a Lender.  The Person serving as the DIP Agent hereunder may accept deposits from, lend money to, and generally engage in any kind of business with, Obligors or any Subsidiary of an Obligor or other Affiliate thereof, all as if it were not the DIP Agent and without any duty to account therefor to any other Lender.

Section 13.4   Lender Credit Decision.  Each Lender acknowledges that it has, independently and without reliance upon the DIP Agent or any other Lender and based on the financial statements referred to herein and such other documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement.  Each Lender also acknowledges that it will, independently and without reliance upon the DIP Agent or any other Lender and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement, any other Loan Document or related agreement or any document furnished hereunder or thereunder.  The DIP Agent shall not have any duty or responsibility, either initially or on an ongoing basis, to provide any Lender with any credit or other similar information regarding Obligors.

Section 13.5   Indemnification.  Lenders agree to indemnify the DIP Agent (to the extent not reimbursed by Obligors), in accordance with their respective Term Loan Percentages, from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever which may be imposed on, incurred by, or asserted against Agent in any way relating to or arising out of this Agreement or any other Loan Document or any action taken or omitted by the DIP Agent under this Agreement or any other Loan Document; provided that no Lender shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from the DIP Agent's gross negligence or willful misconduct, as determined by a final non-appealable order of a court of competent jurisdiction.  Without limitation of the foregoing, each Lender agrees to reimburse the DIP Agent promptly upon demand for its ratable share, as set forth above, of any out-of-pocket expenses (including attorneys' fees) incurred by the DIP Agent in connection with the preparation, execution, delivery, administration, modification, amendment or enforcement (whether through negotiation, legal proceedings or otherwise) of, or legal

advice in respect of rights or responsibilities under, this Agreement and each other Loan Document, to the extent that the DIP Agent is not reimbursed for such expenses by Obligors.  The obligations of Lenders under this Section 13.5 shall survive the Payment in Full and the termination of this Agreement.  If after payment and distribution of any amount by the DIP Agent to Lenders, any Lender or any other Person, including Obligors, any creditor of any Obligor, a liquidator, administrator or trustee in bankruptcy, recovers from the DIP Agent any amount found to have been wrongfully paid to the DIP Agent or disbursed by the DIP Agent to Lenders, then each Lender shall reimburse the DIP Agent any amount received by such Lender.

Section 13.6    <u>Rights and Remedies to Be Exercised by the DIP Agent Only</u>.  Each Lender agrees that, except as set forth in <u>Section 10.4</u>, no Lender shall have any right individually (i) to realize upon the security created by this Agreement or any other Loan Document, (ii) to enforce any provision of this Agreement or any other Loan Document, or (iii) to make demand under this Agreement or any other Loan Document.

Section 13.7    <u>Agency Provisions Relating to Collateral; Release of Liens and Guaranties</u>.  Each Lender hereby irrevocably authorizes and ratifies the DIP Agent's entry into this Agreement and the Loan Documents for the benefit of the Secured Parties. Each Lender hereby irrevocably agrees that any action taken by the DIP Agent with respect to the Collateral in accordance with the provisions of this Agreement or the Loan Documents, and the exercise by the DIP Agent of the powers set forth herein or therein, together with such other powers as are reasonably incidental thereto, shall be authorized by and binding upon all Lenders. The DIP Agent is hereby irrevocably authorized on behalf of all Lenders, without the necessity of any notice to or further consent from any Lender to take any action with respect to any Collateral or the Loan Documents which may be necessary to perfect and maintain perfected the DIP Agent's Liens upon the Collateral, for its benefit and the ratable benefit of Lenders.  Lenders hereby irrevocably agree that the Liens granted to or held by the DIP Agent upon any Collateral shall be automatically released (i) upon Payment in Full; or (ii) if such Collateral constitutes property being sold or disposed of and Borrower certifies to the DIP Agent that the sale or disposition is made in compliance with the terms of this Agreement (and the DIP Agent may rely conclusively on any such certificate, without further inquiry), and to the extent that the property being sold or disposed of constitutes 100% of the Equity Interest of a Subsidiary, the DIP Agent is authorized and directed to release any Guaranty Agreement provided by such Subsidiary; or (iii) if such Collateral constitutes leased property in which no Obligor owned any interest at the time the Lien was granted or at any time thereafter and such lease has expired or been terminated in a transaction not prohibited by this Agreement; or (iv) in connection with any foreclosure sale or other disposition of Collateral and the exercise of remedies pursuant to Section 9.2 after the occurrence and during the continuation of an Event of Default.  Except as provided in the preceding sentence, the DIP Agent will not release any Liens on Collateral without the prior written authorization of Majority Lenders.  Any such release shall not in any manner discharge, affect or impair the Obligations or any Liens (other than those expressly being released) upon (or obligations of the Obligors in respect of) all interests retained by the Obligors, including the proceeds of any sale, all of which shall continue to constitute part of the Collateral.  Upon request by the DIP Agent at any time, Lenders

109

will confirm in writing the DIP Agent's authority to release particular types or items of Collateral pursuant hereto. The DIP Agent shall have no obligation whatsoever to any Lender or to any other Person to assure that the Collateral exists or is owned by any Obligor or is cared for, protected or insured or has been encumbered or that the Liens granted to the DIP Agent by a DIP Order, herein or pursuant to the Loan Documents have been properly or sufficiently or lawfully created, perfected, protected or enforced or are entitled to any particular priority, or to exercise at all or in any particular manner or under any duty of care, disclosure or fidelity, or to continue exercising, any of its rights, authorities and powers granted or available to Agent in this Section 13.7 or in any of the Loan Documents, it being understood and agreed that in respect of the Collateral, or any act, omission or event related thereto, the DIP Agent may act in any manner it may deem appropriate, in its reasonable discretion, but consistent with the provisions of this Agreement and the other Loan Documents, including given the DIP Agent's own interest in the Collateral as a Lender, if any, and that the DIP Agent shall have no duty or liability whatsoever to any Lender. The Obligors and Lenders hereby irrevocably authorize the DIP Agent, based upon the instruction of Majority Lenders, to credit bid and purchase (either directly or through one or more acquisition vehicles) or to sell or otherwise dispose of (or to consent to any such sale or other disposition of) all or any portion of the Collateral at any sale thereof conducted by the DIP Agent under the provisions of the Code or the PPSA], including pursuant to Sections 9-610 or 9-620 of the Code, at any sale thereof conducted under the provisions of the Bankruptcy Code, including Section 363 of the Bankruptcy Code or pursuant to a plan of reorganization, or at any sale or foreclosure conducted by the DIP Agent (whether by judicial action or otherwise) in accordance with applicable law.

Section 13.8   <u>DIP Agent's Right to Purchase Commitments</u>. The DIP Agent shall have the right, but shall not be obligated, at any time upon written notice to any Lender and with the consent of such Lender, which may be granted or withheld in such Lender's reaonable discretion, to purchase for the DIP Agent's own account all of such Lender's interests in this Agreement, the other Loan Documents and the Obligations, for the face amount of the outstanding Obligations owed to such Lender, including all accrued and unpaid interest and fees.

Section 13.9   <u>Resignation of the DIP Agent; Appointment of Successor</u>. The DIP Agent may resign as DIP Agent at any time by notifying the Lenders and the Borrower. If the DIP Agent shall resign under this Agreement, then, (i) Majority Lenders shall have the right to appoint a successor agent or (ii) if a successor agent shall not be so appointed and approved within the fifteen (15) day period following the retiring the DIP Agent's notice to Lenders and Borrower of its resignation, then the retiring DIP Agent may, on behalf of the Lenders appoint a successor agent who shall serve as the DIP Agent until such time as Majority Lenders appoint a successor agent or ratify the retiring DIP Agent's appointment of a successor agent. Upon its appointment, such successor agent shall succeed to the rights, powers and duties of the DIP Agent and the term "DIP Agent" shall mean such successor effective upon its appointment, and the retiring DIP Agent's rights, powers and duties as DIP Agent shall be terminated without any other or further act or deed on the part of such retiring DIP Agent or any of the other parties to this Agreement. After the resignation of the DIP Agent hereunder, the provisions of this

Article 13, Section 6.18 and Section 10.2 shall inure to the benefit of the former DIP Agent and its sub-agents and the former DIP Agent shall not by reason of such resignation be deemed to be released from liability for any actions taken or not taken by it while it was the DIP Agent under this Agreement.  The fees paid by Borrower to any successor DIP Agent shall be the same as those payable to its predecessor unless otherwise agreed between Borrower and such successor DIP Agent.

## ARTICLE 14

## COLLATERAL

Section 14.1  Grant of Security Interest.  To secure payment and performance of all Obligations, each Borrower Party hereby grants to the DIP Agent, for itself and the benefit of the Secured Parties, a continuing security interest in, a Lien upon, and a right of set-off against, and hereby assigns to the DIP Agent, for itself and the benefit of the Secured Parties, as security for the Obligations, all tangible and intangible property of such Borrower Party, whether now owned or hereafter acquired or existing and wherever located, including, without limitation (collectively, the "Collateral"):

(a)  all Accounts,

(b)  all Books and Records,

(c)  all Chattel Paper,

(d)  all Commercial Tort Claims,

(e)  all Contracts,

(f)  all Deposit Accounts and money and all cash, checks, other negotiable instruments, funds and other evidences of payments held therein, (y) Securities Accounts and Security Entitlements (as defined in the UCC) and securities credited thereto and, in each case, all cash, checks and other property held therein or credited thereto

(g)  all Documents,

(h)  all Equipment,

(i)  all Equity Interests,

(j)  all Fixtures,

(k)  all General Intangibles (or "intangibles" under any applicable Canadian PPSL),

(l)  all Inventory,

(m) all Goods (including, without limitation, Inventory, Equipment and As-Extracted Collateral),

(n) all Insurance,

(o) all intellectual property,

(p) all Instruments,

(q) all Investment Property,

(r) all Letter-of-Credit Rights,

(s) all machinery,

(t) all Money,

(u) all owned real estate,

(v) all Payment Intangibles,

(w) all real property leaseholds,

(x) all Receivables and Receivables Records,

(y) all Securities Accounts,

(z) all Securities,

(aa) all Vehicles,

(bb) to the extent not otherwise included in the foregoing, all coal and other minerals severed or extracted from the ground (including all severed or extracted coal purchased, acquired or obtained from other Persons), and all Accounts, General Intangibles and Products and Proceeds thereof or related thereto, regardless of whether any such coal or other minerals are in raw form or processed for sale and regardless of whether or not the Borrower Party or any Obligor had an interest in the coal or other minerals before extraction or severance;

(cc) to the extent not otherwise included above, all other personal property of any kind and all Collateral Records and Collateral Support relating to any of the foregoing; and

(dd) to the extent not covered by clauses (a) through (cc) of this sentence, all other personal property and interest in property of such Borrower Party whether or not subject to the UCC, whether tangible or intangible, and all Proceeds and products of each of the foregoing and all accessions to, substitutions and replacements for, and rents, profits and products of, each of the foregoing, including any and all Proceeds of any insurance, indemnity, warranty or guaranty payable to

such Borrower Party from time to time with respect to any of the foregoing; provided, that upon entry of the Final Order to the extent approved by the Bankruptcy Court, "Collateral" shall include and a Lien shall attach to any Avoidance Proceeds.

Anything herein to the contrary notwithstanding, in no event shall the security interest granted under this Section 14.1 attach to (a) any Excluded Assets, (b) any properties and assets in which the DIP Agent is required to release its Liens pursuant to the provisions hereof on and after such release and (c) any properties and assets that no longer secure the Term Loans or any Obligations in respect thereof pursuant to the provisions hereof on and after such release, provided that, in the case of clauses (b) and (c), if such Liens are required to be released as a result of the sale, transfer or other disposition of any properties or assets of any Borrower Party, such assets or properties will cease to be excluded from the Collateral if the Borrower Party thereafter acquires or reacquires such assets or properties. As of the Agreement Date, the Collateral includes, but is not limited to, the assets set forth in Schedule 14.1.

Section 14.2    Lien Perfection; Further Assurances.  Obligors shall deliver (a) such UCC-1 financing statements as are required by the UCC and (b) such other instruments, assignments or documents as are necessary to perfect DIP Agent's Lien upon any of the Collateral and shall take such other action as may be required to perfect or to continue the perfection of DIP Agent's Lien upon the Collateral.  Each Obligor hereby authorizes DIP Agent to file (but DIP Agent shall not be obligated to so file) any such financing statement in any filing office in any UCC jurisdiction, including financing statements that (A) indicate the Collateral by any description which reasonably approximates the description contained in Section 14.1 and (B) contain any other information required by part 5 of Article 9 of the UCC for the sufficiency or filing office acceptance of any financing statement or amendment, including whether such Obligor is an organization, the type of organization and any organization identification number issued to such Obligor.  At DIP Agent's request, each Obligor shall also promptly execute or cause to be executed and shall deliver to Agent any information, and all documents, instruments and agreements as are necessary or as reasonably requested by Agent, to give effect to or carry out the terms or intent of this Article 14.

[remainder of page intentionally left blank; signature pages follow]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their duly authorized officers, all as of the day and year first above written.

BORROWER:                         XINERGY CORP.


By: _____
    Name:
    Title:


PARENT:                           XINERGY LTD.


By: _____
    Name:
    Title:

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their duly authorized officers, all as of the day and year first above written.

SUBSIDIARY GUARANTORS:                     XINERGY FINANCE (US) INC.


By: _____
     Name:
     Title:


XINERGY STRAIGHT CREEK, INC.
XINERGY SALES, INC.
XINERGY LAND, INC.
MIDDLE FORK MINING, INC.
BIG RUN MINING, INC.
XINERGY OF WEST VIRGINIA, INC.
SHENANDOAH ENERGY, LLC
RAVEN CREST MINERALS, LLC
RAVEN CREST LEASING, LLC
RAVEN CREST MINING, LLC
RAVEN CREST CONTRACTING, LLC
SOUTH FORK COAL COMPANY, LLC
PINNACLE INSURANCE GROUP LLC
BRIER CREEK COAL COMPANY, LLC
BULL CREEK PROCESSING
COMPANY, LLC
XINERGY OF VIRGINIA, INC.
HIGH MAF, LLC
WISE LOADING SERVICES, LLC
STRATA FUELS, LLC
TRUE ENERGY, LLC
WHITEWATER RESOURCES, LLC
WHITEWATER CONTRACTING, LLC
SEWELL MOUNTAIN COAL CO., LLC


By: _____
     Name:
     Title:

LENDERS:                          WBOX 2014-4 LTD.

                                  By:


                                  By: _____

Highbridge International LLC

By: Highbridge Capital Management, LLC,
as trading manager


By: _____
    Name:
    Title:


Highbridge Tactical Credit & Convertibles
Master Fund, L.P.

By: Highbridge Capital Management, LLC,
as trading manager


By: _____
    Name:
    Title:

DIP Agent:                              WBOX 2014-4 LTD.


By: _____
     Name:
     Title:

**Annex I**

**COMMITMENTS**

| Lender | Initial Term Loan Commitment | Delayed Draw Term Loan Commitment |
|---|---|---|
| WBOX 2014-4 Ltd. | $ | $ |
| Highbridge International LLC, | $ | $ |
| Highbridge Tactical Credit & Convertibles Master Fund, L.P. | $ | $ |
| **Total** | $          [ ]² | $          [ ]³ |

---

² To equal $7,500,000 plus the payoff amount for the Prepetition Loan Facility.

³ To equal $40,000,000 minus the aggregate Initial Term Loan Commitment.

**Annex II**

**ADDRESSES**

# ANNEX III

## Initial Budget

# ANNEX IV

## Form of Interim Order

## **Exhibit C**

Combined Project Ace Information

## Situation Overview

- **Appalachian producer of high-quality Metallurgical and Thermal Coal.** Xinergy Ltd. ("Xinergy" or the "Company") is a nonunion Central Appalachian producer of high quality (high-BTU and low Sulfur) metallurgical and thermal coal. The Company controls 60 - 70 million proven & probable tons with a high permitted position, and an estimated 40 million additional tons of similar high quality coal not yet reflected in a reserves report.

- **Two Active Properties.** The Company has five mining properties, two of which are currently active:

  - South Fork, which sells mid-volatile metallurgical coal to steel producers, commodities brokers, and industrial customers throughout North America, Europe, and South America; and

  - Raven Crest, which sells thermal coal to utilities and industrial companies in the Eastern US and Europe

- **Tough Coal Environment.** Xinergy was founded in 2008 and operated profitably for four years. With the precipitous decline in the coal markets beginning in 2012, Xinergy made significant cost cuts and sold or idled assets, thereby establishing a low cost position and returning to EBITDA-positive operation as of mid-2Q14. At the same time, Xinergy invested in operations and reserves, enabling a continuing ramp in production and growing profitability even in the current coal pricing environment.

- **Strong Cost Structure, Wrong Balance Sheet.** Xinergy believes that it has now achieved a strong production cost position and is poised for a potential recovery in the coal markets. However, for near term liquidity reasons, the Company may be forced to seek interim protection under Chapter 11 bankruptcy.

# DIP Collateral

*($ in millions)*

- **Proposed DIP Collateral package to include:** First priority liens on substantially all assets of the issuer and the guarantors, including, without limitation: all capital stock, intellectual property, accounts receivable, equipment, inventory, cash, real estate (including all real property interests related to mining operations), as-extracted collateral, general intangibles, securities, and commodities accounts, and any proceeds and products.  Certain assets are excluded.

| From PRELIMINARY Balance Sheet | |
|---|---|

| Asset Summary | 1/31/2015 |
|---|---|
| Cash and cash equivalents | $1.8 |
| Restricted cash | 0.0 |
| Accounts receivable | 0.6 |
| Inventory | 3.3 |
| Prepaid and other current assets | 0.9 |
| **Total Current Assets** | **$6.7** |
| | |
| Land & Improvements | $8.5 |
| Plant & Improvements | 33.5 |
| Mining Equipment | 6.6 |
| Autos & Trucks | 0.1 |
| Other Equipment | 0.0 |
| **Total PP&E, net** | **$48.7** |
| | |
| Restricted cash | $4.5 |
| Recoupable Royalties | 1.8 |
| Exploration / Evaluation assets - Mine Development | 10.0 |
| Mineral Properties | 35.4 |
| Deferred financing Costs | 4.9 |
| Other non-current assets | 0.0 |
| **Total Other Non-Current Assets** | **$56.7** |
| | |
| **TOTAL BOOK ASSETS** | **$112.1** |

| "Additional" Value | |
|---|---|

For some assets, the Book Value of Xinergy's assets is understated on the Balance Sheet, as compared to Fair Market Value

- Mining equipment

- Reserves

| Equipment ($ MM) | FMV Study * | Book Value |
|---|---|---|
| *June 2014 FMV analysis; No Debt on this Equipment* | | |
| South Fork | $15.8 | |
| Raven Crest | 17.2 | |
| Total | $33.0 | $6.6 |

| | MM Tons | |
|---|---|---|
| Reserves | Total | Permitted |
| Proven & Probable - Metallurgical | 22.9 | 7.9 |
| Proven & Probable - Thermal | 44.3 | 44.3 |
| Proven & Probable - TOTAL | 67.2 | 52.2 |
| Potential Additional Metallurgical (no reserves report) | 40.0 | |

## Company History

- Xinergy was founded in 2008 and listed on the TSX in Dec 2009.

- Xinergy **operated profitably for four years** (2008-2011) with EBITDA as high as $30 million in 2011.

- Xinergy acquired several properties in 2010-2011 (and sold a few as well).

- Xinergy levered up in 2011 to fund development capex, with a $200 million HY offering.

- Starting in 2012, **the coal markets fell apart.** Xinergy saw 10 consecutive quarters of negative EBITDA.

- Starting in mid-2Q14, Xinergy has been narrowing EBITDA losses, until mid-1Q15 when thermal prices plummeted and weather significantly reduced trucked coal out of South Fork

- Today, Xinergy operates two mining complexes in West Virginia:
  - specialty metallurgical (South Fork)
  - high-quality thermal (Raven Crest)

| TIMELINE | |
|---|---|
| EBITDA-positive | **2008**<br>Acquires 1st & 2nd thermal properties (Kentucky & Alabama) |
| | **2009**<br>Reverse merger & TSX listing |
| | **2010**<br>Growth via Acquisitions in West Virginia<br><br>Sold Alabama assets |
| | **2011**<br>Growth via further Acquisitions in West Virginia<br><br>$200 million High Yield offering funds development of the new West Virginia properties |
| EBITDA-negative | **2012**<br>Capex to develop West Virginia properties<br>Coal market falls → Liquidity Issues → forced to monetize above-market contracts and idle certain mines |
| | **2013**<br>Waiting out the storm<br>Sold Kentucky thermal assets<br>Completed Capex on recently-acquired WV properties |
| Approaching Break-even | **2014+**<br>Restart; Production ramp-up<br>Two remaining complexes resume operations and achieve record low production costs<br>Announces it is exploring financial and strategic alternatives to address Balance Sheet |

3

## Xinergy's Mining Assets Today

- Xinergy is a Central Appalachian producer of high quality (high-BTU and low Sulfur) thermal and metallurgical coal. Xinergy operates primarily in West Virginia, and also holds reserves in Virginia.

- The Company has five mining properties, two of which are currently active:

  - South Fork, which sells mid-volatile metallurgical coal to steel producers, commodities brokers, and industrial customers throughout North America, Europe, and South America; and

  - Raven Crest, which sells thermal coal to utilities and industrial companies in the Eastern US and Europe

*NOTE: all reserve tons are reported on a saleable basis*

| MET | Status | State (County) | Type | Coal Quality | Annual Capacity | Ops Cost cost/ton | Total Proven & Probable Mineral Reserves |
|---|---|---|---|---|---|---|---|
| South Fork | Active | West Virginia (Greenbrier) | Surface & UG | Mid-Vol: 26% Low-Sulfur<1% Avg. BTU: 14,500 | 0.54mt current 0.90mt w/ addtl equip | Mid $80's/ton pre-HWM Mid $70's/ton post-HWM | 20.7 mt (excl growth oppty) |
| Sewell Mtn. | Permitted | West Virginia (Fayette, Greenbrier, & Nicholas) | Underground | Mid-Vol: 25% Ultra-low Sulfur | 0.96mt (Estimated) | $85-$95/ton | 42.0 mt following additional process (Estimated) |
| True Energy | Idle | Virginia (Wise) | Surface | High-Vol: 32% | 0.48mt | $75-$80/ton | 2.2 mt + 4.8 mt subsequent to 43-101 |

| THERMAL | Status | State (County) | Type | Coal Quality | Annual Capacity | Ops Cost cost/ton | Total Proven & Probable Mineral Reserves |
|---|---|---|---|---|---|---|---|
| Raven Crest | Active | West Virginia (Boone) | Surface & HWM | Avg. BTU: 12,300-12,500 Avg. Sulfur: 1.25-1.5%AR | 0.90mt | Low $50s/ton | 15.4 mt |
| Brier Creek | Idle | West Virginia (Boone & Kanawha) | Underground | Avg. BTU: 12,500-12,800 Avg. Sulfur: 1.25-1.5%AR | 1.20mt | $62-$65/ton (Projected) | 27.0 mt |

## Map of Current Assets





# Financial Information

## 25 Week Forecast

■ The 25-Week forecast reflects the following assumptions:

- $2 million capex outlay in April / May will be sufficient to increase equipment utilization at South Fork, resulting in lower cash costs

- 18,000 tons per month additional South Fork sales

  ➢ 9,000 tons per month to a U.S. industrial customer at $98/ton FOB South Fork

  ➢ 9,000 tons per month to a U.S. specialty customer with terms similar to a current contracted specialty customer with pricing of $145/ton

- High wall mining contractor will be in place and operating at South Fork at production levels that result in overall reduction in cash costs at South Fork

- No disruptions in anticipated shipping schedules with CSX

- Current specialty contract customer taking contracted tons per month

- No disruption regarding critical vendors on a go forward basis

- No further reductions in spot market pricing

- Xinergy is able to retain key employees

Note: Projections as of March 26, 2015

# 25 Week Forecast (Continued)

## 25-Week Forecast ($ in 000s)

### Weeks 1-13

| Week Ending | 4/10 | 4/17 | 4/24 | 5/1 | 5/8 | 5/15 | 5/22 | 5/29 | 6/5 | 6/12 | 6/19 | 6/26 | 7/3 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Accounts Receivables - Trade | $1,325 | $1,507 | $1,507 | $960 | $1,422 | $1,293 | $1,475 | $1,475 | $2,098 | $1,599 | $1,599 | $500 | $434 |
| Other Receipts | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Total Cash Sources | $1,325 | $1,507 | $1,507 | $960 | $1,422 | $1,293 | $1,475 | $1,475 | $2,098 | $1,599 | $1,599 | $500 | $434 |
| A/P | ($5,208) | ($472) | ($585) | ($3,182) | ($728) | ($472) | ($585) | ($432) | ($1,100) | ($844) | ($390) | ($667) | ($1,300) |
| Royalties | 0 | (621) | 0 | 0 | 0 | 0 | (746) | 0 | 0 | 0 | (621) | 0 | 0 |
| Coal Taxes | (1,868) | 0 | (22) | 0 | 0 | 0 | (23) | (525) | 0 | 0 | 0 | (560) | 0 |
| Insurance | 0 | 0 | 0 | (49) | (9) | 0 | 0 | (29) | (9) | 0 | 0 | 0 | (29) |
| Professional Fees | 0 | 0 | 0 | (367) | 0 | 0 | 0 | 0 | (367) | 0 | 0 | 0 | (367) |
| Payroll & Benefits | (82) | (476) | (10) | (697) | (10) | (547) | (10) | (697) | (10) | (547) | (10) | (547) | (160) |
| Purchased Coal | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Debt Payments | (20,957) | 0 | (50) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Total Cash Uses | ($28,116) | ($1,568) | ($667) | ($4,295) | ($747) | ($1,019) | ($1,364) | ($1,683) | ($1,486) | ($1,392) | ($1,021) | ($1,774) | ($1,856) |
| Beginning Cash Balance | $0 | ($26,791) | ($26,853) | ($26,012) | ($29,347) | ($28,672) | ($28,398) | ($28,287) | ($28,494) | ($27,882) | ($27,675) | ($27,097) | ($28,371) |
| Less: Net Cash Flow | (26,791) | (61) | 840 | (3,334) | 675 | 274 | 111 | (208) | 612 | 207 | 578 | (1,274) | (1,422) |
| Ending Cash Balance | ($26,791) | ($26,853) | ($26,012) | ($29,347) | ($28,672) | ($28,398) | ($28,287) | ($28,494) | ($27,882) | ($27,675) | ($27,097) | ($28,371) | ($29,794) |

### Weeks 14-25

| Week Ending | 7/10 | 7/17 | 7/24 | 7/31 | 8/7 | 8/14 | 8/21 | 8/28 | 9/4 | 9/11 | 9/18 | 9/25 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Accounts Receivables - Trade | $1,439 | $2,321 | $1,074 | $2,926 | $1,621 | $2,039 | $1,074 | $2,926 | $2,221 | $1,439 | $1,840 | $1,621 | $39,734 |
| Other Receipts | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Total Cash Sources | $1,439 | $2,321 | $1,074 | $2,926 | $1,621 | $2,039 | $1,074 | $2,926 | $2,221 | $1,439 | $1,840 | $1,621 | $39,734 |
| A/P | ($1,099) | ($356) | ($661) | ($611) | ($1,588) | ($656) | ($655) | ($616) | ($1,210) | ($1,029) | ($426) | ($851) | ($25,721) |
| Royalties | 0 | (608) | 0 | 0 | 0 | 0 | (1,014) | 0 | 0 | 0 | (780) | 0 | (4,390) |
| Coal Taxes | 0 | 0 | (490) | (105) | 0 | 0 | 0 | (801) | 0 | 0 | 0 | (737) | (5,132) |
| Insurance | (9) | 0 | 0 | (29) | (29) | 0 | 0 | 0 | (49) | (9) | 0 | 0 | (251) |
| Professional Fees | 0 | 0 | 0 | 0 | (367) | 0 | 0 | 0 | (367) | 0 | 0 | 0 | (1,833) |
| Payroll & Benefits | (476) | (82) | (476) | (231) | (476) | (82) | (476) | (82) | (625) | (82) | (476) | (10) | (7,374) |
| Purchased Coal | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Debt Payments | 0 | (50) | (32) | 0 | 0 | 0 | (32) | 0 | 0 | 0 | 0 | (32) | (21,154) |
| Total Cash Uses | ($1,583) | ($1,095) | ($1,659) | ($976) | ($2,459) | ($738) | ($2,177) | ($1,499) | ($2,251) | ($1,119) | ($1,681) | ($1,630) | ($65,856) |
| Beginning Cash Balance | ($29,794) | ($29,938) | ($28,712) | ($29,297) | ($27,347) | ($28,186) | ($26,885) | ($27,988) | ($26,561) | ($26,591) | ($26,272) | ($26,113) | $0 |
| Less: Net Cash Flow | (145) | 1,226 | (584) | 1,950 | (838) | 1,301 | (1,103) | 1,427 | (30) | 319 | 159 | (9) | (26,122) |
| Ending Cash Balance | ($29,938) | ($28,712) | ($29,297) | ($27,347) | ($28,186) | ($26,885) | ($27,988) | ($26,561) | ($26,591) | ($26,272) | ($26,113) | ($26,122) | ($26,122) |

Note: Projections as of March 26, 2015

# Long Term Forecast*

| Long Term Forecast – ($ in 000s) | | | | | | | | | | | | |
| | 2015E | | | 2016E | | | | | 2017E | | | |
| | Q3 | Q4 | 2H 2015 | Q1 | Q2 | Q3 | Q4 | 2016 | Q1 | Q2 | Q3 | Q4 | 2017 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Raven Crest** | | | | | | | | | | | | | |
| Total Sales ('000s tons) | 180 | 180 | 360 | 180 | 180 | 180 | 180 | 720 | 180 | 180 | 180 | 180 | 720 |
| $ / ton | $50 | $50 | $50 | $52 | $52 | $55 | $55 | $54 | $60 | $60 | $60 | $60 | $60 |
| Total Revenue | $9,000 | $9,000 | $18,000 | $9,360 | $9,360 | $9,900 | $9,900 | $38,520 | $10,800 | $10,800 | $10,800 | $10,800 | $43,200 |
| Total Costs | (9,220) | (9,220) | (18,439) | (9,256) | (9,256) | (9,310) | (9,310) | (37,131) | (9,491) | (9,491) | (9,491) | (9,491) | (37,963) |
| Raven Crest EBITDA | ($220) | ($220) | ($439) | $104 | $104 | $590 | $590 | $1,389 | $1,309 | $1,309 | $1,309 | $1,309 | $5,237 |
| **South Fork** | | | | | | | | | | | | | |
| Total Sales ('000s tons)[1] | 135 | 135 | 270 | 141 | 141 | 141 | 141 | 564 | 177 | 177 | 177 | 177 | 708 |
| $ / ton (blended price) | $101 | $103 | $102 | $104 | $104 | $106 | $106 | $105 | $103 | $103 | $103 | $103 | $103 |
| Total Revenue | $13,659 | $13,894 | $27,554 | $14,678 | $14,678 | $14,925 | $14,925 | $59,206 | $18,193 | $18,193 | $18,193 | $18,193 | $72,771 |
| Total Costs | (10,185) | (10,185) | (20,371) | (10,617) | (10,617) | (10,633) | (10,633) | (42,500) | (12,942) | (12,942) | (12,942) | (12,942) | (51,768) |
| South Fork EBITDA | $3,474 | $3,709 | $7,183 | $4,060 | $4,060 | $4,292 | $4,292 | $16,706 | $5,251 | $5,251 | $5,251 | $5,251 | $21,003 |
| **Corporate & Other** | | | | | | | | | | | | | |
| Rebate Revenue | $205 | $205 | $410 | $215 | $215 | $215 | $215 | $861 | $278 | $278 | $278 | $278 | $1,113 |
| Corporate & Other Costs | (1,456) | (1,456) | (2,911) | (1,506) | (1,506) | (1,506) | (1,506) | (6,022) | (1,581) | (1,581) | (1,581) | (1,581) | (6,322) |
| Corporate & Other EBITDA | ($1,251) | ($1,251) | ($2,502) | ($1,290) | ($1,290) | ($1,290) | ($1,290) | ($5,161) | ($1,302) | ($1,302) | ($1,302) | ($1,302) | ($5,209) |
| **Total EBITDA** | $2,003 | $2,238 | $4,242 | $2,874 | $2,874 | $3,592 | $3,592 | $12,933 | $5,258 | $5,258 | $5,258 | $5,258 | $21,031 |
| Less: Raven Crest Capex | (450) | (450) | (900) | (450) | (450) | (450) | (450) | (1,800) | (450) | (450) | (450) | (450) | (1,800) |
| Less: South Fork Capex | (600) | (600) | (1,200) | (600) | (600) | (600) | (600) | (2,400) | (600) | (600) | (600) | (600) | (2,400) |
| Free Cash Flow | $953 | $1,188 | $2,142 | $1,824 | $1,824 | $2,542 | $2,542 | $8,733 | $4,208 | $4,208 | $4,208 | $4,208 | $16,831 |

Note: Projections as of March 26, 2015
Benchmark coal pricing used in long term forecast: $117 / ton in Q3 2015, $119 / ton in Q4 2015, $121 / ton in H1 2016, $123 / ton in H2 2016 and $124 /ton in 2017

# 2014 Financial Results

| 2014 Financial Results ($ in 000s) | | | | | |
|---|---|---|---|---|---|
| | Q1 2014 | Q2 2014 | Q3 2014 | Q4 2014 | FY 2014 |
| Revenue | $11,710 | $20,117 | $19,020 | $20,830 | $71,677 |
| Cost of sales | (14,063) | (18,939) | (16,972) | (20,454) | (70,428) |
| Gross Profit | ($2,353) | $1,178 | $2,048 | $377 | $1,249 |
| Depreciation, Depletion & Amortization | (2,504) | (2,904) | (2,878) | (2,962) | (11,249) |
| General & Administrative | (1,925) | (1,742) | (1,166) | (2,142) | (6,975) |
| Operating Loss | ($6,782) | ($3,468) | ($1,997) | ($4,727) | ($16,974) |
| Net Interest | (5,299) | (5,407) | (5,381) | (5,516) | (21,604) |
| Accretion | (128) | (128) | (128) | (128) | (513) |
| Rail Rebate Income | 315 | 146 | 110 | 173 | 745 |
| Gain / (Loss) on Sale of Straight Creek Assets | 0 | (496) | (5) | (0) | (501) |
| Gain / (Loss) on Sale of Fixed Assets | (45) | (41) | 66 | 639 | 619 |
| Gain / (Loss) on Derivative Financial Liabilities | (198) | 253 | (43) | 0 | 11 |
| Other Net Income (Expense) | 317 | 35 | 5 | (524) | (166) |
| Net Income / (Loss) | ($11,820) | ($9,106) | ($7,374) | ($10,083) | ($38,383) |
| Plus: Net Interest | 5,299 | 5,407 | 5,381 | 5,516 | 21,604 |
| Plus: Depreciation, Depletion & Amortization | 2,504 | 2,904 | 2,878 | 2,962 | 11,249 |
| Plus: Gain / (Loss) on Derivative Financial Liabilities | 198 | (253) | 43 | 0 | (11) |
| Plus: Accretion | 128 | 128 | 128 | 128 | 513 |
| Plus: Stock Compensation Expense | 167 | 57 | 58 | 58 | 340 |
| EBITDA | ($3,523) | ($861) | $1,115 | ($1,419) | ($4,688) |
| Less: Gain on Sale of Whitewater | 0 | 0 | 0 | (639) | (639) |
| Plus: Loss on Sale of Straight Creek | 0 | 496 | 5 | 2 | 502 |
| Adjusted EBITDA | ($3,523) | ($366) | $1,121 | ($2,057) | ($4,825) |
| Capex | ($2,112) | ($1,164) | ($1,239) | ($816) | ($5,331) |
| Cash Interest Paid | (5,307) | (5,411) | (5,383) | (5,520) | (21,620) |
| Proceeds From Sale of Whitewater | 0 | 0 | 0 | 2,050 | 2,050 |
| Unrestricted Cash Balance | $10,436 | $2,060 | $1,782 | $3,742 | $3,742 |

# 2014 Financial Result (Continued)

| 2014 Financial Results by Mine ($ in 000s) | | | | | | |
|---|---|---|---|---|---|---|
| | Raven Crest | South Fork | Whitewater | True Energy | Corporate | Consolidated |
| Revenue | $37,341 | $34,336 | $0 | $0 | $0 | $71,677 |
| Cost of sales | (36,181) | (33,619) | 0 | (628) | 0 | (70,428) |
| Gross Profit | $1,160 | $717 | $0 | ($628) | $0 | $1,249 |
| Depreciation, Depletion & Amortization | (5,174) | (5,808) | (113) | (128) | (25) | (11,249) |
| General & Administrative | (496) | (129) | (136) | (30) | (6,183) | (6,975) |
| Operating Loss | ($4,511) | ($5,219) | ($249) | ($787) | ($6,208) | ($16,974) |
| Net Interest | 0 | (37) | 0 | (69) | (21,498) | (21,604) |
| Accretion | (345) | (84) | 0 | (84) | 0 | (513) |
| Rail Rebate Income | 0 | 745 | 0 | 0 | 0 | 745 |
| Gain / (Loss) on Sale of Straight Creek Assets | 0 | 0 | 0 | 0 | (501) | (501) |
| Gain / (Loss) on Sale of Fixed Assets | 22 | (42) | 639 | 0 | 0 | 619 |
| Gain / (Loss) on Derivative Financial Liabilities | 0 | 0 | 0 | 0 | 11 | 11 |
| Other Net Income (Expense) | (263) | 382 | (100) | 0 | (185) | (166) |
| Net Income / (Loss) | ($5,097) | ($4,256) | $290 | ($939) | ($28,381) | ($38,383) |
| Plus: Net Interest | (0) | 37 | 0 | 69 | 21,498 | 21,604 |
| Plus: Depreciation, Depletion & Amortization | 5,174 | 5,808 | 113 | 128 | 25 | 11,249 |
| Plus: Gain / (Loss) on Derivative Financial Liabilities | 0 | 0 | 0 | 0 | (11) | (11) |
| Plus: Accretion | 345 | 84 | 0 | 84 | 0 | 513 |
| Plus: Stock Compensation Expense | 0 | 0 | 0 | 0 | 340 | 340 |
| EBITDA | $422 | $1,673 | $404 | ($658) | ($6,530) | ($4,688) |
| Less: Gain on Sale of Whitewater | 0 | 0 | (639) | 0 | 0 | (639) |
| Plus: Loss on Sale of Straight Creek | 0 | 0 | 0 | 0 | 502 | 502 |
| Adjusted EBITDA | $422 | $1,673 | ($236) | ($658) | ($6,027) | ($4,825) |
| Capex | ($3,317) | ($1,862) | ($151) | $0 | $0 | ($5,331) |
| Cash Interest Paid | 0 | (37) | 0 | (69) | (21,514) | (21,620) |
| Proceeds From Sale of Whitewater | 0 | 0 | 2,050 | 0 | 0 | 2,050 |
| Unrestricted Cash Balance | ($1,583) | ($2,164) | $1,206 | ($564) | $6,846 | $3,742 |

## 2015 to Date

| | Monthly | | | Consolidating | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **YTD 2015 Financial Results ($ in 000s)** | | | | | | | | | |
| | January | February | YTD | Raven Crest | South Fork | Whitewater | True Energy | Corporate | Consolidated |
| Revenue | $4,430 | $3,216 | $7,646 | $3,657 | $3,989 | $0 | $0 | $0 | $7,646 |
| Cost of sales | (4,510) | (3,722) | (8,232) | (3,705) | (4,431) | 0 | (96) | 0 | (8,232) |
| **Gross Profit** | ($80) | ($507) | ($586) | ($48) | ($442) | $0 | ($96) | $0 | ($586) |
| Depreciation, Depletion & Amortization | (783) | (772) | (1,555) | (750) | (799) | (5) | (0) | (1) | (1,555) |
| General & Administrative | (424) | (434) | (859) | (84) | (29) | (29) | (8) | (709) | (859) |
| **Operating Loss** | ($1,287) | ($1,713) | ($3,000) | ($883) | ($1,270) | ($33) | ($104) | ($710) | ($3,000) |
| Net Interest | (1,865) | (1,680) | (3,545) | 0 | (18) | 0 | (9) | (3,518) | (3,545) |
| Accretion | (43) | (49) | (91) | (58) | (20) | 0 | (14) | 0 | (91) |
| Rail Rebate Income | 31 | 31 | 62 | 0 | 62 | 0 | 0 | 0 | 62 |
| Gain / (Loss) on Contract Termination | (1,291) | 0 | (1,291) | 0 | 0 | 0 | 0 | (1,291) | (1,291) |
| Other Net Income (Expense) | 1 | 9 | 10 | 2 | 0 | 0 | 0 | 8 | 10 |
| **Net Income / (Loss)** | ($4,454) | ($3,402) | ($7,856) | ($939) | ($1,245) | ($33) | ($127) | ($5,512) | ($7,856) |
| Plus: Net Interest | 1,865 | 1,680 | 3,545 | (0) | 18 | 0 | 9 | 3,518 | 3,545 |
| Plus: Depreciation, Depletion & Amortization | 783 | 772 | 1,555 | 750 | 799 | 5 | 0 | 1 | 1,555 |
| Plus: Accretion | 43 | 49 | 91 | 58 | 20 | 0 | 14 | 0 | 91 |
| Plus: Stock Compensation Expense | 19 | 21 | 40 | 0 | 0 | 0 | 0 | 40 | 40 |
| **EBITDA** | ($1,745) | ($880) | ($2,625) | ($131) | ($409) | ($29) | ($104) | ($1,952) | ($2,625) |
| Plus: Loss on Contract Termination | 1,291 | 0 | 1,291 | 0 | 0 | 0 | 0 | 1,291 | 1,291 |
| **Adjusted EBITDA** | ($454) | ($880) | ($1,334) | ($131) | ($409) | ($29) | ($104) | ($661) | ($1,334) |

# Working Capital

| Accounts Payable and Accrued Expenses ($ in 000s) | | | | | | |
|---|---|---|---|---|---|---|
| | Days Outstanding | | | | | |
| Vendor | Current | Over 30 | Over 45 | Over 60 | Over 90 | Total |
| Vendor A | $544 | $928 | $0 | $768 | $910 | $3,150 |
| Vendor B | 56 | 18 | 111 | 178 | 2,118 | 2,481 |
| Other - Raven Crest | 754 | 216 | 333 | 340 | 763 | 2,406 |
| Other - South Fork | 582 | 149 | 474 | 201 | 661 | 2,067 |
| Other - Corporate | 326 | 21 | 68 | 248 | 908 | 1,570 |
| Total Accounts Payable | $2,262 | $1,331 | $987 | $1,735 | $5,359 | $11,674 |
| Plus: Accrued Expenses | | | | | | 2,124 |
| Total Accounts Payable and Accrued Expenses[1] | | | | | | $13,798 |

*(1)    Excludes $505k of open purchase orders*

| Accounts Receivable ($ in 000s) | | | | | |
|---|---|---|---|---|---|
| | Days Outstanding | | | | |
| Customer | Current | Over 30 | Over 60 | Over 90 | Total |
| Customer A | $398 | $289 | $0 | $0 | $687 |
| Customer B | 73 | 0 | 0 | 0 | 73 |
| Customer C | 0 | 0 | 0 | 10 | 10 |
| Customer D | 5 | 0 | 0 | 0 | 5 |
| Total Accounts Receivable | $476 | $289 | $0 | $10 | $775 |

| Inventory ($ in 000s) | |
|---|---|
| **Raven Crest** | |
| Thermal Coal Tons (000s) | 36 |
| Value / Ton[1] | $36.77 |
| **Total Raven Crest Inventory** | $1,337 |
| **South Fork** | |
| Metallurgical Coal Tons (000s) | 21 |
| Value / Ton[1] | $72.22 |
| **Total South Fork Inventory** | $1,535 |
| **Total Raven Crest & South Fork Inventory** | $2,871 |

*(1)    Reflects Company's January 31, 2015 price per ton applied to tons as of March 10, 2015*

# Balance Sheet

| Balance Sheet as of December 31, 2014 ($ in 000s) | | | |
|---|---|---|---|
| **Assets** | | **Liabilities & Shareholders' Equity** | |
| **Current Assets:** | | **Current Liabilities:** | |
| Cash | $2,463 | Accounts Payable | $12,081 |
| Restricted Cash | 2 | Accrued Expenses | 2,816 |
| Trade Accounts Receivable | 3,089 | Accrued Interest Payable | 2,305 |
| Coal Inventories | 2,748 | Other Current Liabilities | 1,832 |
| Other Current Assets | 973 | Current Portion of Asset Retirement Obligations | 24 |
| **Total Current Assets** | $9,275 | Current Portion of Other Notes Payable | 495 |
| | | **Total Current Liabilities** | $19,553 |
| Restricted Cash | $5,940 | | |
| Recoupable Royalties | 1,818 | Notes Payable - Other, Less Current Portion | $828 |
| Property, Plant & Equipment | 49,062 | Asset Retirement Obligations, Less Current Portion | 13,278 |
| Mine Development Costs | 10,063 | Senior Secured Notes Payable | 215,000 |
| Mineral Rights | 35,599 | Derivative Financial Liabilities - Warrants | 343 |
| Deferred Financing Costs | 4,815 | | |
| Other Noncurrent Assets | 6 | **Total Liabilities** | $249,003 |
| | | | |
| **Total Assets** | $116,579 | **Shareholders' Equity:** | |
| | | Share Capital | $59,788 |
| | | Contributed Surplus | 1,648 |
| | | Warrants | 312 |
| | | Stock Options | 6,666 |
| | | Accumulated Deficit | (200,837) |
| | | **Net Shareholders' Equity** | ($132,424) |
| | | | |
| | | **Total Liabilities & Shareholders' Equity** | $116,579 |



# Operations

## Cost Performance is Competitive

*($ in millions, except where indicated otherwise)*

| South Fork | 1Q13 | 2Q13 | 3Q13 | 4Q13 | 1Q14 | 2Q14 | 3Q14 | 4Q14 [1] | | Post-HWM |
|---|---|---|---|---|---|---|---|---|---|---|
| Total Cash Costs | $1.60 | $4.85 | $4.60 | $5.17 | $7.78 | $9.04 | $9.62 | $7.90 | | |
| Tons Produced | 22,663 | 52,289 | 57,641 | 55,816 | 81,460 | 96,200 | 115,095 | 82,796 | | |
| Cost / Ton ($/ton) | $70.63 | $92.72 | $79.78 | $92.54 | $95.45 | $93.94 | $83.61 | $84.38 | ➡ | $ 73.00 - $ 78.00 |

| Raven Crest | 1Q14 | 2Q14 | 3Q14 | 4Q14 [1] |
|---|---|---|---|---|
| Total Cash Costs | $6.54 | $8.90 | $8.59 | $8.05 |
| Tons Produced | 95,917 | 156,096 | 171,620 | 150,516 |
| Cost / Ton ($/ton) | $68.20 | $57.04 | $50.06 | $53.46 |

Due to market conditions, Raven Crest operations were idled from mid-2012 through the end of 2013.

| Select Regional Competitors Cash Costs of Sales [2] | | |
|---|---|---|

| Metallurgical | | Thermal | |
|---|---|---|---|
| Walter - US | $94.56 | Walter - US | $79.76 |
| Corsa - NAPP | $106.33 | Corsa - CAPP | $51.18 |
| Rhino - Easter Met JV | $132.06 | | |

(1) 4Q14 is shown on a preliminary basis; South Fork is presented on an adjusted basis for one-time items

(2) Xinergy costs shown here reflect all production, selling and mine operating costs including hauling, permits, royalties, taxes, commissions, and all other selling-related costs. It is not clear that the other producers are reflecting the same costs in this number.

16

## Q4 2014 Cost Performance





## Coal Prices (Update)

**2015 to Date**

- CAPP thermal pricing has continued to deteriorate (10-15% in the past 8-12 weeks)

- Regional weather (snowstorms) have severely impeded truck-based shipments for Xinergy, which is the method of delivery for one of its more lucrative offtake arrangements.

- On January 19, 2015, Xinergy's specialty metallurgical competitor, Corsa Coal, announced it eliminated 25% of its NAPP workforce, and idled two metallurgical mines, due to market weakness in global metallurgical coals.

- On January 30, 2015, Xinergy's metallurgical and thermal competitor, Alpha Natural Resources, announced it was idling three surface mines in Central Appalachia, and reducing its workforce at two additional surface mines.

**Xinergy's Market Position**

- Management understands from its offtake partners that South Fork single-source mid-vol is getting at least a $6 premium over other producers' mid-vol blends

- The launch of the high wall miner at South Fork in 2015 will be an important event, as it should save roughly $5 - $10 per ton on costs (that amount will vary with the mine plan, due to recovery and high wall mining mix)

- Repaired credit and counterparty perception is crucial to enabling Xinergy to get additional contracts - particularly from parties who pay a premium for certain coal qualities that South Fork can fulfill

  - Management believes, via conversations with sales agents, that it was poised to win RFPs on at least two entities, but was not approved in final committee process.

## Coal Prices (Outlook)

| HCC | | 2015e | 2016e | 2017e | 2018e |
|---|---|---|---|---|---|
| **Average of estimates past 45 days** | | $ 115.83 | $ 135.80 | $ 126.50 | $ 118.00 |
| *Source* | *Date* | | | | |
| Credit Suisse | 3/11/2015 | $ 120.00 | $ 128.00 | $ 133.00 | $ 135.00 |
| RBC | 3/8/2015 | $ 117.00 | $ 118.00 | $ 122.50 | |
| JP Morgan | 3/4/2015 | $ 118.00 | $ 120.00 | $ 125.00 | |
| UBS | 2/26/2015 | $ 110.00 | $ 121.00 | | |
| BB&T | 2/17/2015 | $ 120.00 | $ 130.00 | | |
| Brean Capital | 1/21/2015 | $ 122.00 | $ 140.00 | | |
| Morgan Stanley | 1/20/2015 | $ 122.00 | $ 119.00 | $ 118.00 | $ 118.00 |
| Barclays | 1/14/2015 | $ 119.00 | $ 130.00 | $ 135.00 | |
| Stern Agee | 1/9/2015 | $ 145.00 | $ 160.00 | | |
| Citigroup | 12/1/2014 | $ 122.00 | $ 140.00 | $ 150.00 | $ 145.00 |
| Doyle | 11/7/2014 | $ 120.00 | $ 124.00 | $ 128.00 | $ 140.00 |
| BMO | 11/17/2014 | $ 122.00 | $ 139.00 | $ 155.00 | |
| Imperial (Credit) | 10/30/2014 | $ 120.00 | $ 12.00 | $ 120.00 | $ 120.00 |

| Newcastle | | 2015e | 2016e | 2017e | 2018e |
|---|---|---|---|---|---|
| **Average of estimates past 45 days** | | $ 68.42 | $ 64.55 | $ 71.46 | $ 76.00 |
| *Source* | *Date* | | | | |
| BAML | 3/11/2015 | $ 57.00 | $ 52.00 | | |
| Credit Suisse | 3/11/2015 | $ 78.00 | $ 69.00 | $ 71.00 | $ 76.00 |
| RBC | 3/8/2015 | $ 80.10 | $ 77.73 | $ 79.38 | |
| JP Morgan | 3/4/2015 | $ 62.00 | $ 60.00 | $ 64.00 | |
| UBS | 2/26/2015 | $ 65.00 | $ 64.00 | | |
| Brean Capital | 1/21/2015 | $ 63.00 | $ 68.00 | $ 75.00 | |
| BAML | 1/20/2015 | $ 65.00 | $ 72.00 | $ 82.00 | $ 86.80 |
| Imperial | 1/20/2015 | $ 60.10 | $ 60.10 | $ 60.10 | |
| Barclays | 1/14/2015 | $ 60.00 | $ 65.00 | $ 65.00 | |

## Coal Prices (Historical)





## Management Team

**Gregory "Bernie" Mason**, CEO & President
Bernie joined as President of Xinergy in October of 2009 with over 30 years of experience in the coal industry.  Previously at Appalachian Fuels, LLC as COO.  Extensive M&A experience.

**Michael R. Castle**, CFO
Mike joined Xinergy in January 2010 as Chief Financial Officer with over 20 years experience in the coal industry.  Prior to Xinergy, he worked with a NASDAQ traded coal company.  Strong coal operations background.

**Robert L. Gaylor**, SVP, Investor Relations
Bobby joined Xinergy in April of 2013.  Previously, Bobby was SVP of A&D/M&A at a NYSE company, Miller Energy Resources. Bobby also spent three years as Miller's SVP of Investor Relations.

## South Fork (Summary)

*($ in millions, except where indicated otherwise)*

- Property
  - Single seam Sewell
  - 35,000 acres in Greenbrier County, West Virginia
  - 20.7 million proven and probable tons (reported on a clean ton basis after preparation)

- Operations:
  - Surface and Underground Operations
  - Mid-$80s cost per ton currently, and mid-$70s expected following March 2015 high wall miner deployment

- Infrastructure:  Clearco Plant & CSX Rail Loadout Facility
  - 300 tons per hour with fine-coal recovery and froth flotation
  - Over 1.0 million tons annual capacity
  - Completed Q3 2013 and started shipping trains on a regular schedule Q4 2013

| South Fork | 1Q13 | 2Q13 | 3Q13 | 4Q13 | 1Q14 | 2Q14 | 3Q14 | 4Q14 [1] | Post-HWM |
|---|---|---|---|---|---|---|---|---|---|
| Total Cash Costs | $1.60 | $4.85 | $4.60 | $5.17 | $7.78 | $9.04 | $9.62 | $7.90 | |
| Tons Produced | 22,663 | 52,289 | 57,641 | 55,816 | 81,460 | 96,200 | 115,095 | 82,796 | |
| Cost / Ton ($/ton) | $70.63 | $92.72 | $79.78 | $92.54 | $95.45 | $93.94 | $83.61 | $84.38 ⟹ | $ 73.00 - $ 78.00 |

(1)  4Q14 is shown on a preliminary basis; South Fork is presented on an adjusted basis for one-time items

## South Fork (Property Details)

*In US tons*

| Property Designation | Surface | % of Total | Highwall | % of Total | Underground | % of Total | Total Recoverable |
|---|---|---|---|---|---|---|---|
| Controlled Property | 8,391,200 | 54% | 2,322,720 | 15% | 4,771,090 | 31% | 15,485,010 |
| Uncontrolled Property | 2,235,900 | 43% | 1,787,790 | 34% | 1,220,570 | 23% | 5,244,260 |
| Totals: | 10,627,100 | 51% | 4,110,510 | 20% | 5,991,660 | 29% | **20,729,270** |

| Total Surface & Highwall | |
|---|---|
| 14,737,610 | 71% |

| Total Underground | |
|---|---|
| 5,991,660 | 29% |

| Seam | Controlled | | Uncontrolled | | Total | |
|---|---|---|---|---|---|---|
| | Surface | UG & HWM | Surface | UG & HWM | Total Seam | % |
| Sewell C | 704,100 | | | | 704,100 | 3% |
| Sewell B | 1,190,700 | 1,104,020 | 115,400 | | 2,410,120 | 12% |
| Sewell A Rider | 229,700 | | 2,700 | | 232,400 | 1% |
| Sewell A | 5,673,600 | 5,476,220 | 2,117,800 | 3,008,360 | 16,275,980 | 79% |
| Beckley | 593,100 | 513,570 | | | 1,106,670 | 5% |
| | 8,391,200 | 7,093,810 | 2,235,900 | 3,008,360 | 20,729,270 | 100% |
| | **15,485,010** | | **5,244,260** | | | |
| | **20,729,270** | | | | | |

## South Fork (Reserve Quality)

| Parameter | Typical | (Min) / Max | Reject |
|-----------|---------|-------------|--------|
| Ash | 6.50% | 7.00% | 7.50% |
| Moisture | 8.00% | 8.50% | 9.00% |
| Vol Matter | 27 | (26) 28 | - |
| FC | 70.00% | (65) 75 | - |
| Sulfur | 0.95% | 1.00% | 1.05% |
| Fluidity | 4,000 | (3,000) | - |
| ARNU | 240 | (220) | - |
| Reflection | 1.20 | (1.15) | - |
| Oxidation | 96% | (90) | 90% |
| Vitrinite | 74% | (70) | - |
| V9-V14 | 72% | (70) | - |
| Phos. | 0.33% | - | - |
| FSI | 9.0 | (8.0) | - |
| HGI | 80.00% | - | - |
| CSR | 62 | (60) | - |

# South Fork

**Asset Description**

- The Company's Long Term Forecast projects South Fork coal sales of 270,000 tons in 2H 2015, 564,000 tons in 2016 and 708,000 tons in 2017
- South Fork's total equipment was appraised at approximately $15.8 million as of June 2014
- South Fork contains approximately 20.7 million tons of proven and probable coal reserves

**Estimated Reserves & Resources (000s tons)**

| Seam | Controlled | | | Uncontrolled | | | Total |
|---|---|---|---|---|---|---|---|
| | Surface | UG & HW | Total | Surface | UG & HW | Total | |
| Sewell C | 704 | 0 | 704 | 0 | 0 | 0 | 704 |
| Sewell B | 1,191 | 1,104 | 2,295 | 115 | 0 | 115 | 2,410 |
| Sewell A Rider | 230 | 0 | 230 | 3 | 0 | 3 | 232 |
| Sewell A Rider | 5,674 | 5,476 | 11,150 | 2,118 | 3,008 | 5,126 | 16,276 |
| Beckley | 593 | 514 | 1,107 | 0 | 0 | 0 | 1,107 |
| Estimated Reserves (as of [ ]) | 8,391 | 7,094 | 15,485 | 2,236 | 3,008 | 5,244 | 20,729 |

## South Fork (Continued)

| Historical and Projected Performance ($ in 000s) | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | 2014A | | | | 2015E | | 2016E | 2017E |
| | Q1 | Q2 | Q3 | Q4 | 2014 | Q3 | Q4 | 2H 2015 | | |
| **Revenue** | | | | | | | | | | |
| Total Sales (000s tons) | 77 | 96 | 89 | 106 | 368 | 135 | 135 | 270 | 564 | 708 |
| Tons Produced (000s tons) | 81 | 96 | 115 | 83 | 376 | 135 | 135 | 270 | 564 | 708 |
| $ / ton (blended price) | $88.05 | $97.20 | $95.94 | $91.15 | $93.24 | $101.18 | $102.92 | $102.05 | $104.98 | $102.78 |
| Total Revenues | $6,791 | $9,306 | $8,576 | $9,663 | $34,336 | $13,659 | $13,894 | $27,554 | $59,206 | $72,771 |
| **Cash Costs** | | | | | | | | | | |
| *Direct Costs* | | | | | | | | | | |
| Labor | (1,185) | (1,398) | (1,498) | (1,417) | (5,498) | (1,022) | (1,022) | (2,044) | (4,200) | (5,376) |
| Repair & Maintenance | (642) | (597) | (626) | (311) | (2,176) | (274) | (274) | (548) | (1,125) | (1,440) |
| High Wall Miner | 0 | 0 | 0 | 0 | 0 | (1,952) | (1,952) | (3,905) | (7,839) | (9,270) |
| Other Direct Costs | (3,549) | (4,154) | (4,493) | (3,186) | (15,381) | (2,596) | (2,596) | (5,192) | (10,669) | (13,656) |
| Total Direct Cash Costs | ($5,376) | ($6,149) | ($6,616) | ($4,914) | ($23,055) | ($5,844) | ($5,844) | ($11,689) | ($23,833) | ($29,743) |
| *Indirect Costs* | | | | | | | | | | |
| Prep Plant | ($563) | ($592) | ($600) | ($535) | ($2,291) | ($689) | ($689) | ($1,377) | ($2,876) | ($3,611) |
| Hauling to Wash Plant | (462) | (537) | (723) | (539) | (2,260) | (879) | (879) | (1,758) | (3,672) | (4,539) |
| Sales Tax | (435) | (578) | (561) | (586) | (2,161) | (969) | (969) | (1,937) | (4,237) | (4,877) |
| Other Indirect Costs | (940) | (1,181) | (1,122) | (1,323) | (4,565) | (1,762) | (1,762) | (3,524) | (7,691) | (8,807) |
| Total Indirect Cash Costs | ($2,400) | ($2,888) | ($3,006) | ($2,984) | ($11,278) | ($4,298) | ($4,298) | ($8,597) | ($18,476) | ($21,834) |
| Total Cash Costs | ($7,776) | ($9,037) | ($9,623) | ($7,897) | ($34,333) | ($10,143) | ($10,143) | ($20,285) | ($42,309) | ($51,577) |
| Cash Costs / Ton Produced | ($95.45) | ($93.94) | ($83.61) | ($95.38) | ($91.42) | ($75.13) | ($75.13) | ($75.13) | ($75.02) | ($72.85) |
| Gross Margin | ($984) | $269 | ($1,046) | $1,766 | $4 | $3,517 | $3,752 | $7,268 | $16,897 | $21,194 |
| **Memo:** | | | | | | | | | | |
| Direct Cash Costs / Ton Produced | ($65.99) | ($63.92) | ($57.49) | ($59.35) | ($61.39) | ($43.29) | ($43.29) | ($43.29) | ($42.26) | ($42.01) |

Note: Projections as of March 26, 2015

## South Fork (Continued)

■ South Fork's Clearco Prep Plant was completed in Q3 2013 and began shipping trains regularly in Q4 2013

- The Prep Plant has a throughput rate of 300 tons per hour and over 1.0 million tons of annual capacity

| Clearco Prep Plant Cost Summary ($ in 000s) | | | | | |
|---|---|---|---|---|---|
| | Q1 2014 | Q2 2014 | Q3 2014 | Q4 2014 | 2014 |
| Raw Tons Processed | 94 | 105 | 120 | 125 | 444 |
| Clean Tons Processed | 84 | 91 | 94 | 95 | 364 |
| **Cash Costs** | | | | | |
| *Direct Costs* | | | | | |
| Chemicals | ($36) | ($61) | ($50) | ($55) | ($202) |
| Refuse Handling | (34) | (38) | (64) | (53) | (189) |
| Repairs & Maintenance | (137) | (69) | (92) | (37) | (336) |
| Utilities | (112) | (89) | (68) | (89) | (357) |
| Labor | (139) | (202) | (194) | (196) | (731) |
| Other | (67) | (89) | (100) | (74) | (330) |
| **Total Direct Cash Costs** | ($525) | ($548) | ($569) | ($503) | ($2,145) |
| *Indirect Costs* | | | | | |
| Insurance | ($6) | ($6) | ($7) | ($7) | ($26) |
| Security | (28) | (22) | (22) | (19) | (91) |
| Other | (4) | (16) | (3) | (6) | (29) |
| **Total Indirect Cash Costs** | ($38) | ($44) | ($32) | ($32) | ($146) |
| **Total Cash Costs** | ($563) | ($592) | ($600) | ($535) | ($2,291) |
| *Cash Costs / Raw Ton* | ($5.97) | ($5.63) | ($5.00) | ($4.29) | ($5.16) |
| *Cash Costs / Clean Ton* | ($6.74) | ($6.54) | ($6.36) | ($5.61) | ($6.30) |

## Sewell Mountain

- Property

    - Single seam Sewell (ultra-low Sulfur)

    - 10,000 acres in Fayette County, West Virginia currently under control or able to be brought under control

    - Estimated reserves of 24.5 MT Sewell / 15.3 MT Fire Creek

- Operations:

    - Pre-development

    - Underground

    - Estimated production costs per ton: $85 - $95

- Infrastructure:

    - CSX line to be rehabbed  (20 miles)

    - Ability to truck to the Kanawha River (30 miles)

- Summary of Coal Quality:

    - Vol: 27%   Sulfur: 0.65%   Ash: 5.0%   BTU: 14,600

28

## Sewell Mountain

### Asset Description

- Sewell Mountain's operations have a projected cost per ton of $85 - $95



### Reserves & Resources

| | (000s tons) |
|---|---|
| Est. Sewell Reserves | 24,500 |
| Est. Fire Creek Reserves | 15,300 |
| **Total Reserves** | **39,800** |

### Historical Capital Expenditures ($ in 000s)

## True Energy

- Property

  – Just over 1,000 acres in Wise County, Virginia

  – 2.2 million proven and probable tons reflected in the reserve report; an additional 4.8 million were added subsequent to the report and are now permitted.

- Operations:

  – Surface Operations; idled since 2012

  – Production costs per ton: $75 - $80

- Infrastructure:

  – Norfolk Southern rail access (third party) within a short trucking distance

- Summary of Coal Quality:

  – Vol: 32%   Sulfur: 1.4%  Ash: 12%  BTU: 12,800

EXCLUDES reserves acquired after the 43-101

| Seam | Mineral Resource Tons | | | Mineral Reserve Tons | |
|---|---|---|---|---|---|
| | Measured | Indicated | Inferred | Proven | Probable |
| Clintwood | 66,061 | 21,278 | - | 56,152 | 18,086 |
| Lower Bolling | 670,266 | 52,516 | - | 569,726 | 44,639 |
| Upper Bolling | 1,134,241 | 368,099 | - | 964,105 | 312,884 |
| Kelly | 280,404 | 94,526 | - | 238,343 | 80,347 |
| Sub-Totals | 2,150,972 | 536,419 | - | 1,828,326 | 455,956 |
| **Total** | 2,687,391 | | | 2,284,282 | |

Less: Appx production since Jan 2010 (through 3Q14)        (103,765)

**Estimated Proven & Probable at 3Q14**        2,180,517

| Seam | BTU / lb | Sulfur | Ash | VM | Reflectance | Geisler Plastometer | FSI |
|---|---|---|---|---|---|---|---|
| Clintwood | 13,506 | 1.69% | 9.78% | 33.80% | - | 28,000 | 7.2 |
| Lower Bolling | 14,331 | 1.87% | 7.94% | 36.20% | 0.9 | 28,540 | 7.5 |
| Upper Bolling | 11,794 | 0.81% | 15.51% | 30.70% | 0.95 | 6,004 | 8.3 |
| Kelly | 13,700 | 2.79% | 8.74% | 36.30% | - | 9,355 | 8.5 |
| **Weighted Avg** | **12,798** | **1.40%** | **12.34%** | **33.10%** | **0.93** | **13,248** | **8.1** |

# True Energy

**Asset Description**

- Production costs at True Energy are approximately $75 - $80 per ton

**Estimated Reserves & Resources (000s tons)**

| Seam | Mineral Reserves | | | Mineral Resources | | | |
|---|---|---|---|---|---|---|---|
| | Proven | Probable | Total | Measured | Indicated | Inferred | Total |
| Clintwood | 56 | 18 | 74 | 66 | 21 | 0 | 87 |
| Lower Bolling | 570 | 45 | 614 | 670 | 53 | 0 | 723 |
| Upper Bolling | 964 | 313 | 1,277 | 1,134 | 368 | 0 | 1,502 |
| Kelly | 238 | 80 | 319 | 280 | 95 | 0 | 375 |
| Total (as of Jan. 2010) | 1,828 | 456 | 2,284 | 2,151 | 536 | 0 | 2,687 |
| Less: Production Through Sept. 2014 | | | (104) | | | | |
| Estimated Reserves (as of Sept. 2014) | | | 2,181 | | | | |

## Raven Crest (Summary)

*($ in millions, except where indicated otherwise)*

- Property

  – 12,000 acres in Boone County, West Virginia

  – 15.4 million proven and probable tons (surface tons are shipped run of mine and are reported as such)

- Operations:

  – Surface and High Wall Operations

  – Low-$50's production cost per ton

  – Capacity to produce 65,000 - 75,000 tons per month

- Infrastructure:

  – New (commissioned Jan 2014) Bull Creek preparation plant and loadout

    » 300 tph heavy media

    » Refuse capacity for the life of the reserve (slurry cells)

  – 150 car CSX rail siding adjacent to the preparation plant (Kanawha Freight District)

| Raven Crest | 1Q14 | 2Q14 | 3Q14 | 4Q14 [1] |
|---|---|---|---|---|
| Total Cash Costs | $6.54 | $8.90 | $8.59 | $8.05 |
| Tons Produced | 95,917 | 156,096 | 171,620 | 150,516 |
| Cost / Ton ($/ton) | $68.20 | $57.04 | $50.06 | $53.46 |

Due to market conditions, Raven Crest operations were idled from mid-2012 through the end of 2013.

(1)  4Q14 is shown on a preliminary basis; Raven Crest is unadjusted

# Raven Crest (Property Details)

| Seam | Mineral Resource Tons | | | Mineral Reserve Tons | |
|------|----------|-----------|----------|-----------|-----------|
| | Measured | Indicated | Inferred | Proven | Probable |
| L. Winifrede Rider | 3,600 | - | - | 3,300 | - |
| Winifrede | 39,600 | - | - | 35,500 | - |
| M. Hernshaw | 87,300 | 62,800 | 7,800 | 78,100 | 56,200 |
| Hernshaw | 1,836,600 | 521,400 | 1,857,800 | 1,150,000 | 351,600 |
| U. Cedar Grove | 237,600 | 126,200 | - | 212,600 | 113,100 |
| M. Cedar Grove | 86,100 | - | - | 77,100 | - |
| Cedar Grove | 4,459,900 | 3,324,700 | 123,500 | 2,663,200 | 1,888,100 |
| L. Cedar Grobe | 2,223,700 | 536,900 | 17,100 | 1,149,600 | 405,600 |
| No. 2 Gas | 8,880,800 | 6,466,700 | 4,985,200 | 4,432,300 | 3,251,200 |
| L. No. 2 Gas | 729,000 | 870,200 | - | 648,200 | 769,900 |
| Sub Total | 18,584,200 | 11,908,900 | 6,991,400 | 10,449,900 | 6,835,700 |
| **Totals** | | **37,484,500** | | **17,285,600** | |

Less: Appx production since Jan 2010 (through 3Q14)          (1,839,373)

**Estimated Proven & Probable at 3Q14**          **15,446,227**

## Raven Crest (Reserve Quality)

| Seam | Area | Raw Quality, Dry Basis | | | Washed, Dry Basis (1.60 Float) | | |
|------|------|-----|--------|-----|-----|--------|-----|
| | | BTU | Sulfur | Ash | BTU | Sulfur | Ash |
| Middle Hernshaw | BN #5 | 13,489 | 1.36 | 10.25 | | | |
| Hernshaw | BN #2, BN #5 | 13,901 | 2.31 | 8.03 | 14,296 | 1.79 | 5.7 |
| Cedar Grove | BN #5 | 12,883 | 0.91 | 12.49 | 14,520 | 0.74 | 4.52 |
| Lower Cedar Grove | Bull Creek | 13,326 | 0.94 | 7.31 | 14,163 | 1.13 | 5.26 |
| Cedar & L. Cedar Combined | Foster Hollow | 10,749 | 0.68 | 26.24 | 14,119 | 0.81 | 6.18 |
| No. 2 Gas | BN #2, BN #5 | 13,201 | 1.14 | 15.12 | 14,526 | 0.9 | 4.33 |
| No. 2 Gas | BN #3 | 12,205 | 1.36 | 13.29 | 13,964 | 1.49 | 6.71 |
| Lower No. 2 Gas | BN #2, BN #5 | 13,776 | 0.94 | 8.28 | 14,391 | 0.62 | 5.25 |
| Lower Winifrede Rider | BN #3 | 13,269 | 0.71 | 10.74 | | | |

| Seam | Area | Sulfur | Ash | BTU |
|------|------|--------|-----|-----|
| Lower No. 2 Gas | BN #2 | 0.96 | 13.97 | 12,010 |
| No. 2 Gas | BN #2 | 1.82 | 13.5 | 12,251 |
| Cedar Grove | BN #2 | 1.09 | 9.68 | 12,736 |
| Lower Cedar Grove | BN #2 | 0.87 | 6.79 | 13,098 |
| Middle Hernshaw | BN #2 | 1.73 | 19.11 | 11,335 |
| Hernshaw | BN #2 | 1.43 | 13.74 | 11,895 |
| Winifrede Upper Rider | BN #3 | 0.68 | 29.74 | 9,382 |
| Winifrede Lower Rider | BN #3 | 0.72 | 10.94 | 12,492 |
| Winifrede | BN #3 | 0.76 | 20.97 | 10,602 |

**2014 shipments totaled 637,730 tons at**

- 6.26% moisture
- 11.18% ash
- 0.95% sulfur
- 12,401 Btu

Note: The top table is from 12/31/06 - MMA Study. The bottom table is from 1/1/2009 thru 1/31/2010 - SGS Mineral Labs, Inc.

34

# Raven Crest

## Asset Description

- The Company's long term forecast projects go-forward coal sales of 180,000 tons per quarter
  - Raven Crest has contracted sales linked to spot prices of 30,000 tons per month beginning in January 2014 and extending through the end of 2015
- Raven Crest's cost per ton produced was approximately $53.46 during Q4 2014
- Raven Crest's total equipment was appraised at approximately $17.2 million as of June 2014
- As of September 2014, Raven Crest had approximately 15.4 million tons of proven and probable coal reserves

## Estimated Reserves & Resources (000s tons)

| Seam | Mineral Reserves | | | Mineral Resources | | | |
|---|---|---|---|---|---|---|---|
| | Proven | Probable | Total | Measured | Indicated | Inferred | Total |
| L. Winifrede Rider | 3 | 0 | 3 | 4 | 0 | 0 | 4 |
| Winifrede | 36 | 0 | 36 | 40 | 0 | 0 | 40 |
| M. Hernshaw | 78 | 56 | 134 | 87 | 63 | 8 | 158 |
| Hernshaw | 1,150 | 352 | 1,502 | 1,837 | 521 | 1,858 | 4,216 |
| U. Cedar Grove | 213 | 113 | 326 | 238 | 126 | 0 | 364 |
| M. Cedar Grove | 77 | 0 | 77 | 86 | 0 | 0 | 86 |
| Cedar Drove | 2,663 | 1,888 | 4,551 | 4,460 | 3,325 | 124 | 7,908 |
| L. Cedar Grove | 1,150 | 406 | 1,555 | 2,224 | 537 | 17 | 2,778 |
| No. 2 Gas | 4,432 | 3,251 | 7,684 | 8,881 | 6,467 | 4,985 | 20,333 |
| L. No. 2 Gas | 648 | 770 | 1,418 | 729 | 870 | 0 | 1,599 |
| Total (as of Jan. 2010) | 10,450 | 6,836 | 17,286 | 18,584 | 11,909 | 6,991 | 37,485 |
| Less: Production Through Sept. 2014 | | | (1,839) | | | | |
| Estimated Reserves (as of Sept. 2014) | | | 15,446 | | | | |

# Raven Crest (Continued)

| Historical and Projected Performance ($ in 000s) | | | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | 2014A | | | | | 2015E | | | 2016E | 2017E |
| | Q1 | Q2 | Q3 | Q4 | 2014 | Q3 | Q4 | 2H 2015 | | |
| **Revenue** | | | | | | | | | | |
| Total Sales (000s tons) | 88 | 195 | 189 | 209 | 681 | 180 | 180 | 360 | 720 | 720 |
| Tons Produced (000s tons) | 96 | 156 | 172 | 151 | 574 | 180 | 180 | 360 | 720 | 720 |
| $ / ton | $55.93 | $55.56 | $55.16 | $53.40 | $54.83 | $50.00 | $50.00 | $50.00 | $53.50 | $60.00 |
| Total Revenues | $4,918 | $10,811 | $10,444 | $11,167 | $37,341 | $9,000 | $9,000 | $18,000 | $38,520 | $43,200 |
| **Cash Costs** | | | | | | | | | | |
| *Direct Costs* | | | | | | | | | | |
| Labor | (1,070) | (1,298) | (1,384) | (1,413) | (5,165) | (1,690) | (1,690) | (3,380) | (6,760) | (6,760) |
| Repair & Maintenance | (231) | (909) | (591) | (522) | (2,252) | (624) | (624) | (1,249) | (2,497) | (2,497) |
| Other Direct Costs | (2,133) | (2,262) | (2,077) | (1,989) | (8,461) | (2,362) | (2,362) | (4,724) | (9,449) | (9,811) |
| Total Direct Costs | ($3,434) | ($4,468) | ($4,052) | ($3,924) | ($15,879) | ($4,676) | ($4,676) | ($9,353) | ($18,706) | ($19,068) |
| *Indirect Costs* | | | | | | | | | | |
| Loadout | ($1,081) | ($1,320) | ($1,283) | ($1,139) | ($4,824) | ($1,363) | ($1,363) | ($2,725) | ($5,450) | ($5,450) |
| Hauling to Wash Plant | (463) | (858) | (978) | (738) | (3,037) | (882) | (882) | (1,765) | (3,530) | (3,530) |
| Sales Tax | (408) | (810) | (795) | (833) | (2,846) | (996) | (996) | (1,992) | (3,984) | (3,984) |
| Other Indirect Costs | (1,155) | (1,447) | (1,483) | (1,412) | (5,497) | (1,255) | (1,255) | (2,511) | (5,274) | (5,743) |
| Total Indirect Costs | ($3,107) | ($4,435) | ($4,539) | ($4,122) | ($16,204) | ($4,497) | ($4,497) | ($8,993) | ($18,239) | ($18,707) |
| Total Cash Costs | ($6,541) | ($8,903) | ($8,591) | ($8,047) | ($32,082) | ($9,173) | ($9,173) | ($18,346) | ($36,944) | ($37,776) |
| *Cash Cost / Ton Produced* | ($68.20) | ($57.04) | ($50.06) | ($53.46) | ($55.88) | ($50.96) | ($50.96) | ($50.96) | ($51.31) | ($52.47) |
| Gross Margin | ($1,623) | $1,908 | $1,852 | $3,121 | $5,259 | ($173) | ($173) | ($346) | $1,576 | $5,424 |
| *Memo:* | | | | | | | | | | |
| *Direct Cash Costs / Ton Produced* | ($35.80) | ($28.63) | ($23.61) | ($26.07) | ($27.66) | ($25.98) | ($25.98) | ($25.98) | ($25.98) | ($26.48) |

Note: Projections as of March 26, 2015

36

## Brier Creek

- Property

  - 13,000 acres in Boone County, West Virginia (adjacent to Raven Crest)

  - 27 million proven and probable tons

- Operations:

  - Underground Operations

  - Cost per ton projected to be $62 - $65

- Infrastructure:

  - Shares the Bull Creek preparation plant and loadout at Raven Crest

| Seam | Mineral Resource Tons | | | Mineral Reserve Tons | |
|---|---|---|---|---|---|
| | Measured | Indicated | Inferred | Proven | Probable |
| No. 2 Gas | 22,999,600 | 18,187,300 | 3,390,900 | 10,247,100 | 8,103,200 |
| Lower Cedar Grove | 8,864,300 | 9,360,600 | 12,474,100 | 4,213,500 | 4,449,400 |
| Hernshaw | - | - | 8930400 | - | - |
| Sub-Totals | 31,863,900 | 27,547,900 | 24,795,400 | 14,460,600 | 12,552,600 |
| **Total** | | **59,411,800** | | **27,013,200** | |

Less: Appx production since Jan 2010 (through 3Q14)    -

**Estimated Proven & Probable at 3Q14**    **27,013,200**

| Seam | Raw Quality, Dry Basis | | | Washed, Dry Basis (1.60 Float) | | |
|---|---|---|---|---|---|---|
| | BTU | Sulfur | Ash | BTU | Sulfur | Ash |
| No. 2 Gas | 9,886 | 0.83 | 25.06 | 13,181 | 1.13 | 11.17 |
| Lower Cedar Grove | 12,875 | 1.29 | 9.83 | 14,233 | 1.18 | 5.7 |
| Hernshaw | 11,591 | 1.05 | 13.84 | 13,912 | 0.95 | 6.67 |

# Brier Creek

## Asset Description

- Brier Creek's operations have a projected cost per ton of $62 - $65

## Estimated Reserves & Resources (000s tons)

| Seam | Mineral Reserves | | | Mineral Resources | | | |
|---|---|---|---|---|---|---|---|
| | Proven | Probable | Total | Measured | Indicated | Inferred | Total |
| No. 2 Gas | 10,247 | 8,103 | 18,350 | 23,000 | 18,187 | 3,391 | 44,578 |
| Lower Cedar Grove | 4,214 | 4,449 | 8,663 | 8,864 | 9,361 | 12,474 | 30,699 |
| Hernshaw | 0 | 0 | 0 | 0 | 0 | 8,930 | 8,930 |
| Total (as of Jan. 2010) | 14,461 | 12,553 | 27,013 | 31,864 | 27,548 | 24,795 | 84,207 |
| Less: Production Through Sept. 2014 | | | 0 | | | | |
| Estimated Reserves (as of Sept. 2014) | | | 27,013 | | | | |

38